CHIEF JUDGE DAVID G. ESTUDILLO

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOÃO RICARDO DEBORBA,<br><br>Defendant. | No. CR22-5139-DGE<br><br>MR. DEBORBA'S MOTION TO DISMISS THE INDICTMENT<br><br>NOTED: September 8, 2023<br><br>*[Oral Argument Requested]* |

Mr. DeBorba is a longstanding member of the community who now sits in custody for attempting to exercise his fundamental rights. Mr. DeBorba is a hard-worker, a churchgoer, and a devoted father who, like many others, hoped to exercise his right to possess guns for self-defense. Yet the government seeks to deny him his rights under the Second Amendment because he lacks regular immigration status and was subject to certain restraining orders. He asks this Court to dismiss the charges against him. First the Indictment charges him in Counts 1, 2, and 3, with crimes under statutes that violates the Second Amendment, and is therefore unconstitutional and void. Second, the Indictment alleges conduct in Counts 4, 5, and 6 that falls short of a crime because the claimed false statements about his citizenship and immigration status in connection with his efforts to acquire and carry firearms are not material under the statutes charged. The Court should dismiss the Indictment against Mr. DeBorba and order his immediate release.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

## I.    STATEMENT OF FACTS[1]

Mr. DeBorba came to the United States as a very young man, initially on a visitor's visa in 1999. *See* Dkt. No. 2 at 7. He was promptly accompanied by his father. *See id.* at 8. However, he soon built a family in the United States and has lived in this country for over 20 years. *See id.* at 7–8; Ex. A.

Mr. DeBorba got married and had four children, all of whom are U.S. citizens. *See* Ex. A. He worked hard to support his children and ensure they had a roof over their heads and all of their needs met. *See* Ex. A; Dkt. No. 2 at 9–10. In addition, Mr. DeBorba was involved with his community, and particularly was active in his church. *See* Ex. A. However, despite his devotion and love of the United States, Mr. DeBorba had no path to regularize his immigration status during this time. *See* Ex. A.

In 2019, after living in the United States for approximately 20 years, Mr. DeBorba submitted form applications to purchase and carry firearms. First, he applied for a concealed pistol license through the state of Washington. *See* Dkt. No. 2 at 10–11; Dkt. No. 9 at 4. On this application, Mr. DeBorba checked the "yes" box next to the question: "Are you a United States citizen?" And he checked the "no" boxes next to the questions: "Are you a permanent resident alien? And "Are you a legal alien temporarily residing in Washington?" *See* Dkt. No. 2 at 10; Dkt. No. 9 at 4.

Later that year, he applied to purchase firearms. On these applications, he checked "United States" in response to a question inquiring about his citizenship, and checked "no" on certain questions about his immigration status—namely, whether he was a non-citizen unlawfully in the United States and whether he was a non-citizen who had been admitted on a nonimmigrant visa. *See* Dkt. No. 2 at 10–12; Dkt. No. 9 at 3–4.

---

[1] Mr. DeBorba here recites the statement of facts as alleged and charged by the government for purposes of this Motion to Dismiss the Indictment. However, he maintains the right to take a contrary position at trial.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Later still in 2019, Mr. DeBorba was charged with a domestic violence misdemeanor and a restraining order was issued, restricting his contact with his then-wife except as related to visitation of his children, and prohibiting him from possessing firearms. *See* Dkt. No. 2 at 12–13; Dkt. No. 9 at 2–3. Police later arrested Mr. DeBorba on charges that he violated the restraining order and recovered numerous firearms still in his possession during this arrest. *See id*. Mr. DeBorba was later convicted of another domestic violence misdemeanor and again a restraining order was issued that prohibited Mr. DeBorba from possessing firearms. *See* Dkt. No. 2 at 13–14.

In 2021, federal agents received information from an undisclosed source claiming that Mr. DeBorba was an undocumented immigrant and had been arrested on domestic violence charges. Dkt. No. 2 at 7. This source went on to claim that there were videos of Mr. DeBorba engaged in sport-shooting on YouTube. *See* Dkt. No. 9 at 13–14. Over half a year later, agents obtained a warrant and searched Mr. DeBorba's home, which he shared with roommates. *See* Dkt. No. 9 at 15–16. During the search, agents found five firearms. *See id*.; Dkt. No. 9 at 1.

After initially charging him by complaint, the government Indicted Mr. DeBorba on six felony charges. *See* Dkt. No. 9. Counts 1 and 2 charge Mr. DeBorba with unlawful possession of firearms and ammunition on May 6, 2022, and November 16, 2019, respectively, while he was an undocumented immigrant and subject to a restraining order, in violation of 18 U.S.C. § 922(g)(5) and (8). Count 3 charges Mr. DeBorba with unlawful possession of a firearm while he was an undocumented immigrant, in violation of 18 U.S.C. § 922(g)(5).

Counts 4 and 5 charge Mr. DeBorba with making false statements during the purchase of a firearm on May 8, 2019, and April 4, 2019, respectively. More specifically, each count alleges that the false statements Mr. DeBorba made were to "falsely represent[] himself to be a citizen of the United States of America, and falsely

MR. DEBORBA'S MOTION TO DISMISS INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 3

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

represent[] himself not to be an alien illegally or unlawfully in the United States, and falsely represent[] himself not to be an alien who has been admitted to the United States under a nonimmigrant visa." Dkt. No. 9 at 3–4. Finally, Count 6 charges Mr. DeBorba with making a false claim to U.S. citizenship specifically by falsely representing himself to be a U.S. citizen "in a Concealed Pistol License Application to the Washington State Department of Licensing, an entity having good reason to inquire into the defendant's citizenship." Dkt. No. 9 at 4.

This motion follows.

## II.    ARGUMENT

The Second Amendment protects the individual right to keep and bear arms both in one's home and when moving through the world. The core right protected is the right to arm oneself for protection. In Counts 1, 2, and 3, the government charged Mr. DeBorba with unlawfully possessing firearms and ammunition while being a noncitizen without lawful immigrant status and while being subject to a domestic partner restraining order under 18 U.S.C. § 922(g)(5) and (8) (respectively). These statutes require complete disarmament of members of our community based on factors that are not part of this country's historical tradition of firearm regulation. Mr. DeBorba, a hard-working father who has lived in this country for decades and has only misdemeanor convictions, here stands charged criminally simply for possessing firearms and ammunition. The statutes infringe the core right to arm oneself for self-defense for Mr. DeBorba as well as for the estimated 10 or 11 million non-citizens without lawful

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

immigrant status[2] and the estimated thousands of people subject to restraining orders[3] at any given time. Counts 1, 2, and 3 must be dismissed as unconstitutional.

Furthermore, the false statement counts each carry a materiality element that the Indictment fails to allege. The crime of false statement in the purchase of a firearm under § 922(a)(6), as charged in Counts 4 and 5, is only completed when the false statement is "with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter[.]" 18 U.S.C. § 922(a)(6). And in order to constitute a criminal false claim to U.S. citizenship under § 911, as charged in Count 6, the false claim must "be made to a person having some right to inquire or adequate reason for ascertaining a defendant's citizenship[.]" *United States v. Esparza-Ponce*, 193 F.3d 1133, 1137–38 (9th Cir. 1999). In Counts 4, 5, and 6, the Indictment alleges that the false representations made by Mr. DeBorba were that he was a U.S. citizen and not an undocumented immigrant. However, because the State of Washington and the government could not lawfully prohibit gun sales, or deny a concealed carry license, based on a person's citizenship or immigration status, the claims were not "material to the lawfulness of the sale" of firearms, 18 U.S.C. § 922(a)(6), or "made to a person having some right to inquire or adequate reason for

---

[2] *See* Migration Policy Institute, Profile of the Unauthorized Population: United States, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US (last accessed July 19, 2023); Abby Budiman, *Key Findings About U.S. Immigrants*, Pew Research Center (Aug. 20, 2020), https://www.pewresearch.org/short-reads/2020/08/20/key-findings-about-u-s-immigrants/.

[3] In Washington state alone, 10,708 to 13,149 domestic violence protection orders were filed each year from 2018 to 2021. *See* Admin. Office of Wash. Courts, Gender & Justice Comm'n, Civil Protection Orders: E2SHB 1320 Stakeholder Group Recommendations to Support Access and Safety (Dec. 1, 2021), at 24, https://www.courts.wa.gov/subsite/gjc/documents/1320_Report_to_legislature_12.1.21.pdf.

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

1    ascertaining [Mr. DeBorba's] citizenship[.]" *Esparza-Ponce*, 193 F.3d at 1138.

2    Therefore, Counts 4, 5, and 6 fail to allege a crime and must be dismissed.

### A.    The Court should find § 922(g)(5) and § 922(g)(8) unconstitutional both facially and as applied.

Mr. DeBorba challenges the constitutionality of 18 U.S.C. § 922(g)(5) and (g)(8) both facially and as applied. To hold the statutes facially unconstitutional, the Court must find that "no set of circumstances exists under which the [statute] would be valid," *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 971 (9th Cir. 2003) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (alteration in original). For a facial challenge, the Court's review is limited to the text of the statute itself. *See Calvary Chapel Bible Fellowship v. County of Riverside*, 948 F.3d 1172, 1177 (9th Cir. 2020).

Facial challenges are not disfavored when they neither pertain to "complex and comprehensive legislation" that may be constitutional in many instances, nor rest on speculation. *See Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 962 (9th Cir. 2014) (hearing a facial challenge to a restriction regarding the manner of firearm storage). If a facial challenge is sustained, then the statute "is void in *toto*[.]" *Young v. Hawaii*, 992 F.3d 765, 779 (9th Cir. 2021*), cert. granted, judgment vacated*, 142 S. Ct. 2895, 213 L. Ed. 2d 1108 (2022), *and abrogated on other grounds by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022) (internal quotations omitted).

By contrast, an as-applied constitutional challenge is "wholly fact dependent" and the Court's review would include the facts and circumstances specific to the enforcement of the statute against Mr. DeBorba. *See id*. (internal quotations omitted). Mr. DeBorba here raises both types of challenges to § 922(g)(5) and § 922(g)(8).

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**B.     This Court must apply the test outlined in *Bruen*, which only allows regulations of the right to bear arms that are "consistent with this Nation's historical tradition of firearm regulation."**

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court rewrote the test for determining whether a firearm law violates the Second Amendment. Previously, courts of appeals applying *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), had used a two-step test. First, courts asked whether the regulated conduct fell within the scope of the Second Amendment. If it did, then the burden shifted to the government in the second step, to establish whether the government's interest in the restriction outweighed the infringement on the individual. See *United States v. Chovan*, 735 F.3d 1127, 1134–37 (9th Cir. 2013), *abrogated by Bruen*, 142 S. Ct. 2111 (discussing cases).

*Bruen* got rid of the second step. It held that "a constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." 142 S. Ct. at 2129 (internal quotations omitted). Now, for a law to survive a Second Amendment challenge, the government must "identify an American tradition" justifying the prohibition on the individual's conduct under the first step. *Id*. at 2138. If it cannot, courts may no longer apply a "means-end scrutiny" to uphold the law under the second step. *Id*. at 2125, 2138. Instead, the inquiry ends, and the law is unconstitutional.

As *Bruen* summarized, the "standard for applying the Second Amendment" now requires courts to do the following:

> - If the Second Amendment's "plain text" covers an individual's conduct, courts must presume the Constitution "protects that conduct";
> - To rebut this, the government must show that any restriction is "consistent with the Nation's historical tradition of firearm regulation";
> - If the government cannot do so, the law is unconstitutional.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

*Id*. at 2129–30 (internal quotations omitted). The Court held that it is the government's burden to "affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 2127. Because "constitutional rights are enshrined with the scope they were understood to have when the people adopted them," this analysis is tethered to the historical tradition in place when "[t]he Second Amendment was adopted in 1791; [or when] the Fourteenth [Amendment was adopted] in 1868." *Id*. at 2136.

*Bruen* further provided guidance to courts in conducting the historical review required for step two of this analysis. Specifically, the Court noted that "not all history is created equal." *Id*. at 2136. *Bruen* emphasized the need to examine the history of arms regulation at the time the Second Amendment was defined by its framers, *id*. at 2136–38, which the Ninth Circuit held was "close in time to 1791 (when the Second Amendment was ratified) or 1868 (when the Fourteenth Amendment was ratified)." *Teter v. Lopez*, No. 20-15948, 2023 WL 5008203, at *7 (9th Cir. Aug. 7, 2023) (citing *Bruen*, 142 S. Ct. at 2136).

Furthermore, to determine whether a historical tradition of regulation is sufficiently similar to the challenged modern one, courts "must look to the '***how*** and ***why***" of the two regulations; that is, 'whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry.'" *Teter*, No. 20-15948, 2023 WL 5008203, at *10 (quoting *Bruen*, 142 S. Ct, at 2132–33 (cleaned up by *Teter*) (emphasis added). And the Court required a heightened level of similarity when the challenged regulation addresses a long-standing problem that existed when the Second Amendment was enacted:

> when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional.

*Bruen*, 142 S. Ct. at 2131; *see also Teter*, No. 20-15948, 2023 WL 5008203, at *12 (quoting same). The Court must apply these standards, set out by *Bruen*, when deciding this motion.

### C.    The right to possess and carry weapons for protection is not only protected by the Second Amendment, but also at the Amendment's core.

At the first step of the *Bruen* analysis, the Court must decide whether the restricted conduct here is protected by the plain text of the Second Amendment. Here, the conduct is at the very core of the Second Amendment's protection—the ability to keep and bear arms for personal protection or other lawful purposes (e.g. recreation).

The Ninth Circuit recognized that the Supreme Court in *Bruen* took a purely textualist approach to this question:

> "Applying the above standard, the first question in *Bruen* was "whether the plain text of the Second Amendment protects [the plaintiffs'] proposed course of conduct—carrying handguns publicly for self-defense." [] In answering it, *Bruen* analyzed only the "Second Amendment's text," applying ordinary interpretive principles. [] Because the word "'bear' naturally encompasses public carry," the Court concluded that the conduct at issue in *Bruen* (public carry) was protected by the plain text of the Second Amendment. []"

*Teter*, No. 20-15948, 2023 WL 5008203, at *7 (quoting *Bruen* 142 S. Ct. at 2134–35, 2143) (internal citations omitted).

Here too, the conduct in question—possessing firearms—is plainly covered by the Second Amendment's text. The Court in *Bruen* maintained holdings from earlier cases that the right to bear arms for self-defense is integral to the Second Amendment. In *Heller*, the Court struck down the District of Columbia's regulations banning handgun possession in the home and held that the Second Amendment protects the right

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

to keep and bear arms in one's home for the purpose of self-defense. *Heller*, 554 U.S. at 635. In distinguishing the right to bear arms as independent from involvement in a militia, the Court explained that early "Americans valued the ancient right [and] most undoubtedly thought it even more important for self-defense and hunting." *Id*. at 599. Justice Scalia, writing for the *Heller* majority, even went so far as to describe the dissent's "assertion that individual self-defense is merely a 'subsidiary interest' of the right to keep and bear arms [as] profoundly mistaken." *Id*.

In *McDonald*, the Court struck down municipal ordinances similar to those in *Heller* and held "that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*." *McDonald*, 561 U.S. at 791. In doing so, the *McDonald* Court explained that after all, "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day, and in *Heller*, [the Court] held that individual self-defense is 'the *central component*' of the Second Amendment right." *Id*. at 767 (internal citation omitted) (emphasis in original). Commenting on the importance of self-defense, the Court further explained that if the safety of "members of the community would be enhanced by the possession of handguns in the home for self-defense, then the Second Amendment right protects the rights of minorities and other residents of high-crime areas whose needs are not being met by elected public officials." *Id*. at 790.

Writing in a concurrence in *Bruen*, Justice Alito continued this theme and emphasized the importance of the individual's right to self-defense being effectuated by the right to bear arms, writing: "Some are members of groups whose members feel especially vulnerable. And some of these people reasonably believe that unless they can brandish or, if necessary, use a handgun in the case of attack, they may be murdered, raped, or suffer some other serious injury." 142 S. Ct. at 2158 (J. Alito, concurring).

MR. DEBORBA'S MOTION TO DISMISS INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 10

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Section 922(g) forbids precisely this conduct that the Second Amendment protects. The statute forbids **any gun possession** by certain categories or classes of individuals deemed prohibited persons. *See generally* 18 U.S.C. § 922(g). Thus the statute infringes on Second Amendment-protected activity.

### D.    Mr. DeBorba is part of "the People" protected by the Second Amendment.

The government may argue that § 922(g)(5) and (8) do not infringe on Second Amendment-protected conduct if the person restricted is not part of "the people" that the Second Amendment protects. The Court should roundly reject such an argument. First, the Court should join other Courts in holding that "the people" in the Second Amendment truly means "the people"—as both the plain text, and the meaning of that term in other Amendments of the Bill of Rights indicate. In other words, it refers to all people in the United States. Alternatively, even if the Court finds *some* limiting factor in the meaning of "the People," Mr. DeBorba remains well within that definition.

#### 1.    "The people" protected by the Second Amendment are indeed "the people[,]" not some nebulous or legislatively defined subset.

The argument Mr. DeBorba is not part of "the people" who have rights under the Second Amendment is utterly unsupported by the "Second Amendment's plain text[.]" *Bruen*, 142 S. Ct. at 2129. Furthermore, persuasive authority indicates that *Bruen* meant what it said—that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 2129–30. And that *dicta* purporting to narrow the Second Amendment's protection is not good law.

Of note, the Ninth Circuit has side-stepped this question after *Bruen*. In its two substantive opinions following *Bruen*, the Court has declined to examine the parameters of "the people" at *Bruen* step one, but rather has resolved those cases assuming that the conduct in question is protected by the Second Amendment and proceeding to *Bruen*

MR. DEBORBA'S MOTION TO DISMISS INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 11

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

step two. *See Teter*, No. 20-15948, 2023 WL 5008203, at *9 (n.9) (declining to examine who was covered by "the people" because the statute in question applied to all people and the litigants in question did not appear to belong to any excluded group of people); *United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023) (assuming without deciding that *Bruen* step one was satisfied for Mr. Alaniz's challenge to the Guidelines's two-level enhancement for possession of a firearm during a drug trafficking felony).

However, other courts have tackled the question head on. Both the Third Circuit sitting *en banc* and the Honorable District Judge Carlton W. Reeves have rejected the prospect that "the people" protected by the Second Amendment may be narrowed. *See generally Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023); *United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309 (S.D. Miss. June 28, 2023). Indeed, even prior to *Bruen*, now-Justice and then-Judge Amy Coney Barrett reached the same conclusion while sitting on the Seventh Circuit Court of Appeals. *See Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019), *abrogated by Bruen*, 142 S. Ct. 2111 (Barrett, J., dissenting).

> **i.   References to "responsible" or "law-abiding citizens" in *Heller*, *McDonald*, and *Bruen*, were *dicta* that did not narrow the scope of "the people" protected by the Second Amendment.**

The government has previously sought to narrow the scope of the Second Amendment's protection largely by relying on *dicta* in *Heller*, *McDonald*, and *Bruen*. However, none of those cases involved litigants who were non-citizens or had restraining orders against them or criminal records. Rather the phrase originated in *Heller* in the majority's response to Justice Stevens's dissent. Specifically, Justice Stevens cited to *United States v. Miller*, 307 U.S. 174 (1939) to argue that the Second Amendment "protects the right to keep and bear arms for certain military purposes, but

MR. DEBORBA'S MOTION TO DISMISS INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 12

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

that it does not curtail the Legislature's power to regulate the nonmilitary use and ownership of weapons[.]" *Heller*, 554 U.S. 570, 637–38 (Stevens, J., dissenting). In response, the majority reasoned instead that *Miller*'s holding hinged on the nature of the weapon, not the person. *Miller* involved the interstate transfer of sawed-off shotguns— not regularly purchased guns that would commonly be used for lawful purposes. And the *Heller* majority explained: "We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller*, 554 U.S. at 625. Thus the origin of the phrase had nothing to do with whether certain **people** were excluded from the Second Amendment's protection, but rather whether certain **weapons** were.

As the Third Circuit recognized, "*Heller* said more; it explained that 'the people' as used throughout the Constitution unambiguously refers to all members of the political community, not an unspecified subset.' [] So the Second Amendment right, *Heller* said, presumptively 'belongs to all Americans.'" *Range*, 69 F.4th at 101 (quoting *Heller* 554 U.S. at 580, 581) (internal citations omitted). This language makes clear that *Heller* did not narrow the Second Amendment's reach to a narrow subset of society.

*McDonald* in turn spoke of "citizens" parroting some of the phrasing of the Fourteenth Amendment—as the task in *McDonald* was to determine whether the Fourteenth Amendment extended the Second Amendment's protections against the states. *See generally McDonald*, 561 U.S. 742. However its discussion of citizens largely pertained to the use of that word in the Fourteenth Amendment and the Fourteenth Amendment's plain intent to ensure that oppressed minorities—namely the African American "Freedmen"—had equal rights and were not disarmed. *See id.* at 773–77. And *McDonald*'s only reference to "law-abiding" people was a passing description of a lawful *use* for guns. Namely the *McDonald* Court disputed the idea

1    "that the Second Amendment right does not protect minorities and those lacking

2    political clout." *Id*. at 789. The Court noted that Black Chicagoans subjected to the

3    challenged law faced alarming homicide rates and were left largely unprotected by their

4    government. So the Court reasoned: "If, as petitioners believe, their safety and the

5    safety of other law-abiding members of the community would be enhanced by the

6    possession of handguns in the home for self-defense, then the Second Amendment right

7    protects the rights of minorities and other residents of high-crime areas whose needs are

8    not being met by elected public officials." *Id.* at 790. The petitioners in *McDonald* did

9    not have criminal convictions, so the use of the descriptor by the *McDonald* majority

10   was most logically intended to emphasize the plight of the petitioners.

11          Finally, in *Bruen*, the Court repeated the phrase "law-abiding citizens" from

12   *Heller*, noting that just as people had the right to bear arms in their home for self-

13   defense, so too did they have the right to carry arms in public for self-defense. *See*

14   *Bruen*, 142 S. Ct. at 2122. Again, in *Bruen*, the petitioners were law-abiding citizens,

15   and the issue before the Court was not ***who*** could carry guns in public, but for what

16   purpose people could carry guns in public. *See id*. at 2122, 2125. The issue simply was

17   not before the Court. *Id*. at 2134 ("It is undisputed that petitioners Koch and Nash—two

18   ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second

19   Amendment protects."). Therefore, *Bruen*'s quotations and paraphrases of *Heller* and

20   *McDonald* referring to "law-abiding citizens" are merely *dicta*. Multiple jurists have

21   recognized these phrasings as descriptors not holdings. *See Range*, 69 F.4th at 101;

22   *Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *17–*19; *see also United*

23   *States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015) (recognizing before *Bruen*

24   that the relevant phrase in *Heller* was *dicta*: "While some of *Heller*'s language does

25   link Second Amendment rights with the notions of 'law-abiding citizens' and 'members

26   of the political community,' *see Heller*, 554 U.S. at 580, 625 [], those passages did not

MR. DEBORBA'S MOTION TO DISMISS INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 14

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

reflect an attempt to define the term 'people.' We are reluctant to place more weight on these passing references than the Court itself did.").

### ii. In fact, the "plain text" of the Second Amendment, and tried and true methods of interpretation affirm that "the people" includes all members of American society.

Usual principles of interpretation indicate that "the people" protected by the Second Amendment should be read broadly. First and foremost, there is no reason to read "the people" in the Second Amendment to have different meaning than "the people" has elsewhere in the Constitution. *See Range*, 69 F.4th at 101–02 (noting no reason to adopt inconsistent readings of the "people" in the First, Fourth, and Second amendments); *Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *20 (recognizing that "the people" covers the full national community). Even the Supreme Court in *Heller* made clear that "the people" in the Second Amendment has the same meaning as "the people" in the First and Fourth Amendments—that is the broader "national community," rather than "a subset of the Nation called the 'political community.'" *Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *20. Indeed *Heller* itself tied its understanding of "the people" to the use of that term in other Amendments in the Bill of Rights. *See Heller*, 554 U.S. at 580. The Court recounted the historical use of "the people" as indicating "'that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.'" *Id*. (quoting *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990)).

Justice Coney Barrett, while she was a Judge on the Seventh Circuit Court of Appeals, also illustrated the practical reasons to read "the people" in the Second Amendment broadly:

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

There are competing ways of approaching the constitutionality of gun dispossession laws. Some maintain that there are certain groups of people—for example, violent felons—who fall entirely outside the Second Amendment's scope. . . . Others maintain that all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right. . . . In my view, the latter is the better way to approach the problem. It is one thing to say that certain weapons or activities fall outside the scope of the right. . . . It is another thing to say that certain people fall outside the Amendment's scope. Arms and activities would always be in or out. But a person could be in one day and out the next: the moment he was convicted of a violent crime or suffered the onset of mental illness, his rights would be stripped as a self-executing consequence of his new status. No state action would be required.

. . .

In addition to being analytically awkward, the "scope of the right" approach is at odds with *Heller* itself. There, the Court interpreted the word "people" as referring to "all Americans." 554 U.S. at 580–81, 128 S.Ct. 2783; *see also id*. at 580, 128 S.Ct. 2783 (asserting that "the people" "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community" (citation omitted)). Neither felons nor the mentally ill are categorically excluded from our national community. That does not mean that the government cannot prevent them from possessing guns. Instead, it means that the question is whether the government has the power to disable the exercise of a right that they otherwise possess, rather than whether they possess the right at all.

17
18

*Kanter*, 919 F.3d 437, 451–54 (7th Cir. 2019) (Barrett, J., dissenting) (internal citations except *Heller* omitted); *see also Range*, 69 F.4th at 102 (affirming same).

19
20
21
22
23
24
25
26

Framing the question as whether or not a certain person is within "the people" protected by the Second Amendment would leave many without recourse to challenge the infringement of their constitutional rights. *See Kanter*, 919 F.3d at 452 (Barrett, J. dissenting) (noting that a framing that limited who "the people" protected by the Second Amendment were would leave many whose Second Amendment rights were restricted without "standing to assert constitutional claims that other citizens could assert."). The Third Circuit *en banc* explained:

MR. DEBORBA'S MOTION TO DISMISS INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 16

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

> At root, the Government's claim that only "law-abiding, responsible citizens" are protected by the Second Amendment devolves authority to legislators to decide whom to exclude from "the people." We reject that approach because such "extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label." [] And that deference would contravene *Heller*'s reasoning that "the enshrinement of constitutional rights necessarily takes certain policy choices off the table."

*Range*, 69 F. 4th at 102–03 (internal citations omitted).

The idea that Second Amendment rights are limited to "law-abiding, responsible citizens" raises additional constitutional problems. The Third Circuit *en banc* reasoned that the phrase "is as expansive as it is vague." *Range*, 69 F.4th at 102. The Court further noted that historical restrictions on gun possession by people convicted of serious felonies was unmoored from today's landscape of potential felony convictions—indeed many modern felonies indicate no risk of dangerousness and are not in a practical sense serious crimes at all. *See id*. (citing *Lange v. California*, 141 S. Ct. 2011, 2020 (2021)). Judge Reeves agreed, additionally noting that "[t]he modifier 'responsible,' [] is impossible to apply." *Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *29. As such, it is clear that neither Mr. DeBorba's misdemeanor convictions nor the restraining orders removed him from "the people."

Furthermore, "the people" was not limited to U.S. citizens. *Heller's* reliance on *Verdugo-Urquidez*, as well as common sense, affirms that "the people" in the Second Amendment has the same meaning it does in the First and Fourth Amendments, among other mentions in the Constitution. Namely, the "people" refers to "'a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.'" *Heller*, 554 U.S. at 580 (quoting *Verdugo-Urquidez*, 494 U.S. at 265). The Court in *Verdugo-Urquidez* ultimately held that "aliens receive constitutional protections when they have

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

come within the territory of the United States and developed substantial connections with this country." 494 U.S. at 271.

Indeed, even prior to *Bruen*, the Seventh Circuit has held that the Second Amendment protects undocumented immigrants to the same extent the Fourth Amendment does.

> In the post-*Heller* world, where it is now clear that the Second Amendment right to bear arms is no second-class entitlement, we see no principled way to carve out the Second Amendment and say that the unauthorized (or maybe all noncitizens) are excluded. No language in the Amendment supports such a conclusion, nor, as we have said, does a broader consideration of the Bill of Rights.

*United States v. Meza-Rodriguez*, 798 F.3d 664, 672 (7th Cir. 2015).

This holding rested in tried and true methods of construction and interpretation. Indeed, the First, Second, and Fourth Amendments, which were enacted together as part of the Bill of Rights, employ identical use of the word "the people." *See id*. at 670. This was not lost on the courts. "*Heller* noted the similarities between the Second Amendment and the First and Fourth Amendments, implying that the phrase 'the people' (which occurs in all three) has the same meaning in all three provisions." *Id*. at 669 (citing *Heller*, 554 U.S. at 592 ("[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right.")). Similarly, other portions of the Constitution make clear that the drafters knew how to *exclude* non-citizens from certain privileges. *See id.* at 669 ("And such provisions as Article I, section 2, paragraph 2, which limits membership in the House of Representatives to persons who have been 'seven Years a Citizen,' and Article II, section 1, paragraph 4, which requires the President to be 'a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution,' show that the drafters of the Constitution used the word 'citizen' when they wanted to do so.")

MR. DEBORBA'S MOTION TO DISMISS INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 18

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

It also makes little sense to read a citizenship requirement into the Second Amendment based on its plain text and history. If in 1791, the framers wanted to limit the protections of the Second Amendment to "citizens," (even if that term had different parameters then than now) they could have substituted "citizens" for "the people." *See Verdugo–Urquidez*, 494 U.S. at 265; *see also Fitisemanu v. United States*, 1 F.4th 862, 867 (10th Cir. 2021) (cert. denied) (explaining that the Constitution utilized the term "citizen" repeatedly without necessarily defining the term). They did not. It makes even less sense now and would amount to taking a step backward in the march for greater equality under the law to replace "the people" with "citizens," given the "racial prejudice and xenophobic paranoia" that has historically justified race-based firearms restrictions. *See* Pratheepan Gulasekaram, *"the People" of the Second Amendment: Citizenship and the Right to Bear Arms*, 85 N.Y.U.L. Rev. 1521, 1543 (2010).

"The people" thus does not exclude non-citizens like Mr. DeBorba. Particularly, it does not exclude non-citizens who are established members of the community. Mr. DeBorba—who was physically within the United States and had lived in this country for two decades, supporting his four U.S. citizen children, contributing to his community, and active within civic institutions during that time, *see* Ex. A—plainly is protected by the Second Amendment. The Court should hold that Mr. DeBorba is within "the people" protected by the Second Amendment.

> **2. Even if the Court finds that "the people" protected by the Second Amendment is narrowed to people who were not historically disarmed, Mr. DeBorba is firmly within that group.**

Even when courts that have engaged in a narrowing view of "the people[,]" such view must be rooted in a historical and textual understanding of "the people," rather than a hodge podge interpretation of *dicta*. Under such a view, neither restraining orders

nor immigration status remove Mr. DeBorba from "the people" who have Second Amendment rights.

### i. Even under a narrowing view, a person subject to domestic partner restraining orders is not excluded from "the people" protected by the Second Amendment.

The Fifth Circuit, sitting *en banc*, rejected the government's attempt to significantly narrow the meaning of "the people" in the Second Amendment to exclude people subject to certain restraining orders. In *United States v. Rahimi*, the government argued that references in *Bruen* and *Heller* to "law-abiding, responsible citizens" and "ordinary, law-abiding citizens" meant that a person subject to a domestic violence restraining order is not part of "the people." 61 F.4th 443, 451 (5th Cir. 2023) (en banc), *cert. granted*, 143 S. Ct. 2688 (2023). The Fifth Circuit roundly rejected this contention, noting its longstanding precedent that "the People" in the bill of rights—including in the Second Amendment—"'unambiguously refer[s] to all members of the political community, not an unspecified subset.'" *Id*. (quoting *Heller*, 554 U.S. at 580).

Rather, the Fifth Circuit held that "*Heller*'s reference to 'law-abiding, responsible' citizens meant to exclude from the Court's discussion groups that have historically been stripped of their Second Amendment rights, i.e., groups whose disarmament the Founders 'presumptively' tolerated or would have tolerated." *Id*. at 452 (internal citations omitted).[4] Namely, this phrase referred to the long-tolerated restrictions on gun possession by people with felony convictions and serious mental illness. Even though the Fifth Circuit accepted the idea that people who were historically denied gun rights (people with certain felony convictions and mental illnesses) were not part of "the people" protected by the Second Amendment, it

---

[4] Also reasoning *Bruen*'s reference to "ordinary, law-abiding" citizens had the same meaning.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

nonetheless highlighted major flaws in the government's argument that "the people" may be further limited:

> [T]he Government's proffered interpretation of "law-abiding" admits to no true limiting principle. Under the Government's reading, Congress could remove "unordinary" or "irresponsible" or "non-law-abiding" people— however expediently defined—from the scope of the Second Amendment. Could speeders be stripped of their right to keep and bear arms? Political nonconformists? People who do not recycle or drive an electric vehicle? One easily gets the point: Neither *Heller* nor *Bruen* countenances such a malleable scope of the Second Amendment's protections; to the contrary, the Supreme Court has made clear that "the Second Amendment right is exercised individually and belongs to all Americans," *Heller*, 554 U.S. at 581, 128 S.Ct. 2783.

*Id.* at 453. Nothing in § 922(g)(8) requires that a felony conviction or dangerous crime underlie a qualifying protection order. Instead, the statute completely bars gun possession by members of "the people." The Fifth Circuit ultimately held that Mr. Rahimi—the defendant—was part of "the people" protected by the Fifth Amendment. *See id*. at 452 (noting that a protection order alone did not remove Mr. Rahimi from the "political community" protected by the Second Amendment. "And, while he was *suspected* of other criminal conduct at the time, Rahimi was not a convicted felon or otherwise subject to another 'longstanding prohibition[ ] on the possession of firearms' that would have excluded him.") (quoting *Heller*, 554 U.S. at 626–27) (emphasis in original).

### ii. Similarly, undocumented immigrants are also not excluded from "the people" with Second Amendment rights, even under a narrowing view.

Similarly, the Ninth Circuit pre-*Bruen* declined to hold that undocumented immigrants were not part of "the people" that the Second Amendment protects. The Ninth Circuit wrestled with this question pre-*Bruen* in *United States v. Torres*, 911 F.3d 1253 (9th Cir. 2019). In that case, the Ninth Circuit ultimately agreed with a prior ruling by the Tenth Circuit and decided the question was too large and complicated to

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

1  answer without a clear historical record, and assumed without deciding that

2  undocumented immigrants indeed are included in "the people" that the Second

3  Amendment protects. *Id.* at 1261.

4      However, in answering the question, the Ninth Circuit affirmed its reliance on

5  *Verdugo-Urquidez* and *Heller* for guidance. *Id.* at 1258–59. Thus the Ninth Circuit too

6  tethered its analysis to *Verdugo-Urquidez's* definition, quoted by *Heller*, that "the

7  people" are those "'[ (1) ] who are part of a national community or [ (2) ] who have

8  otherwise developed sufficient connection with this country to be considered part of

9  that community.'" *Id.* at 1259 (quoting *Verdugo-Urquidez*, 494 U.S. at 274–75)

10 (numeration added by *Torres*). The Ninth Circuit also recognized the likely *dicta* nature

11 of *Heller's* "law-abiding, responsible citizens" phrase. *See id.* (quoting *Heller*, 554 U.S.

12 at 635). And noted *Heller's* later holding "that 'the people,' as a term, 'unambiguously

13 refers to all members of the political community, not an unspecified subset'" and direct

14 reliance on the *Verdugo-Urquidez* definition of "the people." *Id.* (quoting  *Heller*, 554

15 U.S. at 580).

16     The Ninth Circuit proceeded to reject multiple other circuits' decisions that used

17 inconsistent reasoning to limit "the people" protected by the Second Amendment to not

18 include undocumented immigrants. *See id.* at 1259–60. Among these, the Ninth Circuit

19 criticized the Fifth Circuit's decision in *United States v. Portillo-Munoz*, 643 F.3d 437

20 (5th Cir. 2011), a holding that the Eighth Circuit later adopted with little explanation,

21 *see United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011). The Ninth Circuit

22 critiqued *Portillo-Munoz's* explicit rejection of *Verdugo-Urquidez* by claiming that

23 "'neither this court nor the Supreme Court has held that the Fourth Amendment extends

24 to a native and citizen of another nation who entered and remained in the United States

25 illegally.'" *Torres*, 911 F.3d at 1260 (quoting *Portillo-Munoz*, 643 F.3d at 440). And

26 the Ninth Circuit noted *Potrillo-Munoz's* reliance on the *dicta* in *Heller* to limit the

Second Amendment's protection to "'members of the political community' 'Americans,' and "law-abiding responsible citizens.'" *Id*. (quoting *Portillo-Munoz*, 643 F.3d at 440).

The Ninth Circuit in *Torres* chose to assume without deciding that undocumented immigrants were part of "the people" protected by the Second Amendment because "the state of the law precludes us from reaching a definite answer" on this large and complicated question. *See id*. at 1261. Namely, at the time the Ninth Circuit was unsure how to resolve the arguably conflicting statements in *Heller* and how to apply the *Verdugo-Urquidez* definition. As detailed above, later jurisprudence has helped clarify these questions.[5]

After *Bruen*, the Eighth Circuit held that non-citizens were not part of "the people" protected by the Second Amendment. *See United States v. Sitladeen*, 64 F.4th 978, 987 (8th Cir. 2023). However, in doing so, the Eighth Circuit did not answer the question anew, but rather held that *Bruen* did not disturb its earlier jurisprudence on the matter. *See id*. at 986–97. As such, it merely affirmed its earlier adoption in *Flores* of the Fifth Circuit's reasoning in *Potrillo-Munoz*. So *Sitladeen* does no more than affirm a holding that the Ninth Circuit has already rejected.

The position that the Ninth Circuit embraced was that of the Tenth Circuit—to assume that non-citizens were part of the people absent proof to the contrary. *See Torres*, 911 F.3d at 1260 (citing *United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012)). The Tenth Circuit in *Huitron-Guizar* reasoned that some non-citizens should be included in "the people," but was unclear where to draw the line. As the Tenth Circuit explained: "*Verdugo–Urquidez* teaches that 'People' is a word of broader

---

[5] However, as noted above, the Ninth Circuit has yet to re-tackle the question, but rather has assumed without deciding that litigants in its two substantive post-*Bruen* decisions were part of "the people" protected by the Second Amendment. *See Teter*, No. 20-15948, 2023 WL 5008203, at *9 (n.9); *Alaniz*, 69 F.4th at 1129.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

content than 'citizens,' and of narrower content than 'persons.'" *Huitron-Guizar*, 678 F.3d at 1168 (internal citations omitted). However, *Huitron-Guizar* accepted the idea that some limitation to "the people" existed but lacked the historical evidence that would indicate which non-citizens may be excluded from "the people" protected by the Second Amendment. *Id.* at 11690. The Tenth Circuit raised important questions:

> We know, for instance, that the founders' notion of citizenship was less rigid than ours, largely tied to the franchise, which itself was often based on little more than a period of residence and being a male with some capital. 2 Collected Works of James Wilson 839–43 (K. Hall & M. Hall eds. 2007). How, historically, has this country regulated weapon possession by foreigners? Are we to understand gun ownership as among the private rights not generally denied aliens, like printing newspapers or tending a farm, or one of the rights tied to self-government, like voting and jury service, largely limited to citizens? Is there a distinction between a "national" community (*Verdugo–Urquidez*) and a "political" one (*Heller*)? Is it significant that *McDonald* [], declared the right "fundamental"?"

*Id.* at 1169[6] (full *McDonald* citation omitted). In the absence of such evidence, the Tenth Circuit assumed non-citizens were part of "the people," *see id.*, and the Ninth Circuit followed, *see Torres*, 911 F.3d at 1261. This approach—to assume that persons are part of "the people" protected by the Second Amendment unless the government proves otherwise, is now required by *Bruen*. *See Teter*, No. 20-15948, 2023 WL 5008203, at *7 ("the first question in *Bruen* was 'whether the plain text of the Second Amendment protects [] course of conduct'") (quoting *Bruen* 142 S. Ct. at 2134–35, 2143) (internal citations omitted).

---

[6] In 1791, U.S. citizenship was only conferred to a "free white person" who had lived in the United States for two years and could prove that "he [was] a person of good character." An Act to Establish an [sic] Uniform Rule of Naturalization, ch. 3, § 1, 1 Stat. 103 (1790). Many classes of people were excluded from citizenship in 1791 that today's modern standards of decency would deem appalling. Yet, aside from his race, Mr. DeBorba satisfied the conduct that would have earned citizenship in 1791. *See* Ex. A.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Here, even if the Court finds that "the people" may exclude certain historically excluded groups such as "'felons and the mentally ill,'" *Rahimi*, 61 F.4th at 452 (quoting *Heller*, 554 U.S. at 626–27), there is no evidence that non-citizens—particularly undocumented immigrants like Mr. DeBorba with deep and decades-long roots in the United States—were one of these groups. As such, the Court should follow the Ninth Circuit's guidance and *Bruen*'s holding and find that Mr. DeBorba is part of "the people" protected by the Second Amendment.

### E.   The government cannot meet its burden to show that disarmament of undocumented immigrants is consistent with the relevant historical tradition of gun regulation.

Applying *Bruen*'s step two, the government cannot show a history of "distinctly similar historical regulation" addressing the question of immigrants' access to weapons. *Bruen*, 142 S. Ct. at 2131. Section § 922(g)(5) was enacted with the purpose general crime control and promoting public safety. This is a long-standing societal problem that existed in 1791 and 1868, so the government must demonstrate a "distinctly similar" historical tradition of firearm regulation at those times to justify § 922(g)(5). *See Bruen*, 142 S. Ct. at 2136; *Teter*, No. 20-15948, 2023 WL 5008203, at *7.

In other cases, the government has introduced evidence of laws based in xenophobia and racism that disarmed certain oppressed groups—including Native Americans, African Americans, and Catholics. However, these are not close analogs for the present-day § 922(g)(5) as they served a purpose (the "why") of political oppression, not crime control, and they do not account for the reconstruction-era history that made clear that the right to bear arms for individual self-defense was fundamental, *especially* to oppressed racial minorities. The government has also identified a small number of statutes that disarmed certain people who refused to swear an oath of allegiance. These too are not sufficiently analogous in their purpose, but also fail to mirror § 922(g)(5) in their methods (the "how")—namely, those statutes allowed people

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

to regain their firearms simply by swearing an oath, while § 922(g)(5) offers undocumented immigrants no such simple means to avoid the restriction.

> **1.      Section 922(g)(5) was enacted to solve a long-standing societal problem—public safety and crime control—so may only be justified by a "distinctly similar" historical tradition of firearm regulation.**

Notably, the statute challenged here is one of *complete* disarmament for large groups of people. In passing the Gun Control Act of 1968 (the "Act"), "Congress did not intend merely to restrict interstate sales but sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976). These prohibited persons were then "comprehensively barred by the Act from acquiring firearms by any means." *Id*. This reflected the Act's "broadly stated principal purpose [which] was 'to make it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'" *Id*. at 220 (quoting S.Rep.No. 1501, 90th Cong., 2d Sess., 22 (1968)). Thus the purpose of the Act was crime control and public safety—a perennial societal problem. *See, e.g.*, Randolph Roth & Cornelia Hughes Dayton, *Homicide Among Adults in Colonial and Revolutionary New England, 1630-1797*, The Ohio State University, Criminal Justice Research Center, 2009, https://cjrc.osu.edu/research/interdisciplinary/hvd/united-states/colonial-revolutionary-new-england (compiling data regarding hundreds of homicides in early American colonies leading up to and including the time the Second Amendment was enacted); John D. Bessler, *Foreword: The Death Penalty in Decline: From Colonial America to the Present*, 50 Crim. L. Bull. 245 (2014) (detailing a variety of crimes, criminal codes, and punishments in U.S. colonies prior to enactment of the Second Amendment).

In 1986, Congress amended the Act to prohibit "aliens" unlawfully present in the United States from possessing a firearm or ammunition. See § 922(g)(5); *see also* PL

99–308 (S 49), PL 99–308, May 19, 1986, 100 Stat 449. 18 U.S.C. § 922(g)(5) outlaws possession of firearms or ammunition for noncitizens who are "illegally or unlawfully in the United States[.]" This amendment was part of a larger bill, which one proponent described as "designed to relieve the Nation's sportsmen and firearm owners from unnecessary burdens and to strengthen law enforcement." 132 Cong. Rec. H1646-01, 1986 WL 780589 (Apr. 9, 1986). The proponent noted many ways that the bill eased restrictions and certain record-keeping requirements on many gun owners and that it would not abandon the law's law enforcement purpose and "strengthen[ed] the controls on selling firearms to criminals, mental incompetents, drug addicts, and illegal aliens." *Id*.; *see also* 131 Cong. Rec. S9101-05, 1985 WL 714011, 38 (July 9, 1985) (noting the amendments would "strengthen provisions that prohibit certain classes of citizens from owning, possessing, or selling firearms. Persons in that class include criminals, adjudged mental incompetents, illegal aliens, dishonorably discharged military personnel, and drug or alcohol abusers."). Again, the purpose of ensuring that undocumented immigrants were prohibited from possessing firearms was one of general crime control. Congress clearly connected restrictions like that in section 922(g)(5) to public safety.

Indeed, the Ninth Circuit has previously agreed with the government that the purpose of § 922(g)(5) is "crime control and public safety." *Torres*, 911 F.3d at 1263. This is "'a general societal problem that has persisted since the 18th century,'" so "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional.'" *Teter*, No. 20-15948, 2023 WL 5008203, at *12 (quoting *Bruen*, 142 S. Ct. at 2131).

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

### 2. Section 922(g)(5) is enforced categorically against a large class of people who cannot avoid its impact by declaring or demonstrating their allegiance to the United States, or otherwise being contributing members of society.

In practice, § 922(g)(5)'s restriction has been enforced with a broad scope, defined in part by regulatory agencies. The Ninth Circuit has deferred to the Bureau of Alcohol, Tobacco and Firearms (ATF)'s regulations to define who is "illegally or unlawfully" in the country. *See United States v. Latu*, 479 F.3d 1153, 1158 (9th Cir. 2007). According to the ATF, this term covers noncitizens:

> (a) Who unlawfully entered the United States without inspection and authorization by an immigration officer and who has not been paroled into the United States under section 212(d)(5) of the Immigration and Nationality Act (INA);
> (b) Who is a nonimmigrant and whose authorized period of stay has expired or who has violated the terms of the nonimmigrant category in which he or she was admitted;
> (c) Paroled under INA section 212(d)(5) whose authorized period of parole has expired or whose parole status has been terminated; or
> (d) Under an order of deportation, exclusion, or removal, or under an order to depart the United States voluntarily, whether or not he or she has left the United States.

27 C.F.R. § 478.11. Indeed, the Ninth Circuit has held that a noncitizen is "illegally and unlawfully" in the United States even if they have a pending application to adjust their immigration status so long as no law prevents their removal or deportation. *Latu*, 479 F.3d at 1159. An individual's "status as an alien 'illegally or unlawfully in the United States' refers to a legal matter" on a "'collateral" question of law." *Rehaif v. United States*, 139 S. Ct. 2191, 2198 (2019) (holding that "in a prosecution under 18 U.S.C. § 922(g) and § 924(a)(2), the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm."). In other words, it is complicated and unclear. Yet, to this ever-shifting category of people, § 922(g)(5) applies an all-out prohibition of the right to bear arms and the fundamental right of self-defense.

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

As demonstrated by *Latu*, even a non-citizen who has applied for immigration status, and in doing so has declared their commitment to the United States and its laws and values, is not spared from § 922(g)(5)'s reach. Similarly, no amount of positive employment in the community nor strong family ties spares a noncitizen from § 922(g)(5)'s punishment. *See United States v. Pierret-Mercedes*, No. CV22CR430ADCBJM, 2023 WL 2957728, at *6 (D.P.R. Apr. 14, 2023).[7] And it matters not that undocumented immigrants are substantially less likely to commit crimes than U.S. citizens. *See* Alex Nowrasteh, Criminal Immigrants in Texas in 2019, Illegal Immigrant Conviction Rates and Arrest Rates for Homicide, Sex Crimes, Larceny, and Other Crimes, CATO Institute (2021), https://www.cato.org/sites/cato.org/files/2021-05/IRPB-19.pdf. Rather, the only way for millions of members of our community, *see supra* n.1, to avoid this restriction of their Second Amendment right is for them to find a lucky and rare pathway through the maze of immigration law to attain lawful permanent resident status.

> **3.** **Despite prior opportunities to do so, the government has not and cannot demonstrate a distinctly similar historical tradition of denying undocumented immigrants their core Second Amendment rights.**

Similar restrictions on gun possession for undocumented immigrants were not prevalent at the time the Second Amendment was enacted nor when it was fully realized at the enactment of the Fourteenth Amendment. Rather, this type of regulation

---

[7] Notably, undocumented immigrants can lawfully own property, are required to pay taxes, *see* Francine J. Lipman, *The Taxation of Undocumented Immigrants: Separate, Unequal, and Without Representation*, 9 Harv. Latino L. Rev. 2, 4-5 (2006), and are entitled to receive a public education, *see Plyler v. Doe*, 457 U.S. 202, 205, 210, 230 (1982) (holding that Texas law effectively denying public education to children who were undocumented immigrants was unconstitutional, and reasoning that while undocumented immigrants and their children are not citizens of the United States or Texas, they were people "in any ordinary sense of the term" and, therefore, were afforded Fourteenth Amendment protections.).

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

was largely enacted much later, in the early 20th century, and was driven by

xenophobia and prejudice:

> Most alien gun restrictions were passed during an era of irrational fear and prejudice against immigrants, especially recently arrived Italians. State legislatures enacted these types of gun laws within the first few decades of the twentieth century, when fear of foreign anarchists during the red-scare era, notions of immigrant mental deficiencies, and stereotypes of immigrants' laziness and proclivity towards crime dominated the popular and political consciousness.

Pratheepan Gulasekaram, *Aliens with Guns: Equal Protection, Federal Power, and the Second Amendment*, 92 Iowa L. Rev. 891, 908–09 (2007) (internal citations omitted).

Such regulations are not instructive here. As the Court made clear in *Bruen*, "not all history is created equal. . . . The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." 142 S. Ct. at 2136; *see also Teter*, No. 20-15948, 2023 WL 5008203, at *7 (citing same).

Instead, the government has previously claimed that the 1700s laws of several colonies disarming enslaved African Americans and Native Americans now justify the disarmament of undocumented immigrants. *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022). However, such laws would be intolerable today, and at the time of reconstruction (discussed below), and have nothing to do with the purported crime control purpose of today's § 922(g). In *Jimenez-Shilon*, decided shortly before *Bruen* (so incorporating its historical analysis into the question of whether the Second Amendment protected the conduct), the government also pointed to a couple *pre*-enactment statutes that hinged gun ownership on an oath of loyalty or allegiance. *See United States v. Jimenez-Shilon*, Brief of the United States, 2021 WL 1207553 (C.A.11), 12. However such disarmament of the disempowered political minority is

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

precisely the type of restriction the Second Amendment intended to prevent ("A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."). All of these examples fail in *Bruen*'s first prong of analysis for distinct similarity—they served different purposes than § 922(g)(5). Those laws aimed to oppress and prevent uprisings by racial or political minorities. While § 922(g)(5) was enacted for the purposes of general crime control.

No historical regulation with the purpose of oppression can justify a current infringement of the Second Amendment. When the British Crown "began to disarm the inhabitants of the most rebellious areas[,]" the Americans (who were not citizens of the United States but inhabitants in America) reacted by invoking their innate right to bear arms. *Heller*, 554 U.S. at 594. Quoting a 1769 article, *Heller* recited the view of these early noncitizen Americans: "[i]t is a natural right which the people have reserved to themselves, confirmed by the Bill of Rights, to keep arms for their own defence." *Id*. (quoting A Journal of the Times: Mar. 17, New York Journal, Supp. 1, Apr. 13, 1769, in Boston Under Military Rule 79 (O. Dickerson ed.1936) (reprinted 1970)).

After *Bruen*, the government has repeatedly relied on *Jimenez-Shilon*, and its pre-*Bruen* arguments regarding who was protected by the Second Amendment to claim that it has demonstrated a sufficient historical tradition of firearm regulation to justify § 922(g)(5). The government has continued to rely on evidence of limited statutes disarming people based on race, enslavement, and religion; and others based on refusal to take an oath of allegiance. And the District Courts considering this argument have obliged. *See, e.g.*, *United States v. Carbajal-Flores*, No. 20-CR-00613, 2022 WL 17752395, at *3 (N.D. Ill. Dec. 19, 2022); *United States v. DaSilva*, No. 3:21-CR-267, 2022 WL 17242870, at *10 (M.D. Pa. Nov. 23, 2022); *United States v. Trinidad-Nova*, No. CR 22-419 (FAB), 2023 WL 3071412, at *5 (D.P.R. Apr. 25, 2023); *United States v. Vizcaino-Peguero*, No. CR 22-168 (FAB), 2023 WL 3194522, at *4 (D.P.R. Apr. 28,

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

2023); *United States v. Pineda-Guevara*, No. 5:23-CR-2-DCB-LGI, 2023 WL 4943609, at *6 (S.D. Miss. Aug. 2, 2023); *United States v. Andrade-Hernandez*, No. 3:23-CR-26-DCB-LGI, 2023 WL 4831408, at *6 (S.D. Miss. July 27, 2023);[8] *United States v. Leveille*, No. 1:18-CR-02945-WJ, 2023 WL 2386266, at *3–4 (D.N.M. Mar. 7, 2023); *United States v. Escobar-Temal*, No. 3:22-CR-00393, 2023 WL 4112762, at *4 (M.D. Tenn. June 21, 2023); *Pierret-Mercedes*, No. CV22CR430ADCBJM, 2023 WL 2957728, at *6.

Those District Courts that have independently engaged these supposed historical analogues have raised significant concerns about the discriminatory purposes of many of these historical statutes, and the related potential discriminatory impact of § 922(g)(5) today. For example, the District Court in *Escobar-Temal*, held that bans on gun ownership by Native Americans

> are not, under *Bruen*, analogous to bans on ownership by unlawfully present aliens. The colonial bans were race-based. Though they may have been partially motivated by the fact that Native Americans were not typically allowed to participate in the militia, it is notable that these laws did not broadly prohibit firearm ownership by immigrants generally; instead, they targeted a specific race. Furthermore, though such laws existed near the time of the Founding, they indisputably would be unconstitutional today under the Equal Protection Clause. Any law that, like bans on Native American gun ownership, targeted members of a specific race would be similarly constitutionally suspect.

---

[8] The District Courts' historical analysis in *Pineda-Guevara* and *Andrade-Hernandez* was both very brief and *dicta*, because the Court disposed of those motions by finding that undocumented immigrants were not part of "the people" protected by the Second Amendment (at *Bruen* step one) in reliance on *Sitladeen*, 64 F.4th 978, and *Portillo-Munoz*, 643 F.3d 437. The Court in *United States v. D'Luna-Mendez*, No. SA-22-CR-00367-OLG, 2023 WL 4535718, at *4 (W.D. Tex. July 13, 2023), *report and recommendation adopted,* No. SA22CR00367OLGESC, 2023 WL 4879837 (W.D. Tex. July 28, 2023) engaged in no further historical analysis, instead relying on *Sitladeen* and *Portillo-Munoz* alone to deny the Motion to Dismiss.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

No. 3:22-CR-00393, 2023 WL 4112762, at *4 (additionally holding "The 'Act for disarming Papists' is also inapt and constitutionally suspect (this time, under the Free Exercise Clause)"). Rather, these courts upheld § 922(g)(5) was rationally similar (not distinctly similar) to statutes requiring oaths of allegiance in order to possess guns close in time to the enactment of the Second Amendment. *See Escobar-Temal*, No. 3:22-CR-00393, 2023 WL 4112762, at *5; *Pierret-Mercedes*, No. CV22CR430ADCBJM, 2023 WL 2957728, at *5; *Levielle*, No. 1:18-CR-02945-WJ, 2023 WL 2386266, at *2–4.

The District Court in *Levielle* specifically held that the government's proffered examples were *not* "distinctly similar" to § 922(g)(5) but went on to apply *Bruen*'s lower "relevantly similar" standard, reasoning that § 922(g)(5) addressed a modern problem because the modern system of U.S. immigration law did not exist at the time the Second Amendment was enacted. The *Levielle* Court held that statutes restricting gun ownership by people who refused to take oaths of allegiance were sufficiently similar to § 922(g)(5) to allow the statute to stand. *See* No. 1:18-CR-02945-WJ, 2023 WL 2386266, at *2–4. Nonetheless, the Court there noted the unfairness in its decision:

> controversy abounds over noncitizens brought here without authorization as infants, who have only known a home in this nation, and who nonetheless frequently face difficulties in attaining lawful citizenship despite clear loyalty to the United States. There are many others who would gladly take the opportunity to become Americans if a pathway to legitimate residency or citizenship existed for them. Alternatively, there are natural-born citizens, national "insiders," who feel no loyalty to their nation and wish it as much harm as any foreign terrorist might. But at its base, the current immigration laws are the imperfect system the United States has set up as a proxy for national allegiance. A history of laws restricting firearm ownership for individuals who refuse to swear allegiance to the United States is analogous to laws directed at undocumented immigrants—not perfectly so, because many undocumented immigrants do not so much refuse as lack any legitimate opportunity to swear such an oath, but analogous nonetheless.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

*Id.* at 3–4. Despite these serious concerns, none of these courts have engaged in analysis of the understanding of the Second Amendment close in time to "the Fourteenth Amendment's adoption in 1868." *Teter*, No. 20-15948, 2023 WL 5008203, at *10.

As discussed above, this Court should not apply the lowered "rationally similar" standard relied upon by these other District Courts. These courts relied on the lowered standard because they found that the nature of regulation of *immigration* was substantially different now than it was at the time the Second Amendment was enacted. *See, e.g.*, *Levielle*, No. 1:18-CR-02945-WJ, 2023 WL 2386266, at *2–4; *Pierret-Mercedes*, No. CV22CR430ADCBJM, 2023 WL 2957728, at *5. But there is no evidence that immigration or migration did not exist at the time of the Second Amendment's enactment. To the contrary—many prominent figures during that time, including people involved in ratifying the Constitution, were immigrants.[9] More to the point, § 922(g)(5) was not enacted in order to deal with a problem of *immigration*. Rather the "why" of § 922(g)(5) is "crime control and public safety." *Torres*, 911 F.3d at 1263. This is "'a general societal problem that has persisted since the 18th century,'" and the government may only justify § 922(g)(5)'s restriction on the Second Amendment with proof of a "distinctly similar historical regulation addressing that problem.'" *Teter*, No. 20-15948, 2023 WL 5008203, at *12 (quoting *Bruen*, 142 S. Ct. at 2131).

Furthermore, the Court should additionally find that the restrictions on firearms possession based on a person's refusal to take an oath of allegiance do not employ a similar means as § 922(g)(5). As discussed above and recognize by the Court in

---

[9] *See* Marie Basile McDaniel, *Immigration and Migration (Colonial Era),* Encyclopedia of Greater Philadelphia (Rutgers University, 2014), https://philadelphiaencyclopedia.org/essays/immigration-and-migration-colonial-era/; ConstitutionFacts.com, *About the Signers of the Articles of Confederation*, https://www.constitutionfacts.com/us-articles-of-confederation/about-the-signers/ (last visited May 22, 2023).

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

*Levielle*, people banned from possessing firearms due to refusal to swear allegiance, could regain their right to bear arms simply by taking the required oath. But most undocumented immigrants like Mr. DeBorba have no such option. *See* 18-CR-02945-WJ, 2023 WL 2386266, at *2–4; Ex. A. This difference renders the regulations significantly *dis*similar. *Cf. United States v. Rahimi*, 61 F.4th 443, 459–60 (5th Cir. 2023) (holding that a regulation that allowed people to regain firearms by paying a surety bond was not sufficiently similar in means to § 922(g)'s total disarmament, discussed below).

> **4.     The government cannot demonstrate, and no court has found, that § 922(g)(5) comports with historical tradition of firearm regulation at the time of the enactment of the Fourteenth Amendment.**

As the Ninth Circuit recognized, poorly tailored historical analogues do not help in the *Bruen* analysis. Regulations not close to two important periods do not demonstrate the relevant historical tradition of firearm regulation. *See Teter*, No. 20-15948, 2023 WL 5008203, at *10. Rather, two narrow periods are especially relevant—the periods "close in time to the Second Amendment's adoption in 1791 or the Fourteenth Amendment's adoption in 1868." *Id*. This is because the Fourteenth Amendment explicitly rejected the discriminatory motives and means used by early colonists and the English to deny others their constitutional rights, including their Second Amendment rights. *See* U.S. Const. amend. XIV.

The Supreme Court in *McDonald* made clear that the framers of the Fourteenth Amendment specifically intended to secure the right to bear arms for oppressed minorities who had been unfairly stripped of this right in the past. The Court summarized some of the horrors that African Americans endured in the wake of the Civil War that led to the passage of the Fourteenth Amendment:

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Throughout the South, armed parties, often consisting of ex-Confederate soldiers serving in the state militias, forcibly took firearms from newly freed slaves. In the first session of the 39th Congress, Senator Henry Wilson told his colleagues: "In Mississippi rebel State forces, men who were in the rebel armies, are traversing the State, visiting the freedmen, disarming them, perpetrating murders and outrages upon them; and the same things are done in other sections of the country." 39th Cong. Globe 40 (1865). The Report of the Joint Committee on Reconstruction—which was widely reprinted in the press and distributed by Members of the 39th Congress to their constituents shortly after Congress approved the Fourteenth Amendment—contained numerous examples of such abuses. See, e.g., H.R.Rep. No. 30, 39th Cong., 1st Sess., pt. 2, pp. 219, 229, 272, pt. 3, pp. 46, 140, pt. 4, pp. 49–50 (1866); see also S. Exec. Doc. No. 2, 39th Cong., 1st Sess., 23–24, 26, 36 (1865). In one town, the "marshal [took] all arms from returned colored soldiers, and [was] very prompt in shooting the blacks whenever an opportunity occur[red]." H.R. Exec. Doc. No. 70, at 238 (internal quotation marks omitted). As Senator Wilson put it during the debate on a failed proposal to disband Southern militias: "There is one unbroken chain of testimony from all people that are loyal to this country, that the greatest outrages are perpetrated by armed men who go up and down the country searching houses, disarming people, committing outrages of every kind and description." 39th Cong. Globe 915 (1866).

*McDonald*, 561 U.S. at 772. The Court noted that Congress's efforts to secure the rights of African Americans to bear arms through legislation failed to stop such terror, leading Congress to adopt the Fourteenth Amendment. *Id.* at 773–74. And "[e]vidence from the period immediately following the ratification of the Fourteenth Amendment only confirms that the right to keep and bear arms was considered fundamental." *Id.* at 776 (reciting commentary regarding the Amendment's purpose: "'Disarm a community and you rob them of the means of defending life. Take away their weapons of defense and you take away the inalienable right of defending liberty.'") (quoting an 1868 speech by Representative Stevens).

Early white colonialists certainly furthered patently discriminatory regulations that specifically disempowered others based on race, religion, and gender. *Bruen* certainly did not mean to imply that discrimination that existed in 1791 should be

carried into the analysis of the constitutionality of laws that exist today that prohibit a class of people from possessing firearms. But, as *McDonald* noted, the intent of the framers of the Fourteenth Amendment was plainly to guarantee the individual fundamental right secured by the Second Amendment, particularly for oppressed minorities. Indeed, "courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Bruen*, 142 S. Ct. at 2133 (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3rd Cir. 2021)). Such is the case here.

Undocumented immigrants face oppression and violence that relates to that faced by African Americans during reconstruction. As reflected throughout history, noncitizens require self-defense just as much, if not more, than citizens. Today, immigration advocates cite fear of deportation as one of the reasons people are not coming forward to report crimes. *See* Prevention of Anti-Immigrant Violence Act of 2021, H.R. 2536, 117th Cong. § 2. Nonetheless, in the last two years the number of violent hate crimes against immigrants and perceived foreigners has increased dramatically.[10] If the Second Amendment "is neither shackled to state defense nor to arms bearing in a military-related sense but is instead animated by concerns over armed self-protection, then robbing the most vulnerable in our society of that right makes little sense." Pratheepan Gulasekaram, *"The People" of the Second Amendment: Citizenship and the Right to Bear Arms*, 85 N.Y.U.L. Rev. 1521, 1577 (2010). After all, "[s]ome are members of groups whose members feel especially vulnerable. And some of these people reasonably believe that unless they can brandish or, if necessary, use a handgun

---

[10] *See* Cal. State Univ. San Bernardino, C. for the Study of Hate & Extremism, Fact Sheet, Anti-Asian Prejudice March 2021, https://www.csusb.edu/sites/default/files/FACT%20SHEET-%20Anti-Asian%20Hate%202020%20rev%203.21.21.pdf (reporting that Anti-Asian hate crime in 16 of America's largest cities increased 145% in 2021, while overall hate crime dropped 6%).

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

in the case of attack, they may be murdered, raped, or suffer some other serious injury." *Bruen*, 142 S. Ct. at 2158 (Alito, J., concurring).

The historical record – which prioritizes self-defense – provides no support for denying undocumented immigrants Second Amendment rights. To the contrary, the historical record surrounding the adoption of the Fourteenth Amendment supports protection of the Second Amendment right to bear arms for vulnerable non-citizens. Because the government has not and cannot meet its burden to demonstrate a distinctly similar historical tradition of firearm regulation as § 922(g)(5), the Court should hold that § 922(g)(5) is unconstitutional.

> **F.   The government cannot meet its burden to show that disarmament of people subject to restraining orders is consistent with the relevant historical tradition of gun regulation.**

The historical record is devoid of regulations that are sufficiently similar to that contained in § 922(g)(8). This statute similarly addresses the long-standing societal problem of general crime control, with a focus on another long-standing societal problem—domestic violence. So the government must demonstrate a "distinctly similar" historical tradition of firearm regulation to justify § 922(g)(8). It cannot do so. First, the cited historical analogues address *general* danger or community violence, not specifically domestic violence—as does § 922(g)(8). Second, while § 922(g)(8) requires complete disarmament on the basis of a restraining order *not* tied to a felony conviction, supposed historical analogues either required felony convictions or allowed those impacted to regain their right to possess firearms with relative ease.

> **1.   Section 922(g)(8) addresses the long-standing problem of domestic violence, so the government must show a "distinctly similar" historical tradition of regulation.**

When the challenged regulation addresses a "general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. Moreover, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id*.

Much like § 922(g)(5), so too § 922(g)(8) was enacted to address a longstanding societal ill. People subject to certain restraining orders were added to § 922(g)'s disarmament regime in 1996, with the passage of the Lautenberg Amendment to the Gun Control Act of 1968. Pub.L. No. 104–208, § 658, 110 Stat. 3009, 3009–371 (1996); *United States v. Carr*, 513 F.3d 1164, 1168 (9th Cir. 2008). And Congress's purpose in enacting this Amendment (which added both § 922(g)(8) and § 922(g)(9)— disarming people convicted of domestic violence misdemeanors) was "to prevent domestic gun violence[.]" *Chovan*, 735 F.3d at 1139–40; *see also United States v. Rahimi*, 61 F.4th 443, 455 (5th Cir.), cert. granted, 143 S. Ct. 2688 (2023) (holding that § 922(g)(8)'s purpose is to prevent "domestic gun abuse.").

Unfortunately, domestic violence is a problem that has plagued this country since its inception. *See, e.g.*, University of Pittsburgh, School of Social Work, Pennsylvania Child Welfare Resource Center, 310: Domestic Violence Issues: An Introduction for Child Welfare Professionals, *Domestic Violence Timeline*, *available at* http://www.pacwrc.pitt.edu/Curriculum/310DomesticViolenceIssuesAnIntroductionfor ChildWelfareProfessionals/Handouts/HO3DomesticViolenceTimeline.pdf (last visited Aug. 29, 2023). Thus, the government must demonstrate "distinctly similar" analogues to § 922(g)(8). *Bruen*, 142 S. Ct. at 2131.

### 2. Section 922(g)(8) uses complete disarmament based on evidence other than a felony conviction to address the problem of domestic violence.

The prohibition on possessing a gun while subject to a protective order contained in § 922(g)(8) is quite broad. The statute provides for the complete disarmament of

MR. DEBORBA'S MOTION TO DISMISS INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 39

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

anyone who "is subject to a court order that restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child[.]" 18 U.S.C. § 922(g)(8). The statute narrows the types of orders that may deny someone their Second Amendment rights only to require that the order comport with basic due process requirements and be based on a judicial finding that the person presents a risk of danger *or* explicitly prohibits the restrained person from threatening or assaulting the protected person(s). *Id*. The Fifth Circuit explained:

> Distilled to its essence, the provision operates to deprive an individual of his right to possess (i.e., "to keep") firearms once a court enters an order, after notice and a hearing, that restrains the individual "from harassing, stalking, or threatening an intimate partner" or the partner's child. The order can rest on a specific finding that the restrained individual poses a "credible threat" to an intimate partner or her child. Or it may simply include a general prohibition on the use, attempted use, or threatened use of physical force reasonably expected to cause bodily injury. The covered individual forfeits his Second Amendment right for the duration of the court's order. This is so even when the individual has not been criminally convicted or accused of any offense and when the underlying proceeding is merely civil in nature.

*Rahimi*, 61 F.4th at 455.

### 3.      The government has not and cannot show a distinctly similar historical tradition of firearm regulation.

The Fifth Circuit held that § 922(g)(8) statute was unconstitutional, even under the relaxed "relevantly similar[.]" *Id*. at 455. Although the Fifth Circuit, sitting *en banc* did not dissect whether § 922(g)(8) addresses a "general societal problem that has persisted since the 18th century," *Bruen*, 142 S. Ct. at 2131, such analysis was unnecessary to reach its holding. This is so because the government's proffered historical analogues did not meet even the relaxed standard.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Specifically, the Fifth Circuit rejected three general types of historical analogues proposed by the government—namely, (1) certain laws providing for disarmament of "dangerous" people, (2) "going armed" laws, and (3) some "surety laws"—proffered by the government as substantially similar to § 922(g)(8). *See id.* at 456.

First, the Fifth Circuit examined the historical record and concluded that laws disarming "dangerous" people were really targeted at people viewed as "disloyal" to the government, not at people who might pose a threat of domestic gun use to a family member. *Id.* at 456–57. Therefore, such analogues did not have a sufficiently similar "why" as § 922(g)(8).

Second, the Fifth Circuit held that "going armed"[11] laws did not represent a similar historic tradition because they only required forfeiture of firearms *after* a criminal conviction under the law, they quickly dropped forfeiture of firearms as a consequence, they were adopted by a small minority of colonies, and they were aimed at people engaged in terrorism, not violence within their own families. *Id.* at 457–59. These laws lacked both a similar "why" and a similar "how" to § 922(g)(8).

Third, "surety" laws, which allowed a civilian to request a surety on a person on a credible showing that person would commit a dangerous crime, were also dissimilar because they did not require total disarmament of the person. Rather such, laws allowed the person suspected to avoid any limitation on possessing guns by simply posting a surety. Or, without posting a surety, the person suspected would only be prevented from carrying a gun in public unless they had a special need to do so. *See id.* at 459–60. These laws arguably lacked a similar "why" to § 922(g)(8). And surely lacked a similar "how" to § 922(g)(8).

---

[11] These laws essentially criminalized certain rioting or terroristic behavior while armed.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

The Fifth Circuit correctly held that the government failed to make the required showing under *Bruen*. In the absence of a historical tradition of distinctly similar (or even relevantly similar) historical regulation, § 922(g)(8) violates the Second Amendment and is unconstitutional.

### G. Any uncertainty or absence of evidence related to the historical record should be resolved in Mr. DeBorba's favor.

*Bruen* made clear that the government carries the burden to "affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. The Court further noted that Judges "are not obliged to sift the historical materials for evidence to sustain [a challenged] statute, . . . That is [the government's] burden." *Id*. at 2150.

Thus, to the extent the Court has any questions or lacks sufficient historical information to fully answer *Bruen*'s test, it must hold the challenged statutes unconstitutional and dismiss the Indictment. When the government failed to present record evidence in the form of expert testimony or similar regarding any claimed historical analogs to § 922(g)(1), Honorable Judge Reeves correctly held the dearth of information against "the party with the burden to prove history and tradition" and dismissed the challenged charge. *See Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at \*15–16. So too here, any questions about the historical record must be held against the government.

### H. The Court should dismiss Counts 1, 2, and 3 of the Indictment as facially unconstitutional, or unconstitutional as applied.

The Court should dismiss Counts 1, 2, and 3 of the Indictment as unconstitutional. As detailed above, Mr. DeBorba has demonstrated that the relevant statutes—§ 922(g)(5) and § 922(g)(8)—facially violate the Second Amendment. Each infringes on the core Second Amendment right of members of the community to

MR. DEBORBA'S MOTION TO DISMISS INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 42

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

possess and bear arms for personal protection, and neither is justified by a sufficient historical analogue.

Furthermore, these statutes are unconstitutional as applied to Mr. DeBorba. As detailed above, Mr. DeBorba has lived in the United States for the majority of his adult life—approximately two decades. He is the father of four U.S. citizen children and has worked tirelessly for years to support them. Furthermore, he engaged in important civic institutions, including his church. *See* Ex. A. He has never been convicted of a felony and for years had no contact with law enforcement whatsoever. He was ultimately subjected to restraining orders arising in two misdemeanor cases while he and his ex-wife were separating. *See* Dkt. Nos. 2, 9. Mr. DeBorba is a loyal member of the community. *See* Ex. A.

These facts and circumstances place Mr. DeBorba firmly within the people protected by the Second Amendment, and do not place him in any category for which there is a sufficiently similar historical tradition of firearms restriction to allow his present disarmament. Therefore, even if this Court declines to find that these statutes are facially unconstitutional, it should find they are unconstitutional as applied to Mr. DeBorba.

I.   **The Court should dismiss Counts 4, 5, and 6 because they fail to allege crimes as citizenship and immigration status are not material to the legality of the sale or concealed carrying of firearms.**

The government has charged Mr. DeBorba in Counts 4 and 5 with making a false statement during the purchase of a firearm specifically alleging on each count that Mr. DeBorba "falsely represented himself to be a citizen of the United States of America and falsely represented himself not to be an alien illegally or unlawfully in the United States, and falsely represented himself not to be an alien who has been admitted to the United States under a nonimmigrant visa." Dkt. No. 9 at 3–4. In Count 6, the government charged Mr. DeBorba with making a false claim to U.S. citizenship

MR. DEBORBA'S MOTION TO DISMISS INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 43

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

specifically alleging that he "falsely and willfully represented himself to be a citizen of the United States in a Concealed Pistol License Application to the Washington State Department of Licensing[.]" *Id.* at 4. However, these alleged false statements were not, as a matter of law, material to the purchase of a firearm or made to an entity with a right to inquire into Mr. DeBorba's citizenship, so the charged Counts fail to allege the materiality elements of the statutes charged. The Indictment thus fails to allege a crime in Counts 4, 5, and 6, and those counts must be dismissed.

It is a long-established rule that "an indictment or information which does not set forth each and every element of the offense fails to allege an offense against the United States." *United States v. Morrison*, 536 F.2d 286, 287 (9th Cir. 1976) (citing *United States v. Debrow*, 346 U.S. 374 (1953)). "An indictment must be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(c)(1). "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Bailey*, 444 U.S. 394, 414 (1980) (internal quotations omitted).

Here, Counts 4, 5, and 6, fail to allege every element of the offenses charged because they specify conduct which, as a matter of law, does not satisfy the materiality element of the respective statutes. As discussed above, restriction on possession or carrying of firearms based on citizenship or immigration status facially violates the Second Amendment. As such, § 922(g)(5) and any similar restrictions are "void in *toto*[.]" *Young*, 992 F.3d at 779. Therefore, as discussed further below, a person's citizenship and immigration status is not "material" to the purchase of a firearm nor did the state have any right to inquire into citizenship and immigration status to restrict Mr. DeBorba's right to carry firearms.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

In order to sustain a conviction for a false claim in the purchase of a firearm under 18 U.S.C. § 922(a)(6), the government must prove that the false statement was "material to the lawfulness of the sale or other disposition of such firearm[.]" 18 U.S.C. § 922(a)(6). This materiality requirement is met only if the false statement is one that would prevent the gun sale in question from legally occurring if the truth were known. In a contentious 5-4 opinion, the Supreme Court upheld a "straw purchaser" conviction under § 922(a)(6) where the buyer purchased the firearm for a family member who was also not legally prohibited from possessing firearms. *See generally Abramski v. United States*, 573 U.S. 169 (2014). Justice Kagan, writing for the narrow majority explained that Mr. Abramski's statement that he was the true purchaser of the firearm "was material because had he revealed that he was purchasing the gun on [another person's] behalf, the sale could not have proceeded under the law—even though [the other person] turned out to be an eligible gun owner. The sale, as an initial matter, would not have complied with § 922(c)'s restrictions on absentee purchases." *Id*. at 189. Justice Scalia, writing for the four-justice dissent, reasoned that the "statement was not 'material to the lawfulness of the sale' since the truth—that Abramski was buying the gun for his uncle [who could legally own guns] with his uncle's money—would not have made the sale unlawful." *Id*. at 194 (Scalia, J., dissenting).

While the majority and the dissent ultimately reached different resolutions of Mr. Abramski's case, their disagreement hinged less on the standard for materiality, than on what was required for a gun sale to go forward. While Justice Kagan, for the majority, found that statutory procedural record-keeping requirements could prevent a gun sale from moving forward if not fulfilled, Justice Scalia, for the dissent, looked to the substantive requirements for the sale to proceed. *Compare id*. at 179–91 *with* 194–204. Yet both used nearly the same test to determine materiality—whether, had the gun dealer known the true information, the gun sale could have gone forward. *See id*.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Here, as detailed above, the answer to that question is yes. Because § 922's restrictions on gun possession and transfers to undocumented immigrants are facially unconstitutional and void, a gun dealer would have no legal basis to decline to sell a gun to Mr. DeBorba. Regardless of whether administrators thought it prudent to collect certain information about a gun purchaser, or added certain questions to the gun transfer form, those administrative decisions do not control the materiality analysis for § 922(a)(6). As Justice Scalia posited (while disputing Mr. Abramski's conviction under a separate statute, § 924(a)(1)(A)), such deference to executive actors raises major problems:

> On the majority's view, if the bureaucrats responsible for creating Form 4473 [(the firearms transfer form)] decided to ask about the buyer's favorite color, a false response would be a federal crime. That is not what the statute says. The statute punishes misstatements "with respect to *information* required to be kept," § 924(a)(1)(A) (emphasis added), not with respect to "information contained in forms required to be kept." Because neither the Act nor any regulation requires a dealer to keep a record of whether a customer is purchasing a gun for himself or for an eligible third party, that question had no place on Form 4473—any more than would the question whether the customer was purchasing the gun as a gift for a particular individual and, if so, who that individual was. And the statute no more criminalizes a false answer to an *ultra vires* question on Form 4473 than it criminalizes the purchaser's volunteering of a false e-mail address on that form.

*Id.* at 206 (Scalia, J., dissenting). So too, information that is not a legal basis to deny a buyer's purchase of a firearm is not "material" to the sale of the firearm under § 922(a)(6), even if a dealer or drafter of the firearm transfer form thought the information would be prudent to gather.

Because the Second Amendment does not tolerate disarmament based on citizenship or immigration status, the false statements alleged in Counts 4 and 5 were not material as a matter of law. The Counts therefore fail to allege crimes under §

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

922(a)(6) by failing to allege the materiality element of the statute, and therefore must be dismissed.

The statute charged in Count 6 also contains a materiality element. The Ninth Circuit has long held that a required element of the crime of false claim to U.S. citizenship under 18 U.S.C. § 911 is that the false representation of U.S. citizenship must be "made to a person having some right to inquire or adequate reason for ascertaining a defendant's citizenship[.]" *United States v. Esparza-Ponce*, 193 F.3d 1133, 1137–38 (9th Cir. 1999) (quoting *United States v. Achtner*, 144 F.2d 49, 52 (2d Cir.1944)); *see also Smiley v. United States*, 181 F.2d 505, 508 (9th Cir. 1950) (same). But, as discussed above, the Washington Department of Licensing could not constitutionally deny a person a concealed carry permit based on their lack of U.S. citizenship. *See generally Bruen*, 142 S. Ct. 2111. Therefore, the Department of Licensing, as a matter of law, lacked any "right to inquire or adequate reason for ascertaining [Mr. DeBorba's] citizenship[.]" *Esparza-Ponce*, 193 F.3d at 1137–38. And the Indictment thus fails to allege § 911's materiality element in Count 6. Count 6, too, must be dismissed.

## III.   CONCLUSION

Mr. DeBorba, through counsel, asks this Court to dismiss the Indictment. Counts 1, 2, and 3 are unconstitutional both facially and as applied. And Counts 4, 5, and 6, fail to allege crimes because they allege conduct that, as a matter of law, fail to satisfy the materiality elements of the respective statutes. The Court therefore should dismiss the Indictment and order Mr. DeBorba's immediate release.

DATED this 29th day of August 2023.

Respectfully submitted,

*s/ Rebecca C. Fish*
Assistant Federal Public Defender
Attorney for João Ricardo DeBorba

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**