The Honorable David G. Estudillo

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,

Plaintiff,

v.

JOAO RICARDO DEBORBA,

Defendant.

NO. 22-5139-DGE

GOVERNMENT'S RESPONSE IN
OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS THE
INDICTMENT

## INTRODUCTION

The Second Amendment recognizes "the right of the people to keep and bear Arms" and says the right "shall not be infringed." U.S. Const. amend II. But that right "is not unlimited" and "remains subject to "lawful regulatory measures." *Dist. of Columbia v. Heller*, 554 U.S. 570, 626, 627 n.26 (2008). And the Second Amendment is not "a regulatory straightjacket." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2133 (2022). Instead, while the Supreme Court in *Bruen* struck down a generally applicable restriction on gun possession, the Court has stressed that its decision applies to "law-abiding citizens" and even said it was not casting doubt on laws designed to "ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). In a concurrence, Justice

Alito stressed that "[o]ur holding decides nothing about who may lawfully possess a firearm" and does not "disturb[] anything that we said in *Heller* or *McDonald [v. City of Chicago*, 561 U.S. 742 (2010)]." *Id.* at 2157 (Alito, J., concurring). Given all that, Joao Ricardo DeBorba's reliance on *Bruen* in arguing that restrictions on the possession of firearms by noncitizens who have violated United States law, and by individuals who have been found by a court to be dangerous enough to merit a domestic violence restraining order, is misplaced. And his *Bruen*-based challenge to the counts charging him with making material false statements in the acquisition of firearms is similarly misplaced; it is well established that a person who provides false information in response to a government question cannot defend against a criminal charge on the ground that asking the question violated the Constitution. The Court should deny his motion to dismiss.

## BACKGROUND

### I.    Statutory Background

Federal law has long restricted the possession of firearms by certain categories of individuals. Two of these disqualifications are relevant here. The first, 18 U.S.C. § 922(g)(5), prohibits the possession of firearms by any noncitizens who are illegally or unlawfully in the United States or have been admitted to the United States under a nonimmigrant visa.

The second, 18 U.S.C. § 922(g)(8), prohibits the possession of firearms by any person "who is subject to a court order" that restrains the person from "harassing, stalking, or threatening an intimate partner"[1] or engaging in conduct that "would place an intimate partner in reasonable fear of bodily injury." The statute further requires that any such restraining order include "a finding that the person represents a credible threat to the physical safety of such intimate partner" and must "by its terms explicitly prohibit[] the

---

[1] "Intimate partner" is defined as a spouse or former spouse of the person, a parent of the person's child, or a current or former cohabitant of the person. 18 U.S.C. § 921(a)(33).

use, attempted use, or threatened use of physical force against such intimate partner" that "would reasonably be expected to cause bodily injury," and that the order be issued after a hearing of which the person had notice and an opportunity to participate.

## II.     DeBorba, a Citizen of Brazil, Unlawfully Remains in the United States and Uses Fraud to Evade Detection

DeBorba, a citizen of Brazil, came to the United States in 1999 using a nonimmigrant B2 visitor's visa that allowed him to remain in the country temporarily for up to six months. Dkt. 2 (criminal complaint) at ¶ 4. Despite this restriction, DeBorba never left the county. He overstayed his visa and remained in the United States until his eventual arrest in May 2022. *Id.*at ¶ 5. DeBorba was able to do this without detection in part by obtaining a Social Security card in 2001 after presenting a false I-94 entry document. *Id.*at ¶ 9. DeBorba's Social Security card indicated that it did not permit his employment. But he falsified I-9 employment eligibility forms by claiming U.S. citizenship and presenting Social Security cards that had been forged or altered to remove the notation, "NOT VALID FOR EMPLOYMENT." In addition, the card that he used in connection with one successful employment application did not bear the seal of the Social Security Administration, but rather bore the seal of the Department of Health and Human Services, indicating it was a forgery. *Id.*at ¶ 11.

## III.    DeBorba Repeatedly Commits Domestic Violence Subjecting Him to Numerous Restraining Orders

In November 2019, DeBorba was arrested for assaulting his wife, and the District Court of Clark County, Washington issued two sequential Domestic Violence No-Contact Orders restraining him from harassing, stalking, threatening, assaulting, or causing bodily harm to her. *Id.* at ¶ 20. The orders also prohibited DeBorba from possessing any firearms and required him to immediately surrender any firearms in his possession. DeBorba was present in court and acknowledged receiving a copy of the orders by signing them. *Id.*

Opposition to Motion to Dismiss - 3
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253-428-3800

In October 2020, DeBorba was convicted of Assault in the Fourth Degree – Domestic Violence and two counts of Domestic Violence Court Order Violations in Clark County Superior Court. *Id.* at ¶ 22. The charges alleged that DeBorba committed assault against his (now-former) wife and two violations of the domestic violence restraining order. *Id.* As part of sentencing, the court issued a new domestic violence restraining order, which again required DeBorba to surrender any firearms in his possession.

In January 2022, DeBorba was again convicted of Assault in the Fourth Degree – Domestic Violence and a Domestic Violence Court Order Violation in Clark County Superior Court. *Id.* at ¶ 29. The charges were based on a violation of the October 2020 domestic violence restraining order and an assault committed against his ex-wife. DeBorba was again notified that he could not possess any firearms.

## IV.    DeBorba Repeatedly Unlawfully Possesses Firearms and Ammunition

Despite being prohibited from doing so, both because he had unlawfully remained in the United States and because his commission of domestic violence resulted in him being prohibited by court-issued restraining order from possessing guns, DeBorba repeatedly made fraudulent statements to obtain firearms.

DeBorba falsified information on a 2019 application for a concealed pistol license, claiming to be a United States citizen. *Id.* at ¶ 13. In March of that year, DeBorba bought a rifle in Portland, Oregon, by falsely claiming on the required Bureau of Alcohol, Tobacco, Firearms and Explosives Firearm Transaction Record (Form 4473) that he was a citizen of the United States, that he was not unlawfully in the United States, and that he had not been admitted under a nonimmigrant visa. *Id.* at ¶ 14. In April of that year, DeBorba purchased a .45 caliber pistol from a Cabela's store in Lacey, Washington, again providing the same false information on the Form 4473. *Id.* at ¶ 15. Days later, he again fraudulently bought a firearm (this time, a rifle) from a store in Lebanon, Oregon. *Id.* at ¶ 16.

Opposition to Motion to Dismiss - 4
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253-428-3800

On April 14, 2018, DeBorba was arrested by the Washington State Patrol for driving under the influence and was found to have a Glock 26 type pistol and his fraudulently obtained concealed pistol license in his car with him. DeBorba initially denied having the pistol. *Id.* at ¶ 17. Following this arrest, DeBorba continued to unlawfully purchase firearms, including a 7.62 caliber rifle and a .38 special revolver in April and May 2019.

In November 2019, days after the Domestic Violence No-Contact Orders issued against him, local police arrested DeBorba for violations of the November 2019 domestic violence restraining order. During the arrest, officers found DeBorba had at his residence approximately twenty firearms which he had failed to surrender as required by the court order. *Id.* at ¶ 21. The firearms included several pistols, an AR-15 type rifle, and additional parts used to assemble AR-15 type rifles. *Id.*

In April 2021, police responded to a report of an assault between DeBorba and his roommates at his residence (where he then lived apart from his family). The roommates both reported that DeBorba still had firearms (even though by that time, DeBorba had been ordered three times not to possess any firearms and to relinquish any firearms in his possession). *Id.* at ¶ 28. The roommates stated that DeBorba had a bolt-action rifle that he often carried in a backpack because it could be disassembled. *Id.*

In August 2021, federal law enforcement received information that DeBorba continued to possess firearms and viewed a social media post on DeBorba's Instagram social media account of DeBorba firing a black AR-15 type rifle with a synthetic stock and optical sight. *Id.* at ¶ 23. The video was found to have been recorded on May 20, 2020, in Washougal, Washington, and thus showed DeBorba's continued violation of his domestic violence restraining order. *Id.* Review of DeBorba's YouTube account showed additional videos of DeBorba firing a rifle at a shooting range. *Id.* at ¶¶ 24-27.

In May 2022, federal law enforcement searched DeBorba's residence, suspecting his continued possession of firearms. *Id.* at ¶ 30. Inside the apartment, agents found

Opposition to Motion to Dismiss - 5
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

evidence of DeBorba's possession and manufacture of firearms, including three AR-15 type rifles, a Ruger 9mm handgun, and a Glock-type handgun. Several of the firearms bore no manufacturer's marks or serial numbers and appeared to be personally manufactured firearms assembled from constituent parts. The apartment also contained a workbench with a vice, a large amount of ammunition, firearms parts, firearms tools, and a completed firearm silencer, as well as suppressor parts, rifle magazines including what appeared to be a 50-round drum magazine, and other firearms accessories. *Id.* at ¶¶ 31-32. DeBorba admitted to possessing the firearms in the residence and to assembling them himself from parts that he purchased through the internet. DeBorba also admitted that he had lied on the forms he used to buy firearms and that he knew that it was illegal for non-citizens such as himself to possess firearms. *Id.* at ¶ 33.

## ARGUMENT

The Second Amendment does not prohibit Congress from disarming individuals who, like DeBorba, have violated this nation's immigration laws or who have demonstrated they are a danger to a domestic partner such that a court has determined a restraining order should issue. Instead, the text of the Second Amendment as well as history and tradition show that legislatures may disarm people who are not law-abiding, responsible citizens..

## I.     Framework for Examining a Regulation Under the Second Amendment

The Constitution protects the right of "law-abiding citizens" to keep and bear arms for self-defense. *Bruen*, 142 S. Ct. at 2125. In *Heller*, however, the Supreme Court defined the right to bear arms as limited to "law-abiding, responsible citizens." 554 U.S. at 635.[2] Consistent with that definition, the Court cautioned that "nothing in [its] opinion

---

[2] *Heller*, as well as the Supreme Court's subsequent decisions interpreting it, *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and *Bruen*, dealt with a generally applicable prohibition on the possession of firearms. *Heller* dealt with a District of Columbia law banning carrying unregistered firearms and prohibiting their registration, and further requiring firearms in the home to be unloaded, locked, or disassembled. *Heller*, 554 U.S. at 574. *McDonald* dealt with a municipal ordinance "effectively banning handgun possession by almost all private citizens." *McDonald*, 561 U.S. at 750. And *Bruen* dealt with state laws criminalizing possession of any firearm without a license, and

Opposition to Motion to Dismiss - 6
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

should cast doubt" on "presumptively lawful regulatory measures." *Id.* at 626-27 & n.26. The Court described these "permissible" measures as falling within "exceptions" to the protected right to bear arms. *Id.* at 635.

The *Bruen* Court confirmed that the right to keep and bear arms belongs only to "law-abiding" citizens. 142 S. Ct. at 2122. In fact, as Judge Lin recently wrote, *Bruen* "referred to those falling under the protection of the Second Amendment as 'law abiding' people (or the equivalent) twenty-four times, with over half of those references appearing in the main opinion." *United States v. Robinson*, No. 2:22-CR-212-TL, 2023 WL 5634712 at *3 (W.D. Wash. Aug 31, 2023). *See, e.g.*, 142 S.Ct. at 2125 (describing petitioners as "law-abiding, adult citizens"); *id.* at 2133 (describing relevant historical metrics as "how and why the regulations burden a law-abiding citizen's right to armed self-defense"); *id.* at 2159 (Alito, J., concurring) ("All that we decide in this case is that the Second Amendment protects the right of law-abiding people to carry a gun outside the home for self-defense . . . ."). Thus, while *Bruen* clarified the "standard for applying the Second Amendment," *id.* at 2129, it did not signal that laws disarming those who are not "law-abiding citizens" are constitutionally suspect. The Court explained that it was applying "[t]he test we set forth in *Heller*" but making it "more explicit." *Id.* at 2131, 2134.

The Supreme Court's statements about the presumed lawfulness of regulations targeting firearms possession by those who are not "law-abiding, responsible citizens" cannot be ignored as simply dicta. The Ninth Circuit has rejected the argument that *Heller*'s language about firearm-possession bans for persons convicted of a felony crime is non-binding: "We disagree. Courts often limit the scope of their holdings and such limitations are integral to those holdings." *Id.*; *accord United States v. Montero-*

---

providing that no license may issue to have and carry a gun outside the home without a showing of a special need for self-protection distinguishable from the general community's. *Bruen*, 142 S. Ct. at 2122-23. To date, the Supreme Court has not applied these decisions to strike down a regulation targeting the possession of firearms by those adjudicated to be violent or dangerous or by aliens unlawfully in the United States.

Opposition to Motion to Dismiss - 7
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

1  *Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (en banc) ("We do not treat

2  considered dicta from the Supreme Court lightly. Rather, we accord it appropriate

3  deference."). *See also United States v. Lane*, (E.D. Va. Aug. 31, 2023) ("If the *Bruen*

4  petitioners' 'law-abiding' status was not relevant to their inclusion in the definition of

5  'the people,' why did the Court go out of its way to mention it? . . . . The Court cannot

6  agree . . . that it can glean nothing from the *Bruen* majority's conspicuous placement of

7  the 'law-abiding citizen' qualification smack-dab in the middle of its debut of step one of

8  its text-and-history test."). Rather, in formulating its decision, the Supreme Court "leaned

9  on prior precedent, as well as the Second Amendment's text and history, to confirm its

10  holding." *Robinson*, 2023 WL 5634712 at *4 (citation omitted).

11      Nothing in *Bruen* casts doubt on *Heller*'s considered statement about the

12  presumptive lawfulness of longstanding, categorical prohibitions on possessing firearms.

13  The *Bruen* Court explained that courts should determine whether a statute satisfies the

14  Second Amendment by looking to "the Second Amendment's plain text," as informed by

15  "this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. *Bruen*

16  rejected the "'two-step'" Second Amendment framework adopted by most Courts of

17  Appeals after *Heller* that "combine[d] history with means-end scrutiny." *Id*. at 2125. It

18  observed that "[s]tep one of the predominant framework is broadly consistent with

19  *Heller*, which demands a test rooted in the Second Amendment's text, as informed by

20  history." *Bruen*, 142 S. Ct. at 2127. But the Court "decline[d] to adopt" the second step of

21  that framework, holding that means-end scrutiny is not supported in the Second

22  Amendment context. *Id*. at 2126–27.

23      In place of means-end scrutiny, the Court set forth a different two-part test. First,

24  the challenger must show that the Second Amendment covers his conduct, because

25  "[w]hen the Second Amendment's plain text covers an individual's conduct, the

26  Constitution presumptively protects that conduct." *Id*. at 2129-30. Second, when a

27  regulation infringes protected conduct, "[t]he government must . . . justify its regulation

Opposition to Motion to Dismiss - 8
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. As explained below, and as is evident considering the Supreme Court's clear statements delineating the Second Amendment right as belonging to "responsible, law-abiding citizens," DeBorba's constitutional challenges to Section 922(g)'s restrictions on the possession of firearms by unlawfully present noncitizens and judicially recognized domestic abusers must fail.

**II.    As a Noncitizen, DeBorba is Not Among "The People" Protected by the Second Amendment**

      **A.    Precedent shows the Second Amendment right belongs to citizens**

In *Heller*, the Supreme Court determined that "the Second Amendment right is exercised individually and belongs to all Americans." 554 U.S. at 581. The rest of the Court's opinion likewise reflects the understanding that the right to keep and bear arms belongs to "citizens" who are "law-abiding." *See id*. at 595 ("right of citizens"); *id*. at 603 ("an individual citizen's right"); *id*. at 608 (right "enjoyed by the citizen" (citation omitted)); *id*. at 613 ("citizens ha[ve] a right to carry arms"); *id*. at 625 ("weapons not typically possessed by law-abiding citizens"); *ibid*. ("possession of firearms by law-abiding citizens"); *id*. at 635 ("law-abiding, responsible citizens").

Subsequent Supreme Court cases have similarly identified the right as belonging to law-abiding citizens. *See, e.g.*, *McDonald*, 561 U.S. at 767-68 ("Thus, we concluded, citizens must be permitted 'to use [handguns] for the core purpose of lawful self-defense.'" (quoting *Heller*, 554 U.S. at 630) (alteration in *McDonald*)); *id*. at 775 ("one of the 'core purposes of the Civil Rights Act of 1866 and of the Fourteenth Amendment was to redress the grievances' of freedmen who had been stripped of their arms and to 'affirm the full and equal right of every citizen to self-defense'" (quoting A. Amar, The Bill of Rights: Creation and Reconstruction 187, 264-65 (1998))); *Bruen*, 142 S. Ct. at 2122 ("In [*Heller*] and [*McDonald*] we recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in

Opposition to Motion to Dismiss - 9
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253-428-3800

the home for self-defense."); *id*. ("ordinary, law-abiding citizens"); *id*. at 2133 (framing appropriate historical analogies as comparing "how and why the regulations burden a law-abiding citizen's right to armed self-defense"); *id*. at 2134 ("It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects."); *id*. at 2150 ("law-abiding citizens"); *id*. at 2156 ("law-abiding citizens"). Of course, undocumented immigrants are not citizens; in addition, they have, by definition, "show[n] a willingness to defy our law" by entering or remaining in the United States illegally, *United States v. Perez*, 6 F.4th 448, 456 (2d Cir. 2021), and thus are not law-abiding citizens protected by the Second Amendment.

Contrary to DeBorba's implications, while the Ninth Circuit rejected a pre-*Bruen* challenge to Section 922(g)(5), it has not yet reached the question of whether noncitizens unlawfully present in the country are covered by the text of the Second Amendment. *See United States v. Torres*, 911 F.3d 1253, 1261 (9th Cir. 2019) (declining to decide "whether unlawful aliens are included in the scope of the Second Amendment right"). *See also Perez*, 6 F.4th at 453 (similar); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1167-70 (10th Cir. 2012) (similar). But a clear majority of Courts of Appeals that have answered the question have determined that undocumented immigrants are not among "the people" or "political community" to whom the Second Amendment applies, or otherwise are not protected by the Second Amendment. *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1043-47 (11th Cir. 2022) (concluding, based on Second Amendment's "text and history," that illegal aliens "do not enjoy the right to keep and bear arms"); *United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) (discussing *Heller*, *Verdugo-Urquidez*, and the historical record at length and concluding "that illegal aliens do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives protection"); *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) (holding that "the protections of the Second Amendment do

not extend to aliens illegally present in this country"); *United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011) ("Whatever else the term means or includes, the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States."); *see also United States v. Singh*, 979 F.3d 697, 724 (9th Cir. 2020) (rejecting challenge to Section 922(g)(5)(B), assuming without deciding that the defendant had Second Amendment rights but noting that "those unlawfully present . . . are neither citizens nor members of the political community"), *cert. denied*, 141 S. Ct. 2671 (2021); *but see United States v. Meza-Rodriguez*, 798 F.3d 664, 669-72 (7th Cir. 2015) (concluding that the defendant was among "the people" but upholding Section 922(g)(5)(A) on other grounds).

   *Bruen* did nothing to cast doubt upon the decisions that have held that the Second Amendment does not extend to undocumented immigrants. *Bruen* noted that the Courts of Appeals had, since *Heller*, coalesced around a two-step framework for evaluating Second Amendment claims: first determining the scope of the right based on its historical meaning, and only then proceeding to the application of means-end scrutiny. The Supreme Court struck down the application of means-end scrutiny, but it blessed the first step in this inquiry as "broadly consistent with *Heller*." *Bruen*, 142 S. Ct. at 2127. Accordingly, this Court can look to the holdings of the Fourth, Fifth, Eighth, and Eleventh Circuits (as well as the concurrence in the Second Circuit's *Perez* decision) to conclude that DeBorba's challenge necessarily fails because individuals unlawfully in the United States are not among "the people" protected by the Second Amendment.

   Nor does Ninth Circuit case law cast doubt on these decisions. While DeBorba claims the court in *Torres* "criticized" and "critiqued" *Portillo-Munoz* (dkt. 36 at p.22), it did no such thing. Rather, the Ninth Circuit merely described the holding in that case and others, ultimately determining it need not decide the issue because it held that even if an alien unlawfully in the country did have rights under the Second Amendment,

1  Section 922(g)(5) was constitutional based on (now-rejected) means-end scrutiny. *Torres,*

2  911 F.3d 1260-62.

3        DeBorba argues that the term "the people" in the Second Amendment must be

4  consistent with its use elsewhere in the Bill of Rights, relying on *Heller*'s quotation of

5  *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990). This reliance is misplaced. In

6  *Verdugo-Urquidez*, the Supreme Court held that the Fourth Amendment does not apply to

7  "the search and seizure by United States agents of property that is owned by a

8  nonresident alien and located in a foreign country." 494 U.S. at 261. The Court expressly

9  declined to decide whether "the Fourth Amendment applie[s] to illegal aliens in the

10  United States." *Id*. at 272. Even assuming that the term "the people" bears the same

11  meaning in the Second and Fourth Amendments, then, *Verdugo-Urquidez* would not

12  establish that the term encompasses noncitizens who are unlawfully present in the United

13  States.

14        Also, the conclusion that the Second Amendment does not apply to noncitizens

15  who are present in the country unlawfully rests not simply on the Second Amendment's

16  reference to "the people," but also on the historical understanding of the scope of the

17  right the Second Amendment codified. *See infra* at Section II.B; *Portillo-Munoz*, 643

18  F.3d at 440-41 (recognizing that "[t]he purposes of the Second and the Fourth

19  Amendment are different" and thus "the use of 'the people' in both" amendments need

20  not "cover exactly the same groups of people"). Moreover, the argument that "the

21  people" must be used consistently throughout the Founding Era constitutional text is

22  simply incorrect, as noncitizens are not among "the people" who may vote in

23  congressional elections. *See* U.S. Const. Art. I § 2 cl. 1 ("The House of Representatives

24  shall be composed of Members chosen every second Year by *the People* of the several

25  States . . . ." (emphasis added)); 18 U.S.C. § 611.

26        In *Plyler v. Doe*, meanwhile, the Supreme Court held that the Equal Protection

27  Clause of the Fourteenth Amendment—which provides that "[n]o State shall . . . deny to

Opposition to Motion to Dismiss - 12
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

any person within its jurisdiction the equal protection of the laws"—protects noncitizens who are present in the United States illegally. 457 U.S. 202 (1982). But that decision involved the meaning of the term "any person" in the Fourteenth Amendment, not the meaning of the distinct term "the people" in the Second Amendment, or the distinct history of the right to keep and bear arms. *Id*. at 214; *see also Jimenez-Shilon*, 34 F.4th at 1045 (distinguishing *Plyler* on this basis). Neither *Verdugo-Urquidez* nor *Plyler* thus suggest that noncitizens who are unlawfully present in the United States are protected by the Second Amendment. And as discussed *infra*, even if they were, Section 922(g)(5) would be a permissible regulation of the right to keep and bear arms.

For these reasons, the only Circuit Court to have reviewed the constitutionality of the noncitizen-in-possession statute post-*Bruen* held that Section 922(g)(5) does not govern conduct that falls within the plain text of the Second Amendment. *United States v. Sitladeen*, 64 F.4th 978 (8th Cir. 2023). In so doing, the Eighth Circuit held that "unlawfully present aliens are not within the class of persons to which the phrase 'the people' refers" and that "[n]othing in *Bruen* casts doubt on our interpretation of that phrase. . . . Indeed, *Bruen* 'decided nothing about *who* may lawfully possess a firearm.'" *Id.* at 985 (quoting *Bruen*, 142 S.Ct. at 2157 (Alito, J., concurring) (emphasis in original)).

Every district court to have considered the issue has come to that same conclusion. Of the twelve district courts that are known to have ruled on the constitutionality of Section 922(g)(5) post-*Bruen*, all have ruled that it does not violate the Second Amendment. *See* Appendix A, attached hereto (listing decisions upholding the constitutionality of Section 922(g)(5) after *Bruen*).

### B. The historical record confirms the Second Amendment right belongs to citizens

The historical record supports the conclusion that the Second Amendment was understood at the time of its ratification to extend the right to bear arms to *citizens*. Under

Opposition to Motion to Dismiss - 13
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

the English Bill of Rights, which "has long been understood to be the predecessor to our

Second Amendment," the right to keep and bear arms was expressly limited to

"Subjects." *Heller*, 554 U.S. at 593 (quoting Bill of Rights 1689, 1 W. & M., ch. 2, § 7,

Eng. Stat. at Large 441); *see id*. ("By the time of the founding, the right to keep and bear

arms had become fundamental for English *subjects*." (emphasis added)). And in colonial

America,

> the right to keep and bear arms "did not extend to all New World
> residents." Joyce Lee Malcolm, To Keep and Bear Arms: The Origins of an
> Anglo-American Right 140 (1996). While "[a]lien men . . . could speak,
> print, worship, enter into contracts, hold personal property in their own
> name, sue and be sued, and exercise sundry other civil rights," they
> "typically could not vote, hold public office, or serve on juries" and did not
> have "the right to bear arms" because these "were rights of members of the
> polity." Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction
> 48 (1998).

*Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment) (footnotes omitted);

*accord Jimenez-Shilon*, 34 F.4th at 1047-48.

Accordingly, colonial-era statutes did not extend the right to bear arms to those

who were, at the time, not considered part of the political community. Massachusetts and

Virginia forbade the arming of Native Americans, *see* Malcolm, *supra*, at 140, and

Virginia also prohibited Catholics from owning arms unless they swore "allegiance to the

Hanoverian dynasty and to the Protestant succession," Robert H. Churchill, *Gun

Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal

Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157 (2007). The right to bear

arms under the English Bill of Rights was similarly "restricted to Protestants" who were

"Subjects." *Heller*, 554 U.S. at 593 (quoting Bill of Rights 1689, ch. 2, § 7); *see also

Carpio-Leon*, 701 F.3d at 980 ("In England, the right to bear arms allowed the

government to disarm those it considered disloyal or dangerous.").

Similarly, during the American Revolution, colonial governments disarmed

persons who refused to "swear an oath of allegiance to the state or the United States."

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of*

Opposition to Motion to Dismiss - 14
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

*Gun Control*, 73 Fordham L. Rev. 487, 506 (2004); *see id.* at 506 nn.128-29 (collecting statutes); *see generally* Churchill, *supra*, at 159 ("[T]he new state governments ... framed their police power to disarm around a test of allegiance."). And during the ratification debates, the New Hampshire ratification convention proposed an amendment stating that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion," while delegates urged the Massachusetts convention to propose a similar amendment guaranteeing "peaceable citizens" the right to keep arms. 2 Bernard Schwartz, The Bill of Rights: A Documentary History 681, 761 (1971); *see Heller*, 554 U.S. at 604 (considering ratification conventions' proposals). Accordingly, "State constitutions in the early republic continued a similar practice by restricting the right to keep and bear arms to citizens." *Perez*, 6 F.4th at 463 & n.6 (Menashi, J., concurring in the judgment) (collecting Alabama, Connecticut, Kentucky, Maine, Mississippi, and Pennsylvania constitutions); *accord Jimenez-Shilon*, 34 F.4th at 1049.

The Bill of Rights codified this understanding of the right to bear arms as being connected with membership in and preservation of the political community. *See McDonald*, 561 U.S. at 769-70 ("The right of *the citizens* to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them" (quoting 3 J. Story, 3038 Commentaries on the Constitution of the United States § 1890, p. 746 (1833)) (emphasis added)).

Against this extensive historical record showing the right to bear arms was understood to attach only to citizens, DeBorba offers no examples of laws that indicate the right to bear arms applied to aliens. This is unsurprising, as "alien men . . . typically could not vote, hold public office, or serve on juries and did not have the right to bear arms because these were rights of members of the polity" and "non-citizens . . . were neither expected, nor usually allowed, to participate in the militia." *Perez*, 6 F.4th at 462

Opposition to Motion to Dismiss - 15
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253-428-3800

1  (Menashi, J., concurring) (quotation marks omitted). *See also Jimenez-Shilon*, 34 F.4th at

2  1047-48 (describing history of "disarmament of groups associated with foreign

3  elements," including "on the ground of alienage" (quotation marks omitted)). And there

4  is no suggestion that any states were viewed at the time as lacking the authority to

5  exclude noncitizens from the right to bear arms. *See Bruen*, 142 S. Ct. at 2133 (where

6  there were "no disputes regarding the lawfulness of [certain] prohibitions," one "can

7  assume it settled" that those prohibitions are "consistent with the Second Amendment").

8      Further, a lack of state or federal laws specifically barring noncitizens from

9  possessing firearms in the founding era does not suggest that such laws were understood

10  to be inconsistent with the Second Amendment. The absence of laws explicitly excluding

11  a group of noncitizens from a right that noncitizens already were understood not to

12  possess is hardly surprising. *See Perez*, 6 F.4th at 462 n.4 (Menashi, J., concurring in the

13  judgment) ("[A]rms bearing and suffrage were intimately linked two hundred years ago

14  and have remained so."). And the fact that states did not prohibit a given practice "does

15  not mean that anyone thought the States lacked the authority to do so." *Dobbs v. Jackson*

16  *Women's Health Org.*, 142 S. Ct. 2228, 2255 (2022). Moreover, DeBorba frames the

17  question incorrectly. As discussed *infra*, while immigration is hardly a new phenomenon,

18  *illegal* immigration is essentially a phenomenon that began in the late 19th century;

19  accordingly, the laws prohibiting illegal immigrants from bearing arms that followed

20  close on the heels of the existence of illegal immigrants suggests that the Second

21  Amendment does not extend to such persons.

22      Section 922(g)(5) disarms noncitizens who are unlawfully present in the United

23  States. Such persons, by definition, are not "law-abiding, responsible citizens" protected

24  by the Second Amendment. *Heller*, 554 U.S. at 635. Accordingly, even if DeBorba were

25  capable of showing he has more substantial connections with the United States than other

26  undocumented immigrants, (dkt. 36 at p.19), he cannot invoke the protections of the

27  Second Amendment, and the Court should deny his motion to dismiss the indictment.

Opposition to Motion to Dismiss - 16
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

1    **III.    Section 922(g)(5) is Consistent with this Nation's Tradition of Firearms**
2            **Regulation**

3            Assuming the Second Amendment applies to noncitizens, it permits limitations on
4    their right to keep and bear arms because those limits are "fairly supported by . . .
5    historical tradition." *Heller*, 554 U.S. at 627; *see, e.g.*, *id*. at 626-27 & n.26 (emphasizing
6    that "nothing in [the Court's] opinion should be taken to cast doubt on longstanding
7    prohibitions on the possession of firearms by felons and the mentally ill," and stating that
8    these "presumptively lawful regulatory measures" were identified "only as examples"
9    and not as an "exhaustive" list). The Supreme Court confirmed in *Bruen* that, even where
10   the Second Amendment applies, the government may justify a challenged restriction by
11   showing "that its firearms regulation is part of the historical tradition that delimits the
12   outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. The Court
13   has affirmed not only that firearms regulations that are direct progeny of those at the
14   relevant historical period are permissible, but also that courts may "determine[e] whether
15   a historical regulation is a proper analogue for a distinctly modern firearm regulation" by
16   determining "whether the two regulations are relevantly similar." *Id.* at 2132 (internal
17   quotation marks omitted).

18          While the Court did not provide an "exhaustive review of the features that render
19   regulations relevantly similar under the Second Amendment," it pointed toward two
20   metrics: "how and why the regulations burden *a law-abiding citizen's* right to armed self-
21   defense."[3] *Id.* at 2132-33 (emphasis added). In deciding this question, the Court
22   explained that the government need not offer a "historical *twin*," but only an analogous,
23   i.e., "relevantly similar," historical regulation that imposed "a comparable burden on the
24   right of armed self-defense" and that was "comparably justified." *Ibid.*

25
26   _____
     [3] Of course, this language in *Bruen* makes it clear that the Court need not reach the stage of examining historical
27   analogies to Section 922(g)(5) because that law imposes no burden on a law-abiding citizen's right to armed self-
     defense.

Opposition to Motion to Dismiss - 17
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

**A.      Nonmembers of the political community have historically been restricted from bearing arms**

As discussed above, there is abundant precedent before, during, and after the American Revolution for disarming nonmembers of the political community. The same sources cited above, from the early English understanding of the political community, to the colonial governments that disarmed those who did not swear oaths of allegiance, to the early state constitutions restricting the right to bear arms to citizens, all demonstrate the historical tradition and understanding that the law may limit the right to bear arms to citizens.

The Bill of Rights codified this understanding of the right to bear arms as being connected to citizenship and to membership in and preservation of the political community. *See McDonald*, 561 U.S. at 769-70 ("The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them" (quoting Story, *supra* at 746)).

Beginning in England and lasting at least through the founding era, history is replete with "representative historical analogue[s]" that categorically disqualified groups from possessing firearms based on a judgment that the group could not be trusted to adhere to the rule of law.

Because the Second Amendment "'codified a right inherited from our English ancestors,'" English legal tradition helps clarify the scope of the "'right secured by the Second Amendment'"—which, as with the English right, "'is not unlimited.'" *Bruen*, 142 S. Ct. at 2127-28 (quoting *Heller*, 554 U.S. at 599, 626). Among the limits well-established in England was the authority to disarm classes of people who, in the legislature's view, could not be depended upon to obey the rule of law. *See, e.g.*, 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71–73 (1688) (codifying an "Act for the

Opposition to Motion to Dismiss - 18
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

1  better secureing the Government by disarming Papists and reputed Papists," which

2  provided that any Catholic who refused to make a declaration renouncing his or her faith

3  could not "have or keepe in his House or elsewhere" any "Arms [,] Weapons[,]

4  Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to

5  him by Order of the Justices of the Peace ... for the defence of his House or person").

6  This example is particularly relevant because the same Parliament "wr[ote] the

7  'predecessor to our Second Amendment' into the 1689 English Bill of Rights," which

8  similarly drew a religion-based distinction, among other limitations. *Bruen*, 142 S. Ct. at

9  2141 (quoting *Heller*, 554 U.S. at 593); *see* 1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of*

10  *the Realm* 143 (1688) (specifying that "Protestants may have Arms for their Defence

11  suitable to their Conditions and as allowed by Law").

12  The American colonies inherited the English tradition of broad legislative

13  authority to disarm classes of people who were viewed as not dependable adherents to the

14  rule of law. Massachusetts, for example, disarmed the supporters of preacher Anne

15  Hutchinson in the 1630s not because of a demonstrated propensity for violence, but

16  because of their lack of fealty to the rule of law. In another example, during the French

17  and Indian War, Maryland, Virginia, and Pennsylvania disarmed Catholics who refused

18  to take a loyalty oath. *See* Michael A. Bellesiles, *Gun Laws in Early America: The*

19  *Regulation of Firearms Ownership, 1607–1794*, 16 Law & Hist. Rev. 567, 574 (1998);

20  52 Archives of Maryland 454 (J. Hall Pleasants ed., 1935); 7 *The Statutes at Large;*

21  *Being A Collection of All the Laws of Virginia* 35-39 (1820) (1756 Va. law); 5 *The*

22  *Statutes at Large of Pennsylvania from 1682 to 1801*, 627 (WM Stanley Ray ed., 1898).

23  Later, over the course of the Revolutionary War, American legislatures passed

24  numerous laws disarming non-violent individuals based on their status or on a judgment

25  that their actions evinced an unwillingness to comply with the legal norms of the nascent

26  social compact—often specifically targeting those who failed to demonstrate loyalty to

27  the emergent American government. *See United States v. Jackson*, 69 F.4th 495, 502-03

Opposition to Motion to Dismiss - 19
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

1    (8th Cir. 2023). The Continental Congress recommended, and most States enacted, laws

2    disarming loyalists and others who refused to swear allegiance to the new Republic. A

3    1775 Connecticut law, for example, provided that any person convicted of "libel [ing] or

4    defam[ing]" any acts or resolves of the Continental Congress or the Connecticut General

5    Assembly "made for the defence or security of the rights and privileges" of the colonies

6    "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the*

7    *Colony of Connecticut From May, 1775 to June, 1776*, at 1993 (1890) (1775 Conn. law).

8    Many of these laws provided that failing or refusing to take the oath resulted in forfeiture

9    of a bundle of additional political rights, including the rights to vote, to serve on juries,

10    and to hold public office—reinforcing the longstanding connection between arms-bearing

11    and these other rights seen as extending only to those within the social compact. *See, e.g.*,

12    1776 Mass. law at 481; 1777 N.C. law at 231; 1777 Pa. Law at 112–13; 1777 Va. law at

13    282.[4]

14         Reflecting this understanding, some states prohibited firearm possession by

15    persons believed to be untrustworthy—for example, those "who refused to declare an

16    oath of loyalty." *Jackson*, 69 F.4th at 503 (citing examples of such laws); *see also*

17    *Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019).

18         Section 922(g)(5)(A) fits squarely within this historical tradition, and certainly

19    does not "burden a *law-abiding citizen's* right to armed self-defense" in a manner

20    inconsistent with historical precedent. *Bruen*, 142 S. Ct. at 2133 (emphasis added).

21

22

23

---

24    [4] The Pennsylvania law is particularly informative because the year before enacting it, Pennsylvania became one of the first states to adopt a state constitutional provision protecting an individual right to bear arms. *Heller*, 554 U.S. at

25    601; *see* Pa. Declaration of Rights of 1776 § XIII, in *The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins* 278 (Neil Cogan ed., Oxford University Press 2d ed. 2014); *see also* N.C. Declaration of Rights of 1776 §

26    XVII, in *The Complete Bill of Rights, supra*, at 277–78 (individual rights-based constitutional provision adopted the year before the North Carolina disarmament law cited above); Mass. Const. of 1780, pt. I, art. XVII, in *The*

27    *Complete Bill of Rights, supra*, at 277 (individual rights-based constitutional provision adopted four years after the Massachusetts disarmament law cited above).

Opposition to Motion to Dismiss - 20
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

**B.      Section 922(g)(5) is analogous to founding-era firearms restrictions**

DeBorba argues that these historical precedents are not close enough analogies, because immigration was a phenomenon present in the late 18th century and there are no direct comparators to Section 922(g)(5)(A) from that era. Dkt. 36 at p.25 (citing *Bruen*, 142 S. Ct. at 2131 ("[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.")). Yet DeBorba frames the question in a misleading manner. Section 922(g)(5) does not prohibit firearm possession by all immigrants, but rather prohibits aliens "illegally or unlawfully in the United States" from shipping, transporting, possessing, or receiving any firearm or ammunition in or affecting interstate or foreign commerce. 18 U.S.C. § 922(g)(5) (emphasis added). The relevant phenomenon is immigration that violates United States law, and that phenomenon largely postdates the Second Amendment.

"The federal government first forayed into the realm of immigration legislation during the 1870s. One decade later, the 1882 Chinese Exclusion Act prohibited Chinese laborers from entering the United States for ten years." *United States v. Munoz-De La O*, No. 2:20-CR-134-RMP-1, 2022 WL 508892, at *1 (E.D. Wash. Feb. 18, 2022); *see also* U.S. Citizenship and Immigration Services, Early American Immigration Policies, https://www.uscis.gov/about-us/our-history/overview-of-ins-history/early-american-immigration-policies (July 30, 2020) ("Americans encouraged relatively free and open immigration during the 18th and early 19th centuries, and rarely questioned that policy until the late 1800s."). In the context of a country that initially drew no connection between the manner of an immigrant's arrival and lawbreaking, there was no need to explicitly restrict any immigrant's possession of firearms (even if, as discussed *supra*, the common understanding was that noncitizens had no affirmative *right* to bear arms). After laws restricting immigration emerged, by contrast, "Congress ha[d] every right to

Opposition to Motion to Dismiss - 21
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

1   conclude that those who show a willingness to defy our law are candidates for further

2   misfeasance or at least a group that ought not be armed when authorities seek them."

3   *Perez*, 6 F.4th at 456 (quotation marks and alteration omitted); *see also Meza-Rodriguez*,

4   798 F.3d at 673 (recognizing that "unauthorized noncitizens" are more "difficult to track"

5   and "have an interest in eluding law enforcement"); *Huitron-Guizar*, 678 F.3d at 1170

6   ("Congress may have concluded that illegal aliens, already in probable present violation

7   of the law, simply do not receive the full panoply of constitutional rights enjoyed by law-

8   abiding citizens. Or that such individuals, largely outside the formal system of

9   registration, employment, and identification, are harder to trace and more likely to

10  assume a false identity."); *Carpio-Leon*, 701 F.3d at 982-83 (similar).

11         In *Bruen*, the Supreme Court recognized that courts should be mindful of changing

12  societal conditions in evaluating how closely a challenged regulation must conform to

13  historical precedent. "While the historical analogies here and in *Heller* are relatively

14  simple to draw, other cases implicating unprecedented societal concerns or dramatic

15  technological changes may require a more nuanced approach." *Bruen*, 142 S. Ct. at 2132.

16         To be clear, analogical reasoning under the Second Amendment is neither a
       regulatory straitjacket nor a regulatory blank check. On the one hand,
17     courts should not uphold every modern law that remotely resembles a
       historical analogue, because doing so risks endorsing outliers that our
18     ancestors would never have accepted. On the other hand, analogical
       reasoning requires only that the government identify a well-established and
19     representative historical analogue, not a historical twin. So even if a
       modern-day regulation is not a dead ringer for historical precursors, it still
20     may be analogous enough to pass constitutional muster.

21  *Id*. at 2133 (cleaned up).

22         Federal laws restricting immigration substantially postdate the Second

23  Amendment. Accordingly, the Government need not identify "a dead ringer for historical

24  precursors," but rather must identify only "a well-established and representative historical

25  analogue." *Id*. The Government has done precisely that here, pointing to laws barring

26  Native Americans, Catholics, and Loyalists from bearing arms. While some of these

27  classifications—such as those based on race or religion—are abhorrent and "would be

Opposition to Motion to Dismiss - 22
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

unconstitutional today" under other constitutional provisions, *Drummond v. Robinson Twp.*, 9 F.4th 217, 228 n.8 (3d Cir. 2021) (quotation marks omitted), they nevertheless show that the right to bear arms was understood to be subject to the government's limitation of that right to those within the political community. Today, by virtue of laws prohibiting immigration outside of authorized channels and criminalizing the violation of those laws, Congress has clearly expressed its understanding that undocumented immigrants are not members of the political community and not entitled to the full panoply of rights afforded to U.S. citizens, including the right to bear arms under the Second Amendment. And the Supreme Court has "firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens." *Demore v. Kim*, 538 U.S. 510, 522 (2003). *See also Carpio-Leon*, 701 F.3d at 982 ("[W]hen Congress regulates illegal aliens by prohibiting them from possessing firearms, it is functioning in a special area of law committed largely to the political branches, and on which we owe Congress special deference" (citations omitted)).[5]

In this light, Congress's decision to bar aliens unlawfully in the United States from possessing firearms fits the criterion identified by the Supreme Court, i.e.: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S.Ct. at 2133. Courts have recognized that "there is a rational basis between prohibiting unlawfully present aliens from possessing firearms and achieving the legitimate goal of public safety. . . . In enacting § 922(g)(5)(A), Congress may well have concluded that unlawfully present aliens "ought not to be armed when authorities seek them." *Sitladeen*,

---

[5] The Supreme Court has held that "the responsibility for regulating the relationship between the United States and our alien visitors"—determinations about which noncitizens should be allowed to enter and remain in the United States and the terms and conditions imposed upon such noncitizens while they are here—is "committed to the political branches" of government. *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). In exercising that power, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Id.* at 80. And because Congress's "power over aliens is of a political character," its exercise of that power is "subject only to narrow judicial review." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n.21 (1976); *see Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953) (holding that congressional power over noncitizens is "largely immune from judicial control").

Opposition to Motion to Dismiss - 23
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

64 F.4th at 989. Similarly, "those in the United States without authorization may be more likely to acquire firearms through illegitimate and difficult-to-trace channels" and "Congress could have rationally determined that unlawfully present aliens themselves are more likely to attempt to evade detection by assuming a false identity." *Id.*

The Court should find that DeBorba, an alien who long relied on forged official documents to unlawfully remain in the United States, is not among "the people" to whom the Second Amendment guarantees the right to bear arms. And even if he is, Section 922(g)(5)'s prohibition on the possession of firearms by undocumented immigrants is consistent with and analogous to this Nation's historical practice of denying the right to possess firearms by those deemed outside the political community.

## IV.    The Second Amendment Does Not Prohibit Congress from Disarming DeBorba and Others Who are Subject to Domestic-Violence Protective Orders

The history of the right to keep and bear arms—before, during, and after the Founding Era—confirms the understanding that the Second Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens. As explained below, English law allowed the government to disarm individuals who were "dangerous" or not "peaceable," Second Amendment precursors proposed during the Founding Era guaranteed the right to keep and bear arms only to "honest and lawful" citizens or those who posed no "danger of public injury," and commentators in the 19th century recognized the government's authority to disarm individuals who were not "orderly," "peaceable," or "well-disposed."

Tradition further confirms that reading of the Second Amendment. American legislatures have long disarmed individuals whom they have found to be dangerous, irresponsible, or otherwise unfit to possess arms. For example, during the Revolutionary War, the Continental Congress recommended, and many States adopted, laws disarming loyalists. States in the 19th century disarmed minors, intoxicated persons, and vagrants.

Opposition to Motion to Dismiss - 24
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

And Congress in the 20th century disarmed felons and persons with mental illnesses. Although different statutes disqualified different groups at different times, they reflect the same enduring principle: Legislatures may disarm those who are not law-abiding, responsible citizens.

Section 922(g)(8) fits within that history and tradition because it disarms persons who are not law-abiding, responsible citizens. Individuals subject to domestic-violence protective orders pose an obvious danger to their intimate partners because guns often cause domestic violence to escalate to homicide and because abusers often use guns to threaten and injure their victims. Armed abusers additionally endanger people beyond their partners—such as children, bystanders, and police officers.

A protective order must, moreover, satisfy strict requirements to trigger Section 922(g)(8). An order must either contain a judicial finding that the person poses a credible threat to the physical safety of another, or explicitly prohibit the use, attempted use, or threatened use of physical force. A court must have issued the order after notice and a hearing. And the disqualification lasts only as long as the order remains in effect. Those requirements confine Section 922(g)(8) to a particularly dangerous and irresponsible subset of persons subject to protective orders.

Finally, at least 48 States and territories have adopted laws that disarm, or authorize courts to disarm, individuals who are subject to domestic-violence protective orders. That consensus confirms that the persons subject to Section 922(g)(8) are among those who can permissibly be disarmed because they cannot be trusted with firearms. It also distinguishes Section 922(g)(8) from the outlier laws found unconstitutional in *Heller*, *Bruen*, and *McDonald*. The Supreme Court has recognized that, in cases of domestic violence, firearms pose a grave threat. *See United States v. Hayes*, 555 U.S. 415, 427 (2009) ("Firearms and domestic strife are a potentially deadly combination nationwide."). More than a million acts of domestic violence occur in the United States every year, and the presence of a gun substantially increases the chance that violence will

Opposition to Motion to Dismiss - 25
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

escalate to homicide. *United States v. Castleman*, 572 U.S. 157, 159-160 (2014). "All too often," the Supreme Court has recognized, "the only difference between a battered woman and a dead woman is the presence of a gun." *Id.* at 160 (brackets and citation omitted).

In Section 922(g)(8), Congress responded to that threat by temporarily disarming individuals who are subject to domestic violence protective orders. The overwhelming majority of States have adopted similar laws. Those commonsense measures continue an established tradition of regulations dating to the Founding and before. As those historical regulations show, the right codified in the Second Amendment has never been understood to prevent legislatures from disarming individuals who are not law-abiding, responsible citizens. Section 922(g)(8) is thus entirely consistent with the Second Amendment because DeBorba and others who have been found to pose a threat of domestic violence plainly are not law-abiding, responsible citizens.

### A. The Supreme Court recognizes that Congress may disarm persons who are not law-abiding, responsible citizens

As noted above, *Bruen* described the Second Amendment as applying to "law abiding" people twenty-four times. Similarly in *Heller*, the Supreme Court described the right to bear arms as a "right of law-abiding, responsible citizens." 554 U.S. at 635. The Court also made clear that legislatures may adopt categorical prohibitions on the possession of arms by those who are not law-abiding and responsible, identifying "longstanding prohibitions on the possession of firearms by felons and the mentally ill" as "examples" of "presumptively lawful regulatory measures." *Id.* at 626, 627 n.26. The plurality in *McDonald* similarly observed that the Second Amendment protects "the safety of . . . law-abiding members of the community." 561 U.S. at 790. And it repeated *Heller*'s, "assurances" that the Amendment allows Congress to disarm felons and individuals with mental illnesses. *Id.* at 786.

Opposition to Motion to Dismiss - 26
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

*Bruen* reaffirmed that reading of the Second Amendment, and reiterated *Heller*'s and *McDonald*'s holding that the Amendment protects "the right of an ordinary, law-abiding citizen to possess a handgun in the home." *Bruen*, 142 S. Ct. at 2122. And the Court agreed with the plaintiffs in that case that "ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense." *Ibid*. In all, the Court's opinion used the term "law-abiding, responsible citizens" and its variants more than a dozen times to describe the Second Amendment's scope,[6] and the concurrences reiterated the point.[7]

Many aspects of Second Amendment doctrine rest on the premise that the Amendment protects only law-abiding, responsible citizens. In judging whether a modern firearms regulation is consistent with a historical precursor, a court must ask "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. In judging whether a weapon is dangerous and unusual, a court must consider whether the weapon is "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. And States may require applicants for gun permits to pass background checks and take safety courses because such requirements ensure that those who carry guns "are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9 (citation omitted). Those legal principles all reflect the understanding that the Second Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens.

---

[6] *See Bruen*, 142 S. Ct. at 2125 ("law-abiding, adult citizens"); *id*. at 2131 ("law-abiding, responsible citizens") (citation omitted); *id*. at 2133 ("a law-abiding citizen's right to armed self-defense" and "law-abiding citizens"); *id*. at 2134 ("ordinary, law-abiding, adult citizens"); *id*. at 2135 n.8 ("law-abiding citizens"); *id*. at 2138 ("law-abiding citizens"); *id*. at 2138 n.9 ("law-abiding, responsible citizens" and "ordinary citizens") (citation omitted); *id*. at 2149 ("the responsible") (citation omitted); *id*. at 2150 ("law-abiding citizens" and "responsible arms carrying"); *id*. at 2156 ("law-abiding, responsible citizens" and "law-abiding citizens").

[7] *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) ("law-abiding residents"); *id*. at 2158 ("law-abiding citizens" and "[ordinary citizens"); *id*. at 2159 ("law-abiding person," "right of law-abiding people," "law-abiding New Yorker," and "ordinary person"); *id*. at 2161 ("right of ordinary law-abiding Americans"); *id*. at 2161 (Kavanaugh, J., concurring) ("ordinary, law-abiding citizens") (citation omitted).

Opposition to Motion to Dismiss - 27
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

**B.    History confirms that Congress may disarm persons who are not law-abiding, responsible citizens**

The Second Amendment's history illuminates its meaning. *See Bruen*, 142 S. Ct. at 2128-29. Because the Amendment "codified a right inherited from our English ancestors," a court should begin with English law. *Id*. at 2127 (citation omitted). Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," a court should also consider evidence of how the Founding generation understood the right. *Id*. at 2136 (citation and emphasis omitted). And because evidence of the "public understanding of a legal text in the period after its enactment or ratification" is probative of original meaning, a court should consider how the Second Amendment was understood in the 19th century. *Heller*, 554 U.S. at 605 (emphasis omitted); *see Bruen*, 142 S. Ct. at 2136-38. Historical evidence from each of those eras— before, at, and after the Founding—leads to the same conclusion: Congress may disarm persons who are not law-abiding, responsible citizens.

**1.    The pre-founding era**

Parliament first recognized a legal right to possess arms in the Bill of Rights, 1 W. & M. Sess. II, c. 2 (1688) (Eng.). The Bill recited that King James II, who had been deposed in the Glorious Revolution, had disarmed "severall good subjects being Protestants." *Ibid*. To prevent the repetition of that abuse, the Bill guaranteed that "the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." *Ibid*.

While the Bill of Rights condemned the disarming of "good subjects," it allowed the disarming of irresponsible ones. It thus did not displace the Militia Act of 1662, which authorized local officials to disarm individuals they judged "dangerous to the Peace of the Kingdome." 14 Car. 2, c. 3, § 13 (Eng.). Consistent with the Militia Act, the Crown often directed local officials to disarm those whom it did not trust to use weapons responsibly—for instance, those who had "disturbed the public Peace." That practice

continued after the adoption of the English Bill of Rights. Indeed, many 18th-century justice-of-the-peace manuals recognized that the Militia Act authorized local officials to disarm those they "judge[d] dangerous."[8]

Similarly, the Statute of Northampton made the offense of "rid[ing]" or "go [ing] armed" punishable by forfeiture of the offender's "armor." 2 Edw. 3, c. 3 (1328) (Eng.); *see Bruen*, 142 S. Ct. at 2139-2142. Leading 18th-century scholars agreed that the Statute forbade carrying weapons in a terrifying manner, and that it made violations punishable by forfeiture of the weapons.[9] The Statute thus allowed the government to disarm persons whose conduct revealed their unfitness to carry arms.

The understanding that the government could lawfully disarm irresponsible subjects remained intact at the time of the American Revolution, as one widely discussed episode illustrates. In 1780, London officials reacted to widespread rioting by confiscating the rioters' arms. *See* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 130-31 (1994). The House of Lords debated – and rejected – a motion declaring that the confiscation violated the English Bill of Rights. *See id*. at 131-32. Members defended the confiscation on the ground that it applied only to the "disorderly" "mob," not to "sober citizens" or "citizens of character."[10] The press similarly distinguished "the riotous mob" from "citizens of character."[11] And private

---

[8] Robert Gardiner, *The Compleat Constable* 68 (3d ed. 1708*); see, e.g.*, Giles Jacob, *The Modern Justice* 338 (1716); W. Nelson, *The Office and Authority of a Justice of Peace* 464 (7th ed. 1721); G. Jacob, *Lex Constitutionis* 331 (2d ed. 1737); Theodore Barlow, *The Justice of Peace* 367 (1745); 2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward-Officer* 231 (6th ed. 1756).

[9] *See, e.g.*, 4 William Blackstone, *Commentaries on the Laws of England* 149 (10th ed. 1787); 1 Richard Burn, *The Justice of the Peace, and Parish Officer* 13-14 (2d ed. 1756); 1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (1716).

[10] *See, e.g.*, 21 *The Parliamentary History of England, from The Earliest Period to the Year 1803*, at 691 (T.C. Hansard 1814) (speech of Lord Amherst) (June 19, 1780) (defending disarmament of the "mob"); *id*. at 730-731 (June 21, 1780) (speech of Lord Stormont) (distinguishing "disorderly" persons from "sober citizen[s]").

[11] 49 *The London Magazine or Gentleman's Monthly Intelligencer* 518 (Nov. 1780); *see, e.g.*, 42 *The Scots Magazine* 419 (Aug. 1780) (distinguishing "suspicious persons" from "reputable citizens").

Opposition to Motion to Dismiss - 29
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

groups that supported the right to bear arms warned that the confiscation did not set a precedent for disarming "peaceable Subjects."[12]

In short, although the English Bill of Rights secured a right to possess arms, the government could (and did) disarm those who could not be trusted to use arms lawfully and responsibly. Because the English right "has long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593, that background strongly suggests that the Second Amendment likewise allows Congress to disarm individuals who are not law-abiding, responsible citizens.

### 2.    The founding era

Many precursors to the Second Amendment described the class of persons entitled to keep and bear arms using synonyms for "law-abiding, responsible citizens." In 1780, for example, the town of Williamsburg proposed amending the newly drafted Massachusetts constitution to provide that "the people have a right to keep and bear Arms for their Own and the Common defence." *The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780*, at 624 (Oscar Handlin & Mary Handlin eds., 1966). The town explained: "we esteem it an essential priviledge to keep Arms in Our houses for Our Own Defence and *while we Continue honest and Law-full Subjects of Government* we Ought Never to be deprived of them." *Ibid.* (emphasis added).

Anti-Federalists expressed a similar understanding of the right at Pennsylvania's ratifying convention. They proposed a bill of rights that, among other things, forbade "disarming the people, or any of them, *unless for crimes committed, or real danger of public injury from individuals*." 2 *The Documentary History of the Ratification of the Constitution (Documentary History)* 598 (Merrill Jensen ed., 1976) (emphasis added).

---

[12] *See* 2 *The Remembrancer; or, Impartial Repository of Public Events, for the Year 1780*, at 139 (1780) (resolutions adopted in York); 1 *The Remembrancer; or Impartial Repository of Public Events, for the Year 1781*, at 24 (1780) (resolutions adopted in Middlesex); *id.* at 112 (resolutions adopted in Huntingdonshire).

Opposition to Motion to Dismiss - 30
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253-428-3800

The Federalists defeated the proposal, but the Anti-Federalists published it in the Dissent of the Minority of the Convention, *id.* at 624, which was widely read and proved "highly influential," *Heller*, 554 U.S. at 604. A contemporary commentator, discussing the proposal, agreed that Congress should have the power to disarm individuals who posed a "real danger of public injury." Nicholas Collin, *Remarks on the Amendments to the Federal Constitution…by a Foreign Spectator*, No. 11 (Nov. 28, 1788), in *Three Neglected Pieces of the Documentary History of the Constitution and Bill of Rights* 40 (Stanton D. Krauss ed., 2019).

At the Massachusetts ratifying convention, Samuel Adams similarly proposed a bill of rights that would have denied Congress the power "to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 6 *Documentary History* 1453 (John P. Kaminski & Gaspare J. Saladino eds., 2000) (emphasis added). A contemporary described the proposal as an effort to protect "the right of *peaceable citizens* to bear arms." Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), in 7 *Documentary History* 1583 (John P. Kaminski & Gaspare J. Saladino eds., 2001) (emphasis added). The convention rejected the proposal, but only because Adams had waited until the morning of the day of ratification to present it. *Ibid*.

Although those precursors used different language from the Second Amendment, they shed light on the Amendment's meaning. *See Heller*, 554 U.S. at 604 (relying on the "minority proposal in Pennsylvania" and "Samuel Adams' proposal"). The Amendment codified a "pre-existing," "venerable," and "widely understood" right, making it unlikely that "different people of the founding period had vastly different conceptions" of its scope. *Id*. at 603-605. The precursors discussed above reveal a common conception that the government may disarm those who are not law-abiding, responsible citizens.

### 3. Post-founding

Antebellum commentators shared the Founding generation's understanding of the Second Amendment's scope. Not every commentator who discussed the right specifically

Opposition to Motion to Dismiss - 31
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253-428-3800

addressed the government's power to disarm certain individuals—just as not every commentator specifically discussed its power to prohibit dangerous and unusual weapons or to bar carrying weapons in sensitive places. But the commentators that did address the issue confirmed that the government may disarm those who are not responsible or law-abiding.

For example, John Holmes, a legal scholar from Maine, interpreted the Second Amendment and its state counterpart to mean that a "free citizen, *if he demeans himself peaceably*, is not to be disarmed." John Holmes, *The Statesman, or Principles of Legislation and Law* 186 (1840) (emphasis added). "Thus are the rights of self defence guarded and secured," he added, "to every one *who entitles himself by his demeanor* to the protection of his country." *Ibid.* (emphasis added). A state convention in Rhode Island resolved that the Second Amendment forbade "taking from peaceable citizens their arms." *State Convention of the Suffrage men of Rhode Island*, Vermont Gazette, Dec. 13, 1842, at 1. And Joseph Gales, a mayor of Washington, D.C., recognized the right of a "peaceable citizen" to bear arms, but asked rhetorically, "why should not the lawless ruffian be disarmed and deprived of the power of executing the promptings of his depraved passions?" Joseph Gales, *Prevention of Crime*, in O.H. Smith, *Early Indiana Trials and Sketches* 466-67 (1858).

Opponents of slavery voiced similar views during the Bleeding Kansas conflict of the mid-1850s. On the one hand, they supported disarming groups responsible for violence in Kansas. Senator (and future Vice President) Henry Wilson, for instance, complained that "armed bandits" were "violating law, order, and peace," and called for legislation "to disarm any armed bands, from the slave States or the free States, who enter the Territory for unlawful purposes." Cong. Globe App., 34th Cong., 1st Sess., 1090 (Aug. 7, 1856). Senator Benjamin Wade likewise called on Congress to "[d]isarm these lawless bands." *Id.* at 1091. On the other hand, opponents of slavery criticized Kansas

Opposition to Motion to Dismiss - 32
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

1   authorities for disarming "peaceable" free-state settlers.[13] A petition published in William

2   Lloyd Garrison's newspaper even urged the impeachment of President Pierce for his

3   efforts to disarm "peaceable citizens." A.J. Grover, *Impeachment of Franklin Pierce*

4   (Aug. 1, 1856), in The Liberator, Aug. 22, 1856, at 140.

5         Sources from during the Civil War reflect the same understanding. In 1863, a

6   Union general ordered that "all loyal and peaceable citizens in Missouri will be permitted

7   to bear arms." Hdqrs. Dep't of the Missouri, General Orders, No. 86 (Aug. 25, 1863), in

8   *The War of the Rebellion: A Compilation of the Official Records of the Union and*

9   *Confederate Armies*, ser. 1, vol. 22, pt. 2, at 475 (1888). A war memoir recounted a

10  Union soldier's belief that "it was unconstitutional to disarm peac[e]able citizens."

11  *Chickasaw, The Scout*, in R.W. Surby, *Grierson Raids* 253 (1865). And after the war,

12  Senator Henry Wilson defended Congress's "power to disarm ruffians or traitors, or men

13  who are committing outrages against law or the rights of men." Cong. Globe, 39th Cong.,

14  1st Sess. 915 (1866).

15        As Reconstruction began, many southern States sought to disarm Black citizens,

16  prompting "an outpouring of discussion" about the right to keep and bear arms. *Heller*,

17  554 U.S. at 614. Participants in that discussion affirmed the right to possess arms for self-

18  defense, yet cautioned that the right protected only "peaceable" or "well-disposed"

19  citizens. In Georgia, for example, the Freedmen's Bureau issued a circular explaining that

20  "[a]ll men, without distinction of color, have the right to keep arms," but that "[a]ny

21  person, white or black, may be disarmed if convicted of making an improper and

22  dangerous use of arms." H.R. Exec. Doc. No. 70,39th Cong., 1st Sess. 65 (1866). The

23  Bureau also recognized that the "freedmen of South Carolina have shown by their

24

_____

25  [13] *See, e.g.*, New-York Daily Tribune, Oct. 2, 1856, at 4 ("When [a Kansas official] entered the houses of peaceable
    citizens and demanded that they should deliver up their arms, he *** violated one of those provisions of the

26  Constitution which a free people should guard with the most jealous care."); *High-Handed Outrage in Kansas*,
    Holmes County Republican, Oct. 30, 1856, at 1 (denouncing the disarmament of "[pjeaceable American [c]itizens"

27  in Kansas as a violation of their "constitutional rights").

Opposition to Motion to Dismiss - 33
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

peaceful conduct that they can safely be trusted with fire-arms." H.R. Rep. No. 30, 39th Cong., 1st Sess. Pt. II, 229 (1866). And a Reconstruction order guaranteed the "constitutional rights of all loyal and well-disposed inhabitants" in South Carolina, but added that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. at 908-909.

Commentators continued to interpret the Second Amendment the same way later in the century. One newspaper article argued that "pistols cannot safely be committed to every irresponsible hand," that the Constitution does not protect "the right of every drunken loafer to bear about in his pocket the implements of murder," and that the right instead belongs only to those "whom it was safe to trust with firearms." *The Sale of Pistols*, New York Times, June 22, 1874, at 4. Another article referred to the "constitutional right of every peaceable citizen to carry arms for his own defense." *Kansas Legislature: Some Criticisms on Pending Bills*, The Topeka Daily Capital, Feb. 2, 1883, at 6.

All in all, post-ratification sources point in the same direction as English and Founding Era sources. Although different commentators used different terms — "peaceable," "well-disposed," and so on — they recognized that a legislature could disarm those who were not law-abiding, responsible citizens.

### C.    The Nation has a long tradition of disarming persons who are not law-abiding, responsible citizens

"[T]his Nation's historical tradition of firearm regulation" further illuminates the Second Amendment's scope. *Bruen*, 142 S. Ct. at 2126. And the United States has a longstanding tradition, dating to colonial times and continuing to the present, of disarming persons whom legislatures have found are not law-abiding, responsible citizens.

Most relevant here, early American legislatures denied arms to classes of individuals considered unfit to possess them. When the Revolutionary War began, for

Opposition to Motion to Dismiss - 34
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

1    example, the Continental Congress recommended, and most States enacted, laws

2    disarming loyalists and others who refused to swear allegiance to the new Republic.[14]

3    Similarly, after putting down Shays' Rebellion in 1787, Massachusetts required the

4    rebels, as a condition of being pardoned, to surrender their arms, which would be

5    returned to them after three years if they kept the peace.[15]

6         Colonies and early States also punished irresponsible use of arms with forfeiture

7    of the arms. Early American justice-of-the-peace manuals explained that the Statute of

8    Northampton—which the colonies inherited along with other pre-colonization statutes,

9    *see Patterson v. Winn*, 5 Pet. 233, 241 (1831)—empowered justices of the peace to

10   confiscate the arms of persons who carried them in a manner that spread fear or terror.[16]

11   Some 17th- and 18th-century American statutes expressly recodified that rule.[17] Others

12   made forfeiture part of the penalty for offenses such as unsafe storage of guns or

13   gunpowder.[18] Although those laws involved forfeiture of arms involved in an offense,

14   rather than bans on possessing arms, they show that legislatures could restrict an

15

---

16   [14] *See* 4 *Journals of the Continental Congress* 1774-1789, at 205 (Worthington Chauncey Ford ed., 1906) (Mar. 14,
17   1776); Act of Dec. 1775, *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, inclusive*
     193 (Charles J. Hoadly ed., 1890); Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General Assembly of the State of*
18   *New-Jersey* 90 (1777); Act of 1777, ch. 6, § 9, 24 *The State Records of North Carolina* 89 (Walter Clark ed., 1905);
     Act of May 1, 1776, ch. 21, § 2, 5 *Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* 480
19   (1886); Resolves of Apr. 6, 1776, 8 *The Statutes at Large of Pennsylvania from 1682-1801*, at 559-561 (1902); Act
     of 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (John Russell
20   Bartlett ed., 1862); Act of May 1777, ch. 3, 9 *The Statutes at Large: Being a Collection of All the Laws of Virginia,
     from the First Session of the Legislature, in the Year 1619*, at 282 (William Waller Hening ed., 1821).
     [15] *See* Act of Feb. 16, 1787, §§ 1-3, 1 *Private and Special Statutes of the Commonwealth of Massachusetts* 145-147
21   (1805).
     [16] *See, e.g.*, James Davis, *The Office and Authority of a Justice of Peace* 5 (1774) (N.C.); Joseph Greenleaf, *An*
22   *Abridgment of Burn's Justice of the Peace and Parish Officer* 12-13 (1773) (Mass.); William Waller Hening, *The
     New Virginia Justice* 18 (1795) (Va.); Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22-24 (2d ed.
23   1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor Generalis* 12 (Robert
     Hodge printing 1788) (N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.).
     [17] *See* Act of Nov. 1, 1692, ch. 18, § 6, 1 A*cts and Resolves of the Province of Massachusetts Bay* 52-53 (1869); Act
24   of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor ed., 1904); Act of Nov. 27, 1786,
     ch. 21, *A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are
25   now in Force* 33 (1794).
     [18] *See* Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890); Act of Feb. 18, 1794, § 1, *The Laws of the State
26   of New Hampshire* 460 (1815); Ordinance of Oct. 9, 1652, *Laws and Ordinances of New Netherland*, 1638-1674, at
     138 (E.B. O'Callaghan ed., 1868); Act of Mar. 15, 1788, ch. 81, §1, 2 *Laws of the State of New-York*, 95-96 (2d ed.
27   1807); Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 209-210
     (1906).

Opposition to Motion to Dismiss - 35
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253-428-3800

individual's ability to bear arms if his conduct suggested that he would not use them responsibly.

A few decades later, States began to adopt surety statutes that required certain potentially irresponsible individuals who carried firearms to post bond. *See Bruen*, 142 S. Ct. at 2148. The earliest such statute, enacted by Massachusetts, required a gun owner to post bond if his conduct created "reasonable cause to fear an injury, or breach of the peace," and if he lacked a special need for self-defense. Mass. Rev. Stat. ch. 134, § 16 (1836). At least nine other jurisdictions adopted variants of that law later in the 19th century. *See Bruen*, 142 S. Ct. at 2148 n.23 (collecting statutes). Those laws, too, confirm that irresponsible individuals were subject to special restrictions that did not (indeed, could not) apply to ordinary, law-abiding citizens. *See id.* at 2122 (holding a proper-cause requirement unconstitutional as applied to ordinary citizens).

Continuing in the 19th century, as guns became more lethal and more widely available, *see* pp. 48-49, *infra*, legislatures disarmed a range of individuals whom they deemed unfit to carry firearms. At least 29 jurisdictions banned or restricted the sale of firearms to, or the possession of firearms by, individuals below specified ages.[19] Several States banned the sale of guns to persons of unsound mind.[20] At least a dozen States

---

[19] *See* Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.); Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17; Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881); Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112; Act of Apr. 16, 1881, §2, 1881 Ill. Laws 73; Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59; Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873); Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39; Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656; Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51; Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14; Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556; Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468; Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80; Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112; Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157; Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92; Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221; Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83; Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67; Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140.

[20] *See* Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21.

---

disarmed "tramps"—that is, vagrants.[21] Some States forbade intoxicated persons from buying or carrying guns.[22] One State forbade the carrying of arms by "any person who has ever borne arms against the government of the United States."[23] Another disarmed certain individuals in identified categories if they were "not known to be peaceable and quiet persons."[24]

State courts upheld such laws on the ground that the disqualified individuals were apt to use arms irresponsibly. The Missouri Supreme Court, for example, upheld a ban on carrying arms while intoxicated as a "reasonable regulation" that prevented the "mischief to be apprehended from an intoxicated person going abroad with fire-arms." *State v. Shelby*, 2 S.W. 468, 469 (1886). And the Ohio Supreme Court explained that a law disarming "tramps" was consistent with the right to keep and bear arms because that right "was never intended as a warrant for vicious persons to carry weapons with which to terrorize others." *State v. Hogan*, 58 N.E. 572, 575 (1900).

The tradition of disarming unfit persons continued into the 20th century. In the 1930s, Congress disqualified violent criminals, fugitives from justice, and persons under felony indictment. *See* Federal Firearms Act, ch. 850, § 2(d)-(f), 52 Stat. 1251. In the 1960s, Congress disqualified felons in general, drug users and addicts, and persons with mental illnesses. *See* Act of Oct. 3, 1961, Pub. L. No. 87-342, §§ 1-2, 75 Stat. 757; Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1220. In the 1980s, Congress

---

[21] *See* Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394; Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879); Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69; Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232; Miss. Rev. Code ch. 77, § 2964 (1880); Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170; Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297; Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355; Act of June 12, 1879, § 2, 1879 Ohio Laws 192; Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30; Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274.

[22] *See* Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Apr. 3, 1883, ch. 329, § 3, 1883 Wis. Sess. Laws, Vol. 1, at 290.

[23] *See* Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25.

[24] *See* Act of Apr. 30, 1855, §§ 1-2, in 2 *The General Laws of the State of California, from 1850 to 1864, inclusive* 1076-1077 (Theodore H. Hitchell ed., 1865).

Opposition to Motion to Dismiss - 37
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

disqualified noncitizens who are unlawfully present in the United States and persons who have been dishonorably discharged from the Armed Forces. *See* Firearms Owners' Protection Act, Pub. L. No. 99-308, § 102(5)(D), 100 Stat. 452. And in the 1990s, Congress disarmed persons subject to domestic-violence protective orders, *see* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 110401(c), 108 Stat. 2014, and domestic-violence misdemeanants, *see* Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, Div. A, Tit. I, Sec. 101(f) [tit. VI, § 658(b)(2)], 110 Stat. 3009-372. That series of statutes reflects Congress's longstanding judgment that "firearms must be kept away from persons…who might be expected to misuse them." *Dickerson v. New Banner Institute, Inc*., 460 U.S. 103, 119 (1983).

In short, from the earliest days of the Republic to modern times, legislatures have disarmed individuals who could not be trusted with firearms. Different legislatures have disarmed different groups at different times: loyalists and rebels in the 18th century; under-age individuals and persons of unsound mind in the 19th century; and felons, drug addicts, and domestic abusers in the 20th century. But those disqualifications all reflect the same enduring principle: The Second Amendment allows Congress to disarm individuals who are not law-abiding, responsible citizens.

## V.    Section 922(g)(8) Does not Violate the Second Amendment

### A.    Individuals subject to domestic-violence protective orders are in the category of dangerous persons whom Congress may deny firearms

As explained above, Congress's power to disarm those who are "dangerous" or not "responsible" is part of the Nation's historical tradition: English law allowed the disarmament of dangerous individuals, *see* pp. 28-29, *supra*; an influential Second Amendment precursor contemplated the disarmament of individuals who posed a "real danger of public injury," *see* pp. 30-31, *supra*; 19th century sources recognized legislatures' power to disarm individuals whose possession of arms would endanger the public, *see* pp. 32-34, *supra*; and American legislatures have been disarming such

Opposition to Motion to Dismiss - 38
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

individuals since the 17th century, *see* pp. 34-38, *supra*. Members of the Supreme Court have also recognized that, whatever the outer limits of Congress's power to disqualify categories of persons from possessing arms, Congress may at a minimum disarm "dangerous individuals," *NYSRPA v. City of New York*, 140 S. Ct. 1525, 1541 (2020) (Alito, J., dissenting), or individuals "who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety," *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting).

In exercising that authority, Congress need not require case-by-case findings of dangerousness like those required by Section 922(g)(8). Congress may make categorical judgments about responsibility; "[t]hat *some* categorical limits are proper is part of the original meaning" of the Second Amendment. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc), cert. denied, 562 U.S. 1303 (2011). Congress also may disarm persons who are not law-abiding, or, as explained above, who are not citizens. *See, e.g.*, 18 U.S.C. 922(g)(1) (felons); 18 U.S.C. 922(g)(5) (noncitizens who are present in the United States unlawfully). This Court, however, need not determine the full scope of the "law-abiding, responsible citizens" principle to resolve DeBorba's challenge to Section 922(g)(8). The Court need only hold that a person is not responsible and thus may be disarmed if his possession of a firearm would endanger himself or others.

Judged by that standard, Section 922(g)(8) complies with the Second Amendment. Because persons who are subject to domestic-violence protective orders pose an obvious danger to others, they are not "responsible" individuals, and the Second Amendment allows Congress to disarm them. *See, e.g.*, *United States v. Boyd*, 999 F.3d 171, 186 (3d Cir.), cert. denied, 142 S. Ct. 511 (2021) (holding persons subject to domestic-violence protective orders are indistinguishable from a class of presumptively dangerous persons historically excluded from Second Amendment protections); *United States v. Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011) ("Insofar as § 922(g)(8) prohibits possession of firearms by those who are found to represent 'a credible threat to the physical safety of [an]

Opposition to Motion to Dismiss - 39
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

1    intimate partner or child,' 18 U.S.C. § 922(g)(8)(C)(i), it is consistent with a common-

2    law tradition that the right to bear arms is limited to peaceable or virtuous citizens.").

3         Post-*Bruen* Ninth Circuit precedent likewise supports that conclusion. *See United*

4    *States v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023). Applying *Bruen*, the Court rejected a

5    Second Amendment challenge to the constitutionality of a U.S. Sentencing Guidelines

6    provision that enhances a defendant's sentence if he possesses a dangerous weapon at the

7    time of a felony drug offense. *Id*. at 1129–30. The Court explained that while the

8    challenged firearm restriction was part of the Sentencing Guidelines—a modern

9    invention with no exact historical twin—it fit within a long tradition of regulations

10   designed to disarm dangerous people. *Id.* at 1129–30. It was a kind of gun regulation, the

11   Court said, "that the Founders would have tolerated." *Id.* at 1130 (citing *Bruen*, 142 S. Ct.

12   at 2132). Like the Guidelines provision at issue in *Alaniz*, Section 922(g)(8) is a

13   restriction that the founders would have accepted as lawful.

14        Individuals subject to the protective orders covered by Section 922(g)(8) pose a

15   grave danger to others. Most obviously, their possession of firearms imperils their

16   intimate partners. "Domestic violence often escalates in severity over time," and "the

17   presence of a firearm increases the likelihood that it will escalate to homicide."

18   *Castleman*, 572 U.S. at 160. The presence of a gun in a household with a domestic abuser

19   increases the risk of homicide fivefold. Aaron J. Kivisto & Megan Porter, *Firearm Use*

20   *Increases Risk of Multiple Victims in Domestic Homicides*, 48 J. Am. Acad. Psychiatry L.

21   26, 26 (2020). And domestic assaults with guns are around 12 times likelier to cause

22   death than assaults without guns. *See* Anthony A. Braga et al, *Firearm Instrumentality:*

23   *Do Guns Make Violent Situations More Lethal*, 2021 Ann. Rev. Criminology 147, 153.

24        Armed domestic abusers pose additional dangers. Abusers often use guns to

25   intimidate their partners—for instance, by brandishing or firing guns during arguments.

26   *See* Andrew R. Klein, Nat'l Inst. of Justice, Office of Justice Programs, U.S. Dep't of

27   Justice, *Special Report, Practical Implications of Current Domestic Violence Research:*

Opposition to Motion to Dismiss - 40
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

*For Law Enforcement, Prosecutors and Judges* 26 (June 2009). Abusers also use guns to threaten, pistol-whip, and shoot their partners or their partners' children, relatives, and pets. *See* Avanti Ad-hia et al., Nonfatal use of firearms in intimate partner violence: Results of a national survey, 147 Prev. Med. 106,500, at 2, 5 (June 2021). Such tactics enable abusers to cause acute physical harm, to "degrade, isolate, and control" their partners, and to perpetuate their pattern of abuse. *Id*. at 2 (citation omitted).

Those concerns apply with particular force to cases involving protective orders. Victims who seek judicial protection are likely to have experienced especially severe abuse. *See* TK Logan et al., *Relationship Characteristics and Protective Orders Among a Diverse Sample of Women*, 22 J. Fam. Violence 237, 241 (2007). They are likelier than other victims to report that their abusers used guns to threaten, pistol-whip, or shoot them. *See* Kellie R. Lynch et al., *Firearm-related Abuse and Protective Order Requests Among Intimate Partner Violence Victims*, 37 J. Interp. Violence 12,974, 12,984 (2021).

Nor does the entry of a protective order guarantee the end of the abuse. Domestic abuse has a high recidivism rate, *see Skoien*, 614 F.3d at 644, and abusers often persist in their abuse despite protective orders—a point illustrated by this case, *see* Reinie Cordier et al., *The Effectiveness of Protection Orders in Reducing Recidivism in Domestic Violence: A Systematic Review and Meta-Analysis*, 22 Trauma, Violence, & Abuse 804, 825 (2021). A victim's decision to obtain an order can even prompt violent retaliation. *See* Tom Lininger, *A Better Way to Disarm Batterers*, 54 Hast. L.J. 525, 567 (Mar. 2003).

Armed domestic abusers also endanger people other than their partners. In around a quarter of the cases where an abuser killed an intimate partner, the abuser also killed someone else, such as a child, family member, or roommate. *See* Sharon G. Smith et al., *Intimate Partner Homicide and Corollary Victims in 16 States: National Violent Death Reporting System, 2003-2009*, 104 Am. J. Pub. Health 461, 463-464 (Mar. 2014). Some of those additional victims tried to intervene; others were in the wrong place at the wrong time. *Id*. at 464. Deprived of their victims, moreover, persons subject to protective orders

Opposition to Motion to Dismiss - 41
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

often go on to abuse other intimate partners or family members. *See* Klein 18. One study found that more than 40% of individuals arrested for violating a protective order abused more than one victim. *Ibid*.

Armed domestic abusers endanger the police too. One study found that domestic disputes were "the most dangerous type of call for responding officers," causing more officer deaths in the line of duty than any other type of call. Nick Bruel & Mike Keith, *Deadly Calls and Fatal Encounters: Analysis of U.S. law enforcement line of duty deaths when officers responded to dispatched calls for service and conducted enforcement, 2010-2014*, at 15 (2016). In almost all of those cases, the responding officers were killed with a gun. *Ibid*.

Finally, armed domestic abusers endanger the public at large. In more than two-thirds of the mass shootings that occurred from 2014 to 2019, the shooter either had a history of domestic violence or fired at a partner or family member as part of the shooting. Lisa B. Geller et al., *The role of domestic violence in fatal mass shootings in the United States, 2014.-2019*, 8 Injury Epidemiology 38, at 5 (2021).

In response to this danger, the overwhelming majority of States and territories have restricted gun possession by persons subject to protective orders. At least 32 jurisdictions disarm persons subject to orders that satisfy specified criteria.[25] Statutes in at least 16 more jurisdictions specifically permit, or have been read by appellate courts to permit, the imposition of a firearm disqualification as part of a protective order.[26] That

---

[25] *See* Ala. Code § 13A-11-72(a); Cal. Fam. Code § 6389(a); Colo. Rev. Stat. § 13-14-105.5(1)(a); Conn. Gen. Stat. § 53a-217(a)(4); D.C. Code § 16-1004(h)(2); Fla. Stat. § 790.233(1); Haw. Rev. Stat. § 134-7(f); 430 Ill. Comp. Stat. 65/8.2; Iowa Code 724.26(2)(a); Kan. Stat. Ann. § 21-6301(a)(17); La. Rev. Stat. Ann. § 46:2136.3(A); Me. Rev. Stat. Ann. tit. 15, § 393(1)(D); Md. Code Ann. Pub. Safety § 5-133(b)(12); Mass. Gen. Laws ch. 140, § 129B(1)(vii); Minn. Stat. § 624.713, subdiv. 1(13); N.H. Rev. Stat. Ann. § 173-B:5(II); N.J. Rev. Stat. § 2C:25-29(b); N.M. Stat. Ann. § 30-7-16.D; N.Y. Crim. Proc. Law § 530.14(2); Or. Rev. Stat. 166.255(1) (a); 23 Pa. Cons. Stat. Ann. § 6108(a.1)(1); P.R. Laws Ann. tit. 8, § 621; R.I. Gen. Laws § 11-47-5(b); S.C. Code Ann. § 16-25-30(A)(4); Tenn. Code Ann. § 39-13-113(h)(1); Tex. Fam. Code Ann. § 85.022(d); Utah Code Ann. § 76-10-503(b)(xi); Va. Code Ann. § 18.2-308.1:4(A); V.I. Code Ann. tit. 23, § 456a(a)(8); Wash. Rev. Code § 9.41.040(2)(a)(iv); W. Va. Code Ann. § 61-7-7(7); Wis. Stat. § 813.12(4m)(a).

[26] *See* Alaska Stat. 18.66.100(c)(6)-(7); Am. Samoa Code Ann. § 47.0204(b)(5) and (c)(1); Ariz. Rev. Stat. Ann. § 13-3602(G)(4); Del. Code Ann. tit. 10, § 1045(a)(8); Ind. Code § 34-26-5-9(d)(4); Mich. Comp. Laws Ann.

Opposition to Motion to Dismiss - 42
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

1   adds up to at least 48 jurisdictions that restrict gun possession by persons subject to

2   protective orders or permit courts to impose such restrictions. This legislative consensus

3   confirms that persons subject to protective orders are not, in fact, among the law-abiding,

4   responsible citizens protected from disarmament by the Second Amendment. Modern

5   evidence, to be sure, "does not provide insight into the meaning of the Second

6   Amendment when it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154 n.28. But the

7   modern laws discussed above do not contradict earlier evidence; rather, they continue the

8   Nation's long tradition of disarming irresponsible citizens.

9       The ubiquity of those restrictions also distinguishes Section 922(g)(8) from the

10  handgun bans found unconstitutional in *Heller* and *McDonald*, and the may-issue

11  licensing regime found unconstitutional in *Bruen*. *See Bruen*, 142 S. Ct. at 2123;

12  *McDonald*, 561 U.S. at 750; *Heller*, 554 U.S. at 628-29. The handgun bans in *Heller* and

13  *McDonald* were "extreme outlier[s]; only a few jurisdictions in the entire country had

14  similar laws." *Bruen*, 142 S. Ct. at 2160 (Alito, J., concurring). The licensing regime in

15  *Bruen* was likewise an "outlier"; only six States had similar laws. *Id*. at 2161

16  (Kavanaugh, J., concurring). Laws like Section 922(g)(8), in contrast, are common

17  throughout the Nation.

18      In sum, DeBorba and other persons subject to domestic-violence protective orders

19  fall squarely within the category of irresponsible individuals whom the Second

20  Amendment has always allowed Congress to disarm. As a member of Congress

21  remarked, "if you are not responsible enough to keep from doing harm to your spouse or

22  your children, then society does not deem you responsible enough to own a gun." *No

23  Guns for Abusers*, Wash. Post., Nov. 6, 1993, at A24 (quoting Rep. Robert Torricelli).

24  _____

25  § 600.2950(1)(e); Mont. Code Ann. § 40-15-201(f); Neb. Rev. Stat. § 42-924(1)(a)(vii); Nev. Rev. Stat. Ann.
    33.0305(1); N.C. Gen. Stat. § 14-269.8(a); N.D. Cent. Code § 14.07.1-02.4.g; 8 N. Mar. I. Code § 1916(b)(5) and

26  (c)(1); S.D. Codified Laws § 25-10-24; Vt. Stat. Ann. tit. 15, § 1104(a)(1)(E); *Chouk v. Chouk*, No. 2022-CA-1193-
    ME, 2023 WL 2193405, at *1 (Ky. Ct. App. Feb. 24, 2023) (citing Ky. Rev. Stat. Ann. § 403.740(1)(c)); *Clementz-

27  McBeth v. Craft*, No. 2-11-16, 2012 WL 776851, at *5-*7 (Ohio Ct. App. Mar. 12, 2012) (citing Ohio Rev. Code
    Ann. § 3113.31).

Opposition to Motion to Dismiss - 43
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

**B.      Section 922(g)(8)'s strict requirements confirm its constitutionality**

A protective order triggers disarmament under Section 922(g)(8) only if it satisfies stringent requirements, which confine the statute to the most dangerous domestic abusers and guard against the risk of inadvertently disarming law-abiding, responsible citizens.

First, a protective order disqualifies a person from possessing guns only if it restrains him from "harassing, stalking, or threatening" an intimate partner or child, or from "engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child." 18 U.S.C. § 922(g)(8)(B). That requirement limits Section 922(g)(8) to the domestic-violence context, in which guns pose a particularly serious threat.

Second, a protective order can result in disarmament only if it satisfies at least one of the two conditions listed in Section 922(g)(8)(C) (and here the order satisfied both, see pp. 4-5, *supra*). Under the first condition, Section 922(g)(8) applies if the order includes a finding that the person "represents a credible threat to the physical safety" of the intimate partner or child. 18 U.S.C. § 922(g)(8)(C)(i). If a court has found that a person poses a "credible threat" to someone else's "physical safety," that person, by definition, is not a responsible citizen.

Section 922(g)(8) also applies if the order "by its terms explicitly prohibits the use, attempted use, or threatened use of physical force" that "would reasonably be expected to cause bodily injury." 18 U.S.C. § 922(g)(8)(C)(ii). Congress reasonably determined that a court would specifically forbid "physical force" only if it perceived a real danger that the person would, in fact, use such force. Under traditional equitable principles, after all, courts do not grant injunctive relief to address "an unfounded fear" or a "possibility of some remote future injury." 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1, at 139, 141 (2013). Rather, courts grant such relief only to address "a likelihood [of] irreparable harm" or a "presently existing actual threat." *Id*. at 138, 141.

Opposition to Motion to Dismiss - 44
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

Third, Section 922(g)(8) applies only if a court issued the order after giving the person "actual notice" and "a hearing." 18 U.S.C. § 922(g)(8)(A). Those safeguards ensure that individuals receive a fair opportunity to respond to the allegations against them before they are disarmed. The requirement of notice and a hearing also minimizes the risk that law-abiding, responsible citizens will lose their ability to possess guns because of erroneous orders.

Finally, Section 922(g)(8) prohibits someone from possessing guns only if he "*is* subject to" a protective order. 18 U.S.C. § 922(g)(8) (emphasis added). The prohibition ends when the order expires. In this case, for instance, the various domestic-violence protective orders issued against DeBorba (which were issued in three separate cases in total) each had explicit expiration dates, so the resulting disqualification under Section 922(g)(8) was time-limited.

### C.    DeBorba's contrary arguments lack merit

#### 1.    Congress may disarm persons subject to protective orders even if they are among "the people"

Relying on a Fifth Circuit case for which certiorari has been granted by the Supreme Court, DeBorba argues that the Second Amendment prohibits the disarming of persons subject to domestic-violence protective orders. Dkt. 36 at pp. 20-21, 39-42 (citing *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), cert. granted, 143 S. Ct. 2688 (2023)). But apart from the opinion having no precedential value due to the Supreme Court's grant of review, *Rahimi* is not persuasive, as our nation's history and legal traditions have always allowed for Congress to make judgments as to who is too dangerous to be trusted with firearms.

The Bill of Rights secures rights "inherited from our English ancestors, and which had from time immemorial been subject to certain well-recognized exceptions." *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897). "In incorporating these principles into the fundamental law there was no intention of disregarding the exceptions, which

continued to be recognized as if they had been formally expressed." *Ibid*. The First
Amendment, for example, allows legislatures to ban true threats, even though a threat is a
form of "speech." *See Counterman v. Colorado*, 143 S. Ct. 2106, 2114 (2023). And the
Second Amendment allows legislatures to ban dangerous and unusual weapons, such as
short-barreled shotguns, even though they are "arms." *See Heller*, 554 U.S. at 624-25. So
too, history and tradition establish that the Second Amendment allows legislatures to
disarm persons who are not law-abiding, responsible citizens, regardless of whether they
are among "the people."

      The Fifth Circuit in *Rahimi* claimed that the government's reading lacks a
"limiting principle" and would allow Congress to disarm "speeders" or those "who do not
recycle." 61 F.4th at 453. But the "law-abiding, responsible citizens" principle no more
allows Congress to disarm anyone it pleases than the sensitive-places doctrine allows
Congress to ban guns anywhere it pleases. *See Bruen*, 142 S. Ct. at 2133. Rather, the
Supreme Court's references to "law-abiding" and "responsible" citizens reflect the
Second Amendment's history and tradition and exclude only criminals and individuals
whose possession of firearms would endanger themselves or others (such as underage
individuals, persons with mental illnesses, drug users, and persons subject to protective
orders). And it trivializes the profound harms of domestic violence to liken disarming
domestic abusers to disarming "speeders" or those "who do not recycle."

### 2. Congress may disarm persons subject to protective orders even if the Founders did not

      The lack of laws targeting firearms possession by those who commit domestic
violence regulation at the time of the Nation's founding (*see* dkt. 36 at pp.38-39) does not
support invalidation of Section 922(g)(8). The Supreme Court's precedents make clear
that a modern regulation can comply with the Second Amendment even if it lacks "a
historical twin." *Bruen*, 142 S. Ct. at 2133 (emphasis omitted). For example, the
Amendment allows Congress to disarm felons, *see Heller*, 554 U.S. at 626, even though

Opposition to Motion to Dismiss - 46
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

1    the first federal law disarming felons dates to 1938, see p. 37, *supra*. And although "the

2    historical record yields relatively few 18th- and 19th-century 'sensitive places'"—for

3    example, "legislative assemblies, polling places, and courthouses"—the Amendment

4    allows "modern regulations prohibiting the carry of firearms in new and analogous

5    sensitive places." *Bruen*, 142 S. Ct. at 2133. Relatedly, the Court has dismissed, as

6    "bordering on the frivolous," the argument that the Amendment protects "only those arms

7    in existence in the 18th century." *Heller*, 554 U.S. at 582. The notion that the

8    Amendment permits only those regulations that existed in the 18th century has no more

9    merit. *Cf. McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 373 (1995) (Scalia, J.,

10   dissenting) ("Quite obviously, not every restriction upon expression that did not exist in

11   1791 or 1868 is *ipso facto* unconstitutional.").

12          DeBorba's argument also conflicts with common sense. Past lawmakers' failure to

13   adopt a given regulation does not necessarily (or even ordinarily) reflect doubts about its

14   constitutionality. The idea of adopting such a regulation may never have occurred to the

15   lawmakers. They may have considered the regulation unnecessary, impractical, or

16   politically inexpedient. Or they may have failed to act because of the "sluggishness of

17   government, the multitude of matters that clamor for attention, and the relative ease with

18   which men are persuaded to postpone troublesome decisions." *Duckworth v. Arkansas*,

19   314 U.S. 390, 400 (1941) (Jackson, J., concurring in result); *see Zuber v. Allen*, 396 U.S.

20   168, 185 n.21 (1969) ("Congressional inaction frequently betokens unawareness,

21   preoccupation, or paralysis.").

22          Of course, an absence of a history of similar regulations may be "relevant" to the

23   Second Amendment inquiry. *Bruen*, 142 S. Ct. at 2131. But the Supreme Court has never

24   treated it as dispositive. Instead, both *Bruen* and *Heller* relied on historical authorities

25   invalidating or disapproving analogous regulations "on constitutional grounds." *Ibid*.; *see*

26   *id*. at 2145-2147; *Heller*, 554 U.S. at 629. DeBorba has cited no such authorities here.

27

Opposition to Motion to Dismiss - 47
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

1    The absence of historical laws specifically targeting domestic abusers is especially

2    unilluminating because it is readily explained by legal, social, and technological factors

3    that have nothing to do with the Second Amendment. To start, past generations could not

4    have disarmed persons subject to protective orders because such orders did not exist. For

5    much of the Nation's history, the common-law doctrine of interspousal tort immunity

6    precluded courts from hearing abused wives' civil suits against their husbands. *See*

7    *Thompson v. Thompson*, 218 U.S. 611, 618 (1910); Reva B. Siegel, *"The Rule of Love":*

8    *Wife Beating as Prerogative and Privacy*, 105 Yale L.J. 2117, 2161-2170 (1996). State

9    laws authorizing courts to issue protective orders emerged only in the late 1970s. *See*

10   Jeffrey Fagan, Nat'l Inst. of Justice, Office of Justice Programs, U.S. Dep't of Justice,

11   *The Criminalization of Domestic Violence: Promises and Limits* 3 (Jan. 1996).

12   Past inaction also reflected the now-discredited belief that public authorities

13   should not intervene to prevent domestic violence because doing so could undermine

14   marital harmony. *See* Siegel 2154-2170. A 19th-century state court thus refused to hear

15   battery charges against a man who beat his wife because it preferred the "lesser evil of

16   trifling violence" to the "greater evil of raising the curtain upon domestic privacy." *State*

17   *v. Rhodes*, 61 N.C. 453, 459 (1868). Another state court refused to hear allegations that a

18   man violently attacked his wife because it would be "better to draw the curtain, shut out

19   the public gaze, and leave the parties to forget and forgive." *Abbott v. Abbott*, 67 Me.

20   304, 307 (1877) (citation omitted). As late as the 1960s, police manuals stated that

21   officers responding to domestic-violence complaints "should never create a police

22   problem when there is only a family problem." Siegel 2171 (citation and emphasis

23   omitted).

24   Finally, because of technological differences, the combination of firearms and

25   domestic strife did not pose the same threat in the past that it poses today. Guns in the

26   18th century generally fired only one shot, often misfired, took a long time to load, and

27   could not be kept loaded for long periods. *See* Randolph Roth, *Why Guns Are and Are*

Opposition to Motion to Dismiss - 48
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

*Not the Problem*, in Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 117 (2019). Household homicides were rare in colonial times and only rarely committed with guns. *See id*. at 108, 116-17. But later technological developments—such as metallic cartridges; cheap, mass-produced revolvers; and guns capable of firing multiple shots—have led to the increased use of guns in homicides, including domestic homicides. *See id*. at 123-127. Now, more than half of the women who are killed by their intimate partners are killed with guns. *See* Violence Policy Center, *When Men Murder Women: An Analysis of 2018 Homicide Data* 5 (Sept. 2020). The Second Amendment allows Congress to address those "novel modern conditions." *Bruen*, 142 S. Ct. at 2134 (citation omitted).

### 3.    DeBorba misunderstands the historical inquiry required by the Supreme Court's Second Amendment jurisprudence

DeBorba argues that the government has failed to identify an adequate historical analogue to Section 922(g)(8). (*See* dkt. 36 at pp.38-39.) But his approach to the historical inquiry is flawed on two levels.

As an initial matter, it would be error to reduce the inquiry into the Second Amendment's original meaning to a search for a specific historical analogue. "The test [this] Court set forth in *Heller* and [*Bruen*] requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131. That inquiry into original meaning "will often involve reasoning by analogy" to historical statutes, but it need not always do so. *Id*. at 2132. Here, the government has provided extensive evidence apart from historical analogues—for example, parliamentary and congressional debates, precursors to the Second Amendment, treatises, and commentaries—showing that the Second Amendment permits Congress to disarm persons who are not law-abiding, responsible citizens.

Moreover, the Supreme Court has emphasized that even when the government defends a modern law by invoking historical statutes, it need only cite a "historical

Opposition to Motion to Dismiss - 49
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

analogue, not a historical twin." *Bruen*, 142 S. Ct. 2133. In judging whether a modern

law is "analogous enough" to "historical precursors" to "pass constitutional muster," a

court should ask whether the laws "impose a comparable burden" and are "comparably

justified." *Ibid*. Here, the government has identified many historical laws that impose the

same type of burden as Section 922(g)(8) (disqualifying someone from possessing arms)

for the same type of reason (the person is not responsible enough to be trusted with

arms). *See* pp. 34-38, *supra*.

DeBorba objects that Section 922(g)(8) differs from historical laws by disarming

persons based on civil orders rather than criminal convictions. (Dkt. 36 at pp.39-40.) But

legal sources from the 17th, 18th, and 19th centuries recognize the government's power

to disarm irresponsible individuals regardless of their criminal records. *See* pp. 28-34,

*supra*. States have long disarmed groups other than criminals—for example, loyalists,

minors, and intoxicated persons. *See* pp. 34-38, *supra*. And the Supreme Court has

approved not only laws disarming "felons," but also laws disarming "the mentally ill."

*Heller*, 554 U.S. at 626.

More fundamentally, DeBorba's (and the Fifth Circuit's) divide-and-conquer

approach to the historical evidence is badly misguided. A court applying the Second

Amendment should not isolate each historical precursor and ask if it differs from the

challenged regulation in some way. A court should instead examine the historical

evidence as a whole, determine whether it establishes a category of permissible

regulation (such as "dangerous and unusual weapons" or "sensitive places"), and

determine whether the challenged law fits in that category. The historical evidence here

shows that the Second Amendment permits laws disarming persons who are not law-

abiding, responsible citizens, and Section 922(g)(8) plainly qualifies as such a law.[27]

---

[27] DeBorba's "as-applied" challenge fails for the same reasons—that firearms may be denied to those who are not law abiding, responsible citizens. While DeBorba claims to be a supportive father who had little contact with law enforcement for years and is "a loyal member of the community," he in fact for years had knowingly violated the Nation's immigration laws, falsified federal immigration forms and Social Security cards, lied on federal Firearms

Opposition to Motion to Dismiss - 50
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

1    **VI.   The Second Amendment Does Not Entitle DeBorba to Knowingly Make False**
2    **Statements in the Acquisition of Firearms or a Concealed Carry Permit**

3         DeBorba moves to dismiss three counts alleging false statements during the
4    purchase of firearms, in violation of 18 U.S.C. § 922(a)(6) (Counts 4 and 5), and a false
5    claim to United States citizenship, in violation of 18 U.S.C. § 911 (Count 6). DeBorba
6    argues that the falsified answers regarding his alienage and citizenship are not material to
7    the sale of a firearm in light of *Bruen.* (Dkt. 36 at 43-47.) The motion should be denied as
8    to these counts because longstanding precedent holds that a person who provides false
9    information in response to a government question cannot defend against a criminal
10   charge on the ground that asking the question violated the Constitution. Also, the conduct
11   burdened by Section 922(a)(6) does not fall within the scope of the Second Amendment
12   right, and Section 922(a)(6) is consistent with the Nation's historical tradition of firearm
13   regulation.

14        **A.    The premise of DeBorba's challenge is mistaken**

15        DeBorba contends that his false statements that he is a citizen were not material
16   because the government is not entitled to prevent noncitizens from possessing firearms.
17   Even if he were correct that Sections 922(g)(5) and (g)(8) violate the Second
18   Amendment, his argument would be wrong. A person "who furnishes false information to
19   the Government in feigned compliance with a statutory requirement cannot defend
20   against prosecution for his fraud by challenging the validity of the requirement itself."
21   *United States v. Knox*, 396 U.S. 77, 79 (1969). As the Supreme Court has explained, "it
22   cannot be thought that as a general principle of law a citizen has a privilege to answer
23   fraudulently a question that the Government should not have asked." *Bryson v. United*
24   *States*, 396 U.S. 64, 72 (1969). "Our legal system provides methods for challenging the
25   Government's right to ask questions—lying is not one of them." *Ibid.*

26   ───────────────────────────

27   Transaction Records, and repeatedly committed and was convicted of domestic violence. *See* pp.3-6, *supra*. For the reasons explained above, restricting his possession of firearms does not violate the Second Amendment.

Opposition to Motion to Dismiss - 51
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

1   Applying this rule, the Seventh Circuit recently reversed a district court decision

2   dismissing a Section 922(a)(6) indictment on the ground that Section 922(n) (which

3   barred the defendant from possessing a firearm) violates the Second Amendment. *United*

4   *States v. Holden*, 70 F.4th 1015 (2023). The Court explained that Congress is entitled to

5   require would-be purchasers "to provide information—their names, addresses, Social

6   Security numbers, criminal histories, and so on," and even assuming that the Second

7   Amendment "would prevent enforcement of a statute saying, for example, that 'anyone

8   whose surname starts with the letter H is forbidden to possess a firearm,'" that "would

9   not prevent Congress from demanding purchasers' real names." *Id*. at 1017. "So too with

10  Social Security numbers: the Constitution may block the federal government from

11  limiting gun ownership to people who have Social Security numbers, but it would not

12  interfere with the use of such numbers to identify, and perhaps check the criminal history

13  of, people who do have them." *Id*.

14      The federal government has the power to collect correct information, and "false

15  statements may be punished even when the government is not entitled to demand

16  answers—when, for example, compelling a truthful statement would incriminate the

17  speaker." *Id*. (citing *United States v. Kapp*, 302 U.S. 214, 218 (1937); *Dennis v. United*

18  *States*, 384 U.S. 855, 866–67 (1966); *United States v. Knox*, 396 U.S. 77, 79 (1969)).

19  "The word 'material' in § 922(a)(6) does not create a privilege to lie, when the answer is

20  material to a statute, whether or not that statute has an independent constitutional

21  problem." *Holden*, 70 F.4th at 1017.

22      As the Seventh Circuit explained, answering the questions on an application for a

23  firearm permit or to purchase a firearm is "material" in the sense that it affects the

24  dealer's willingness to sell the firearm. *Id*. A defendant cannot show that it is "not

25  material 'to the lawfulness of the sale'" on the theory that the prohibition to which it is

26  relevant "must be treated as if it had never been enacted." *Id*. Instead, "[s]omeone who

27  wants a court to [treat the prohibition as void] should file a declaratory-judgment action

Opposition to Motion to Dismiss - 52
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

1   rather than tell a lie in an effort to evade detection that the sale would violate the statute."

2   *Id.*

3   DeBorba's contention that he cannot be held responsible for making material false

4   statements if Sections 922(g)(5) and 922(g)(8) violate the Second Amendment is

5   mistaken. His motion to dismiss counts 4–6 must be denied.

6   **B.    Because Sections 922(g)(5) and 922(g)(8) do not violate the Second
         Amendment, Counts 4 through 6 similarly do not**

7

8   DeBorba's argument that the counts alleging knowingly false statements fail to

9   state an offense is in any event meritless, because Sections 922(g)(5) and 922(g)(8) do

10  not violate the Second Amendment. Because prohibitions on the possession of firearms

11  by noncitizens unlawfully in the United States and by persons subject to domestic-

12  violence protective orders are constitutional, the offenses alleging false statements related

13  to these offenses are constitutional as well.

14  **C.    The false statement offenses impose no direct burden on the ability to
         obtain or possess a firearm**

15

16  DeBorba's argument must fail at the outset because he cannot show he was

17  burdened by the prohibition in Section 922(a)(6) which punishes a person for knowingly

18  making a false statement in connection with the purchase of a firearm, nor were these

19  rights burdened by the prohibition in Section 911 on falsely claiming United States

20  citizenship, related to his application for a permit to carry a concealed pistol.

21  Neither of these sections, in and of themselves, prohibit the possession of a

22  firearm. Instead, they simply prohibit a purchaser, in the case of Section 922(a)(6), or a

23  concealed-carry permit applicant, in the case of Section 911, from deceiving a seller in

24  the context of a firearm purchase or permit application. *See United States v. Conrad*, 923

25  F.Supp.2d 843, 852 (W.D. Va. Oct. 19, 2012) ("[Section 922(a)(6)] does not prohibit

26  possession of a firearm at all; it merely asks that a person seeking to purchase a firearm

27  not lie in the process of doing so.")

Opposition to Motion to Dismiss - 53
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

1    Moreover, the Supreme Court has indicated its approval of precisely the type of

2    regulation imposed by Section 922(a)(6); *See McDonald,* 561 U.S. at 786 (emphasizing

3    that "longstanding regulatory measures" such as "'laws imposing conditions and

4    qualifications on the commercial sale of arms'" are presumptively constitutional (quoting

5    *Heller*, 554 U.S. at 626)); *see also Graham v. United States*, No 3:11-cv-470, 2012 WL

6    611852 at *3 (N.D. Ind. Feb. 24, 2012) (citing *McDonald* and *Heller* in finding scope of

7    Second Amendment right "doesn't give a person the right to lie to acquire a firearm").

8    Importantly, while *Bruen* struck down a law criminalizing possession of any

9    firearm without a license and providing that no license may issue to have and carry a gun

10   outside the home without a showing of a special need, the Court did not disturb the "shall

11   issue" licensing laws that exist in 43 states, noting that "[N]othing in our analysis should

12   be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing

13   regimes. . . . [T]hese shall-issue regimes, which often require applicants to undergo a

14   background check or pass a firearms safety course, are designed to ensure only that those

15   bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" 142 S.

16   Ct. at 2138 n.9. Justice Kavanaugh's concurrence also emphasized that states can

17   constitutionally require license applications to "undergo fingerprinting, a background

18   check, a mental health records check, and training in firearms handling and in laws

19   regarding the use of force, among other possible requirements." *Id*. at 2162. If such

20   administrative burdens on the carrying of firearms are permissible, then administrative

21   steps required to purchase firearms also are permissible.

22   Because the prohibition contained in Section 922(a)(6) does not restrict a

23   purchaser from obtaining or possessing a firearm, instead only punishing a purchaser who

24   lies to obtain a firearm, this statute does not run afoul of the Second Amendment, and

25   DeBorba's motion to dismiss Counts 4 through 6 should be denied.

26

27

Opposition to Motion to Dismiss - 54
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

**D.    Even if Sections 922(a)(6) and 911 burden conduct that is protected under the Second Amendment, they are consistent with this Nation's historical tradition of firearms regulation**

While, as explained above, there is no need to apply the *Bruen* analysis to either Section 922(a)(6) or 911, both sections are consistent with this Nation's historical tradition of firearms regulation.

The regulatory scheme served by Section 922(a)(6) is designed to ensure that firearms do not fall into the hands of a prohibited person, while Section 911 more generally prohibits falsely representing oneself as a United States citizen. As discussed above, requiring the administrative step of truthfully filling out a license application does not run afoul of the Second Amendment's protections. However, even if the Court were swayed by DeBorba's argument, there are historical analogues to these regulatory schemes.

"Colonial government substantially controlled the firearms trade." *Teixeira v. Cnty of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017). For example, "a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals." Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 77 (2017). "A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also 'of arms and munitions.'" *Id*. In the early 17th century, Connecticut banned residents from selling firearms outside the colony. *Teixeira*, 873 F.3d at 685. Virginia provided that people were at "liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony." *Id*. at 685 n.18 (emphasis added). Still other colonies "controlled the conditions of trade" in firearms. *Id*. at 685.

All of these laws restrict aspects of the firearms trade. Some restricted the individuals to whom a seller could sell firearms. Although those statutes and restrictions were not identical to the current federal scheme regulating sales of firearms, *Bruen* does

Opposition to Motion to Dismiss - 55
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800

not require that they be identical. Instead, *Bruen* made clear that the government need only identify a "historical analogue, not a historical twin." 142 S. Ct. at 2133.

## CONCLUSION

For the reasons set forth above, the government respectfully requests the Court deny DeBorba's motion to dismiss the indictment.

DATED this 15th day of September, 2023.

Respectfully submitted,

TESSA M. GORMAN
Acting United States Attorney

*s/Max B. Shiner*
MAX B. SHINER
Assistant United States Attorney
1201 Pacific Ave., Suite 700
Tacoma, WA 98402
Telephone: (253) 428-3822
Fax: (253) 428-3826
E-mail: max.shiner@usdoj.gov

Opposition to Motion to Dismiss - 56
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
253- 428-3800