1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

HONORABLE CHIEF JUDGE DAVID G. ESTUDILLO

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

JOÃO RICARDO DEBORBA,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

No. CR22-5139-DGE

MR. DEBORBA'S REPLY TO THE
GOVERNMENT'S OPPOSITION TO
HIS MOTION TO DISMISS COUNTS 1
THROUGH 6 OF THE SUPERSEDING
INDICTMENT

        The government makes a valiant effort to avoid dismissal of the charges here and invalidation of relevant gun control measures. However, under the controlling test, effort, intentions, and policy are irrelevant to the resolution of Mr. DeBorba's Motion to Dismiss. *See generally New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). No amount of re-framing of language, stretched analogies, or concerns about policy impacts can exempt the government from its burden under *Bruen*. The resolution of Mr. DeBorba's Motion depends only on the text of the Second Amendment and the relevant historical tradition of firearm regulation, or lack thereof. The government has not met its burden to demonstrate that the Second Amendment was intended to permit disarmament based on immigration status or domestic violence protection efforts. As such, the Court should dismiss Counts 1 through 6 of the Superseding Indictment.[1]

---

[1] Mr. DeBorba moved to dismiss all counts of the Indictment against him when he faced six Counts, charging violations of 18 U.S.C. § 922(g)(5), 18 U.S.C. § 922(g)(8), 18 U.S.C. § (22)(a)(6), and 18 U.S.C. § 911. Dkt. 9, 36. After Mr. DeBorba filed this

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## I.    ARGUMENT

As Mr. DeBorba predicted in his Motion to Dismiss, the government has not carried its burden to demonstrate a historical tradition of regulation that justifies §§ 922(g)(5) and (8)'s infringement of the Second Amendment's protections. Although crime, immigration, and domestic violence all existed at the time the Second Amendment was ratified, U.S. laws at the time did not disarm noncitizens, immigrants, or people suspected of perpetrating domestic violence. The government's attempts to overcome this reality are unavailing. In addition to explaining why the government's arguments cannot save these statutes, Mr. DeBorba here also submits a declaration by an expert in the intersection of gun regulation and immigration; the declaration details the historical record relevant to this issue. *See* Ex. B (Declaration of Professor Pratheepan (Deep) Gulasekaram, which was filed in *United States v. Vasquez-Ramirez*, 22-CR-0087-RMP (E.D. Wash. 2023) at Dkt. 41-1, as Ex. A to Mr. Vasquez's Motion to Dismiss).

First, the government asks the Court to avoid applying *Bruen* at all by instead finding that mentions of "law-abiding citizens" in the Supreme Court's modern Second Amendment jurisprudence mean Mr. DeBorba, and people like him, have no Second Amendment Rights. Dkt. 51 at 6–10. But this proposition assigns meaning and precedential value to the phrase without evidence that such meaning was intended, something the Ninth Circuit recognized prior to *Bruen*.

---

Motion to Dismiss, the government returned a Superseding Indictment charging the same 6 counts and adding a Count 7, which charges him with possession of an unregistered NFA weapon under 26 U.S.C. § 5861(d) and 5845(a)(7). Dkt. 40. Mr. DeBorba asks this Court to treat his original Motion to Dismiss, dkt. 36, and this Reply as moving to dismiss Counts 1 through 6 of the Superseding Indictment. To this end, Mr. DeBorba is attaching an updated Proposed Order to this Reply, to reflect the current procedural posture. As discussed at the recent status hearing, Mr. DeBorba intends to separately file additional motions pertaining to the new Count 7 and new discovery.

MR. DEBORA'S REPLY TO THE
GOVERNMENT'S OPPOSITION TO
HIS MOTION TO DISMISS
(*United States v. DeBorba*, CR22-5139-DGE) - 2

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1    Second, the government fails to otherwise demonstrate that §§ 922(g)(5) and (8)

2    do not regulate conduct[2] (or in the government's formulation people) protected by the

3    Second Amendment. Dkt. 51 at 10–16. The government's arguments misunderstand

4    Ninth Circuit precedent, are not supported by the text of the Second Amendment and

5    canons of interpretation, and are inconsistent with relevant history.

6    Third, the government implores the Court to apply a relaxed standard for its

7    proposed historical analogues for §§ 922(g)(5) and (8) because, it argues, new *laws*

8    restricting immigration and domestic violence render immigration and domestic

9    violence new "societal" problems. Dkt. 51 at 16, 48. But such a conclusion would

10   rewrite the test established in *Bruen* and threaten the very concept of a constitutionally-

11   protected rights. It would allow the government to simply regulate new areas of life in

12   order to create new "problems" that permit infringement of constitutional rights.

13   Fourth, the government's proposed historical analogues to justify §§ 922(g)(5)

14   and (8) are not sufficiently similar to these laws in their "how" and "why." Dkt. 51 at

15   17–22, 24–40. The government proposes a handful of historic regulations enacted for

16   purposes different than the crime control purpose of § 922, including some that utilized

17   substantially different means. More concerning, though, the government asks the Court

18   to find that a disjointed "category" of historic regulations allow the government today

19   to disarm anyone it deems "untrustworthy," "irresponsible," or "dangerous." Again,

20   such a holding would be contrary to our very constitutional structure.

21   Fifth, the government's attempt to shift its burden under *Bruen* was rejected by

22   the *Bruen* Court as well as courts interpreting *Bruen*. The government asks this Court to

23   require Mr. DeBorba to prove that some court during the ratification era invalidated

24   proposed regulations similar to §§ 922(g)(5) and (8) or some positive proof that no

25

26   ―――――――――――
     [2] The government does not dispute that possession of firearms and ammunition is
     conduct covered by the Second Amendment. *See generally* Dkt. 51.

MR. DEBORA'S REPLY TO THE
GOVERNMENT'S OPPOSITION TO
HIS MOTION TO DISMISS
(*United States v. DeBorba*, CR22-5139-DGE) - 3

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1  similar regulation existed *because* it they were understood as incompatible with the

2  Second Amendment. Dkt. 51 at 47–50. But such a burden is antithetical to *Bruen*.

3  Indeed, *Bruen* firmly placed the burden with the government, cautioning courts against

4  trying to meet that burden for the government or speculating as to other reasons the

5  government may not have met its burden to demonstrate an analogous historical

6  tradition of regulation. The Ninth Circuit as well as the Honorable District Judge

7  Carlton Reeves have reiterated the importance of keeping the burden under *Bruen* with

8  the government. Because the government has not met its burden, the Court should

9  dismiss Counts 1 through 3.

10        Sixth and finally, the government's arguments regarding the impact of an

11 unconstitutional statute or regulation on *other* false statement charges do not defeat Mr.

12 DeBorba's Motion to Dismiss Counts 4 through 6 (charging false statement in the

13 purchase of a firearm and false claim to U.S. citizenship). The Supreme Court

14 precedent cited by the government does not analyze the impact that the invalidation of a

15 regulation has on the *materiality* element the § 1001 false statement charges at issue in

16 those cases; these cases thus do not control the outcome of Mr. DeBorba's Motion. And

17 the Seventh Circuit's holding is similarly not dispositive—the Seventh Circuit held that

18 a false statement about whether a purchaser was under indictment would be material

19 even if § 922(n) (which prohibits firearm possession by people under felony

20 indictment) were unconstitutional. But this holding rested on the multiple ways that the

21 answer to that question would reveal *other* bases to deny a gun sale, apart from §

22 922(n). Because no such bases exist for questions about citizenship and immigration

23 status, the Court should dismiss Counts 4 through 6.

24

25

26

MR. DEBORA'S REPLY TO THE
GOVERNMENT'S OPPOSITION TO
HIS MOTION TO DISMISS
(*United States v. DeBorba*, CR22-5139-DGE) - 4

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

**A.      The government relies on the frequency, rather than the context and meaning, of the Supreme Court's use of the phrase "law-abiding citizens" to claim the phrase limits the Second Amendment's reach.**

The government argues primarily that "the people" protected by the Second Amendment is limited to "law abiding citizens," *see* Dkt. No. 51 at 6–9, a phrase that appears nowhere in "the plain text of the Second Amendment[.]" *Teter v. Lopez*, 76 F.4th 938, 948 (9th Cir. 2023) (quoting *Bruen* 142 S. Ct. at 2134). As previously argued, this phrase is *dicta* from *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and *Bruen*, none of which involved litigants who were not U.S. citizens or who had criminal convictions. *See* Dkt. 36 at 12–15. Moreover, the phrase arose in the Court's characterization of its prior case *United States v. Miller*, 307 U.S. 174 (1939), as distinguishing between types of *weapons*, not types of people: "We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller*, 554 U.S. at 625. Yet the government does not engage with this context or the meaning of the phrase as used. Instead, the government asks the Court to accept the phrase as narrowing the meaning of "the people" in the Second Amendment because it has been oft repeated. *See* Dkt. No. 51 at 7–8.

Furthermore, the government wrongly implies that the Ninth Circuit has previously rejected the contention that the phrase "law-abiding citizens" in *Heller* was not controlling. In arguing that the phrase was not dicta, the government asserts:

> The Supreme Court's statements about the presumed lawfulness of regulations targeting firearms possession by those who are not "law-abiding, responsible citizens" cannot be ignored as simply dicta. The Ninth Circuit has rejected the argument that *Heller*'s language about firearm-possession bans for persons convicted of a felony crime is non-binding: "We disagree. Courts often limit the scope of their holdings and such limitations are integral to those holdings."

Dkt. 51 at 7 (the government's internal citation for this quotation was missing and/or incorrect. However, undersigned counsel believes the quotation derives from *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010)). The government's positioning of this quotation is misleading.

The quotation in question did not refer to the term "law abiding citizens," and the government acknowledged as much. *See* Dkt. 51 at 7. In *Vongxay*, the Ninth Circuit disagreed with the contention that *Heller*'s "language about certain long-standing restrictions on gun possession is dicta, and therefore not binding." 594 F.3d at 1115. Namely, the Ninth Circuit found precedential value in the Supreme Court's explicit ***limitation*** on its holding: "Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, *nothing in our opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felons* and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* (quoting *Heller*, 554 U.S. at 626–27) (emphasis in *Vongxay*). Thus the Ninth Circuit treated the Supreme Court's limitation on its holding in *Heller* as meaningful. This is no surprise.

But the Ninth Circuit's treatment of that passage in *Heller*, which explicitly pertains to the bounds of the Court's holding, as meaningful does not render the passing use of the phrase "law-abiding citizens" non-dicta. As Mr. DeBorba previously explained, multiple jurists have reasoned that this passing phrase does not actually limit the reach of the Second Amendment. Dkt. 36 at 12–15. And, as discussed below, the Ninth Circuit has previously agreed with such reasoning. *See United States v. Torres,* 911 F.3d 1253, 1261 (9th Cir. 2019).

In fact, the government's law-abiding-citizens position goes against constitutionalism itself. *See Range v. Att'y Gen.*, 69 F.4th 96, 103 (3rd Cir. 2023). If, as

the government claims, constitutional rights depend on being a "law-abiding citizen," legislatures could take away those rights by statute alone. Ordinary law, after all, is capable of turning individuals from "law-abiding" to not—and, for that matter, from "citizens" to not. *Id.*; *see, e.g.*, 8 U.S.C. §§ 1424(a), 1451(c) (purporting to allow the government to "revo[ke]" a naturalized citizen's citizenship if the citizen joins certain political parties).

The Constitution is, however, "superior to any ordinary act of the legislature." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803). Letting legislators pick who gets the Constitution's protections would flip that ordering, thereby "giving to the legislature a practical and real omnipotence." *Id.* That would "subvert the very foundation of all written constitutions." *Id.*; *see also Range*, 69 F.4th at 103 ("At root, the Government's claim that only 'law-abiding, responsible citizens' are protected by the Second Amendment devolves authority to legislators to decide whom to exclude from 'the people.'"). Elevating statute over Constitution in that way, the Supreme Court has long held, is improper. *Marbury*, 5 U.S. at 178.

**B.    The government's claim that "the people" is limited to U.S. citizens defies text, history, and Ninth Circuit precedent.**

The government asks the Court to adopt a position the Ninth Circuit rejected—namely, that undocumented immigrants are not among "the people" protected by the Second Amendment. Dkt. 51 at 9–17. First, the Ninth Circuit rejected the caselaw the government cites to support its invitation to use the phrase "law-abiding citizens" to define "the people;" second, the actual text of the Second Amendment and its context do not support the government's claim; and third, the historical context for the amendment also provides no support for this reading.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1

2

### 1.  The government's position was previously rejected by the Ninth Circuit.

The Ninth Circuit rejected the proposition that only U.S. citizens have Second Amendment rights in *United States v. Torres,* 911 F.3d at 1261. The Ninth Circuit was well aware of the cases relied on by the government to support its argument—*United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012); *United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011); and *United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011). *Torres*, 911 F.3d at 1259–61. The Ninth Circuit's recitation of the reasoning from these cases was not mere background. The Ninth Circuit recited these analyses to *reject* their reasoning and holdings.

Instead, the Ninth Circuit adopted the reasoning of the Tenth Circuit, which reasoned that the phrase "law-abiding citizens" did not answer the question at hand:

> 1) *Heller* did not reach the question of who "the people" were and provided no analysis pertaining to noncitizens. *Torres*, 911 F.3d at 1261 ("The Tenth Circuit's conclusion was grounded in the fact that the *Heller* decision did not purport to decide the scope of the phrase 'the people' in the Second Amendment, but, rather, 'the question in Heller was the amendment's raison d'être—does it protect an individual or collective right?—and [noncitizens] were not part of that calculus.'") (quoting *United States v. Huitron-Guizar*, 678 F.3d 1164, 1168 (10th Cir. 2012)).

> 2) *Heller*'s use of the term "citizen" was not clearly meant to refer to legal citizenship, and such a reading would be inconsistent with the opinion as a whole. *Id.* ("the Tenth Circuit was concerned with finding that *Heller*'s decision excluded [undocumented immigrants] because it could not conclude 'the word "citizen" was used deliberately to settle the question, not least because doing so would conflict with *[United States v.] Verdugo-Urquidez*[, 494 U.S. 259 (1990)], a case *Heller* relied on.'") (quoting same).

> 3) The question of who is among "the people" protected by the Second Amendment is "'large and complicated'" so the "prudent course of action" was to assume that "the people" includes undocumented immigrants. *Id.* (quoting *Huitron-Guizar*, 678 F.3d at 1169-70).

By adopting this reasoning, *Torres,* 911 F.3d at 1261, the Ninth Circuit agreed that the use of the phrase "law-abiding citizens" in *Heller* was not dispositive, and that it lacked a record sufficient to otherwise exclude noncitizens or even undocumented immigrants from "the people" who have Second Amendment rights. *Id*. at 1261–62. The Ninth Circuit *rejected* reasoning to the contrary, for example the Fifth Circuit's heavy reliance on language in *Heller* describing "those persons who held a Second Amendment right as members of the political community,' 'Americans,' and 'law-abiding, responsible citizens.'" *Id*. at 1259–60 (quoting *Portillo-Munoz*, 643 F.3d at 440). The government asks the Court to defy the Ninth Circuit's precedent.

Although Mr. DeBorba explained this backdrop, the government nonetheless relies on *United States v. Sitladeen*, 64 F.4th 978 (8th Cir. 2023), without acknowledging that that case simply relies on the rejected reasoning in *Portrillo-Munoz* (adopted by the Eighth Circuit in *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir.2011) (per curiam)) that the Ninth Circuit rejected. *See* Dkt. 51 at 13. Even the Eighth Circuit in *Sitladeen* raised doubts about its own conclusion:

> **_Flores's textual interpretation may or may not be correct_**. But until the Supreme Court or our en banc court determines otherwise, the law of circuit is that [undocumented immigrants] are not part of the people to whom the protections of the Second Amendment extend.

*Id*. at 987 (emphasis added). It is rare to see a panel openly-question whether it reached the right decision, providing insight into the shaky foundation of this pre-*Bruen* analysis of this issue.

Furthermore, the Ninth Circuit's latest decision interpreting *Bruen* pointedly avoided the term "citizen" outside of quotations of prior authority. *See generally Baird v. Bonta*, No. 23-15016, 2023 WL 5763345 (9th Cir. Sept. 7, 2023) (reversing denial of a preliminary injunction of a law restricting "Californians'" right to openly carry firearms).

MR. DEBORA'S REPLY TO THE
GOVERNMENT'S OPPOSITION TO
HIS MOTION TO DISMISS
(*United States v. DeBorba*, CR22-5139-DGE) - 9

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**2.      The plain text of the Second Amendment, and canons of interpretation, do not support the government's narrow reading of "the people."**

The government argues the plain text of the Second Amendment does not define "the people" because the phrase the people is used beyond the Bill of Rights, in other parts of the constitution. Dkt. 51 at 12–13. But the government fails to peak into the different phrasing surrounding different usages, or into the Constitution's clear use of the term "citizen" where citizenship requirements were actually intended.

As Professor Gulasekaram's Declaration (attached as Ex. B) makes clear, the text and structure of the Constitution and the Bill of Rights indicate that "the people" in the Second Amendment has the same meaning as "the people" in the First and Fourth Amendments. And, the text of the Constitution indeed uses the word "citizen" multiple times to actually limit certain provisions to citizens in the legal (as opposed to colloquial) sense.

The government claims "the people" *might* refer only to U.S. citizens because one use of "the people" in the Constitution refers to those who may vote for members of Congress, a right today reserved to U.S. citizens. *See* Dkt. 51 at 12. But the government ignores the totality of the phrase used. As explained by Professor Gulasekaram,

> References to the "we the people of the United States" or "the people of the several states" or "the people [of each State]" are textually dissimilar from "the people" in its other manifestations. Those uses refer to a specific body that either ratified the Constitution or have the political authority in a particularized jurisdiction who possess the power to elect representatives. Further, they were ratified prior to subsequent appearances of "the people" in the Bill of Rights.

Ex. B at 19–20, ¶54 (quoting U.S. Const., Preamble.; U.S. Const., Art. I., § 2; and U.S. Const., amend. XVII).

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

By contrast, "the people" in the Bill of Rights—which were passed all together—appears unadorned (i.e. not "the people *of* the several states" or "the people *of* the United States"). *Id*. at 21, ¶55. In particular, scholarship has focused on the phrase in the First, Second, and Fourth Amendments, which all are understood to confer positive rights to individuals. *Id*. at 21, ¶57.[3] The text compels a consistent understanding of the unadorned phrase "the people" in these Amendments, which were ratified as a package (and not at the same time as the Preamble or Articles of the Constitution).

Furthermore, the Constitution is replete with the word "citizen," used to limit privileges or provisions to legal citizens. These provisions have been passed over time, including at the time of the original ratification and the ratification of the Reconstruction Amendments. Ex. B at 21–22, ¶58. In the Articles of the Constitution, ratified shortly before the Bill of Rights, "citizen" was used to limit who could be elected to Congress and the Presidency, to ensure citizens of each state enjoyed the benefits of citizenship in the other states in the Union, and to define diversity jurisdiction for the Federal Courts. *Id*. Decades later, the Reconstruction Amendments used the word "citizen" to ensure that emancipated African Americans were not denied the rights of citizenship, like voting and representation. *See id*. (citing U.S. Const. amend. XIV, XV). Not until the twentieth century were additional Amendments passed using the word "citizen" to further protect the right to vote. *See id*.

"[W]here the document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea." Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 170 (2012); *accord Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1789 (2022) (describing

---

[3] The Ninth and Tenth Amendments also refer to "the people," noting that rights not enumerated and powers not delegated are retained by "the people." These amendments preserve the system of federalism and limited government. Ex. B at 21, ¶56.

MR. DEBORA'S REPLY TO THE
GOVERNMENT'S OPPOSITION TO
HIS MOTION TO DISMISS
(*United States v. DeBorba*, CR22-5139-DGE) - 11

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

the same material-variation canon). Simply put: the Framers said "citizen" when they meant "citizen." That they used broader "the people" language in the Second Amendment reveals that the rights conveyed there are not limited by citizenship.

Additionally, the use of "the people" as opposed to "persons" or "any person" does not exclude noncitizens, as the government suggests. Dkt. 51 at 13. The government argues that precedent enshrining the constitutional rights of noncitizens, including undocumented immigrants, is not controlling because it arises under the Fourteenth Amendment, which uses the phrase "any person." *Id*.

However, the Supreme Court held that the Second Amendment is among the fundamental due process rights that is incorporated by the Fourteenth Amendment's Due Process Clause. *McDonald*, 561 U.S. at 778, 791 ("it is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty.") ("We therefore hold that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in Heller.").

And binding case law similarly provides undocumented immigrants with constitutional protection. As the Ninth Circuit has put it: "once [a noncitizen] has 'entered' U.S. territory, legally or illegally, he or she has constitutional rights." *Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1108 (9th Cir. 2001) (emphasizing that this conclusion is supported by "numerous cases" (citing *Mathews v. Diaz*, 426 U.S. 67, 77 (1976); *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958); *Plyler v. Doe*, 457 U.S. 202 (1982))); see also *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (similar).

And that is also specifically true for rights the Constitution gives to "the people"; binding precedent likewise holds that undocumented immigrants on American soil can specifically access those rights too. *See Kim Ho Ma*, 257 F.3d at 1108 at n.23 (collecting cases on First and Fourth Amendment protections); *see, e.g., Am.-Arab Anti-*

MR. DEBORA'S REPLY TO THE GOVERNMENT'S OPPOSITION TO HIS MOTION TO DISMISS (*United States v. DeBorba*, CR22-5139-DGE) - 12

FEDERAL PUBLIC DEFENDER
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

*Discrimination Comm. v. Reno*, 70 F.3d 1045, 1066 (9th Cir. 1995) ("We reject the government's contention that we apply gradations of First Amendment protection . . . in determining which citizens and [noncitizens] may receive particular government benefits."); *see also Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 744 (9th Cir. 2021) (concluding that non-resident foreigners could assert First Amendment rights for conduct they directed at the United States). Like the text itself, controlling authority gives undocumented immigrants in this country constitutional rights, including rights afforded to "the people."

Finally, the government's reference to *rejected* proposals for the Second Amendment, *see* Dkt. 51 at 31, do not suggest that those proposals should be read into the enacted Amendment. To the contrary, "[g]enerally, legislatures reject an amendment because they do not intend a bill to include the provisions in the rejected amendment." Sutherland Statutory Construction 2A, *§ 48:18. Legislative action on proposed changes to a bill* (7th ed.) (citing cases).

### 3. The government has not demonstrated a historical understanding of "the people" as limited to U.S. citizens.

The historical context also does not indicate that "the people" in the Second Amendment was intended to apply only to legal citizens. When the Constitution was ratified, the term "the people" had no settled meaning. Ex. B at 19, ¶50. "Citizens" prior to ratification were people who were opposed to British rule and instead adherents of the American Revolution. *Id.* at ¶51. And Americans "were committed to certain principles about the acquisition of citizenship" at the time of ratification, "but they had yet to develop fully the meaning of the status." *Id.* at 20, ¶52 (quoting James H. Kettner, Development of American Citizenship, 209 (UNC Press 1975). But the meaning of "the people" remained unsettled even after the Constitution was ratified. *Id.* at 20, ¶52.

MR. DEBORA'S REPLY TO THE
GOVERNMENT'S OPPOSITION TO
HIS MOTION TO DISMISS
(*United States v. DeBorba*, CR22-5139-DGE) - 13

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1    Yet the government asks the Court to now interpret old statutes based in bigotry

2 and xenophobia as instead demonstrating that noncitizens were "not considered part of

3 the political community." Dkt. 51 at 14. The government argues that "the people" in the

4 Second Amendment did not include such disfavored groups, so must also exclude

5 noncitizens. The government's purported categorization is not equivalent to noncitizens

6 or even undocumented immigrants. Indeed, the concept of citizenship existed, as did

7 immigrants, and no gun restrictions were applied on these bases. Instead, the

8 regulations cited by the government discriminated based largely on race or religion. *See*

9 Ex. B at 29–30, ¶81.

10    This vague collection of statutes disarming so-called outsiders was not defined

11 by citizenship or immigration status, but rather by racial and religious bias:

12       In general, pre-1776 colonial era restrictions on firearms possession did
13       not focus on citizenship or membership in the British Empire per se.
         Instead, such regulations focused on prohibiting trade, sales, or
14       possession of firearms by racial and ethnic status, and to a lesser extent,
         residence within the territory. In particular, extant regulations prohibited
15       gun sales and possession by [Native Americans, enslaved African
         Americans, Multi-Racial people,][4] and similar groups.
16
17       . . .

18       During the Founding and Ratification era, post-1776, restrictions on
         firearms continued to exclude [Native Americans, enslaved African
19       Americans, African Americans, and Multi-Racial people] from firearm
         possession. In addition to these restrictions, some jurisdictions post-1776
20       sought to disarm those who were not loyal to the cause of independence,
         or had not pledged fidelity to the state.
21
22 Ex. B at 44, ¶123 and 46, ¶125; *see also id*. at 44–46, ¶124 (listing examples of pre-

23 colonial regulations); 46–52, ¶¶126–32 (listing examples of ratification era and post-

24 ratification regulations). None of these historical regulations have anything to do with

25

26 [4] The original language used in these regulations is quoted in Ex. B. In this pleading,
alterations are made to avoid repeating antiquated and offensive language.

MR. DEBORA'S REPLY TO THE
GOVERNMENT'S OPPOSITION TO
HIS MOTION TO DISMISS
(*United States v. DeBorba*, CR22-5139-DGE) - 14

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1  citizenship or immigration status. Nor do they evidence a historical understanding of
2  "the people" as limited to U.S. citizens. Rather, they reflect the extreme racial
3  discrimination at the time.

4       And the restrictions based on loyalty oaths cited by the government were
5  intended to preserve a particular hierarchy, not to deprive noncitizens, or their
6  equivalent, of arms. *See* Ex. B at 12 ¶30 ("Primarily, those early-era restrictions
7  reflected loyalty-based exclusions against the British Empire and colonial rule, or
8  prevailing social and racial hierarchies that countenanced exclusions of [enslaved
9  African Americans], free Blacks, and Native Americans from firearm possession.");
10  *United States v. Rahimi*, 61 F.4th 443, 457 (5th Cir. 2023) (striking down 18 U.S.C. §
11  922(g)(8) after evaluating historical analogues, stating "[t]he purpose of laws disarming
12  'disloyal' or 'unacceptable' groups was ostensibly the preservation of political and
13  social order"). These regulations were concerned with wartime social order in the
14  colonies, as they refer to "Non-Associators" and those "disaffected to the cause of
15  America." Ex. B at 46–47, ¶126. They were not concerned with legal citizenship. They
16  are not evidence that noncitizens were not amongst "the people."

17       Nor are the government's citations to colloquial use of the word "citizen" in
18  connection with the right to bear arms persuasive. Rather, the term "citizen"—
19  *particularly* in the 1700s—had meanings beyond formal, legal citizenship. The Oxford
20  English Dictionary lists numerous meanings in use at the time of the Second
21  Amendment's ratification, leading with "[a]n inhabitant of a city or town; esp. one
22  possessing civic rights and privileges, a burgess or freeman of a city." Oxford English
23  Dictionary, "Citizen,"
24  https://www.oed.com/dictionary/citizen_n?tab=meaning_and_use&tl=true#9254061,
25  2023 (last visited Sept. 28, 2023). More reasonably, a "citizen" in the government's

MR. DEBORA'S REPLY TO THE
GOVERNMENT'S OPPOSITION TO
HIS MOTION TO DISMISS
(*United States v. DeBorba*, CR22-5139-DGE) - 15

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

quotations referred to a layperson—a resident who was not part of the military or government.

The historical record does not support the government's narrow reading of "the people." Rather, the Court should follow Ninth Circuit precedent, the plain text of the Second Amendment, and relevant historical context and find that "the people" protected by the Second Amendment includes noncitizens and undocumented immigrants. Even if the Court were to apply *Verdugo-Urquidez*'s "sufficient connection" test, 494 U.S. at 265, Mr. DeBorba has easily satisfied this test, something the government does not meaningfully dispute, *see* Dkt. 51 at 16.

### C. The government has not demonstrated a new "societal problem" warranting a relaxed analytical standard for either § 922(g)(5) or (g)(8)—rather, crime, immigration, and domestic violence have all existed since the 1700s.

For both challenged statutes, the government argues that the Court should apply a more forgiving standard to *Bruen* step 2. The government asks this Court to find that each statute addresses a new societal problem *not* because people have changed their behavior, technology, or make-up of society, but rather because the government has changed the law in intervening years. Dkt. 51 at 16, 48. The Court was perfectly clear in *Bruen*, "when a challenged regulation addresses **a general societal problem that has persisted since the 18th century**, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 142 S. Ct. at 2131 (emphasis added).

Likely aware that it cannot show any "distinctly similar historical regulation addressing" crime control, immigration, or domestic violence, *Bruen*, 142 S. Ct. at 2131, the government tries to redefine the circumstances that would require it to make such a showing. The government seeks to redefine a "societal" problem as instead a legal restriction. But this was not the Court's ruling.

MR. DEBORA'S REPLY TO THE
GOVERNMENT'S OPPOSITION TO
HIS MOTION TO DISMISS
(*United States v. DeBorba*, CR22-5139-DGE) - 16

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Nor is there any indication that the Court intended the government's enactment of new laws to render a longstanding societal problem suddenly new. The word "societal" means "of or relating to society : SOCIAL," Merriam-Webster, "Societal," https://www.merriam-webster.com/dictionary/societal, 2023 (last accessed Sept. 28, 2023). "Society" in turn means, alternately,

- "companionship or association with one's fellows : friendly or intimate intercourse : COMPANY[;]"

> - "a voluntary association of individuals for common ends especially : an organized group working together or periodically meeting because of common interests, beliefs, or profession[;]"
> - "an enduring and cooperating social group whose members have developed organized patterns of relationships through interaction with one another[;]" or
> - "a community, nation, or broad grouping of people having common traditions, institutions, and collective activities and interests[.]"

Merriam-Webster, "Society," https://www.merriam-webster.com/dictionary/society, 2023 (last accessed Sept. 28, 2023). A societal problem thus does not generally refer to the government's decision to change laws. And to the extent the government argues that changing societal mores sparked the change in the laws—the laws were not enacted to solve the problem of changed moral attitudes. They were enacted to solve the problems of general crime and domestic violence.[5]

The Court should reject the government's attempt to change *Bruen*'s holding. Rather, applying *Bruen* as written, it is undisputed that crime, immigration, and domestic violence were all in existence during and have persisted since the 18th century. *See* Dkt. 36 at 26, 34, 39. Noncitizens with firearms was a concept that existed when our Nation was founded—colonists just did not care to regulate firearms based on

---

[5] For the sake of argument, Mr. DeBorba here addresses the idea that § 922(g)(5) was enacted to address the "problem" of immigration. However, as argued in his Motion, the statute was actually a general crime control provision. Dkt. 36 at 26–27.

MR. DEBORA'S REPLY TO THE
GOVERNMENT'S OPPOSITION TO
HIS MOTION TO DISMISS
(*United States v. DeBorba*, CR22-5139-DGE) - 17

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

citizenship. At the time of ratification, federal law restricted naturalization to "any free White person… of good character" who had resided in the United States for two years and took an oath to support the Constitution. Ex. B at 49, ¶ 128. As a result, newly-arriving noncitizen white men existed as a social group in 1791. Colonial legislators could have regulated this group's firearm rights. They didn't. And the government conceded as much. Dkt. 51 at 38.

Similarly, the government concedes that domestic violence existed during the ratification era. Indeed, the government cites numerous examples of people seeking legal recourse for domestic violence and being turned away, even well after the ratification era. *See* Dkt. 51 at 48.[6] The government acknowledges that despite the evident problem, no restrictions were placed on people's right to bear arms based on their alleged involvement in or risk of committing domestic violence. *Id*. at 46, 48.

The government's position raises precisely the constitutional concerns discussed by the Third Circuit in *Range*. The Third Circuit there rejected the government's attempt to confine "the people" protected by the Second Amendment to "law-abiding citizens" in *Bruen* step 1, reasoning:

> the Government's claim that only "law-abiding, responsible citizens" are protected by the Second Amendment devolves authority to legislators to decide whom to exclude from "the people." We reject that approach because such "extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label." *Folajtar [v. Attorney General of the U.S.]*, 980 F.3d [897,] 912 [(3rd Cir. 2020)] (Bibas, J., dissenting). And that deference would contravene *Heller*'s reasoning that "the enshrinement of constitutional rights necessarily takes

---

[6] The government attempts one final claim of a new "societal problem" by arguing that the improved efficiency of firearms since the ratification era rendered the use of firearms in domestic violence a "new" problem. Dkt. 51 at 48–49. But this argument is both dubious (notably, the government made no similar argument to justify § 922(g)(5)) and insufficient to save § 922(g)(8). Indeed § 922(g)(8) does not confine itself to the problem of "new" and "efficient" firearms, but prohibits impacted people from possessing *any* firearm or ammunition.

MR. DEBORA'S REPLY TO THE
GOVERNMENT'S OPPOSITION TO
HIS MOTION TO DISMISS
(*United States v. DeBorba*, CR22-5139-DGE) - 18

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

certain policy choices off the table." 554 U.S. at 636, 128 S.Ct. 2783; *see also Bruen*, 142 S. Ct. at 2131 (warning against "judicial deference to legislative interest balancing").

69 F.4th at 102–03. Although the government here renews its attempt subvert *Bruen*'s holding at step 2, *Range*'s warning remains relevant.

 If the Court were to accept the government's argument that a societal problem is "new" when, after decades of ignoring or tolerating it, the government decides to pass laws criminalizing or restricting it, then the legislature has the power to redefine the Second Amendment. For example, although multi-generational households have existed for centuries, Congress could decide that adult children who reside with their parents are "untrustworthy" or "dangerous." Congress could use its Commerce Clause powers, or the many states could pass laws prohibiting adults from living with their parents rent free for more than three months. The existence of this new law would not make the problem of adult children living with their parents "new." Nor would Congress or even the public's sudden judgment that such people are untrustworthy or dangerous. But under the government's argument, such a law would allow the government to disarm adult children living with their parents by a vague analogy to historic disarmament of oppressed groups and people who refused to swear oaths of loyalty. This would render the Second Amendment largely illusory, and subject to the policy whims of the day. This cannot be.

 This is also why *Bruen* made clear that Second Amendment analysis includes *no* policy analysis, no means-ends scrutiny. *Bruen*, 142 S. Ct. at 2129. The government's various policy arguments to support the challenged statutes are simply irrelevant. *See* Dkt. 51 at 23–24 (citing plausible policy reasons for enacting § 922(g)(5)); 25-26 (citing policy arguments and research regarding domestic violence homicides to justify § 922(g)(8)). *Bruen* made clear that the required analysis is rooted in history. And the

MR. DEBORA'S REPLY TO THE
GOVERNMENT'S OPPOSITION TO
HIS MOTION TO DISMISS
(*United States v. DeBorba*, CR22-5139-DGE) - 19

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

government's assertion that current policy-makers are doing a better job than those of yesteryear does not change that analysis.

**D.**     **The Court should reject the government's attempt to sanitize and group unrelated regulations to allow it substantial power to disarm anyone it may deem "irresponsible" or "dangerous."**

The government has not shown that distinctly similar nor even relevantly similar (the relaxed standard for gun restrictions addressing new societal problems) historical analogues for either § 922(g)(5) or § 922(g)(8). In each instance, the government asks the Court to find a pattern from a handful of unrelated laws that allows it to disarm people that the government categorizes as either "untrustworthy" and "irresponsible" or "dangerous." But these exceedingly vague characterizations of historical regulations are not similar to the regulations challenged here and are so broad they lack a meaningful limiting principle.

The Ninth Circuit recently made clear that it demands more than vague analogies to uphold a statute under *Bruen*, citing with approval other Circuits' decisions that have rejected analogues similarly tenuous to those presented by the government here:

> Courts in our sister circuits have consistently recognized that the *Bruen* standard for identifying a closely analogous historical regulation is a demanding one. A proper analysis demands "paying close attention to the enforcement and impact of various regulations." *Atkinson [v. Garland]*, 70 F.4th [1018,] 1022 [(7th Cir. 2023)]. So, for instance, postbellum statutes banning the carry of firearms "while under the influence" were deemed not analogous to a modern carry ban on "unlawful users" of intoxicants because "there is a considerable difference between someone who is actively intoxicated and someone who is an 'unlawful user.' " *United States v. Daniels*, 77 F.4th 337, 347 (5th Cir. 2023) []. And Founding-era statutes that disarmed groups of persons who governments thought might be dangerous because of their race or religion were not considered analogous to modern carry prohibitions on released felons also thought to be dangerous: "any such analogy would be far too broad." *Range []*, 69 F.4th [at] 103–05 [].

MR. DEBORA'S REPLY TO THE
GOVERNMENT'S OPPOSITION TO
HIS MOTION TO DISMISS
(*United States v. DeBorba*, CR22-5139-DGE) - 20

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

*Baird*, No. 23-15016, 2023 WL 5763345, at *8. As discussed further below, the government here advances supposed analogues that are as disjointed or more disjointed than those rejected in *Atkinson*, *Daniels*, and *Range*.

        1.    **The government's claimed "tradition" of disarmament of outsiders is both contrary to the Second Amendment's purpose, and dissimilar from § 922(g)(5)—a general crime control measure that disarms noncitizens.**

First, the government claims that old laws disarming disfavored minorities and people who would not take loyalty oaths demonstrate a pattern of disarming "untrustworthy" people. Dkt. 51 at 18–20. Such a broad categorization of historical precedent, much like the government's claims that "the people" include only "law-abiding citizens," "admits to no true limiting principle." *Rahimi*, 61 F.4th at 453. There is no consistency to whom is deemed "untrustworthy" in the government's view or why except for the particular prejudices of the moment.

Furthermore, the regulations disarming racial and religious minorities, in addition to being constitutionally defective on other grounds,[7] were precisely the type of oppression the Second Amendment was meant to prevent. Indeed, the English Declaration of Rights thought to contain a predecessor of the Second Amendment was established in response to a monarch's wrongful disarmament of a disfavored religious group (there, Protestants). To foreclose such disarmament in the future, the Declaration of Rights enshrined this oppressed group's right to bear arms. *See* Stephen P. Halbrook, *The Second Amendment Was Adopted to Protect Liberty, Not Slavery: A Reply to*

---

[7] As Hon. District Judge Eli Richardson explained, "it is notable that these laws did not broadly prohibit firearm ownership by immigrants generally; instead, they targeted a specific race. Furthermore, though such laws existed near the time of the Founding, they indisputably would be unconstitutional today under the Equal Protection Clause. . . . "The 'Act for disarming Papists' is also inapt and constitutionally suspect (this time, under the Free Exercise Clause)." *United States v. Escobar-Temal,* No. 3:22-CR-00393, 2023 WL 4112762, at *4 (M.D. Tenn. 2023).

*Professors Bogus and Anderson*, 20 Geo. J.L. & Pub. Pol'y 575, 580 (2022) (internal

citations omitted). And it was Northerners from states who had abolished slavery who

pushed for a Bill of Rights, including the Second Amendment, to protect ordinary

people against government or military oppression, not to facilitate the continuation of

slavery or the oppression of disfavored groups. *See generally id*. Post-ratification laws

disarming racial minorities reflect the hypocrisy and bigotry of the time, not the

purpose of the Second Amendment.

   While religious-based disarmament may have some support in the English

tradition of firearm regulation, they are antithetical to the American tradition of firearm

regulation. As previously discussed, the Bill of Rights was adopted as a package and,

critically, the First Amendment's enactment was a direct response to infringement of

religious liberty in the colonies. *See Everson v. Board of Ed. Of Ewing Tp*., 330 U.S. 1,

11 (1947). After passing the Catholic disarmament bill in 1765, Virginia became the

flashpoint for Thomas Jefferson and James Madison's initial "Virginia Bill for

Religious Liberty," which has been recognized as sharing the same objectives as the

First Amendment. *Id*. at 11-14. As courts have found, it make little sense for the

government to carry its burden under *Bruen*'s second step by citing laws that would be

unconstitutional today. *See, e.g., United States v. Hicks*, No. W:21-CR-00060-ADA,

2023 WL 164170, at *7 (W.D. Tex. Jan. 9, 2023) ("This Court is also skeptical of using

historical laws that removed someone's Second Amendment rights based on race, class,

and religion to support doing the same today. Indeed, the Court believes that 'rejecting'

the discriminatory application of those unconstitutional laws historically—while still

arguing those laws should be a basis for the Court's decision—walks too fine a line.").

   The Supreme Court anticipated the need to resolve such complicated history:

"'post-ratification adoption or acceptance of laws that are inconsistent with the original

meaning of the constitutional text obviously cannot overcome or alter that text.'"

MR. DEBORA'S REPLY TO THE
GOVERNMENT'S OPPOSITION TO
HIS MOTION TO DISMISS
(*United States v. DeBorba*, CR22-5139-DGE) - 22

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1    *Bruen*, 142 S. Ct. at 2137 (quoting *Heller*, 670 F.3d at 1274, n. 6 (Kavanaugh, J.,

2    dissenting)). In any event, as detailed in *McDonald*, the Fourteenth Amendment made

3    clear that the Second Amendment was not confined to white people, and that the

4    racially discriminatory regulations relied on by the government here were

5    unconstitutional. *See McDonald*, 561 U.S. at 772 (detailing the drafters' intent that

6    African American people be empowered to defend themselves against acts of violence

7    from their white neighbors); *see also* Dkt. 36 at 35–36 (discussing same).

8        Furthermore, the government's claim that regulations requiring an oath of

9    loyalty in order to posses a gun was a means of disarming the "untrustworthy" is not

10   supported. Rather, the record reflects that such oath of loyalty regulations were

11   motivated by a desire to keep a social hierarchy, not by a distrust of those who did not

12   swear an oath. *See* Ex. B at 43, ¶121; *Rahimi*, 61 F.4th at 457 ("[t]he purpose of laws

13   disarming 'disloyal' or 'unacceptable' groups was ostensibly the preservation of

14   political and social order"). Indeed, these regulations were concerned with wartime

15   social order in the colonies, as they refer to "Non-Associators" and those "disaffected to

16   the cause of America." Ex. B at 46–47, ¶126.

17       The Supreme Court has cautioned that upholding a modern regulation that only

18   "remotely resembles a historical analogue" would entail "endorsing outliers that our

19   ancestors would never have accepted" and would thus be inconsistent with the

20   historical inquiry required to protect the Second Amendment rights. *Bruen*, 142 S. Ct. at

21   2133 (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021)); *see also*

22   *Baird*, No. 23-15016, 2023 WL 5763345, at *5 (quoting same).

23       As the government acknowledges, § 922(g)(5) was not enacted to oppress a

24   particular racial group or preserve a particular hierarchy, it was a general crime control

25   law. Dkt. 51 at 23–24. Thus, the government has not shown a sufficiently (*either*

26

MR. DEBORA'S REPLY TO THE
GOVERNMENT'S OPPOSITION TO
HIS MOTION TO DISMISS
(*United States v. DeBorba*, CR22-5139-DGE) - 23

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

distinctly *or* relevantly) similar "why" behind its purported historical analogues and § 922(g)(5).

Rather, disarming noncitizens is a modern concept. The first federal bills aimed at criminalizing firearm possession by noncitizens were not even proposed until 1922, Ex. B at 36, ¶97, and did not pass until nearly 20 years later with the Alien Registration Act of 1940. *Id*. at 40, ¶106. But even this law stopped short of banning firearms for noncitizens. It was not until 1968 that Congress passed the first actual firearm prohibition for noncitizens, which is the statute at issue here: § 922(g)(5). *Id*. at 42, ¶114. Laws this recent have been explicitly rejected by the Supreme Court as appropriate analogues. *See Bruen*, 142 S. Ct. at 2154 n.28 ("We will not address any of the 20th-century historical evidence brought to bear by respondents or their amici. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment").

### 2. The Third Circuit and Mr. DeBorba are not improperly "dividing and conquering" the government's proposed § 922(g)(8) analogues, but are faithfully applying *Bruen*.

The government asserts that Mr. "DeBorba's (and the Fifth Circuit's) divide-and-conquer approach to the historical evidence is badly misguided." Dkt. 51. The government further argues, without citation, that "A court applying the Second Amendment should not isolate each historical precursor and ask if it differs from the challenged regulation in some way. A court should instead examine the historical evidence as a whole, determine whether it establishes a category of permissible regulation (such as 'dangerous and unusual weapons' or 'sensitive places'), and determine whether the challenged law fits in that category." *Id*. But the government's claimed "category" of regulation is vague to the point of being meaningless.

MR. DEBORA'S REPLY TO THE GOVERNMENT'S OPPOSITION TO HIS MOTION TO DISMISS (*United States v. DeBorba*, CR22-5139-DGE) - 24

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

1    Indeed, the Court in *Bruen* cautioned against incoherent categories of

2   restrictions, like the restrictions on the "irresponsible," "law-breaking," or "dangerous"

3   advocated by the government. The Court explained:

4         And because "[e]verything is similar in infinite ways to everything else,"
          [C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 774
5         (1993)], one needs "some metric enabling the analogizer to assess which
          similarities are important and which are not," F. Schauer & B. Spellman,
6         *Analogy, Expertise, and Experience*, 84 U. Chi. L. Rev. 249, 254 (2017).
          For instance, a green truck and a green hat are relevantly similar if one's
7         metric is "things that are green." *See ibid*. They are not relevantly similar
          if the applicable metric is "things you can wear."
8

9   *Bruen*, 142 S. Ct. at 2132. In trying to justify § 922(g)(8), the government gathered

10  discordant historic regulations and tried to find a commonality. But such method

11  inevitably results in a commonality that is so broad it could apply to nearly any

12  regulation.

13       The government groups its proposed analogues under the umbrella of limiting

14  gun access in any way for "dangerous" or "irresponsible" people. Dkt. 51 at 39–40. As

15  previously briefed, the Fifth Circuit correctly rejected these proposed analogues. Dkt.

16  36 at 40–42. They are not analogous to § 922(g)(8) in the areas that matter under

17  *Bruen*—the "how" and "why." None target a group based on allegations or supposed

18  risk of domestic violence, some require actual criminal convictions, and some employ

19  means short of complete disarmament. *See id*.

20       The "category" of regulation that the government advocates—restrictions on the

21  rights of people deemed "dangerous" or "irresponsible"—could further apply to an

22  immense breadth of possible regulations. It could justify the disarmament of all people

23  with low credit scores, all people who play first-person shooter video games, all people

24  who are male, *see* The Violence Project, *Mass Public Shootings Today Are More*

25  *Frequent and Deadlier*, https://www.theviolenceproject.org/key-findings/ (last visited

26  Sept. 28, 2023) (indicating 97 percent of mass shootings are committed by men). But

MR. DEBORA'S REPLY TO THE
GOVERNMENT'S OPPOSITION TO
HIS MOTION TO DISMISS
(*United States v. DeBorba*, CR22-5139-DGE) - 25

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

proper Second Amendment analysis is not subject to the policy judgement of the moment. Rather, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636.

Furthermore, the government incorrectly claims that the Ninth Circuit endorsed such a category in *United States v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023). *See* Dkt. 51 at 40 (characterizing *Alaniz* as holding that a Sentencing Guidelines enhancement for using a gun to commit a drug trafficking crime "fit within a long tradition of regulations designed to disarm dangerous people."). But *Alaniz* did no such thing. Rather, the Ninth Circuit in *Alaniz* identified *actually similar* historic regulations. Namely, the Ninth Circuit held that the sentencing enhancement "clearly comports with a history and tradition of regulating the possession of firearms during the commission of felonies involving a risk of violence." *Id*. at 1129. Indeed, the government there offered "a number of founding-era statutes to prove a historical tradition of sentencing enhancements tied to firearm possession." *Id*. Nothing about *Alaniz* suggests that the Ninth Circuit would accept the vague analogues offered here.

### E.   The Court should reject the government's attempt to shift its burden to Mr. DeBorba—an attempt that directly contradicts *Bruen*.

The government tries to avoid its burden of proof by hypothesizing reasons why historical regulations that are similar to the challenged statutes do not exist. The government posits,

> Past lawmakers' failure to adopt a given regulation does not necessarily (or even ordinarily) reflect doubts about its constitutionality. The idea of adopting such a regulation may never have occurred to the lawmakers. They may have considered the regulation unnecessary, impractical, or politically inexpedient. Or they may have failed to act because of the "sluggishness of government, the multitude of matters that clamor for attention, and the relative ease with which men are persuaded to postpone troublesome decisions." *Duckworth v. Arkansas*, 314 U.S. 390, 400 (1941) (Jackson, J., concurring in result); *see Zuber v. Allen*, 396 U.S.

168, 185 n.21 (1969) ("Congressional inaction frequently betokens unawareness, preoccupation, or paralysis.") Dkt. 51 at 47.

*Bruen* plainly rejected similar speculation, and kept the burden of demonstrating such historical tradition firmly with the government. "The dissent speculates that the absence of recorded cases involving surety laws may simply 'show that these laws were normally followed.' []. Perhaps. But again, the burden rests with the government to establish the relevant tradition of regulation, [], and, given all of the other features of surety laws that make them poor analogues to New York's proper-cause standard, we consider the barren record of enforcement to be simply one additional reason to discount their relevance." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2149 (n.25) (2022) (citations omitted).

The government further distorts *Bruen* to try to shift its burden to Mr. DeBorba: "Of course, an absence of a history of similar regulations may be 'relevant' to the Second Amendment inquiry. *Bruen*, 142 S. Ct. at 2131. But the Supreme Court has never treated it as dispositive. Instead, both *Bruen* and *Heller* relied on historical authorities invalidating or disapproving analogous regulations 'on constitutional grounds.'" Dkt. 51 at 47 (citing *Bruen*, 142 S.Ct. at 2131; *Heller*, 554 U.S. at 629.). Again, this mis-states *Bruen*'s plain holding.

The Court actually listed multiple ways that the government may fail to meet its burden:

> For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds,

MR. DEBORA'S REPLY TO THE
GOVERNMENT'S OPPOSITION TO
HIS MOTION TO DISMISS
(*United States v. DeBorba*, CR22-5139-DGE) - 27

FEDERAL PUBLIC DEFENDER
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

that rejection surely would provide some probative evidence of unconstitutionality.

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2131, 213 L. Ed. 2d 387 (2022). There is no requirement that *all* of these possibilities be present for a current statute to be unconstitutional.

And the Court also acknowledged reasons why the government's demand for a court decision invalidating an analogous historical regulation may not exist. Amendments may be misunderstood by later courts or legislatures: "'post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.'" *Bruen*, 142 S. Ct. at 2137 (quoting *Heller*, 670 F.3d at 1274, n. 6 (Kavanaugh, J., dissenting)). Furthermore, the lack of contemporaneous court or other decision rejecting regulations as contrary to the Second Amendment may reflect the long-held misconception that the Second Amendment did not restrict regulations by the states, as opposed to the federal government. *See* Ex. B at 43–44, ¶122. But most likely, the lack of such decisions reflects the reality that relevantly analogous historical regulations do not exist.

The Court should not relieve nor shift the government's burden. Judges "are not obliged to sift the historical materials for evidence to sustain [a challenged] statute, . . . That is [the government's] burden." *Bruen*, 142 S. Ct at 2150. Any unanswered questions must be held to the government. The Ninth Circuit recently emphasized this principle:

> A government may regulate the manner of that [open firearm] carry only if it demonstrates that the regulation is identical or closely analogous to a firearm regulation broadly in effect when the Second or Fourteenth Amendment was ratified. [*Bruen*, 142 S. Ct.] at 2129–30, 2133. A ***district court should not try to help the government carry its burden by "sift[ing] . . . historical materials"* to find an analogue*. Id*. at 2150. The principle of party presentation instead requires the court to "rely on the parties to frame the issues for decision." *United States v. Sineneng-Smith*, [] 140 S. Ct. 1575, 1579 [] (2020) (quoting *Greenlaw v. United States*,

MR. DEBORA'S REPLY TO THE
GOVERNMENT'S OPPOSITION TO
HIS MOTION TO DISMISS
(*United States v. DeBorba*, CR22-5139-DGE) - 28

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

554 U.S. 237, 243 [] (2008)); *see also Bruen*, 142 S. Ct. at 2130 n.6
("Courts are ... entitled to decide a case based on the historical record
compiled by the parties.").

*Baird*, No. 23-15016, 2023 WL 5763345, at *3 (emphasis added); *see also United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *15–16 (S.D. Miss. June 28, 2023) (dismissing § 922(g)(1) charge when "the party with the burden to prove history and tradition" failed to present a sufficient historical record).

> **F.    The government incorrectly relies on interpretation of *other* elements for *other* false statement charges rather than addressing its failure to allege the materiality requirements of the offenses charged here.**

The government seeks to defeat Mr. DeBorba's Motion to Dismiss Counts 4 through 6 by arguing he cannot defend himself by arguing the government had no right to pose the questions at issue. Dkt. 51 at 51. The government relies primarily on decades-old cases interpreting 18 U.S.C. § 1001, the general false statement to a federal official statute, not charged here.

The government argues that a "person 'who furnishes false information to the Government in feigned compliance with a statutory requirement cannot defend against prosecution for his fraud by challenging the validity of the requirement itself.'" Dkt. 51 at 51 (quoting *United States v. Knox*, 396 U.S. 77, 79 (1969)). Similarly, the government asserts that "'it cannot be thought that as a general principle of law a citizen has a privilege to answer fraudulently a question that the Government should not have asked.'" *Id*. (quoting *Bryson v. United States*, 396 U.S. 64, 72 (1969)).

However, both *Knox* and *Bryson* examined elements *other* than materiality of § 1001. Mr. Knox did not argue that his false statement was not material, but rather argued that his answer was improperly compelled in violation of his Fifth Amendment rights. "Knox's ground for complaint is not that his false information inculpated him for a prior or subsequent criminal act; rather, it is that under the compulsion of [certain required IRS forms] he committed a criminal act, that of giving false information to the

MR. DEBORA'S REPLY TO THE
GOVERNMENT'S OPPOSITION TO
HIS MOTION TO DISMISS
(*United States v. DeBorba*, CR22-5139-DGE) - 29

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

Government." *Knox*, 396 U.S. at 82. The Court's statement that the Fifth Amendment implications did not entitle him to lie has no bearing on whether the statements alleged in Mr. DeBorba's case were material.

In *Bryson*, the Court discussed the "federal jurisdiction" element of § 1001 not the materiality element. Mr. Bryson had been convicted of a § 1001 charge after he claimed that he was not a member or affiliate of the Communist Party. The statement was made pursuant to a law at the time that required people to aver that they were not communists in order to receive protection under certain labor laws. The requirement was later repealed and ultimately ruled unconstitutional under the First Amendment. *See Bryson*, 396 U.S. at 68–69. The Court analyzed the validity of Mr. Bryson's conviction only under § 1001's element requiring the statement be made "in any matter within the jurisdiction of any department or agency of the United States[,]" not under its materiality element[8]:

> In this case, the Board received petitioner's affidavit pursuant to explicit statutory authority, which only a short time before had been upheld as constitutional in *Douds*. Given that under s 9(h) the Board's 'power to act on union charges (was) conditioned on filing of the necessary affidavits,' *Leedom v. International Union of Mine, Mill and Smelting Workers*, 352 U.S. 145, 148—149, 77 S.Ct. 154, 156, 1 L.Ed.2d 201 (1956), the Board certainly had the apparent authority, granted by statute, necessary for purposes of s 1001. Thus, we hold that irrespective of whether *Douds* would be reaffirmed today, petitioner made a false statement in a 'matter within the jurisdiction' of the Board.

*Bryson*, 396 U.S. at 71. This holding did not discuss materiality, nor the statutes charged here, so does not control the resolution of Mr. DeBorba's Motion.

The government finally cites to non-controlling authority that does relate to the Motion raised here. *See* Dkt. 51 at 52. In *United States v. Holden*, the Seventh Circuit rejected an argument that a § 922(a)(6) (false statement in the purchase of a firearm)

---

[8] The statute in effect at the time was 18 USC 1001 (1949), *found in* 80 P.L. 772, 749, 62 Stat. 683, 80 Cong. Ch. 645 (1948).

MR. DEBORA'S REPLY TO THE
GOVERNMENT'S OPPOSITION TO
HIS MOTION TO DISMISS
(*United States v. DeBorba*, CR22-5139-DGE) - 30

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

conviction was invalid because the answer to the question at issue—whether the

purchaser was under indictment—was immaterial. 70 F.4th 1015, 1018 (7th Cir. 2023).

Similar to Mr. DeBorba, Mr. Holden there argued that the question was immaterial

because § 922(n), which prohibits gun possession by people under felony indictment,

was unconstitutional under *Bruen*. The Seventh Circuit certainly looked to the Supreme

Court law cited above, but ultimately reasoned that the question of whether a purchaser

was under indictment was material to the gun sale even if § 922(n) did not exist. *See id*.

The Court noted that the invalidation of certain gun regulations did not create a

right to lie about things that would still be "material" to a gun transaction: "The word

'material' in § 922(a)(6) does not create a privilege to lie, ***when the answer is material***

***to a statute***, whether or not that statute has an independent constitutional problem." *Id*.

at 1017 (emphasis added).

The Seventh Circuit held that § 922(n) (the statute that would plainly make the

question of whether the purchaser was under indictment material to the gun sale) was

not facially unconstitutional under *Bruen*. *Id*. Yet, in case it were wrong about § 922(n)

the Court proceeded to identify *other* reasons that a question about whether a purchaser

was under indictment would be material to a gun sale:

> Suppose the Supreme Court were to hold § 922(n) invalid in all of its
> applications (that is, "on its face"). Section 922(a)(6) speaks of facts
> material to "this chapter" of the Criminal Code. Knowledge that the
> applicant is under indictment might lead the dealer or federal official to
> check just what the charge is. Suppose the check reveals that the applicant
> is [a noncitizen] charged with unlawful reentry after a removal order. That
> would forbid a sale under 18 U.S.C. § 922(g)(5). *See United States v.*
> *Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015). A check might reveal that
> the applicant is a fugitive, barred by § 922(g)(2). It might reveal a
> conviction that blocks ownership under § 922(g)(1). (For example, the
> indictment might charge a person with possessing a gun despite a prior
> conviction for a violent crime.) And given the lag between filing a form
> and the transfer of the gun, some would-be purchasers who are indicted

by the first date may be convicted by the second; an honest answer would
allow that possibility to be checked.

*Id*. at 1018. Thus the Seventh Circuit's analysis remains tethered to the element of the §
922(a)(6) charge filed. It articulated reasons *besides* the potentially invalid § 922(n) that
an answer about whether a purchaser was under indictment would be "material to the
lawfulness of the sale or other disposition of such firearm[.]" 18 U.S.C. § 922(a)(6).

But questions about citizenship and immigration status, unlike questions about
pending indictments, are unlikely to reveal *other* bases for declining a gun sale. Indeed,
undocumented immigrants are substantially less likely to commit crimes than U.S.
citizens. *See* Alex Nowrasteh, Criminal Immigrants in Texas in 2019, Illegal Immigrant
Conviction Rates and Arrest Rates for Homicide, Sex Crimes, Larceny, and Other
Crimes, CATO Institute (2021), https://www.cato.org/sites/cato.org/files/2021-
05/IRPB-19.pdf. Such information is further irrelevant to furthering the government's
purpose of keeping track of guns for future law enforcement needs. *See Abramski v.
United States*, 573 U.S. 169, 180 (2014).[9]

Instead, because § 922(g)(5) is facially unconstitutional, an answer to a question
about citizenship or immigration status has no bearing on whether a gun sale could go
forward, and is not "material to the lawfulness of the sale or other disposition of such
firearm[.]" 18 U.S.C. § 922(a)(6). Instead, such questions become the source of
quintessential *im*material statements. The answers to these questions are as immaterial
to the sale of a gun as a question about the purchaser's favorite color.

---

[9] The government argues that even though there is no basis to restrict gun sales if, for
example a purchaser's last name begins with an "H," a false statement to the question
about the purchaser's name is still material. Dkt. 51 at 52. However a question about a
purchaser's name is relevant because registration of firearms allows for better tracing
and investigation by law enforcement should the gun be used in a crime. *Abramski*, 573
U.S. at 180. A person's citizenship or immigration status serves no such purpose.
Particularly where the form already contains the person's name, date of birth, address,
and other identifying information.

MR. DEBORA'S REPLY TO THE
GOVERNMENT'S OPPOSITION TO
HIS MOTION TO DISMISS
(*United States v. DeBorba*, CR22-5139-DGE) - 32

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1   Similarly, with regard to the false claim to U.S. citizenship charge under § 911,

2   the government has not demonstrated that a statement about citizenship has any

3   materiality to a concealed carry permit if § 922(g)(5) is unconstitutional. Because

4   § 922(g)(5) is unconstitutional, as argued above, the Washington Department of

5   Licensing had no "right to inquire or adequate reason for ascertaining [Mr. DeBorba's]

6   citizenship[.]" *Esparza-Ponce*, 193 F.3d at 1138. The Court should dismiss Counts 4

7   through 6.

## II.   CONCLUSION

9   The Court need only apply *Bruen*'s test faithfully to conclude that §§ 922(g)(5)

10  and (8) violate the Second Amendment. As such, the Court should dismiss Counts 1

11  through 6 of the Superseding Indictment. As tempting as it is to engage in the

12  longstanding practice of policy analysis and means-ends review, *Bruen* has limited the

13  Second Amendment analysis to text and history. This test here confirms that

14  §§ 922(g)(5) and (8) are unconstitutional.

16  DATED this 29th day of September, 2023.

Respectfully submitted,

s/ *Rebecca Fish*
Assistant Federal Public Defender
Attorney for João Ricardo DeBorba

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**