# Exhibit B

United States District Court
Eastern District of Washington

*United States of America*

*v.*                                    No. 2:22-cr-087-RMP-1

*Oscar Vazquez-Ramirez*

## EXPERT REPORT AND DECLARATION OF PRATHEEPAN GULASEKARAM

I declare under penalty of perjury that the following is true and accurate to the best of my knowledge:

### I.      Qualifications

1.      I reside in Boulder, Colorado. I am an attorney licensed to practice in California (CA State Bar No. 220885). My complete curriculum vitae follows this Declaration.

2.      I hold a law degree from Stanford Law School and a bachelor of arts degree from Brown University.

3.      As of August 2023, I am Provost Professor of Law at University of Colorado Law School, where I will teach both immigration law and constitutional law. From August 2007 through July 2023, I was Professor of Law and Faculty Fellow at the Markkula Center for Applied Ethics at Santa Clara University School of Law, where I taught immigration law, constitutional law, and seminars in state and local immigration law. For several academic terms, I have taught immigration law as a Visiting Professor at Stanford Law School, University of California Berkeley Law School, and University of California, Berkeley (undergraduate program). Prior to 2007, I taught two years at New York University School of Law as Acting Assistant Professor of Lawyering, and one year at Loyola University New Orleans School of Law as Visiting Professor.

4.      I co-author the most widely used immigration law textbook used in law schools, IMMIGRATION AND CITIZENSHIP: PROCESS AND POLICY (9th Ed) (West Academic 2021) (with T. Alexander Aleinikoff, et. al.).

5.     My academic research focuses on the nexus between constitutional law and immigration law, and I maintain two specific areas of scholarly expertise: (1) The constitutional rights of noncitizens, with a specific focus on Second Amendment rights; and (2) State and local authority to enact immigration policies, an area referred to as "immigration federalism."  I regularly publish academic articles in these subjects and am routinely invited to present work at academic conferences on these subjects.

6.     With regards to the constitutional rights of noncitizens, I have published four articles for legal journals exploring federal and state regulation of firearm possession by noncitizens. Most recently, T*he Second Amendment's "People" Problem* is forthcoming in Fall 2023 with Vanderbilt Law Review. Previously, I published *Guns and Membership in the American Polity*, 21 William & Mary B. Rts. J. 619 (2012), *The People of the Second Amendment: Citizenship and the Right to Bear Arms,* 85 N.Y.U. L. Rev. 1521 (2010), and *Aliens with Guns: Federal Power, Noncitizens, and the Second Amendment*, 92 Iowa L. Rev. 891 (2007). Those works have been cited by several federal and state courts, including *United States v. Jimenez-Shilon*, 34 F.4th 1042 (11th Cir. 2022); *Fletcher v. Haas*, 851 F. Supp.2d 287, 295 (D. Mass. 2012); and *Pohlabel v. State*, 268 P.3d 1264, 1271 (Nev. 2012).

7.     With regards to immigration federalism, I am the co-author of a book that provides an in-depth empirical evaluation of state and local immigration laws. THE NEW IMMIGRATION FEDERALISM (Cambridge Univ. Press 2015) (with S.K. Ramakrishnan). In addition, I have authored numerous law journal articles on the legality of state and local regulation of noncitizens, appearing in the Colombia, N.Y.U., Northwestern, Minnesota, Ohio State, University of Illinois, Arizona State, U.C. Davis, U.C. Irvine, and University of Washington Law Reviews, and the Stanford Law Review Online. See c.v., following.

8.     In addition to my scholarly work, I have authored several blog posts and articles in popular media publications on these subjects. I regularly serve as a media commentator on these issues, with commentary or analyses quoted in National Public Radio or local affiliates, the New York Times, the Atlantic, the Guardian,

the Los Angeles Times, the Washington Post, the San Francisco Chronicle, the San Jose Mercury News, CNN, and USA Today among others. See c.v., following.

## II.     Relevant Case Background

9.     On July 19, 2022, a grand jury charged Mr. Vazquez-Ramirez with violating, among other federal statutes, 18 U.S.C. § 922(g)(5)(A).

10.     Section § 922(g)(5)(A) criminalizes possession of a firearm or ammunition by a noncitizen who is "illegally or unlawfully in the United States."

11.     The record indicates that Mr. Vazquez-Ramirez was born in Mexico. The United States has no record of a lawful entry with inspection. Mr. Vazquez-Ramirez is not in possession of a green card, a nonimmigrant visa, or other deferred or humanitarian status.

12.     On Dec. 15, 2021, a Washington State police officer stopped Mr. Vazquez-Ramirez's vehicle for a traffic violation. During the stop, the police officer discovered that Mr. Vazquez-Ramirez was in possession of a handgun. The officer arrested Mr. Vazquez-Ramirez.

13.     During an interview of Mr. Vazquez-Ramirez by police officers, he stated that the firearm was purchased from a friend approximately two years before the arrest.

14.     Thus far, the Department of Homeland Security has not filed a removal charge based on the firearm. Instead, they have charged Mr. Vazquez-Ramirez with removal under 8 U.S.C. § 1182(a)(7)(i)(II) for being a noncitizen whose visa has not been issued in compliance with immigration laws. In addition to serving as a basis for a criminal sentence, a conviction for a violation of § 922(g)(5) can later serve as the basis for deportation under 8 U.S.C. § 1227(a)(2)(C). That deportation provision permits removal of any noncitizen for an underlying conviction of any federal, state, or local firearms law.

## III.     Summary of Request and Methodology:

15.     The Federal Defenders of Eastern Washington and Idaho retained me to provide a Declaration regarding the federal regulation of noncitizen firearm possession,

including the criminal statute the defendant in this case was charged with, 18 U.S.C. § 922(g)(5), and the regulation of noncitizen firearm possession in the United States generally, in light of the Supreme Court's interpretative methodology in *New York Rifle & Pistol Assoc. v. Bruen*, 142 S. Ct. 2111 (2022).

16.   To investigate the background of the regulation of noncitizens' firearm possession in the United States, I surveyed and reviewed enacted statutes as compiled in various online repositories and databases, including:

    a.   Duke Law School, Center for Firearms Law, *Repository of Historical Gun Laws* available at https://firearmslaw.duke.edu/repository/search-the-repository/

    b.   Mark Frasetto, *Firearms and Weapons Legislation Up to the Early Twentieth Century* (Jan. 2013) available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2200991

    c.   Digests and compilations of colonial and state laws, including:

        i.   THE LAWS OF THE COMMONWEALTH OF MASSACHUSETTS FROM NOV. 28, 1780 TO FEB. 28, 1807 (J.T. Buckingham, 1807)

        ii.   AN ABRIDGEMENT OF THE LAWS OF PENNSYLVANIA FROM 1700 TO 1811 (Farrand, Hopkins, Zantzinger, & Co. 1811)

        iii.   A DIGEST OF THE LAWS OF THE UNITED STATES & THE STATE OF SOUTH CAROLINA RELATING TO THE MILITIA (Thomas D. Condy 1830)

        iv.   A DIGEST OF THE LAWS OF TEXAS (Thomas, Cowperthwait & Co 1850)

17.   Specifically with regards to federal regulation of firearm possession by noncitizens, I reviewed Congressional Records containing federal legislative debate and committee hearings on various federal legislative proposals related to firearms and noncitizens from 1922 through 1968, and amendments to enacted federal laws from 1968 through 1998.

18.   To supplement my review of enacted statutes, I have reviewed the following secondary and academic literature:

a.  Books and academic journal articles written by historians and political scientists, including:

    i.  Alexandra Filindra, RACE, RIGHTS, AND RIFLES (Univ. of Chicago Press, forthcoming October 2023) (page proofs provided by author for review)

    ii.  Patrick J. Charles, VOTE GUN (Columbia Univ. Press 2023)

    iii.  Patrick J. Charles, ARMED IN AMERICA (Prometheus Books 2018)

    iv.  Patrick J. Charles, *The Fugazi Second Amendment: Bruen's Text, History, and Tradition Problem and How to Fix it*, 71 Clev. St. L. Rev. 623 (2023)

    v.  James H. Kettner, THE DEVELOPMENT OF AMERICAN CITIZENSHIP 1608-1870 (Univ. of North Carolina Press 1978)

    vi.  THE FEDERALIST PAPERS (Clinton Rossiter, Ed.) (Penguin 1961)

    vii.  Julia Rose Kraut, THREAT OF DISSENT: A HISTORY OF IDEOLOGICAL EXCLUSION AND DEPORTATION IN THE UNITED STATES (2020)

    viii.  Kitty Calavita, INSIDE THE STATE: THE BRACERO PROGRAM, IMMIGRATION, AND THE I.N.S. (1992).

    ix.  Mae M. Ngai, IMPOSSIBLE SUBJECTS: ILLEGAL ALIENS AND THE MAKING OF MODERN AMERICA (Princeton Univ. Press 2004).

    x.  Mae M. Ngai, *The Architecture of Race in American Immigration Law: A Reexamination of the Immigration Act of 1924*, 86 J. Am. Hist. 67 (1999).

b.  Multiple law journal articles written by various legal and social science experts, including (non-exhaustive list):

    i.  Joseph Blocher & Caitlin Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders*, Duke Law School Public Law & Legal Theory Series No. 2020-80 (2020)

    ii.  Joseph Blocher & Eric Ruben, *Originalism-By-Analogy and Second Amendment Adjudication*, 133 Yale L. J. -- (forthcoming 2023) (draft available on SSRN)

iii.     Joy Milligan & Bertrall Ross, *We (Who are Not) The People*, -- Tex. L. Rev. – (forthcoming 2023) (draft on file with author)

iv.     Jacob D. Charles, *Defeasible Second Amendment Rights: Conceptualizing Gun Laws that Dispossess Prohibited Persons*, 83 Law & Contemp. Probs. 53 (2020)

v.     Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 Geo. L.J. 309, 319 (1991)

vi.     Robert J. Cottrol & Raymond T. Diamond, *Never Intended to be Applied to a White Population: Firearms Regulation and Racial Disparity – The Redeemed South's Legacy to a National Jurisprudence*, 70 Chi-Kent L. Rev. 1307, 1324-27 (1995)

vii.     Meg Penrose, *A Return to the States' Rights Model: Amending the Constitution's Most Controversial and Misunderstood Provision,* 46 Conn. L. Rev. 1463, 1478 (2014)

viii.     Saul Cornell & Emma Cornell, *The Second Amendment and Firearms Regulation: A Venerable Tradition Regulating Liberty While Securing Public Safety*, 108 Am. J. Public Health 867 (2018)

ix.     Mark A. Frassetto, *The Nonracist and Antiracist History of Firearms Public Carry Regulation*, 74 S.M.U. L. Rev. F. 169 (2021)

x.     *Recent Cases: Second Circuit Rules Prohibition of Firearms Possession by Undocumented Immigrants Passes Intermediate Scrutiny* (United States v. Perez), 135 Harv. L. Rev. 1156, 1161 (2021)

xi.     D. Carolina Nunez, *Inside the Border, Outside the Law: Undocumented Immigrants and the Fourth Amendment*, 85 S. Cal. L. Rev. 85 (2011)

xii.     M. Isabel Medina, *Exploring the Use of the Word "Citizen" in Writings on the Fourth Amendment*, 83 Indiana L.J. 1557 (2008)

xiii.    David C. Williams, *The Militia Movement and the Second Amendment: Conjuring with the People*, 81 Cornell L. Rev. 896 (1998)

xiv.    Saul Cornell & Nathan DeDino, *A Well-Regulated Right: The Early American Origins of Gun Control*, 73 Ford. L. Rev. 487 (2004)

xv.    Eugene Volokh, *The Commonplace Second Amendment,* 73 N.Y.U. L. Rev. 793 (1996).

xvi.    Gerald Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 Colum. L. Rev. 1833 (1993).

xvii.    Douglas S. Massey & Karen Pren, *Unintended Consequences of U.S. Immigration Policy: Explaining the Post-1965 Surge from Latin America*, 38 Population and Dev. Rev. 1 (2012)

xviii.    Ernst W. Puttkammer, *Legislation Affecting the Deportation of Aliens*, 3 U. Chi. L. Rev. 229 (1936)

19.    In addition, this Declaration relies on my prior research in this field. I have been writing and publishing on the intersection of noncitizens and firearms regulation since 2006. In those seventeen years, I have:

a.    Conducted numerous Westlaw and other legal database searches for federal and case law on firearms regulation, and the regulation of noncitizens in particular.

b.    Compiled databases of state regulations on firearms that implicate citizenship or immigration status.

c.    Engaged Research Assistants in reviewing my findings, as well as independently uncovering federal, state, and local regulations that distinguish between citizens and noncitizens with regards to firearms regulation.

d.    Presented draft papers at numerous legal conferences and workshops focused on immigration law or second amendment scholarship.

20.    Finally, both as part of my professional development generally and in anticipation of drafting this Declaration specifically, I have attended conferences, workshops, and paper roundtables focused on the rights of noncitizens and legal developments in Second Amendment jurisprudence. In the past few years, I have either been an invited speaker, commenter, or attendee at the Immigration Law Scholars Annual

Conference at Loyola Marymount University Law School (May 2022), workshops hosted by the Duke Center for Firearms Law at Duke University Law School (Nov. 2021 & May 2020), and the Second Amendment at the Supreme Court symposium at University of California Davis Law School (Oct. 2021). Most recently, I attended the "Text (and What Kind of) History?" Conference at Stanford Law School, sponsored by the Stanford Constitutional Law Center for the purpose of reviewing the academic publications and speaker presentations for the panel on "Text, History, and the Second Amendment" (May 20, 2023). These academic conferences have afforded me the opportunity to interact with, and discuss the work of, leading legal scholars of the Second Amendment, as well as historians who focus on firearms regulations from the Colonial and Founding Periods through the twentieth-century.

## IV.    Limitations

The information and conclusions in this Declaration are subject to the following limitations:

21.    In my research, I have not encountered historians or legal academics who focus specifically on the intersection between firearms regulation and immigration status. Indeed, it is this gap in the academic literature that prompted me to engage in this line of study, including surveys of enacted laws from American history and the legislative history behind firearms laws directed at noncitizens. Where possible, I have done my best to contextualize the surveyed enactments with the work of historians, including the works of Mae Ngai, Saul Cornell, and Patrick J. Charles, who hold appointments at academic institutions or with the United States government. Beyond the work of the historians themselves, however, the information in this Declaration is not the subject of historical inquiry through the means typically employed by academics trained in historicity and historical research methods.

22.    I am a law professor trained in legal methods and legal research, and I have conducted that research and arrived at conclusions in this Declaration using the methods typically employed by legal scholars. Accordingly, this Declaration

primarily presents assessments of legal doctrine, corresponding statutory enactments, and evidence of positive law, enacted by jurisdictions at various times. This focus on affirmatively enacted statutes cannot, by itself, reveal information about common understandings of constitutional or statutory text in the various time periods. As such, nothing in this Declaration is sufficient to make claims about social understandings and enforcement practices. Finally, this Declaration, by itself, does not provide the legal and social background motivating lawmakers of the past. Thus, important context regarding how prior lawmakers thought about the nature of constitutional rights, the public policy concerns motivating their legislative responses (or the absence thereof), the salience of citizenship or immigration status, or the interrelationship between several constitutional rights, are all beyond the scope of this Declaration.

23.   The various authors and compilers of databases and online repositories examined for this Declaration (including those listed in para. 16, above) caution that those sources do not represent comprehensive and complete repositories of all firearms restrictions or all restrictions concerning noncitizens.

24.   Especially in regards to firearms regulation, much historical law and policy was formulated at the town, municipal, county, and state levels. As such, this Declaration similarly cannot claim to be a complete or exhaustive review of firearms regulations pertaining to noncitizens. Indeed, it would be difficult to conduct a comprehensive search without significant time and expense researching archives in various subfederal jurisdictions, even assuming that such information would have been kept and archived. Had I considered such an inquiry vital to this Declaration, I would have attempted it. For purposes of this Declaration, however, such a jurisdiction-by-jurisdiction archival search is unnecessary. The various online repositories of gun laws, such as the Duke Repository of Historical Gun Laws, have compiled a significant breadth of such policies, including numerous colonial, founding era, and state policies from all major jurisdictions, over several historical eras. to mitigate the limitations of those repositories and databases, I have supplemented reliance on various repositories with other sources, by including information from colonial and state digests and compilations of laws. In

combination, these collective sources provide sufficient examples and trends from which to draw the conclusions made in this Declaration.

## V.    Summary of Conclusions:

Each of the following summary conclusions is elaborated upon in the Parts that follow:

25.    In considering Second Amendment challenges to arms regulations, the Supreme Court recently instructed courts to consider whether the policy implicates the "plain text" of the amendment; if it does, the Court then requires the government to provide evidence of historical antecedents to the modern-day regulation. *New York State Rifle & Pistol Assoc. v. Bruen*, 142 S.Ct 2111 (2022) (striking down the state's discretionary permitting scheme for issuing firearms carrying permits and prescribing a two-part inquiry for evaluation). At the outset, I want to clarify that in prior academic work and in media commentary, I have expressed the view that "plain text" inquiry is unlikely to yield definitive answers to the scope of "the people", and that an exclusively historical inquiry is an incoherent and inappropriate methodology for evaluating the constitutionality of present-day status-based firearms regulations. *See, e.g.,* Gulasekaram, *The Second Amendment's "People" Problem*, 76 Vand. L. Rev. – (forthcoming 2023; draft available on ssrn) (critiquing *Bruen*'s methodology as it applies to the "who" of gun regulation). For purposes of the conclusions in this Declaration, however, I proceed under *Bruen*'s methodological rubric.

26.    The term "the people" as used in the Second Amendment is not further defined by the text of the Constitution, and does not otherwise admit of any clear or uncontroverted meaning. More importantly, the term does not have a clear relationship to U.S. citizenship or immigration status, especially the immigration status categories created by present-day federal immigration law. Further, the Supreme Court rarely has proffered clarification of the meaning of the phrase. When it has, its interpretation has either been based on racial prejudice and white supremacy, see *Dred Scott v. Sandford*, 60 U.S. 393 (1856), or by judicially-created standards that go beyond the "plain text" of the Constitution. See *District of*

*Columbia v. Heller*, 554 U.S. 570 (2008); *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990).

27.     In presenting evidence of historical predecessors to the challenged regulation, the Court has stated that prior regulations need be "analogues" to the contemporary regulation, but need not be historical "twins." Whether one solely focuses on <u>federal</u> regulation of firearms and noncitizens, or one considers the historical import of past <u>state and local</u> regulations, there are no historical "twins" to § 922(g)(5). Further, any potential historical "analogues" to § 922(g)(5) operate at a high level of generality, or require comparisons to historical prohibitions created to exclude on the basis of racial, religious, or other animus forbidden by modern constitutional standards. In addition, an open question remains as to whether such historical membership-related restrictions are sufficiently numerous or comprehensive to be constitutionally relevant. *Cf. Bruen*, 142 S.Ct at 2142 (rejecting possibility that a few colonial-era regulations could constitute a sufficient history or tradition to justify the state's discretionary permitting scheme).

28.     With regards to prior <u>federal</u> antecedents to present-day restrictions on noncitizen firearm possession, the federal government did not regulate firearm possession by noncitizens until 1940, when Congress enacted the first firearms-related <u>deportation</u> law.

    a.     Federal lawmakers unsuccessfully introduced the bills to deport noncitizens for firearms possession or use in the 1920s and 1930s. Notably, concerned with foreign "racketeers and gun men" associated with organized crime, federal lawmakers from 1935 to 1937 unsuccessfully introduced a series of bills intended to deport noncitizens for firearms violations.

    b.     In 1939, as fears of the rise of Nazi Germany and the possibility of United States' military engagement escalated, federal lawmakers once again introduced deportation provisions triggered by convictions for possession or use of "shotguns" or "automatic weapons." Based in part on fears of noncitizens constituting a subversive "Fifth Column" in the United States, Congress passed the Alien Registration Act of 1940. As part of the Act's primary focus on suppressing "foreign" ideologies and creating a

comprehensive scheme for registering noncitizens, the Act's deportation provision included the first federal regulation of noncitizens and firearm possession.

29. Congress enacted federal <u>criminal</u> prohibitions on noncitizen possession, including the provision at issue in this case, in 1968.

    a.    The federal government did not regulate immigration comprehensively until 1875. As part of Congress' initial admissions regulations, federal law prohibited entry of foreigners who committed "crimes involving moral turpitude." Courts and adjudicators, however, did not consider firearms possession a "crime involving moral turpitude."

    b.    Federal criminal prohibitions on noncitizen possession of firearms, including the federal law at issue in this case, were first enacted in 1968 as part of the omnibus crime and firearms regulations of that year.

    c.    In 1986, the federal criminal bar on firearm and ammunition possession by unlawfully present noncitizens was re-codified into its present statutory form at 18 U.S.C. § 922(g)(5).

30. Apart from federal regulations, before, during, and immediately after the Constitution's ratification, <u>colonies and states</u> enacted some firearms laws and militia membership restrictions based on citizenship, loyalty, or membership in relevant polities. Primarily, those early-era restrictions reflected loyalty-based exclusions against the British Empire and colonial rule, or prevailing social and racial hierarchies that countenanced exclusions of slaves, free Blacks, and Native Americans from firearm possession. See, e.g., *United States v. Rahimi*, 61 F.4th 443, 457 (5th Cir. 2023) (striking down 18 U.S.C. § 922(g)(8) after evaluating historical analogues, stating "[t]he purpose of laws disarming 'disloyal' or 'unacceptable' groups was ostensibly the preservation of political and social order, not the protection of an identified person from the threat of 'domestic gun abuse'").

31. In the early 1900s—well past the historical era recent Supreme Court decisions, including *Bruen*, count for historical purposes—some states enacted firearms laws that specifically excluded noncitizens from possession. At that time, the Second Amendment did not constrain state-level gun regulation. In addition, courts later

struck down some of those enactments as violations of state constitutions or the federal equal protection guarantee.

## VI.    Second Amendment Jurisprudence and Current Interpretative Methodology

32.    For most of American history, the Supreme Court did not proffer interpretations of the Second Amendment. The paucity of Supreme Court cases directly addressing the scope of the Second Amendment is due to two primary factors:

   a.    First, the Second Amendment remained unincorporated, and thus inapplicable against state and local gun regulations, until 2010. Prior to the ratification of the Fourteenth Amendment, the Supreme Court interpreted the Bill of Rights to apply only against the federal government. *See Barron v. Baltimore*, 32 U.S. 243 (1833) (holding that the Fifth Amendment's Takings Clause could not be raised in a challenge to the actions of a city). Even after ratification of the Fourteenth Amendment, however, the Supreme Court continued to hold that the Second Amendment only constrained federal actions. *See Presser v. Illinois*, 116 U.S. 252, 265 (1886) (upholding state law banning individuals from forming private military groups and drilling and parading in public, stating "[A] conclusive answer to the contention that this amendment prohibits the legislation in question lies in the fact that the amendment is a limitation only upon the power of Congress and the national government, and not upon that of the state."); *United States v. Cruikshank*, 92 U.S. 542, 553 (1875) ("The second amendment declares that [the right to bear arms] shall not be infringed, but this, as has been seen, means no more than that it shall not be infringed by Congress. This is one of the amendments that has no other effect than to restrict the powers of the national government…"). The federal government did not restrict firearms until 1927, when it enacted a prohibition on mailing firearms, and then more comprehensively in 1934 when it prohibited possession of certain types of firearms.

   b.    Second, when provisions of the National Firearms Act of 1934 (NFA) were challenged on Second Amendment grounds, the Supreme Court rejected an

"individual rights" reading of the amendment in favor of a militia-related interpretation. Upholding NFA provisions banning possession of automatic weapons and sawed-off shotguns, the Supreme Court opined that the Second Amendment did not protect possession of a short-barreled shotgun because that weapon bore "no reasonable relationship to the preservation or efficiency of a well-regulated militia." *United States v. Miller*, 307 U.S. 174, 178 (1939) (upholding provisions of the 1934 National Firearms Act).

33.     Prior to 2008, the Supreme Court issued only one ruling squarely addressing the scope of the Second Amendment, upholding the challenged regulation against the right to keep and bear arms in that case. *See Miller*, 307 U.S. 174.

34.     In subsequent cases involving firearms regulations, the Supreme Court upheld such laws and focused its analysis on provisions other than the Second Amendment. *See*, *e.g.*, *Barrett v. United States*, 423 U.S. 212 (1976) (upholding Gun Control Act of 1968's prohibition of receipt of a firearm by a convicted felon under commerce clause principles, and not mentioning either the Second Amendment or the right to keep and bear arms in its opinion).

35.     In 2008, the Supreme Court reversed course and held that the Second Amendment protected an individual right to bear arms for the purpose of self-defense. *See District of Columbia v. Heller*, 554 U.S. 570 (2008) (striking down D.C. handgun law). The ruling opened the possibility of constitutional challenges to the myriad of extant local, state, and federal gun regulations.

36.     Post-*Heller*, federal courts deployed a two-part inquiry to assess Second Amendment challenges to federal and state gun regulations, first asking how close the regulation came to infringing core second amendment rights, and then applying heightened "tiers of scrutiny" to assess the ends-means fit of the challenged regulation. *Bruen*, 142 S.Ct. at 2126-2129 (reviewing doctrinal methodology of post-*Heller* circuit court opinions).

37.     In 2010, the Supreme Court held that the federal constitutional right to keep and bear arms, as interpreted in *Heller*, applied to state and municipal gun regulations. *See McDonald v. City of Chicago*, 561 U.S. 742 (2010) (with no majority opinion,

holding that the Fourteenth Amendment incorporated the Second Amendment against the states).

38.   The recency of the Second Amendment's incorporation matters to the legislation discussed in this Declaration because the primary, if not exclusive, evidence of historical regulation of noncitizens' firearm possession is state-level regulations enacted when the Second Amendment did not apply to state-level conduct. States and localities, however, did not have to comply with Second Amendment in the relevant time period during which the government must show evidence of historical antecedents.  Indeed, until 2010 states could regulate firearm possession without regard to the scope of "the people" protected by the Second Amendment or the substantive scope of the "right to keep and bear arms" in the federal constitution.

39.   In 2022, *New York State Rifle & Pistol Assoc. v. Bruen* reaffirmed *Heller*'s holding and applied the Second Amendment to strike down a state discretionary permitting scheme for carrying of concealed weapons in public. 142 S.Ct. 2111 (striking down New York's 1911 Sullivan Law).

40.   Notably, *Bruen* purported to reject the "tiers of scrutiny" approach to federal right to keep and bear arms challenges, in favor of a two-part inquiry focusing on "text and history":

   a.   First, *Bruen* instructs courts to determine whether the Amendment's "plain text" includes the conduct regulated the law.

   b.   If it does, *Bruen*'s second-step instructs courts to determine if the government has met its burden of establishing that the challenged regulation is the same as historical antecedents, or is closely analogous to them.

41.   In conducting this second inquiry, the Court has cautioned that the historical antecedents need not be an exact match; rather, they must be sufficiently analogous to the challenged regulation. *Bruen*, 142 S. Ct. at 2132 ([A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*.") (emphasis in original). This search for analogues is a novel interpretive methodology that does not track traditional "originalist" or "original meaning" interpretive modes. *See* Joseph Blocher & Eric Ruben, *Originalism-by-Analog*y, 133 Yale L.J. – (forthcoming 2023)

(describing the dominant scholarly understanding of originalism as a search for original public meaning of statutory or constitutional text).

42. In considering whether regulations are analogous, *Bruen* instructs courts to consider whether the societal problem addressed by contemporary regulations is one that has existed since the eighteenth century:

> For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality. 142 S. Ct. at 2131-33

43. The Court, however, provided no instruction into the interpretative dilemmas this new mode creates, including the question of how or at what level of generality a lower court might identify and define a "general societal problem" and how to determine if a historical regulation is sufficiently similar. Instead, the Court stated that "…reasoning by analogy" is a "commonplace task for any lawyer or judge," and suggested two nebulous metrics to help guide lower courts—namely "how and why" the regulations burden the right to armed self-defense. *Bruen,* 142 S.Ct. at 2132-33.

44. Despite this minimal guidance, a lower court attempting to apply *Bruen*'s methodology faithfully to 18 U.S.C. § 922(g)(5)'s criminal ban on possession by unlawfully present noncitizens might proceed as follows:

a. The question whether the conduct covered by the regulation falls within the plain text of the amendment further breaks down into two factors: (1) whether the conduct regulated by the law is activity covered by the Second Amendment; and (2) whether the status of the individual or group regulated falls within "the people" who may raise the right to keep and bear arms. *See, e.g., United States v. Bullock*, -- F.Supp.3d -- 2023 WL 4232309 *20-21 (S.D. Miss. June 28, 2023) (critiquing courts that have focused on the

"status" of an individual rather than "conduct" being regulated at *Bruen*'s step one). Assessing those two sub-inquiries separately yields the following:

i.  The regulation enacts a flat and categorical ban on possession of any kind of firearm or ammunition. The conduct of simple possession falls within the plain meaning of "keep and bear arms." *See United States v. DaSilva*, 2022 WL 17242870 *9 (M.D. Penn. Nov. 23, 2022) ("There can be no dispute that the right to keep and bear arms includes the 'possession' of a firearm and ammunition.").

ii. The operative concern for purposes of this litigation, however, is whether unlawfully present noncitizens (or non-immigrants for 922(g)(5)(B)) are part of "the people" who may wield arms. Post-*Bruen*, at least one court has decided an 922(g)(5)(A) challenge at this preliminary stage, holding that noncitizens do not fall within the plain text meaning of "the people." *United States v. Sitladeen*, 64 F.4th 978 (8th Cir. 2023). Other courts have been reluctant to exclude noncitizens, including unlawfully present individuals, from "the people." *See*, *e.g.*, *United States v. Leveille*, -- F.Supp.3d – 2023 WL 2386266 (D. N.M. Mar. 7, 2023); *United States v. Carbajal-Flores*, 2022 WL 17752395 (N.D. Ill. Dec. 19, 2022); *United States v. Da Silva*, 2022 WL 17242870 (M.D. Penn. Nov. 23, 2022). *See also* Part VII for a more detailed discussion of the meaning of "the people."

b.  Assuming that a federal court finds that unlawfully present noncitizens are "the people," or that plain text cannot resolve the inquiry adequately, that court would proceed to *Bruen*'s second step. In that inquiry, it would then assess whether the government has put forth sufficient evidence in the form of historical analogues to the modern-day regulation. *United States v. Da Silva*, 2022 WL 17242870 *13-25 (M.D. Penn. Nov. 23, 2022) (upholding constitutionality of 18 U.S.C. § 922(g)(5)); cf. *United States v. Rahimi*, 61 F.4th 443 2023 (5th Cir. 2023) (striking down § 922(g)(8), prohibiting possession by individuals with a civil domestic violence order, after concluding that the regulation lacked analogous historical antecedents),

*cert. granted* 600 U.S. – (June 30, 2023). That historical inquiry is subject to the following limitations:

 i. This second step presents a methodological concern for lower courts, as they either must rely on the input of professional historians (if available), representations by experts in amicus briefs (if available), or the representations of the parties themselves. *See Bullock*, -- F. Supp.3d --, 2023 WL 4232309 at *15-17 (noting the lack of amicus briefs and professional historian input in the case regarding the constitutionality of the felon-in-possession bar, and describing Second Amendment litigation as a "pyramid turned on its head" because of the abundance of amicus briefs to supplement the trial record at the Supreme Court, but the lack of such expert input at the lower court).

 ii. Parts IX-X present potential antecedents for regulation of noncitizen possession. This Declaration concludes that none of these possible antecedents to § 922(g)(5) meets *Bruen*'s standards for relevant historical analogues.

## VII. "The People" and Noncitizens

45. At the outset, it is worth noting that at least one lower court post-*Bruen* has emphasized that *Bruen*'s step one should focus exclusively on the "conduct" regulated and not the status of the individual. *See Bullock*, -- F. Supp.3d --, 2023 WL 4232309 at *20 (stating "*Bruen*'s step one requires us to look at the 'conduct' being regulated, not the status of the person performing the conduct," and finding that possession of a firearm by a felon is within the conduct protected by the amendment). This Declaration notes this possibility, but proceeds on the assumption that other courts may include textual analysis of specific rightsholders covered by "the people" under *Bruen*'s first step.

46. Whether the term "the people" as used in the amendment and throughout the Constitution refers to specific rightsholders is an open question, and no text in the Constitution provides a clear answer.

47.     For example, commenters and judges alternatively have suggested that "the people" might connote the importance of the right, or signify provisions of the constitution that legitimize consent to be governed and are indispensable to it, but does not limit rightsholders and does not neatly map on to contemporary immigration status categories. See, e.g., *Verdugo-Urquidez*, 494 U.S. at 276 (Kennedy, J., concurring, stating "…[E]xplicit recognition of "the right of the people" to Fourth Amendment protection may be interpreted to underscore the importance of the right, rather than to restrict the category of persons who may assert it."); *cf. Helle*r, 554 U.S. at 644-45 (Stevens, J., dissenting, contesting the majority's attempts to narrowly define "the people").

48.     Even one assumes that "the people," as used in the Second Amendment and in other parts of the Constitution, identifies particular rightsholders, neither scholars nor courts have agreed upon or substantiated the rationale behind any particular standard to identify those rightsholders. Most importantly, for purposes of *Bruen*'s methodology, the definitions thus far been proffered in case law incorporate judicially-created standards that go beyond the "plain text" of the amendment.

## A.      Rightsholders Specified by Text of the Constitution

49.     The text of the original Constitution and its Amendments evinces various formulations to refer to individuals or groups of individuals covered by those provisions.

50.     The people" had no fixed meaning at the time of ratification, with neither that phrase or the content of "citizenship" settled by the early 1800s. *See generally*, James H. Kettner, THE DEVELOPMENT OF AMERICAN CITIZENSHIP, 1608-1870 (UNC Press 1975).

51.     Prior to ratification, "citizen" appeared to denote loyalty to the newly-declared nation and the principles of the Revolution. Kettner, DEVELOPMENT OF AMERICAN CITIZENSHIP, 207-08. In other words, citizenship at the time primarily meant opposition to British rule or a rejection of British subjectship.

52.     Even after the Revolution and the ratification of the Constitution, however, "the people" had no settled or agreed upon meaning. Kettner, DEVELOPMENT OF AMERICAN CITIZENSHIP, 209 ("By the beginning of the nineteenth century, then, Americans had only begun to discover the complexity of the question "Who are 'the People'"? They were committed to certain principles about the acquisition of citizenship, but they had yet to develop fully the meaning of the status.").

53.     The Constitution uses the term "the people" in several distinct provisions (emphasis added):

   a.     "*We the people* of the United States…" U.S. Const., Preamble.

   b.     "The House of Representatives shall be composed of Members chosen every second Year by *the People of the several States*…" U.S. Const., Art. I., § 2

   c.     "…the right of *the people* peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const., Amdt. I

   d.     "…the right of *the people* to keep and bear arms…" U.S. Const., Amdt. II

   e.     "The right of *the people* to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures…" U.S. Const., Amdt. IV

   f.     "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by *the people*." U.S. Const., Amdt. IX

   g.     "The powers not delegated to the United States by the Constitution nor prohibited by it to the States, are reserved to the States respectively, or to *the people*." U.S. Const., Amdt. X

   h.     "The Senate of the United States shall be composed of two Senators from each State, elected by *the people thereof*, for six years…" U.S. Const., Amdt XVII

54.     References to the "we the people of the United States" or "the people of the several states" or "the people [of each State]" are textually dissimilar from "the people" in its other manifestations. Those uses refer to a specific body that either ratified the Constitution or have the political authority in a particularized jurisdiction who

possess the power to elect representatives. Further, they were ratified prior to subsequent appearances of "the people" in the Bill of Rights.

55. In comparison, the unadorned phrase "the people" appears in the First, Second, Fourth, Ninth and Tenth Amendments, all of which were ratified at the same time.

56. Neither the Ninth or Tenth Amendments is commonly understood to confer specific or individual rights. Rather, both are widely acknowledged as creating rules of interpretative construction and/or operate as structural dictates that acknowledge the federalism balance created by the Constitution, and the possibilities for exercising sovereignty in our system of government.

57. Accordingly, most judicial and academic commentary on "the people" identifying particular classes of rightsholders focuses on its uses in the First Amendment's petition and assembly clause, the Second Amendment, and the Fourth Amendment.

58. Otherwise, the Constitution identifies rightsholders and groups covered by the text with the descriptors "persons," "such Persons," "all other persons," "the accused," and "citizen":

    a.    Use of the word "citizen":

        i.    Being a "*Citizen* of the United States" as a qualification to be chosen as a member of the House of Representatives, U.S. Const., Art. I, § 2

        ii.    Being a "*Citizen* of the United States" as a qualification to chosen as a member of the Senate, U.S. Const., Art. I, § 3

        iii.    Being a "natural born *Citizen*" as a qualification for being eligible for the office of President, U.S. Const., Art. II, § 1, cl. 6

        iv.    Referring to the status of being "*Citizens* of another State" or "*Citizens* of different States" or "*Citizens* of the same State" to invoke jurisdiction of federal court, U.S. Const., Art. III, § 2.

        v.    Entitling the "*Citizens* of each State" to the Privileges and Immunities of "Citizen in the several States," U.S. Const., Art. IV, § 2.

vi.      Providing sovereign immunity for states from suits by "*Citizens* of another State" or "Citizens…of any Foreign State." U.S. Const., Amdt. XI.

vii.      Declaring that all persons born or naturalized in the United States, and subject to the jurisdiction of the United States, are "*citizens* of the United States and of the State wherein they reside" U.S. Const., Amdt XIV, § 1.

viii.      Forbidding state deprivation of the "privileges or immunities of *citizens* of the United States," U.S. Const., Amdt XIV, § 1

ix.      Defining apportionment and districting for electing various officers by reference to male "*citizens* of the United States" over the age of twenty-one years, U.S. Const., Amdt XIV, § 2.

x.      Protecting "*citizens* of the United States" from federal or state denials of their right to vote based on race, color, or servitude, U.S. Const., Amdt. XV.

xi.      Protecting "*citizens* of the United States" from abridgements or denials of their right to vote on account of sex. U.S. Const., Amdt XIX.

xii.      Forbidding the use of poll taxes or other taxes to abridge or deny the right of "*citizens* of the United States" to vote for federal officers. U.S. Const., Amdt XXIV.

xiii.      Protecting "*citizens* of the United States" over the age of eighteen years from abridgements or denials

b.      Use of the word "person"

i.      Protecting any "person" from federal prosecution without Grand Jury indictment, double jeopardy, self-incrimination, deprivation without due process of law, or a taking of private property.  U.S. Const., Amdt. V.

ii.      Protecting "all persons" from state deprivations without due process. U.S. Const., Amdt XIV.

        iii.      Protecting "all persons" from state deprivations of equal protection of the laws. U.S Const., Amdt XIV.

    c.      Use of variations of "persons" to identify slavery or slaves:

        i.      As specified above, the Constitution uses the term "Person" or "Persons" throughout its text to refer to individuals who may be eligible for holding federal office, subject to certain impeachments and prosecutions, or to determine apportionment of districts.

        ii.      In addition, two specific uses of "person" describe enslaved persons or the institution of slavery without specific mention of either:

            1.      Determining districting and taxes by the "whole number of *free persons*" plus three-fifths of "all *other Persons*." U.S. Const., Art. I, § 2, cl. 3.

            2.      Denying Congress the power to regulate the migration and importation of "*such Persons* as any of the States now existing shall think proper to admit" until the year 1808. U.S. Const., Art. I, § 9.

    d.      Use of the phrase "the accused":

        i.      Protecting criminal trial rights and procedures for "the accused." U.S. Const., Amdt. VI.

59.    The use of various descriptors for rightsholders or groups covered by the Constitution, including "the people" and "citizen," suggests that the terms do not mean the same thing, if one assumes the conventional canon of interpretation that the constitution's drafters were intentional and specific about word choice and descriptions. *See, e.g*, *Verdugo*, 494 U.S. at 265-65 (stating that "'the people' is a term of art employed in select parts of the Constitution.").

**B.**    **The Supreme Court's Interpretations of "the People"**

60.    The Supreme Court has rarely attempted to define "the people." Moreover, none of the definitions the Court has thus far proffered is based in a "plain text" analysis of "the people."

61.     *Dred Scott v. Sandford*, 60 U.S. 393 (1856), appears to be the Court's first engagement with the boundaries of "the people." There, the Court expressly equated "the people" with citizenship, and tied constitutional rights, including the right to keep and bear arms, to that status. Citizenship to the *Dred Scott* majority, however, did not appear linked to immigration or foreigner status; rather the majority linked citizenship with race and racial hierarchies:

> The words "people of the United States" and "citizens" are synonymous terms, and mean the same thing. They both describe the political body who, according to our republican institutions, form the sovereignty and who hold the power and conduct the Government through their representatives.
>
> …
>
> [I]t cannot be believed that the large slave holding States regarded [members of the "African race"] as included in the word citizens, or would have consented to a Constitution which might compel them to receive them in that character from another State. For if they were so received…it would exempt them from the operation of the special laws and from the police regulations which they considered to be necessary for their own safety. It would give to persons of the negro race…the right to enter every other State whenever they pleased…to go where they pleased at every hour of the day or night without molestation…and it would give them full liberty of speech …upon all subjects upon which its own citizens might speak; to hold public meetings on political affairs, and *to keep and carry arms wherever they went*. 60 U.S. at 404 and 416-17 (1856) (emphasis added)

62.     The *Dred Scott* majority analysis thus offers scant insight into a plain text meaning of "the people" or why the phrase might be limited to "citizens." Instead, the majority's explication of both phrases, and their tie to constitutional rights, was contingent on an explicit claim of racial supremacy of Whites over Blacks and racial threat from the "negro race."

63.     The Court next directly addressed the relationship between "the people," citizenship or immigration status, and constitutional rights 144 years later in *United States v. Verdugo-Urquidez*. 494 U.S. 259 (1990). In *Verdugo*, the Court rejected the ability of a noncitizen captured in Mexico and brought to the United States for prosecution to raise a Fourth Amendment challenge to the search of his residence in Mexico.

64.     Although six Justices agreed that the noncitizen-defendant could not invoke the Fourth Amendment, that decision did not yield a majority rationale. In the lead opinion, four Justices chose to resolve the case by offering an interpretation of "the people," and further that the noncitizen-defendant was not part of "the people."

65.     Despite suggesting that "the people" was a "term of art" and seeking to interpret it through textual and intratextual analysis, the lead opinion conceded that the constitutional text was inconclusive. 494 U.S. at 265 ("While this textual exegesis is by no means conclusive, …"). Nevertheless, that opinion proceeded to craft a novel definition, positing that "the people" meant a "class of persons who are part of the national community or who have otherwise developed sufficient connection to the country to be considered part of that community." *Id.*

66.     A fifth Justice, Justice Anthony Kennedy, concurred, but wrote separately to reject expressly the lead opinion's definition of "the people" and its particular formulation of the phrase. *See* 494 U.S. at 276 (Kennedy, J., concurring) ("… I cannot place any weight on the reference to "the people" in the Fourth Amendment as a source of restricting its protections…[E]xplicit recognition of "the right of the people" to Fourth Amendment protection may be interpreted to underscore the importance of the right, rather than to restrict the category of persons who may assert it."). A sixth Justice, Justice John Paul Stevens, concurred only in judgment, and would have resolved the case on other grounds. 494 U.S. at 279 (Stevens, J. concurring in judgment) ("[A]liens who are lawfully present in the United States are among those "people" who are entitled to the protection of the Bill of Rights, including the Fourth Amendment. Respondent is surely such a person even though he was brought and held here against his will.").

67.     According to the concurring Justices, the Court should have resolved the case by considering the location of the search rather than attempt to delimit "the people." 494 U.S. at 278 (Kennedy, J., concurring) ("the Constitution does not require United States agents to obtain a warrant when searching the foreign home of a nonresident alien. If the search had occurred in a residence within the United States, I have little doubt that the full protections of the Fourth Amendment would apply."); 494 U.S. at 279 (Stevens, J., concurring in judgement) ("I do not believe

the Warrant Clause has any application to searches of noncitizens' homes in foreign jurisdictions because American magistrates have no power to authorize such searches.").

68.    The dissenting Justices would have resolved the case in favor of the noncitizen-defendant on a principle of "mutuality" when the government exercises coercive authority over the noncitizen in a domestic criminal prosecution, or would have remanded the case for consideration of the reasonableness of the search. 494 U.S. at 283-85 (Brennan, J., joined by Marshall J., dissenting) (rejecting the plurality's interpretation of "the people"); 494 U.S. at 297 (Blackmun, J., dissenting) (rejecting plurality definition of "the people" and arguing that noncitizen-defendant should be treated as one of "the governed."); 494 U.S. at 284 ("Respondent is entitled to the protections of the Fourth Amendment because our Government, by investigating him and attempting to hold him accountable under United States criminal laws, has treated him as a member of our community for purposes of enforcing our laws…. By concluding that respondent is not one of "the people" protected by the Fourth Amendment, the majority disregards basic notions of mutuality."); 494 U.S. at 297-98 (Blackmun, J., dissenting) (stating "…[T]he enforcement of domestic criminal law seems to me to be the paradigmatic exercise of sovereignty over those who are compelled to obey….", but arguing that the case should be remanded to lower courts for further proceedings to determine whether the search met the requirements of probable cause and reasonableness).

69.    Thus, counting the dissenting justices together with the concurring justices, a majority of Justices in *Verdugo* agreed that the Court need not interpret "the people" or should not have limited it as the lead opinion suggested.

70.    Lower federal courts applying the "members of the national community," or "sufficient connections" standard from *Verdugo*'s lead opinion (see para. 65 above), have come to conflicting conclusions, with each case turning on the particular characteristics of the noncitizen and the discretion of individual judges in assessing the relative importance of those characteristics. *See generally*, D. Carolina Nunez, *Inside the Border, Outside the Law: Undocumented Immigrants*

*and the Fourth Amendment*, 85 S.Cal. L. Rev. 85 (2011) (surveying cases attempting to apply the *Verdugo* opinion's definition of "the people").

71. Twenty-eight years after *Verdugo*, in *District of Columbia v. Heller*, the Supreme Court again proffered an interpretation of "the people," albeit in *dicta*. 554 U.S. 570 (2008) (striking down a D.C. law banning most handgun possession, and opining on "the people" despite noting that "Dick Heller is a DC special police officer who was authorized to carry a handgun while on duty at the Thurgood Marshall Judiciary Building.").

72. Like *Dred Scott* and *Verdugo* before it, the *Heller* majority's interpretation of "the people" depended on more than text or history. Instead, the *Heller* majority primarily relied on precedent, purporting to adopt the *Verdugo* lead opinion's formulation. Yet, in doing so, the *Heller* majority misquoted the prior opinion's definition.

73. *Heller* identified "the people" of the Second Amendment (and the First and Fourth Amendments) as "all members of the *political* community." 554 U.S. at 580 (emphasis added).

74. The *Heller* majority's reformulation of Justice Rehnquist's definition in *Verdugo* is significant in three ways.

    a. First, it substitutes the word "political" for "national" as the descriptor for the "community" to which the class of persons need belong. By doing so, *Heller*—by fiat and without explanation—narrows "the people" to those who can or do participate in political rights and self-governance. In other words, *Heller*'s reformulation of "the people" hews close to "citizens," without expressly stating so or substantiating the break from precedent.

    b. Second, even as it narrows "the people," the descriptor "members of the political community" still admits of multiple possible classes of persons. *See* Note, *The Meaning(s) of "the People" in the Constitution*, 126 Harv. L. Rev. 1078, 1087 (2013) (noting ambiguity with "members of the political community," and suggesting it may mean: "(1) registered voters; (2) eligible voters…; (3) all citizens; (4) those who are, or expect to become, eligible to vote; (5) those who are legally entitled to contribute to political

campaigns; and (6) those who are participating in U.S. government or politics.")

c.   Third, *Heller* ignores the *Verdugo* lead opinion's alternative definition that would allow those with "sufficient connections to the country" also to be included within "the people."

\*\*\*

75.   At the plain text stage of the inquiry, it is clear that the conduct of possessing a firearm – the conduct covered by 18 U.S.C. § 922(g)(5) – falls within the literal meaning of "keep and bear arms."

76.   In contrast, the meaning of "the people" remains opaque. Textual analysis yields no clear answer as to whether it excludes noncitizens, or even particular subsets such as unlawfully present noncitizens. Supreme Court expositions of the phrase similarly do not yield clear answers to the question whether the term excludes unlawfully present noncitizens over whom the government exercises criminal jurisdiction. *See, e.g., Verdugo*, 494 U.S. at 265 (creating a definition of "the people" that might include unlawfully present individuals with "sufficient connections" to the United States.).

77.   In *Bruen*'s second stage, the government bears the burden of producing evidence of historically analogous regulations. See Parts VIII-XI below.

## VIII.  Federal Immigration Categories and the Identification of a Persistent Societal Problem

78.   As noted, *Bruen* requires courts to evaluate the sufficiency of the government's evidence of historical analogues to modern day regulations. Part of that inquiry, and the aptness of the comparison between contemporary and prior regulations, depends on the identification of a persistent societal problem from prior eras.

79.   18 U.S.C. § 922(g)(5) targets firearm possession by "illegally or unlawfully present" noncitizens.

80.   The societal or public policy concern of unlawfully or present noncitizens, as present-day statutes employ the terms, was not a persistent social problem of the

colonial, Founding, or post-ratification eras. The immigration categories used in present-day immigration law did not exist at the time of the Second Amendment's ratification. Indeed, the first federal immigration laws regulating admission were enacted in the late-1800's, nearly a century after the Second Amendment's ratification. Thus, the late 19th century is the first time federal admissions laws would have existed for an individual to violate, and thus render themselves "illegally" or "unlawfully" present. Moreover, the concept of an "unlawfully present" noncitizen or "unauthorized" noncitizen as we understand those terms today, primarily is a product of post-1965 immigration law.

81.     At ratification, the Constitution assumed the existence of citizens both of the United States and the several states, but did not provide any standards or qualifications for recognition as either.

     a.     Two provisions of the original Constitution reference state citizenship. See U.S. Const., Art. III (providing for federal court jurisdiction for "Citizens of different States"), and Art. IV ("The Citizens of each State shall be entitled to all the Privileges and Immunities of Citizens in the several States"). Post-ratification states maintained their own rules for state citizenship, with many following conventions from English common law. *See* Kettner, DEVELOPMENT OF AMERICAN CITIZENSHIP at 214-220.

     b.     The original Constitution recognized the existence of federal citizenship, and provided authority for Congress to create a "uniform rule for naturalization." The first federal naturalization law provided for the possibility for any "free white person" to become a U.S. citizen. *See An Act to Establish a Uniform Rule of Naturalization*, Pub. L. 1-3, 1 State 103, ch. 3, 1st Cong. (1790). In addition, the Act delegated the act of making naturalization decisions to state courts. 1 Stat. 103, ch. 3 ("That any Alien being a free white person, who shall have resided within…the United States for …two years, may be admitted to become a citizen thereof on application to any common law Court of record in any of the States wherein he shall have resided for the term of one year at least, and making proof to the satisfaction of such Court that he is a person of good character, and taking

the oath…prescribed by law to support the Constitution of the United States, which Oath…such Court shall administer.").

c.   The enactment of the Civil Rights Act of 1866 followed by the ratification of the Fourteenth Amendment in 1868 brought renewed focus on, and primacy to, national citizenship.

82.   Thus, while the Constitution provided for federal and state citizenship, it did not otherwise define immigration categories or statuses. Further, while Congress enacted naturalization statutes, it did not regulate immigration or create immigration categories throughout most of the 19th century. In other words, the first Congresses concerned themselves with naturalization (the question of who, among white, foreign born residents, could become citizens), but not unlawful migration or unlawful presence. Moreover, neither gun possession in general, nor that by noncitizens was a federal legislative concern.

83.   Congress began regulating immigration and restricting migration in 1875, and only established a federal immigration bureaucracy in 1891. The United States Border Patrol was created in 1924. In 1929, Congress made illegal entry and re-entry federal crimes. The rise of "illegal" or "unlawful" or "unauthorized" migration, however, further post-dates those developments, and is largely a post-1965 phenomenon.

a.   In 1875, Congress began federal regulation of admission into the United States. *Page Act of 1875*, Pub. L. 43-141, 18 Stat. 477, 43rd Cong. (1875) (first federal law to regulate immigration, primarily barring the entry of Asian women for "lewd and immoral" purposes). Soon thereafter, in 1882 Congress enacted the Chinese Exclusion Act. Pub. L. 47-126, 22 stat. 58, 47th Cong. (1882) (barring immigration of Chinese laborers for an initial period of ten years, and later renewed and extended). These early federal immigration laws excluded certain categories of individuals from entering the country.

b.   Through the late 19th and early 20th centuries, amendments to those original federal laws provided for deportation of individuals found to be non-compliant with them, while other related enactments expanded grounds for

exclusion and deportation. *Scott Act of 1888*, Pub. L. 50-1064, 25 Stat. 504, 50th Cong. (1888) (barring formerly resident Chinese workers from returning to the United States after leaving); *Geary Act*, Publ. L. 52-60, 27 Stat. 25, 52nd Cong. (1892) (extending Chinese Exclusion Act, and creating racially-specific deportation laws for Chinese residents without a permit); *Immigration Act of 1917*, Pub. L. 64-301, 39 Stat. 874, 64th cong. (1917) (creating Asiatic "barred zone" for immigration into the United States).

c.     In 1891, Congress established a federal bureaucracy and infrastructure for enforcing federal immigration restrictions. *Immigration Act of 1891*, Pub. L. 51-551, 26 Stat. 1084a, 51st Cong. (1891) (first federal law creating an immigration bureau, and empowering it to process migrants and enforce federal immigration restrictions).

d.     Only in 1924 did Congress authorize funding for the Border Patrol. Labor Appropriations Act of 1924. Customs and Border Patrol, *1924: Border Patrol Established*, Oct. 6, 2022 available at https://www.cbp.gov/about/history/1924-border-patrol-established; Pub. L. 68-502, 443 Stat. 1014, Ch. 364, 68th Cong. (1925) (providing $1,000,000 funding for border patrol and specifying uses).

e.     The Immigration Act of 1924 primarily is known for cementing the "National Origins Quota" system for immigration, significantly privileging northern and western European migration while severely restricting or banning migration from other parts of the world. *See* Mae M. Ngai, *The Architecture of Race in American Immigration Law: A Reexamination of the Immigration Act of 1924*, 86 J. Am Hist. 67 (1999). In addition, however, the 1924 Act also distinguished between "immigrants" arriving for permanent settlement in the country, and those noncitizens visiting temporarily for business or pleasure. *See The Immigration Act of 1924*, Pub. L. 68-139, 43 Stat. 153, 68th Cong. (1924) (Sec. 3 of Act defining "Immigrant").

f.     Only in 1929 did Congress criminalize illegal entry into the United States. *Undesirable Aliens Act*, Pub. L. 70-1018, 45 Stat. 1551 (1929).

84.    The category of "immigrants" recognized by the 1924 Immigration comports with present-day definitions in the Immigration and Nationality Act (INA), and is otherwise referred to as "lawful permanent resident," or more colloquially as "green card holders." *See* 8 U.S.C. § 1101(a)(15) (defining the term "immigrant" and contrasting it with "nonimmigrants"). The category of temporary visitors for a specific purpose is now referred to as "nonimmigrants," and is comprised of multiple temporary statuses based on the purpose and duration of a noncitizen's stay. 8 U.S.C. §§ 1101(a)(15)(A) – (V). Later enactments would add additional categories for humanitarian admissions, including the "refugee" and "asylum" categories. 8 U.S.C. § 1158.

85.    Entry or presence in the country outside of these categories that permit lawful entry and presence in the United States could be considered unlawful or unauthorized. *See* 8 U.S.C. §§ 1182 & 1227 (defining classes of inadmissible and deportable noncitizens, including those who enter without inspection).

86.    "Illegal" or "unauthorized" or "unlawful" presence then, plausibly became a societal problem at the earliest in the late 1800's, when migrants who evaded the overtly-racist Chinese Exclusion Laws might be considered the first "unlawful" or "unauthorized" noncitizens. *See*, *e.g.*, Emily Ryo, *Through the Back Door: Applying Theories of Legal Compliance to Illegal Immigration during the Chinese Exclusion Era*, 31 L. & Soc. Inq. 109 (Winter 2006); *see also* Gerald Neuman, *The Lost Century of American Immigration Law* (1776-1875), 93 Colum. L. Rev. 1833, 1834, 1841-80, 1896-1901 (1933) (arguing that it might be possible to conceive of individuals who violated state and local immigration laws prior to 1875 as a form of "illegal aliens," but noting that those regulations might be applied to intra-state and intra-country movements, and not just international migration).

87.    The concept of an unlawfully present or unauthorized noncitizens as we understand the public policy concern today and to which current federal law responds, however, far post-dates the era of Chinese Exclusion. Influential and widely-respected sociologists, historians, and demographers locate the "societal problem" of unlawful migration and unlawful presence to which present day criminal and immigration policies respond, as a post-1965 development. *See generally* Douglas

S. Massey & Karen Pren, *Unintended Consequences of U.S. Immigration Policy: Explaining the Post-1965 Surge from Latin America*, 38 Population and Dev. Rev. 1 (2012); Kitty Calavita, INSIDE THE STATE: THE BRACERO PROGRAM, IMMIGRATION, AND THE I.N.S. (1992) (chronicling the effects of the end of the Bracero program in 1964).

88.    In 1965, Congress amended the 1952 INA to remove the nationality-based restrictions for migration into the United States. At the same time, however, the 1965 and post-1965 amendments numerically restricted migration from countries of historically high immigration to the country, and countries with long-standing historic and geographic ties to the United States. As sociologists, demographers, and historians have documented, after implementation of the post-1965 federal policies, the social and public policy issue of "undocumented" "illegal" or "unauthorized" immigration evolves into the legislative and policy concern we understand it as today. *See generally*, Mae M. Ngai, IMPOSSIBLE SUBJECTS: ILLEGAL ALIENS AND THE MAKING OF MODERN AMERICA (Princeton Univ. Press 2004); Douglas S. Massey, *How a 1965 Immigration Reform Created Illegal Immigration*, Wash. Post., Sep. 25, 2015.

89.    In sum, 18 U.S.C. § 922(g)(5) – enacted in its initial form in 1968 and with its focus on "illegal" or "unlawful" presence – employs a legal category that was not cognizable in American law until the mid-1880s in a much different form, and only after 1965 in the way lawmakers understand immigration statuses and unlawful presence today. Thus, any group-based restrictions from the Founding or Ratification eras, even ones based on citizenship status, are unlikely to be analogous to the "how and why" of present-day criminal restrictions on noncitizen possession.

## IX.    Federal Restrictions on Firearm Possession by Noncitizens, Including Unlawfully Present Noncitizens

90.    As detailed in Subparts IX. A – D below, federal regulation of firearm possession or use, including 18 U.S.C. § 922(g)(5), were enacted in the mid-to-late 20th century.

   a.   Congress enacted the first <u>deportation</u> law based on firearms convictions in 1940.

b. Twenty-Eight years later in 1968, Congress enacted the first <u>criminal</u> prohibition targeting possession by unlawfully present noncitizens.

A. **Federal Regulation of "Dangerous" or "Criminal" Noncitizens from Ratification through the 1920's**

91. The first federal laws aimed at removing "dangerous" foreigners were the Alien and Sedition Acts of 1798. *Sedition Act*, 1798 Laws, ch. 74, 1 Stat. 596 (1798); *Alien Enemies Act,* 1798 Laws, ch. 66, 1 Stat. 577 (1798) (codified as amended at 50 U.S.C.A. § 21). Those laws did not regulate firearms or weapons possession, instead delegating to the President the authority to remove foreigners who were "dangerous to the peace and safety of the United States." Those laws intended to punish advocacy and critique of the government, not arms-bearing. The Alien Friends Act expired in 1801. The Alien Enemies Act, triggered at times of hostilities has remained in force in various amended forms, and was in part the basis for Japanese internment in the 1940s. *See generally*, Julia Rose Kraut, THREAT OF DISSENT: A HISTORY OF IDEOLOGICAL EXCLUSION AND DEPORTATION IN THE UNITED STATES (2020).

92. As noted above (Part VIII, para. 81-83), other than the Alien and Sedition Acts, the federal government did not regulate admissions and removal of noncitizens until the late-1800s. In addition, the federal government did not restrict firearms possession.

93. In 1891, Congress enacted federal immigration law to exclude foreigners who had committed a "crime involving moral turpitude." *Immigration Act of 1891*, Pub. L. 51-551, 26 Stat. 1084a, 55th Cong., 2d Sess. (1891). Without further statutory specification, interpretation as to the scope of the crimes included in that phrase was left to courts. While the contours of what crimes were included within that description remain unsettled to this day, federal courts repeatedly found that gun possession was not a crime involving moral turpitude, and thus could not serve as the sole basis for exclusion or deportation. *See*, *e.g.*, *United States ex. rel. Andreacchi v. Curran*, 38 Fed. 2d. 498 (S.D.N.Y. 1926) (holding that conviction

for carrying a concealed weapon did not constitute a crime involving moral turpitude under federal immigration law); *Ex Parte Saraceno*, 182 Fed. 955 (S.D.N.Y. 1910) (same).

**B.**   **Federal Proposals for Deportation of Noncitizens with Firearms Violations in the 1920s through 1939**

94.   By the turn of the 20th Century, Congress added a specific focus on subversive and anarchical noncitizens to supplement extant, general legislative concern with undesirable classes of immigrants based on race, poverty, prostitution, and criminality.

95.   In 1901, President William McKinley was assassinated with a pistol by Leon Czolgosz. Although Czolgosz was a U.S. citizen possibly born in the United States in 1873 to immigrant parents, authorities and media reports mistakenly identified him as an immigrant and a noncitizen. *See* Cary Federman, *The Life of an Unknown Assassin: Leon Czolgosz and the Death of William McKinley*, 14 Crime, History, & Societies 85, para. 3, 34 (2010); David Cole, *Enemy Aliens*, 54 Stan. L. Rev. 953, 994 (2002). Although he described himself as a socialist, media reports also labeled him an "anarchist." *Id.* McKinley's assassination and the misidentification of Czolgosz helped precipitate the 1903 Immigration Act, also known as the Anarchist Exclusion Act. *Immigration Act of 1903,* Pub. L. 57-162, 32 Stat. 1213, 57th Cong. (1903) (prohibiting admission and naturalization of anarchists, persons believing in or advocating overthrow of the U.S. government by force or violence, or assassination of public officials). The legislation targeted the ideology of certain foreigners and noncitizens, but not their firearms use.

96.   Congress continued and expanded its concern with "anarchists" and persons advocating overthrow of government by force into World War I. In 1917 Congress passed the *Immigration of 1917*, which added crimes involving explosives to the list of deportable crimes. Pub. L. No. 64-301, §§ 3, 19, 39 Stat. 874, 875, 889 (1917). A year later in the midst of World War I, Congress expanded its ideological regulation of noncitizens, enacting a law that allowed deportation of anarchists and

those who believed in the overthrow of government by force or violence. *An Act to Exclude and Expel from the United States Aliens who are Members of the Anarchistic and Similar Classes*, Pub. L. 65-221, 40 Stat. 1012, 65th Cong (1918). Again, the deportation law targeted ideology, advocacy, and association, but not firearms' possession.

97.     As per my research, the first federal bills specifically aimed at criminalizing firearm possession by noncitizens were introduced in late 1922 by Senator Arthur Capper. His proposals were generally targeted at restricting gun sales, possession, and public carrying throughout the District of Columbia, but all contained provisions directed at noncitizen possession in particular. *See A Bill to Control the Possession, Sale, and Use of Pistols and Revolvers in the District of Columbia*, S. 4012, 67th Cong., 2d Sess. (Sept. 20, 1922) (Sec. 5, entitled "Aliens and Criminals Must Not Possess Arms," proposing criminal penalties for any "unnaturalized foreign-born person" for possession of a pistol or revolver in Washington, D.C.). Senator Capper's 1922 bill was not enacted into law, and neither were follow-up bills in 1924 and 1925 attempting to enact the same provisions. *See* S. 1907, 69th Cong., 2d Sess. (Dec. 21, 1925) (Sec. 11(c) of proposed bill prohibiting gun sales by D.C. dealers to unnaturalized foreign born persons); S. 3052, 68th Cong., 1st Sess. (Apr. 7, 1924); *see generally* Patrick J. Charles, ARMED IN AMERICA 192-193.

98.     Other than the Capper proposals, members of Congress became more interested in generally regulating firearm purchases, shipment, and carrying as organized crime and gun-related gang activity became a prominent national concern during the 1920s and 1930s, during Prohibition and the "Tommy-gun" era. Michael A. Foster, *Federal Firearms Law: Overview and Selected Legal Issues for the 116th Congress*, Cong. Res. Serv. Report 45629 at 1-2 (Mar. 25, 2019); *see also History of Gun-Control Legislation*, Wash. Post., Dec. 23, 2012 (noting President F.D. Roosevelt's "New Deal for Crime" legislation to address the sensationalized crime of the era).

99.     After enacting a federal prohibition on the shipping of firearms through the mail, *see Mailing of Firearms Act of 1927* (currently codified at 18 U.S.C. § 1715), Congress passed its first major restriction of firearms in 1934. The National Firearms Act of 1934 (NFA) prohibited possession of machine guns and "sawed-

off" shotguns in private hands. *National Firearms Act,* Pub. L. No. 73-474, 48 Stat. 1236 (1934); Patrick J. Charles, VOTE GUN 56.

100.    In the wake of the NFA's successful enactment, from 1935 to 1937 a few members of Congress introduced bills specifically to deter noncitizens possession of firearms, introducing provisions that triggered deportation for machine gun and sawed-off shotgun violations. *See, e.g.*, *An Act to Authorize the Prompt Deportation of Criminals and Certain Other Aliens, and for Other Purposes*, H.R. 6391, 75th Cong., 1st Sess. (1937) (§ 2 of the bill providing for deportation of noncitizen for a conviction for "possessing or carrying any firearm" within 5 years of the institution of deportation proceedings); *A Bill to Authorize the Prompt Deportation of Criminals and Certain Other Aliens,* H.R. 5573, 75th Cong., 1st Sess. (1937) (§ 2 of the bill providing for deportation of noncitizens "convicted of possessing or carrying any concealed or dangerous weapon" and § 3 providing for deportation for possessing or carrying an automatic or semi-automatic weapon); S. 2969, 74th Cong., 2d Sess. (1936) ("Kerr-Coolidge" bills introduced by Sen. Coolidge with provision to deport noncitizen for "crime of possessing or carrying any concealed or dangerous weapon"); H.R. 8163, 74th Cong., 1st Sess. (1935) (bill introduced by Rep. Judge Kerr with similar concealed weapon deportation provision).

101.    Legislative discussion of these mid-1930's proposals suggested that lawmakers primarily sought to address the presumed connection between foreigners and organized crime. Legislators and commentors frequently discussed noncitizens acting as "gunmen" and "racketeers" for mob or gang violence as their motivation for the deportation bills. *See, e.g.*, *Deportation of Criminals, Preservation of Family Units, Permit Noncriminal Aliens to Legalize their Status*, House Rep. No. 1110 to Accompany H.R. 8163, 74th Cong., 1st Sess. at 4 (1935) (report from Rep. Kerr stating that exclusion of gun possession from "crimes involving moral turpitude" has permitted "many vicious racketeers, gangsters, and extortionists" to avoid deportation, thereby necessitating new immigration legislation that specifically targets concealed weapons).

102.    Indeed, lawmakers acknowledged that the deportation provisions were intended to get at mass violence and organized crime, not at noncitizen possession for sport,

hunting, or self-defense. *Deportation of Aliens*, Hearings before Senate Subcommittee of the Committee on Immigration, 75th Cong, 1st Sess. at 113 (Aug. 5-7, 1937) (hearings on H.R. 6391) (statement of Edward Shaughnessy, Acting Comm. of Immigration Service, stating that "we don't want to deport [a man who has a revolver for protection]…We want to deport the alien who takes a machine gun and raises havoc with it," and advocating for a broadly written law that provides the immigration service with enough discretion to get at the bill's target noncitizens), at 138 (Statement of Chester E. Taylor, Asst. Gen. Sec. YMCA, stating that his organization had "serious doubts" about deporting a man for possession of a firearm, but that the federal government needed a broadly written law to target noncitizen "gangsters"), at 160 (Statement of Read Lewis, stating that he was worried about application to noncitizens who possessed firearms for protection, and advocating for adding language to reach only "the gangster and racketeer"), and at 183-4 (attaching to the subcommittee hearing, Statement of Rep. Martin Dies (TX), sponsoring and supporting H.R. 5573, stating that Congress need a bill to get at aliens fomenting "discord in the United States" and noting that noncitizens were justified in having firearms for self-defense and hunting, but no justification existed for a "machine gun or to engage in gang warfare"); *see also*, Ernst W. Puttkammer, *Legislation Affecting the Deportation of Aliens*, 3 U. Chi. L. Rev. 229, 233-34 (1936) (lauding Kerr-Coolidge bills, arguing "[i]t inflicts no hardship on the law-abiding alien and is a greatly needed weapon against the alien gunman and racketeer."); *Deportation Bill Passed by House*, New York Times, June 11, 1937 (noting that proponents of H.R. 6391 argued that it would help deport 23,000 "alien gunmen and racketeers").

103. These initial firearms deportation provisions were not enacted. For example, H.R. 6391 passed the House on June 10, 1937, but died in the Senate without getting out of committee. H.R. 5573 did not pass the House.

**C.**     **The Alien Registration Act of 1940, and the First Civil Penalties for Noncitizen Firearm Possession**

104.    In mid-1939, legislative proposals for a firearms-specific deportation provision began to gain more support. In addition to the prior justifications tied to "racketeer" violence, the 1939 bills tied noncitizen firearm regulation to growing concerns with Nazism, socialism, and fascism. In 1939 and 1940, for example, the National Rifle Association (NRA) called for prohibition of guns for "undesirable aliens" and "Fifth Columnists." *See* Patrick J. Charles, VOTE GUN 64-70. (Note that the "fifth column" means a "group of secret sympathizers or supporters of an enemy" who "engage in espionage or sabotage within defense lines or national borders," Merriam-Webster Dictionary (2023)).

105.    Legislative debates in the summer of 1939 reflect concerns with noncitizens who would use guns as part of "subversive" activities and to inflict mass casualties on the American populace. For House discussion of H.R. 5138 (later enacted as the Alien Registration Act of 1940), *see* 86 Cong. Rec. 9029–36 (1940); 86 Cong. Rec. 8340–47 (1940); 84 Cong. Rec. 10445–56 (1939); 84 Cong. Rec. 10354–85 (1939); 84 Cong. Rec. 9532–41 (1939). The Senate similarly held discussions, and similarly focused on the bill's potential to targeted disloyalty and subversive activities. See generally, 84 Cong. Rec. 10358 (1939) (Congressman Hobbs: "Our guests in this country have no right to abuse our hospitality by arming themselves with that kind of paraphernalia . . . .We maintain that these guests of ours in our national home are perfectly welcome to live here if they will not insist upon having or carrying machine guns or similar death-dealing weapons. Such weapons are made for one purpose only – to take human life."); 84 Cong. Rec. 9537 (1939) (Congressman Smith: "It is a little difficult for me to understand why Members of Congress should object to the deportation of those folk who come here from foreign countries and indulge in the use of machine guns and sawed-off shotguns upon our population").

106.    Ultimately, the first firearms specific federal law directed at noncitizens passed as part of the Alien Registration Act of 1940. *Alien Registration Act*, Pub. Law 670, Chap 439, 54 Stat. 670, 76th Cong. (1940). The Act's primary concern was dissension within the U.S. military. In addition, the Act called for the registration of all noncitizens. Both the military dissension and registration provisions hinted at the Act's overriding concern with "subversive" activities by foreigners, and sought to punish "anarchist" and "communist" ideas associated with foreigners. For example, President Franklin Roosevelt's statements upon signing the bill focused on questions of noncitizen loyalty and federalism concerns. *See* Franklin D. Roosevelt, *Statement on Signing the Alien Registration Act*, June 29, 1940 (available    at    The    American    Presidency    Project https://www.presidency.ucsb.edu/node/209766).

107.    Media coverage leading up to the 1940 Act similarly focused on the concern of espionage and "Fifth Columnists." *See Control of Aliens Nears Senate Vote*, New York Times, May 26, 1940 (discussing purpose of Act as controlling interference with military, and rooting out "Fifth Columnists" in federal government and labor unions); *House Passes Bill to Deport All Aliens Advocating "Any" Change in Our Government*, New York Times, Mar. 24, 1939.

108.    As part of the Act's focus on subversive activities, it also modified or added several grounds for deportation, including adding a provision that provided for the deportation of noncitizens for violations of laws regulating the possession of automatic weapons and "sawed-off shotguns." *Alien Registration Act of 1940*, § 20(b)(3) ("Any alien who, at any time after entry, shall have been convicted of possessing or carrying in violation of any law any weapon which shoots or is designed to shoot automatically more than one shot without manual reloading, by a single function of the trigger, or a weapon commonly called a sawed-off shotgun.") (modifying parts of *the Immigration Act of 1917*, 8 U.S.C. § 155).

109.    In 1952, when Congress compiled and codified extant immigration laws into the Immigration and Nationality Act of 1952, it recodified the firearms deportation provision of the Alien Registration Act into 8 U.S.C. § 241(a)(14) (1952). Pub. L. 414, chap. 477, 66 Stat. 163, 82nd Cong. (1952). The 1952 recodification maintained

the 1940 Act's focus on "automatic weapons" and "sawed-off shotgun" violations as the predicates for deportation.

110.  In 1990, Congress amended the firearms deportation provision to include any firearm, providing for removal of a noncitizen for convictions "under any law of purchasing, selling, offering for sale, exchanging, using, owning, possessing, or carrying…any weapon, part, or accessory which is a firearm or destructive device…in violation of any law." *Immigration Act of 1990*, Pub. L. 101-649, 103 Stat. 4978 (1990). Currently, that deportation provision is codified at 8 U.S.C. § 1227(a)(2)(C).

111.  Beyond providing a basis for deportation, removal prosecutions under 8 U.S.C. § 1227(a)(2)(C) can trigger mandatory immigration incarceration. *See* 8 U.S.C. § 1226 (c)(1)(B) (listing deportation under § 1227(a)(2)(C) as one of the offenses for which the Attorney General "shall take into custody" the noncitizen for detention).

112.  In addition to the specific firearms deportation provision [currently codified at 8 U.S.C. § 1227(a)(2)(C)], the INA singles-out or includes firearms related conduct in two other provisions.

  a.  First, in 1988 Congress added "illegal trafficking in firearms and destructive devices" to its original list of "aggravated felonies" that could trigger deportation. *See* 8 U.S.C. §§ 1101(a)(43), 1227(a)(2)(A)(iii) (originally listing the three crimes of murder, drug trafficking and illegal trafficking in firearms and destructive devices under the definition of "aggravated felony"). In 1994, Congress expanded the definition of "aggravated felony" to include violations of federal firearms law, including violations of possession laws included in 18 U.S.C. 922. *See Immigration and Nationality Technical Corrections Act of 1994*, Pub. L. 104-416, 108 Stat. 4305, 103rd Cong. (1994), codified at 8 U.S.C. § 1101(a)(43)(E).

  b.  Second, a later amendment to the INA added "crimes of violence" to the aggravated felony definition. 8 U.S.C. § 1101(a)(43)(F). Although the provision does not reference firearms, it can be applied to violent firearms related conduct.

113.    When any aggravated felony, including those that involve or require firearms use, constitutes the basis for removal, the noncitizen is stripped of a several avenues for relief from deportation available to noncitizens who are charged with other grounds for removal. *See, e.g.*, 8 US.C. § 1229b(a)(3) (rendering any noncitizen convicted of an aggravated felony ineligible for "cancellation of removal"), and § 1229c(b)(1)(B) (rendering any noncitizen convicted of an aggravated felony ineligible for "voluntary departure").

## D.    The Enactment of 18 U.S.C. § 922(g)(5) and the First Federal Criminal Prohibitions on Possession of Firearms by Certain Noncitizens

114.    Although Congress enacted the first firearms-related deportation provision in 1940, the first federal criminal prohibition on noncitizen possession was not enacted until 1968.

115.    Following the assassinations of Martin Luther King, Jr. and Robert F. Kennedy and significant unrest and violence in urban centers, in 1968 Congress enacted two laws, the Omnibus Crime Control and Safe Streets Act, Pub. L. 99-308, 100 stat. 449 (1968), and the Gun Control Act, Pub. L. 90-618, 92 stat. 1213 (1968).

116.    Together, the Acts sought to regulate the interstate sale and purchase of firearms by specific dealers, and prohibit the sale and purchase of firearms by specific groups. In particular, Title VII of the Omnibus Crime Control and Safe Streets Act imposed criminal liability for any "alien [who is] illegally or unlawfully in the United States," to "receive[], possess[], or transport[]" any firearm. Pub. L. 90-351, § 1201 (1968).

117.    In 1986, Congress repealed that particular section of the 1968 law, and re-enacted and recodified it as 18 U.S.C. § 922(g)(5) as part of the Firearm Owners' Protection Act, Pub. L. 99-308, 100 stat. 449 (1986).

118.    In 1998, Congress added the prohibition on nonimmigrant possession and separated § 922(g)(5) into two subsections: (1) Section (g)(5)(A) prohibiting possession by noncitizens who are "illegally or unlawfully in the United States," and (2) Section (g)(5)(B) which, subject to a very limited exception, bars noncitizens "admitted to

the United States under a nonimmigrant visa." Pub. L. 105-277, 112 Stat. 2681-71 (1998) (the limited exception in § 922(g)(5)(B) exempts those with nonimmigrant visas admitted for the purposes of lawful hunting or sporting, or in possession of a hunting license issued in the United States, see § 922(y)(2)).

## X.   Pre-Ratification and Founding Era Restrictions on Firearm Possession by Particular Groups

119.   As noted in Part IX, federal deportation laws targeting noncitizens for firearms violations were enacted in 1940, with criminal prohibitions following in 1968.

120.   Federal courts assessing the constitutionality of 18 U.S.C. § 922(g)(5) immediately prior to, and soon after, the Supreme Court's decision in *New York Rifle & Pistol Association v. Bruen* (2022), however, sought guidance from state-level restrictions and not just from the background of federal regulations. *See United States v. Jimenez-Shilon*, 34 F.4th 1046-49 (11th Cir. 2022) (pre-*Bruen*, citing the existence of some founding era restrictions on various groups as evidence of a historical antecedent for § 922(g)(5)); *United States v. DaSilva*, 2022 WL 17242870 (M.D. Penn. Nov. 23, 2022) (post-*Bruen*, citing *Jiminez-Shilon* and existence of some founding era restrictions as evidence of historical antecedents for § 922(g)(5).

121.   Parts X.A – D surveys some of the potential antecedents and historical analogues that federal courts may be referencing when deciding the constitutionality of 18 U.S.C. § 922(g)(5). As detailed below, colonial and early state level group-based restrictions primarily were premised on racial exclusions (as opposed to citizenship and immigration status per se), or were tied to notions of loyalty, especially during the Revolutionary period. *Cf. Rahimi*, 61 F.4th at 457 (striking down 18 U.S.C. § 922(g)(8) after evaluating historical analogues, stating "[t]he purpose of laws disarming 'disloyal' or 'unacceptable' groups was ostensibly the preservation of political and social order, not the protection of an identified person from the threat of 'domestic gun abuse'").

122.   It is worth remembering that the Second Amendment did not carry the same legal meaning that it does today, at least with regards to its application against state level authorities (see para. 34-35 above). Prior to 1791, colonial and state restrictions

would not have raised constitutional concerns as the U.S. Constitution and the Second Amendment were yet to be drafted or ratified. Even after ratification of the Second Amendment, the Bill of Rights as a whole only restricted the federal government. *See Barron v. Baltimore*, 32 U.S. 243 (1833) (unanimously holding that the takings clause of the Fifth Amendment, and the protections of the first eight amendments to the Bill of Rights, only constrained the federal government and did not apply to the states). State firearms regulations would have been constrained only by state constitutional provisions, which may have been worded and interpreted differently than the right to keep and bear arms protected the Second Amendment. The Second Amendment ultimately was found to be incorporated against states and localities in *McDonald v. City of Chicago*, 561 U.S. 742 (2010) (deciding that Second Amendment's right to keep and bear arms for the purpose of self-defense was incorporated by the Fourteenth Amendment, and thus applicable against the states).

## A.      Colonial Era Restrictions

123.    In general, pre-1776 colonial era restrictions on firearms possession did not focus on citizenship or membership in the British Empire *per se*. Instead, such regulations focused on prohibiting trade, sales, or possession of firearms by racial and ethnic status, and to a lesser extent, residence within the territory. In particular, extant regulations prohibited gun sales and possession by "Indians," "slaves," "mulattoes," and similar groups.

124.    Examples of colonial-era restrictions include (emphasis added in all):

    a.      **Laws of the Colony of Massachusetts 37 § 2 (1633)**: "…Nor shall any person sell, give or barter, directly or indirectly, any gun or guns, powder, bullets, shot, lead, *to any Indian whatsoever, or to any person inhabiting out of this jurisdiction*…."

b.    **The Public Records of the Colony of Connecticut Prior to the Union with New Haven Colony (May 1665)**: "It is ordered that no man within this Jurisdiction shall directly or indirectly amend, repair, or cause to amended or repaired any gun small or great belonging to any Indian, nor shall endure the same, nor shall sell or give *to any Indian*, directly or indirectly, any such gun or gunpowder…"

c.    **Records of the Colony of New Plymouth in New England (1676)**: "For as much as by frequent and sad experience it is found, that selling…of arms and ammunition *to the Indians is very poisonous and destructive to the English*, it is therefore ordered…by the council of war for this jurisdiction that whosoever shall be found to sell, barter, or give, directly or indirectly, any gun or guns, or ammunition of any kind to any Indian or Indians…shall be put to death…"

d.    **An Act for the Speedy Trial of Criminals, Maryland Laws 117, Chap. 26 § 32 (1715)**: "*No negro or other slave within this province* shall be permitted to carry any guns or any other offensive weapon, from off their master's land, without license from their said master; and if any negro or other slave shall presume so to do, he shall be liable to be carried before a justice of peace and be whipped, and his gun or other offensive weapon shall be forfeited to him that shall seize the same and carry such negro so offending before a justice of the peace."

e.    **South Carolina Acts 168 § 23 (1740)**: "it shall not be lawful for *any slave, unless in the presence of some white person*, to carry or make use of firearms or any offensive weapon whatsoever, unless such negro or slave shall have a ticket or license in writing from his master, mistress or overseer, to hunt and kill game, cattle, or mischievous birds or beasts of prey, and that such license be renewed once every month, or unless there be some white person of the age of 16 or upwards, in the company of such slave when he is hunting or shooting; or that such slave be actually carrying his masters arms too or

from his masters plantation, by a special ticket, for that purpose, or unless such slave be found in the day time actually keeping off rice birds, or other birds within the plantation to which such slave belongs, loading the same gun at night within the dwelling house of his master, mistress or white overseer. And provided also that no negro or other slave shall have liberty to carry any guns, cutlass, pistol or other weapon abroad form at any time between Saturday evening after sunset and Monday morning before sunrise.

f.  *See generally*, Meg Penrose, *A Return to the States' Rights Model: Amending the Constitution's Most Controversial and Misunderstood Provision,* 46 Conn. L. Rev. 1463, 1478 (2014) ("[T]he Founders perpetuated our English heritage of discriminating between who could be trusted with weapons and who could not. Blacks—both free and slaves— Indians, non-Loyalists, Catholics, and other groups were selectively excluded from legal access to weaponry."); Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 Geo. L.J. 309, 319 (1991) ("The English distrust of the lower classes, and then certain religious groups, was replaced in America by a distrust of two racial minorities: Native Americans and blacks.").

## B.  Founding Era Restrictions

125.  During the Founding and Ratification era, post-1776, restrictions on firearms continued to exclude "Indians," "Slaves," "Negroes," and "Mulattoes" from firearm possession. In addition to these restrictions, some jurisdictions post-1776 sought to disarm those who were not loyal to the cause of independence, or had not pledged fidelity to the state.

126.  Examples of Founding-Era restrictions include (emphasis added):

a.  **An Act for the executing in the Colony of the Massachusetts Bay, in New England, on Resolve of the American Congress, dated March 14,**

Exhibit - A - Page 46

**1776, recommending the disarming of such persons as are notoriously disaffected to the cause of America, or who refuse to associate to defend by arms the United American Colonies, against the hostile attempts of the British fleets and armies, and for the restraining and punishing persons who are inimical to the rights and liberties of the said United Colonies, and for directing the Proceedings therein, Act of Mar. 14, 1776, chap. VII (1776)**: "Be it therefore enacted by the Council, and House of Representatives in General Court assembled, and by the Authority of the same, that every male person above sixteen years of age, resident in any town or place in this colony, *who shall neglect or refuse to subscribe a printed or written declaration of the form and tenor herein after prescribed*, upon being required thereto by the Committee of Correspondence, Inspection and Safety for the town or place in which he dwells, or any of them, shall be disarmed and have taken from him in manner hereafter directed, all such arms, ammunition and warlike implements, as by the strictest search can be found in his possession or belonging to him; which declaration shall be in the form and words following, viz . . . Provided, nevertheless, and be it further enacted, that nothing in this shall be Act shall be construed to extend to the disarming, disqualifying or any way punishing any of the denomination of Christians called Quakers, for not fighting the aforesaid declaration, in case upon being required to sign the following Declaration, and having the same tendered to him, shall not refuse or neglect to subscribe it.

b.   **An Ordinance Respected the Arms of Non-Associators, Pennsylvania Laws 11, § 1 (1776)**: "The colonel or next officer in command of every battalion of militia in this state is hereby authorized, empowered, and required to collect, receive and take all the arms in his district or township nearest to such officer which are in the *hands of non-associators* in the most expeditions and effectual manner in his power…"

c.    **An act to oblige the free male inhabitants of this state above a certain age to give assurance of Allegiance to the same, and for other purposes, Virginia Act of May 5, 1777 chap. 3 (1777)**: "Whereas allegiance and protection are reciprocal, and those who will not bear the former are not entitled to the benefits of the later, Therefore Be it enacted by the General Assembly, that *all free born male inhabitants* of this state, above the age of sixteen years, *except imported servants during the time of their service*, shall, on or before the tenth day of October next, take and subscribe the following oath or affirmation before some one of the justices of the peace of the county, city, or borough, where they shall respectively inhabit; and the said justice shall give a certificate thereof to every such person, and the said oath or affirmation shall be as followeth, viz . . . And the justices tendering such oath or affirmation are hereby directed to deliver a list of the names of such recusants to the county lieutenant, or chief commanding officer of the militia, who is hereby authorized and directed forthwith to cause *such recusants to be disarmed* . . . And be it farther enacted, that every person above the age before mentioned, except as before excepted, refusing or neglected to take and subscribe the oath or affirmation aforesaid, shall, during the time of such neglect or refusal, be incapable to holding any office in this state, serving on juries, suing for any debts, electing or being elected, or buying lands, tenements, or hereditaments.

d.    **An Act for Disarming Persons Who Shall Not Have Given Attestations of Allegiance and Fidelity to this State, Pennsylvania Laws 193, § 4, 5 (1779)**: "And whereas it is very improper and dangerous that *persons disaffected to the liberty and independence of this state* shall possess of have in their keeping, or elsewhere, any firearms, or other weapons used in war, or any gun powder, § 5. That from and after the passing of this act, the lieutenant or any sub lieutenant of the militia of any county or place within this state, shall be, and is hereby empowered to disarm any person or person who shall not have taken any oath or affirmation of allegiance to this or any

other state and against who information on oath shall be given before any justice of the peace that such person is suspected to be disaffected to the independence of this state, and shall take from every such person any cannon, mortar, or other piece of ordinance, or any blunderbuss, wall piece, musket, fuse, carbine or pistols, or other firearms, or any hand gun; and any sword, cutlass, bayonet, pike or other warlike weapon, out of any building, house or place belonging to such person.

e.   *See generally*, Joseph Blocher & Caitlin Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders*, Duke Law School Public Law & Legal Theory Series No. 2020-80 (2020); Saul Cornell & Emma Cornell, *The Second Amendment and Firearms Regulation: A Venerable Tradition Regulating Liberty While Securing Public Safety*, 108 Am. J. Public Health 867 (2018)

## C.   Post-Ratification Racial Restrictions on Gun Possession

127.   The Constitution of the United States was ratified in 1788, followed by the Bill of Rights (including the Second Amendment) in 1791. Post-ratification, several states and territories enacted statutes requiring the disarmament of several groups. As with prior restrictions, the included and excluded group were racially-defined.

128.   At that time, included and excluded racial and/or political groups overlapped with the status of citizenship. For example, federal law enacted immediately after ratification restricted naturalization to any "free White person…of good character" who had resided in the United States for two years and took an oath to support the Constitution. *See An Act to Establish a Uniform Rule of Naturalization*, Pub. L. 1-3, 1 State 103, ch. 3, 1ˢᵗ Cong. (1790). Later amendments altered the number of prerequisite residency years, but maintained the racial restriction. *See*, *e.g.*, *The Naturalization Act of 1795*, Pub. L. 3-20, 1 Stat. 414, chap. 20, 3ʳᵈ Cong. (1795) (increasing residency requirement to five years); *The Naturalization Act of 1798*, Pub. L. 5-54, 1 Stat. 566, chap. 54, 5ᵗʰ Cong. (1798) (increasing residency

requirement to fourteen years); *The Naturalization Act of 1802*, Pub. L. 7-28, 2 Stat. 153, chap. 28, 7th Cong. (1802) (restoring five year residency requirement).

129. Whites remained the only group eligible for citizenship until after the Civil War, when the Fourteenth Amendment extended citizenship to nearly every person born within the United States regardless of race. U.S. Const., Amdt XIV, § 1, cl. 1 ("All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."). Following the Fourteenth Amendment, Congress amended federal naturalization law to allow the possibility for naturalization of both White foreigners and "aliens of African nativity and to persons of African descent." *The Naturalization Act of 1870*, Pub. L. 41-254, 16 Stat. 254, 41st Cong. (1870).

130. For the sake of completeness, it is worth noting that—at least formally—the first non-Whites extended the possibility of being recognized as U.S. citizens were select members of the Choctaw Indians in Mississippi, who were granted the possibility of citizenship and land rights after the signing of The Treaty of Dancing Rabbit Creek with the United States in 1830. *Treaty of Dancing Rabbit Creek*, Art. XIV, 7 Stat. 333, ratified by U.S. Senate on Feb. 25, 1831 (removal treaty signed between the United States Government and members of the Choctaw American Indian tribe, pursuant to the *Indian Removal Act of 1830*, Pub. L. 21-148, 4 Stat. 411, 21st Cong. (1830)). Not surprisingly, as part of the wholesale uprooting of Native Americans from their indigenous lands in the early 1800s, the treaty protections applied to select few and in large part, were not honored.

131. In general, however, during the relevant period, citizenship—either by birth in the territory or by naturalization—remained racially restricted to Whites.

132. Examples of post-Ratification racially restrictive gun laws include (emphasis added):

   a.   **Kentucky Acts 106 (1798)**: *No negro, mulatto, or Indian whatsoever* shall keep or carry gun…or other weapon whatsoever, offensive or defensive, but all and every gun, weapon, and ammunition found in the possession or custody of any negro, mulatto, or Indian may be seized by any person …"

b.      **A Law for the Regulation of Slaves, Mississippi Laws 113 (1799)**: "*No Negro or mulatto* shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun, weapon and ammunition found in the possession or custody of any negro or mulatto may be seized by any person . . . every such offender shall have and receive by order of such justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense."

c.      **A Law Respecting Slaves, Indiana Acts 108 (1804)**: And be it further enacted, That *no slave or mulatto* whatsoever shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive, but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof thereof made before any justice of the peace of the district where such seizure shall be, shall by his order be forfeited to the seizor, for his use and moreover every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back, well laid for every such offense.

d.      **An Act to Restrain the Evil Practices Arising from Negroes Keeping Dogs, and to Prohibit Them from Carrying Guns or Offensive Weapons, Maryland Laws chap. 81, 44 (1806)**: "It shall not be lawful *any free negro or mulatto* to go at large with any gun, or other offensive weapon; and in case any free negro or mulatto shall be seen going at large carrying a gun or other offensive weapon, he shall be liable…"

e.      **An Act prescribing the rules and Conduct to be Observed with Respect to Negroes and Other Slaves of this Territory, (Louisiana 1806)**: "*No slave* shall, by day or by night, carry any visible or hidden arms, not even with a permission for so doing, and in case any person or persons shall find any slave or slaves, using or carrying such fire arms, or any offensive

weapons of any other kind, contrary to the true meaning of this act, he, she or they, lawfully, may seize and carry away such fire arms, or other offensive weapons.....The inhabitants who keep slaves for the purpose of hunting, shall never deliver to the said slaves any fire arms for the purpose of hunting, without a permission by writing, which shall not serve beyond the limits of the plantation of the owners."

f.  **Indian Intercourse, Statutes of Mississippi (1807)**: "And be it further enacted, That if *any such citizen*, or other person, shall purchase, or receive of *any Indian*, in the way of trade or barter, a gun, or other article commonly used in hunting, any instrument of husbandry, or cooking utensil, of the kind usually obtained by the Indians, in their intercourse with white people, or any article of clothing, excepting skins or furs, he shall forfeit a sum not exceeding fifty dollars, and be imprisoned not exceeding thirty days."

g.  **An Act for the Better Preservation of the Breed of Deer, and Preventing Unlawful Hunting, Kentucky Leg. Sess. Feb. 24, 1834, § 8 (1834)**: "And be it further enacted by the authority aforesaid, That whosoever shall hereafter use any fire-hunting or the killing of any deer by such means on any patented land, every person present at such fire hunting shall forfeit and pay twenty shillings for every such offense; and *if any Indian be found fire-hunting* as aforesaid, it shall and may be lawful for the owner of such land, or his or her overseer, to take away the gun of such Indian, and the same to keep to his own use."

## D.   Post-Ratification Militia Restrictions

133.   Post-ratification of the Constitution and the Bill of Rights, several states and territories also enacted statutes defining who would be eligible and required to serve in state or local militias, and which groups would be disarmed and excluded from the same. As with prior restrictions, the included and excluded group were racially

defined, generally prohibiting all non-Whites from participating and/or excluding specific racial and ethnic groups.

134.    Citizenship, as used in several statutes, appeared to refer to state citizenship (see para. 80-81, above). Citizenship—whether national or state—complimented racial restrictions. Because only Whites could be citizens, racial prohibitions and militia membership restrictions excluded similar, if not the same, groups.

135.    Examples of Post-Ratification militia laws include (emphasis added):

    a.    **An Act in Addition to an Act, Entitled "An Act for Regulating the Militia within This State," New Hampshire Laws 525 (1795)**: "*Every free, able bodied, white male citizen of this state*, resident therein, who is, or shall be of the age of fifteen years and under forty years of age, under such exceptions as are made in said act, shall be enrolled in the militia and shall in all other respects be considered as liable to do the duties of the militia in the same way and manner, as those of the age of eighteen years and upwards."

    b.    **An Act Establishing and Regulating the Militia, The Statutes of Ohio and of the Northwest Territory, (Ohio 1799)**: Be it enacted…that each and *every free, able bodied, white male citizen of the territory*, who is or shall be the age of eighteen years, and under the age of forty five years, …shall…be enrolled in the militia…and every citizen, so enrolled and notified, shall, within six months thereafter, provide himself with a good musket, a sufficient bayonet and belt, or a fuse, two spare flints, a knapsack and a pouch, with a box therein, to contain not less than twenty-four cartridges…"

    c.    **An Act to Provide for the National Defense by Organizing the Militia, Texas Gen. Laws 54-55, § 1 (1836)**: "That *every free able bodied male citizen of this republic*, resident therein, who is or shall be of the age of seventeen years, …shall severally and respectively be enrolled in the

militia…That every *citizen* so enrolled and notified, shall within ten days thereafter provide himself with a good musket, a sufficient bayonet and belt, six flints, knapsack and cartridge box…"

    d.    **An Act to Regulate the Militia, Rhode Island Pub. Laws 501, § 1 (1844)**: "*Every able bodied white male citizen in this state*, who is or shall be the age of eighteen years…shall be enrolled in the militia"

    e.    **Minnesota Stat. Chap. 120, §§1, 8 (1858)**: "Be it enacted by the legislature of the state of Minnesota: That *all able-bodied, white male citizens resident of this state*, being eighteen years of age, and under the age of forty-five years, excepting persons exempt by law, shall be enrolled in the militia, and perform military duty in such manner—not incompatible with the constitution and laws of the United States—as hereinafter prescribed."

## E.    Other 19th Century Group-Based Restrictions on Firearms

136.    During and after the Civil War, some state-level provisions continued to restrict firearms on the basis of race.

137.    The "Black Codes," of some states, for example, kept Black citizens from possessing or carrying firearms, regardless of formal citizenship status.

138.    In addition, several state constitutional provisions enacted or amended in the late 19th century protected the rights of "citizens" or "citizens of [this] state." In considering these state constitutional provisions, it is worth bearing in mind the following.

    a.    First, some of the state constitutional protections reference state residency and membership in the political body of the state specifically. Those references may not bear any relationship to national citizenship or immigration status under federal law.

    b.    Second, the constitutional protection for "citizens" in those constitutions does not necessarily connote state regulation of noncitizens through statutory enactments.

State legislative enactments may or may not have included citizenship-based restrictions, irrespective of state constitutional text.

c. Third, to the extent those provisions mean to refer to national citizenship or citizenship in opposition to non-citizenship, they use the term "citizen" rather than "the people."

d. Finally, as noted in para. 81-83 above, federal immigration statuses in force today did not exist at the time of these enactments.

139. Examples of Nineteenth Century enactments include (emphasis added in all):

a. **An Act Relating to Free Negroes Having Arms, North Carolina Sess. Laws 68, § 1 (1860)**: "If *any free negro* shall wear or carry about his person or keep in his house any shot gun, musket, rifle, pistol, sword, cane, dagger, bowie knife, powder or shot, he shall be guilty of a misdemeanor, and upon conviction fined not less than fifty dollars."

b. **An Act to Amend the Code of State of Delaware entitled "For the Protection of Fish, Oysters, and Game", Del. Laws 365, ch. 328, § 10 (1863)**: "It shall be unlawful for *any person not being a citizen of this State*, to catch, take, or kill…any [wild game]…and any boat or vessel, …and any gun … shall be forfeited and maybe seized…"

c. **An Act to Confer Civil Rights on Freedmen, and for other Purposes** (Mississippi Black Codes) (1865): "*No freedman, free negro or mulatto*, not in the military service of the United States Government, and not licensed…by the board of Policy of his or her county, shall keep or carry firearms of any kind…"

d. **Acts of the General Assembly of the state of South Carolina (1866)** (including the South Carolina Black Codes, § XIII (1865): "*Persons of color constitute no part of the Militia of the state*, and no one of them shall, without permission…be allowed to keep a firearm, sword, or other military weapon…"

e.       **An Act to Protect the Owners of Firearms, Oregon Rev. Stat. 18, § 1 (1868):** "*Every white male citizen of this state* above the age of sixteen years, shall be entitled to have…the following firearms…"

f.       **Const. of State of Tennessee, Art. I, § 26 (1870)**: "That the *citizens of this State* shall have a right to keep and to bear arms for their common defense; but the Legislature shall have power, by law, to regulate the wearing of arms with a view to prevent crime."

g.       **Const. of State of Missouri, Art. II, § 17 (1875):** "That the right of *no citizen* to keep and bear arms in defense of his home, person and property, or in aid of the civil power, when hereto legally summoned, shall be called in question; but nothing herein contained is intended to justify the practice of wearing concealed weapons."

h.       **Const. of State of Texas, Art. I, § 23 (1876)**: "*Every citizen* shall have the right to keep and bear arms in the lawful defense of himself or the State, but the Legislature shall have the power by law to regulate the wearing of arms with a view to prevent crime."

i.       **Const. of State of Mississippi, Art. III, § 12 (1890):** "The *right of every citizen* to keep and bear arms in defense of his home, person or property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but the legislatures may regulate or forbid carrying concealed weapons."

j.       **An Act for the Better Protection of the Game and Fish of this State, Wyoming Sess. Laws 27, § 14 (1899):** "*Any person who is a bona fide citizen of the state* of Wyoming shall upon payment of one dollar….be entitled to receive…a gun license which…shall permit such person to …hunt and kill any of the animals….  Any person who is not a resident of

the State of Wyoming, shall upon payment…of the sum of forty dollars be entitled to receive…a license…."

## F.     Early 20th Century to Present Day State Level Firearms Restrictions Based on Citizenship or Immigration Status

140.    As I have chronicled in other work, several states enacted laws that regulated arms possession based on citizenship or immigration status in the early 20th century, with some states still maintaining some forms of alienage distinction. *See*, *e.g.*, Gulasekaram, *Aliens with Guns: Equal Protection, Federal Power, and the Second Amendment*, 92 Iowa L. Rev. 891 (2008).

141.    Notably, these enactments post-date any relevant time period as prescribed by the Supreme Court in *Bruen*. 142 S. Ct. at 2137-55 (discounting evidence of enactments from the early twentieth century in striking down New York's 1911 permitting scheme).

142.    Several of these laws intended to regulate particular uses of firearms (*e.g.*, for gaming or hunting purposes), and did not operate as general firearms prohibitions.

143.    Several of these laws have since been repealed or struck down by state or federal courts, either on state right to bear arms grounds, equal protection grounds, or federalism grounds.

144.    Examples of 20th Century State Level Firearms Restrictions Based on Citizenship or Immigration Status include (emphasis added in all):

a.     **An Act for the Protection of Fish, Game, and Birds, Utah Laws 197, ch. 118, § 30 (1905)**: It shall be unlawful for *any non-resident person or for resident who is not a citizen of the United States* to kill any game, animals, birds or fish in this State, without first having procured the license to do so hereinafter provided for. *Any non-resident person or any resident who is not a citizen of the United States*, upon the payment to the State Commissioner, of the sum of twenty-five dollars, shall be entitled to receive a license… will entitle him to hunt and kill game,…."

b.   **An Act ...prohibiting the Hunting …of Game by Unnaturalized Foreign-born Residents; Forbidding the Ownership or Possession of Shotgun or Rifle by any Unnaturalized Foreign-born Resident, Pennsylvania Laws 466, §§ 1 (1909):** "…[I]t shall be unlawful for *any unnaturalized foreign born resident* to hunt for or capture or kill, in this Commonwealth, any wild bird or animal, either game or otherwise, of any description excepting in defense of person or property; and to that end it shall be unlawful for *any unnaturalized foreign born resident*, within this Commonwealth, to either own or be possessed of a shotgun or rifle of any make."

c.   **An Act Relating the Carrying of Firearms, Requiring Licenses of Certain Persons, Washington Sess**. Laws 303, ch. 52, § 1 (1911): *Any person not a citizen of the United States*, who shall have or carry firearms, or any dangerous or deadly weapons in any public place, at any time, shall be guilty of a felony…."

d.   **An Act Relating to Game and Fish, North Dakota Laws 225, c**h. 161, § 67 (1915): It shall be unlawful for *any person who is not a citizen of the United States or who has not declared his intention to become such*, to hunt, shoot, capture, take, kill, trap, snare or in any manner destroy, wound or maim any wild bird or animal . . . except in defense of person or property; and to that end it shall be unlawful for *any person who is not a citizen of the United States or who has not declared his intention to become such*, to either own or be possessed of a shot gun or rifle of any make. Each and every person violating any provision of this Section shall upon conviction thereof, be sentenced to pay a fine of not less than twenty-five dollars, nor more than fifty dollars and costs of prosecution, or to serve not less than ten days nor more than thirty days in the county jail, or both such fine and imprisonment at the discretion of the court; provided that in addition to the before-named penalty, all guns of the before mentioned kinds found in the possession or

under the control of *such persons not citizens of the United States* . . . shall upon conviction of such person, or upon his signing a declaration of guilt, be declared forfeited to the State of North Dakota and shall be sold as provided in this Act.

e.     **An Act Prohibiting the Hunting…of Wild Birds or Game by Unnaturalized, Foreign-Born Persons; Forbidding the Ownership or Possession of Shotgun or Rile by Any Unnaturalized, Foreign-Born Person, New Jersey Laws 662-63, ch. 355, § 1 (1915):** From and after the passage of this act it shall be unlawful for *any unnaturalized, foreign-born person* to hunt for or capture, or kill in this State, any wild bird or animal, either game or otherwise, of any description, excepting in defense of person or property; and to that end it shall be unlawful for *any unnaturalized, foreign-born person, within this State*, to either own or be possessed of a shotgun or rifle of any make.

f.     **Colorado Sess. Laws 416-417, § 1 (1919):** ".… [I]t shall be unlawful for *any unnaturalized foreign-born resident* to hunt for or capture or kill, in this state; any wild bird or animal, either game or otherwise, of any description, excepting in defense of persons or property; and to that end it shall be *unlawful for any unnaturalized foreign-born resident*, within this state, to either own or be possessed of a shotgun or rifle of any make, or a pistol or firearm of any kind.

g.     **An Act to Control and Regulate the Possession, Sale, and Use of Pistols, Revolvers, and Other Firearms Capable of Being Concealed Upon the Person, 1923 California Stat. 695, § 2 (1923)**: "… [N]o *unnaturalized foreign born person* and no person who has been convicted of a felony against the person or property of another or against the government of the United States or of the State of California … shall own or have in his possession or under his custody or control any pistol, revolver or other

firearm capable of being concealed upon the person. The terms "pistol," "revolver," and "firearms capable of being concealed upon the person" as used in this act shall be construed to apply to and include all firearms having a barrel less than twelve inches in length…."

h.    **Oregon Laws 469-71, § 5 (1925):** "…[I]t shall be unlawful for any person within this state to carry concealed upon his person or within any vehicle which is under his control or direction any pistol, revolver or other firearm capable of being concealed upon the person without having a license to carry such firearm, as hereinafter provided in section 8 hereof. … This section shall not be construed to prohibit *any citizen of the United States*, over the age of eighteen years, who resides or is temporarily sojourning within this state, … from owning, possessing or keeping within his place of residence or place of business any pistol, revolver or other firearm capable of being concealed upon the person, and no permit or license to purchase, own, possess or keep any such firearm at his place of residence or place of business shall be required of *any such citizen*.

i.    **Indiana Acts 495-98, §§ 7, 9 (1925):** "SEC. 7. The clerk of any circuit court of the State of Indiana, shall, upon application of *any citizen having a bona fide residence or place of business within the State of Indiana*, or of any person having a bona fide residence or place of business within the United States, and a permit to carry a firearm concealed upon his person issued by the authorities of any other state or subdivision of the United States, issue a permit to such citizen to carry a pistol or revolver within the State of Indiana, .... SEC. 9. No person shall within the State of Indiana sell, deliver or otherwise transfer a pistol or revolver to *a person who he has reasonable cause to believe either is not a citizen* or has been convicted of a felony against the person or property of another..."

145.    Some of these early laws were later repealed or modified. For example, the 1909
        Pennsylvania ban on unnaturalized foreign-born residents hunting, and possessing
        rifles and shotguns, was initially upheld by the U.S. Supreme Court against a
        Fourteenth Amendment challenge, applying then-extant due process and equal
        protection principles. *See Patsone v. Pennsylvania*, 232 U.S. 138 (1914). The
        Pennsylvania legislature, however, later amended the law in 1975, eliminating the
        "unnaturalized foreign-born" language.  1975 Pennsylvania Acts 122 (1975).

146.    Other State and federal courts struck down other state gun laws premised on
        citizenship or immigration status using modern constitutional standards. *See*, *e.g.*,
        *Chan v. City of Troy*, 559 N.W.2d 374, 379 (Mich. Ct. App. 1997) (striking down
        on Fourteenth Amendment equal protection grounds, state law amended in 1990
        that denied permanent residents gun-possession rights); *State v. Chumphol*, 634
        P.2d 451, 451-52 (Nev. 1981) (striking down on Fourteenth Amendment equal
        protection grounds, 1925 state law denying concealed weapons licenses to
        noncitizens); *People v. Rappard*, 28 Cal. App. 3d 302, 305 (Cal. Ct. App. 1972)
        (striking down on state and federal equal protection grounds, state law first enacted
        in 1923 barring concealed weapons carry by noncitizens).

147.    Nevertheless, throughout the 20th century states enacted or amended laws that
        regulated aspects of gun purchase, possession, or permitting on the basis of
        immigration status, and some of those distinctions persist to present day. *See
        generally*, Gulasekaram, Aliens with Guns, 92 Iowa L. Rev. at 895, nn. 11-13
        (categorizing and listing state level restrictions premised on immigration status as
        of 2008). Note that some of these cited laws have been repealed or modified since
        2008 or struck down by courts. *See*, *e.g.*, *Fletcher v. Haas*, 851 F. Supp.2d 287 (D.
        Mass 2012) (holding that lawful permanent residents are part of "the people," and
        striking down provision of state gun licensing law that barred possession by lawful
        permanent residents, to wit *An Act Further Regulating the Law Relative to the
        Purchase, Sale and Possession of Firearms, Rifles and Shotguns*, 1972 Mass. Acts
        172 (1972)).

148.    Several states still maintain citizenship and immigration distinctions in their
        firearms related regulations. A few states maintain categorical bans on possession

by all noncitizens. Some present-day iterations of state gun laws premised on immigration status, similar to the 18 U.S.C. § 922(g)(5), bar certain sub-groups of noncitizens such as unlawfully present noncitizens or nonimmigrants from firearm possession. Others regulate particular aspects of gun possession, such as concealed carry permitting, on the basis of citizenship or immigration status. Still others introduce different requirements or documentary requirements noncitizens seek to purchase firearms or apply for licenses to own and carry them.

149. Some examples of present-day, state level restrictions on noncitizens' firearm possession, permitting, or use include (emphasis added in all):

   a.  **Criminal Possession of a Weapon, New York Pen. Law § 265.01(5) (2022)** (criminalizing possession of deadly weapon by noncitizens)

   b.  **Unlawful Carrying of a Handgun Indiana Code Ann. §§ 35-47-2-1.5(2)(A)-(D) & (3), 35-47-2-3 (2022)** (banning noncitizens who entered the country without inspection, nonimmigrants, and persons with removal orders from gun possession)

   c.  **Permits to Acquire Firearms, Ammunition, and Dangerous Weapons, Hawaii Rev. Stat. § 134-2 (2023)** (requiring individual be a citizen over the age of twenty-one to receive firearms permit, with limited and temporary exceptions for noncitizens in sport-shooting competitions)

   d.  **Possession of Firearm by Alien, Rhode Island Gen. Laws § 11-47-7 (2023)** (barring purchase, ownership, and carrying of firearm by unlawfully present noncitizen)

   e.  **Convicted Felons and Delinquents, Oklahoma Stat. § 21-1283(E) (2022)** (barring possession by illegally or unlawfully present noncitizen).

f.   **Firearm Identification Cards, Conditions, Restrictions, Massachusetts Gen. Laws ch. 140 § 129B (1)(vi) (2023)** (barring possession by all non-lawful permanent resident noncitizens)

g.   **Possession or Transportation of Certain Firearms by Certain Persons, Virginia Code §§ 18.2-308.2:01(A), (B) (2022)** (prohibiting persons who are not U.S. citizens or permanent residents from possessing, transporting, or carrying a firearm)

h.   **South Dakota Code § 23-7-7.1 (2023)** (requiring individual to be a "citizen or legal resident of the United States" to qualify for concealed weapon permit)

i.   **Permits to Carry Concealed Weapons, Arizona Rev. Stat. §§ 13-3112(E)(1), (5) (2023)** (requiring residency in the state or United States citizenship to apply for a concealed carry permit, and disqualifying those unlawfully present in the United States)

150.   To my knowledge, many of these present-day regulations either have not been litigated, or have yet to reach judicial resolution by a federal court or an apex court within the jurisdiction.

151.   In addition, to my knowledge, these restrictions originally were enacted prior to the Supreme Court decision in *Heller*, determining that the Second Amendment protected an individual's right of armed self-defense.

152.   Given the Supreme Court's recent Second Amendment jurisprudence on the scope of the right to keep and bear arms and interpretative methodologies for Second Amendment analysis, these laws may soon be the subject of constitutional challenges, similar to the current litigation regarding 18 U.S.C. § 922(g)(5).

**XI.    Compensation**

153.    For my participation in this litigation and the preparation of this Declaration, I am being compensated at an hourly rate of $250.00, in addition to reimbursement for reasonable travel expenses associated with any deposition or trial appearance.

**XII.   List of Cases in which Declarant Has Been Retained as an Expert in Previous Four Years as Required by Fed. R. Crim. P. 16**

154.    On August 2019, I submitted an Expert Report and Declaration in *Intercommunity Justice & Peace Center v. Registrar, Ohio Bureau of Motor Vehicles* **(S.D. Ohio 2020)** *and Community Refugee & Immigration Services v. Registrar, Ohio Bureau of Motor Vehicles* **(S.D. Ohio 2020)** (written declaration for plaintiffs, analyzing legal defects in Ohio Bureau of Motor Vehicle's attempted exclusion of certain refugees and children of unauthorized noncitizens from receiving driver's licenses; summary judgement awarded to plaintiffs *Intercommunity Justice & Peace Center v. Ohio BMV*, 440 F.Supp.3d 877 (S.D. Ohio 2020)).

**XIII.  List of Declarant's Publications from Previous Ten Years as Required by Fed. R. Crim. P. 16.**

155.    See Curriculum Vitae of Pratheepan Gulasekaram, following this Declaration.

**XIV.   Litigation Documents Reviewed in Drafting this Declaration**

156.    In preparing this Declaration, I have reviewed the following documents associated with this case, provided to me by Mr. Vazquez-Ramirez's counsel. Those materials include

-    Indictment in *United States v. Vazquez-Ramirez* 2:22-CR-87-RMP (E.D. Wash. July 19, 2022)

-    U.S. Dep't of Justice, Report of Investigation, 787060-22-0063 (July 12, 2022)

- Criminal History Record of Oscar Vazquez-Ramirez, NCIC Response No. 3869369011 (July 15, 2022)
- U.S. Dep't of Homeland Sec., Record of Deportable/Inadmissible Alien, A201998638 (Aug. 1, 2022)
- Statement of Arresting Officer and Preliminary Finding of Probable Cause, Case No. 21-004306 Superior Court of Washington for Adams County (Nov. 19, 2021)

I declare under penalty of perjury that the foregoing is accurate to the best of my knowledge.


DATE: August 15, 2023                                   Submitted by

                                                        Pratheepan Gulasekaram

Exhibit - A - Page 65

# Pratheepan (Deep) Gulasekaram

pgulasekaram@colorado.edu; 303.492.1568 (office)

## EDUCATION

**Stanford Law School**, *JD with Distinction* (2001)

**Brown University**, *BA, magna cum laude, British and American Literature* (1996)
Ratcliffe Hicks Prize for highest standing in Language and Literature

## LEGAL TEACHING EXPERIENCE

**University of Colorado Law School,** *Professor of Law* (Fall 2023 - Present)
Courses: Constitutional Law; Immigration Law

**Santa Clara University School of Law,** *Professor of Law & Faculty Scholar, Markkula Center for Applied Ethics* (2007-2023)
Courses: Constitutional Law I & II; Immigration Law; Immigration Law & Policy (seminar/practicum)
Program Director, SCU School of Law Summer Study Abroad Program (Shanghai, China)
2019 SCU Presidential Recognition Award; 2012 SCU Law School Public Interest & Social Justice Achievement Award

**Stanford Law School,** *Visiting Professor* (Fall 2021; Fall 2011)
Course: Immigration Law

**University of California, Berkeley & U.C. Berkeley Law School** *Visiting Professor* (Spring 2018, 2019, 2020)
Courses: Immigration and Citizenship Law & Policy (Spring 2018/19) (undergraduate)
Immigration Law (Spring 2020) (law school)

**New York University School of Law**, *Acting Assistant Professor* (2005-2007)
Course: Lawyering

**Loyola University School of Law** (New Orleans, LA)*, Visiting Assistant Professor* (2004-2005)
Courses: Constitutional Law I, II

## OTHER LEGAL EXPERIENCE

**The Honorable Jacques L. Wiener, Jr.**
**United States Court of Appeals for the Fifth Circuit**, *Law Clerk* (New Orleans, LA) (2001-2002)

**O'Melveny & Myers LLP**, *Associate Attorney* (Century City, CA) (2003-2004)
**Susman Godfrey LLP**, *Associate Attorney* (Los Angeles, CA) (2002-2003)
**Covington & Burling** (Washington, DC); **Sullivan & Cromwell** (Los Angeles, CA) (Summer 2000)

**Asian Law Caucus**, *Extern* (San Francisco, CA) (2000-2001)

## CASEBOOKS, BOOKS, & BOOK CHAPTERS

*Immigration and Citizenship: Process and Policy* (9th Ed.) (2021) (with T. Alexander Aleinikoff, David Martin, Hiroshi Motomura, Maryellen Fullerton, & Juliet Stumpf) (leading immigration law casebook used in law schools); *Immigration and Nationality Laws of the United States: Selected Statutes, Regulations, and Forms* (2022) (Aleinikoff, et. al. Eds.)

*The New Immigration Federalism* (CAMBRIDGE UNIVERSITY PRESS 2015) (with S.K. Ramakrishnan)

**United States v. Cruikshank** *Reimagined* (chapter for *Critical Race Judgments: Rewritten U.S. Supreme Court Opinions on Race and Law* (CAMBRIDGE UNIVERSITY PRESS 2022) (D. Carbado, A. Onwuachi-Willig, R. Lenhardt, B. Capers, Eds.)

*Immigration Localism* (chapter for *The New Preemption Reader: Legislation, Cases and Commentary on the Leading Challenge in Today's State and Government Law* (1st Ed.) (2019) (N. Davidson and R. Briffault, Eds.)) (with Rose C. Villazor, Rick Su)

*Immigration and American Federalism* (chapter for *Controversies in American Federalism and Public Policy*, (ROUTLEDGE PRESS 2018) (Christopher Banks, Ed.))

### ACADEMIC ARTICLES

*The Borderline Constitution* (work-in-progress) (with Justin Driver)

*The Second Amendment's "People" Problem*, 76 VANDERBILT L. REV. – (forthcoming)

*Immigration Enforcement Preemption,* 84 OHIO ST. L. J. 535 (2023)

*Restructuring Immigration Enforcement Federalism,* 2021 U. ILL. L. REV. ONLINE 39 (2021) (Symposium on Biden's 100 Days)

*Anti-Sanctuary & Immigration Localism*, 119 COLUMBIA L. REV. 837 (2019) (with Rose C. Villazor, Rick Su)
    <u>Cited by:</u>    *City of Gary, Indiana v. Nicholson, and State of Indiana*, 181 N.E.3d 390 (Ind. App. 2021)

*Privatized Detention & Immigration Federalism,* 71 STANFORD L. REV. ONLINE 135 (2019) (with David S. Rubenstein)

*Sanctuary Networks*, 103 MINNESOTA L. REV. 1209 (2019) (with Rose C. Villazor)

*The New Sanctuary and Anti-Sanctuary Movements,* 52 U.C. DAVIS L. REV. 549 (2018) (with Rose C. Villazor)

*Immigration Exceptionalism*, 111 NORTHWESTERN UNIV. L. REV. 583 (2017) (with David S. Rubenstein)

*The President and Immigration Federalism*, 68 FLORIDA L. REV. 101 (2016) (with S.K. Ramakrishnan)

*Understanding Immigration Federalism in the United States* (March 2014) (with S.K. Ramakrishnan) (commissioned report for the Center for American Progress)

*Immigration Federalism:  A Reappraisal*, 88 NEW YORK UNIV. L. REV. 2074 (2013) (with S.K. Ramakrishnan)

*Guns and Membership in the American Polity*, 21 WILLIAM & MARY BILL OF RIGHTS J. 619 (2012) (symposium)

*The Importance of the Political in Immigration Federalism*, 44 ARIZONA STATE L. J. 1431 (2012) (with S.K. Ramakrishnan)

*Restrictive State and Local Immigration Laws: Solutions in Search of Problems*, 6 ADVANCE 5 (November 2012) (with S.K. Ramakrishnan) (Issue Brief for the American Constitution Society for Law & Policy)

*Why a Wall?* 2 U.C. IRVINE L. REV. 147 (2012) (symposium)

*No Exception to the Rule:  The Unconstitutionality of State Immigration Enforcement Laws*, 5 ADVANCE 37 (October 2011) (Issue Brief for the American Constitution Society for Law & Policy)

*"The People" of the Second Amendment: Citizenship & the Right to Bear Arms*, 85 NEW YORK UNIV. L. REV. 1521 (2010)
    <u>Cited by:</u>    *United States v. Jiminez-Shilon*, 6 F.4th 1042 (11th Cir. 2022); *Fletcher v. Haas*, 851 F.Supp.2d 287, 295 (D. Mass. 2012); *Pohlabel v. State*, 268 P.3d 1264, 1271 (Nev. 2012); Am. Jur. 2d §§ 26, 1877, 2309, 2714
    <u>Response:</u>    Eugene Volokh, *A Cautionary Note for Readers of "The People" of the Second Amendment*, N.Y.U. L. Rev. The Legal Workshop Online (Dec. 8, 2011)
    <u>Reply:</u>    Pratheepan Gulasekaram, *A Cautionary Note to Readers of Professor Volokh's "Cautionary Note,"* N.Y.U. L. Rev. The Legal Workshop Online (Dec. 8, 2011)

*Sanctuary Ordinances & Immigration Federalism:  A Dialectical Analysis*, 55 WAYNE L. REV. 1683 (2009) (with Rose C. Villazor)
    <u>Cited by:</u>    *Villas at Parkside Partners v. Farmers Branch*, 726 F.3d 524, 561 (5th Cir. 2013) (Higginson, J., concurring)

*Sub-National Immigration Regulation & the Pursuit of Cultural Cohesion*, 77 U. CINCINNATI L. REV. 1441 (2009)

*Aliens with Guns:  Equal Protection, Federal Power, and the Second Amendment*, 92 IOWA L. REV. 891 (2007)
    <u>Cited by:</u>    *Fletcher v. Haas*, 851 F.Supp.2d 287 (D. Mass. 2012)

*Protecting Unauthorized Use of Trademark in Expressive Works*, 80 WASHINGTON L. REV. 887 (2005)
    <u>Winner:</u>    2006 Ladas Memorial Award for Trademark Scholarship

*Foundations of World Order* by Francis A. Boyle, 36 STANFORD J. INTL. L. 181 (2000) (book review)

### POPULAR PUBLICATIONS, EDITORIALS, BLOGS & OTHER LEGAL WRITING

*"The People", Citizenship, and Firearms*, SECOND THOUGHTS BLOG, Duke Univ. Center for Firearms Law, Jan. 13, 2022 (essay for series on Race & Guns in America)

*The President, Immigration Law, and Federalism*, BALKINIZATION BLOG (Nov. 2020) (essay for online symposium, responding to Adam Cox and Cristina Rodriguez, *The President and Immigration Law* (OUP 2020))

*Sanctuary and Anti-Sanctuary Laws and the United States Constitution*, Federal Agency for Civic Education, Germany and Institute of Migration Research and Intercultural Studies, University of Osnabrueck (Fall 2020) (solicited by German government and translated for German and European audience)

*Cities Can't Defy State Health Orders by Claiming to be "Sanctuaries" for Businesses,* LOS ANGELES TIMES, May 22, 2020 (Op-Ed)

*Local Immigration Non-Enforcement and Local Gun Deregulation*, SECOND THOUGHTS BLOG, Duke Univ. Center for Firearms Law, May 14, 2020 (online symposium essay)

*Expert Report & Declaration, Intercommunity Justice & Peace Center v. Registrar, Ohio Bureau of Motor Vehicles* **(S.D. Ohio 2020)** *and Community Refugee & Immigration Services v. Registrar, Ohio Bureau of Motor Vehicles* **(S.D. Ohio 2020)** (written declaration for plaintiffs, analyzing legal defects in Ohio BMV's attempted exclusion of certain refugees and children of unauthorized noncitizens from receiving driver's licenses; summary judgement awarded to plaintiffs *Intercommunity Justice & Peace Center v. Ohio BMV*, 440 F.Supp.3d 877 (S.D. Ohio 2020))

*Kansas v. Garcia (2019): Argument Preview, Argument Analysis, Opinion Analysis,* SCOTUSBLOG, Oct.-Nov. 2019

*The Perilous Stakes of Immigration Law by Executive Fiat,* THE HILL, Nov. 9, 2018 (with David S. Rubenstein)

*An Immigration Legacy at Odds with Justice Kennedy's Animating Principles,* SCOTUSBLOG, July 3, 2018

*The Case for Non-Governmental Sanctuary,* LOS ANGELES TIMES, April 5, 2018 (with Rose C. Villazor) (Op-Ed)

*The Truth About the Administration's Anti-Sanctuary Campaign,* AMERICAN CONSTITUTION SOCIETY FOR LAW & POLICY, Oct. 18, 2017 (blog post)

*Trump's Travel Ban 2.0,* AMERICAN CONSTITUTION SOCIETY FOR LAW & POLICY, May 17, 2017 (blog post) (commentary on the Ninth Circuit oral argument in *Hawaii v. Trump*)

*An Annotated Guide to Donald Trump's Revised Travel Ban*, THE GUARDIAN, Mar. 7, 2017

*Sanctuary Cities are Safe, Despite Trump's Executive Order,* AMERICAN CONSTITUTION SOCIETY FOR LAW & POLICY, Jan.31, 2017 (blog post)

*Take the Immigration Fight to the States*, LOS ANGELES TIMES, June 27, 2016 (with S.K. Ramakrishnan) (Op-Ed)

*How the Supreme Court's Deadlock Will Change Immigration Politics*, WASHINGTON POST, June 24, 2016 (Op-Ed) (with S.K. Ramakrishnan)

*United States v. Texas: Ex Ante or Ex Post Judicial Review,* YALE NOTICE & COMMENT BLOG, June 9, 2016 (with D.S. Rubenstein) (blog post)

*The President, Partisanship, and Immigration Policy,* SANTA CLARA LAW MAGAZINE, Vol. 22 Spring 2016

*President and States in a Partisan Battle over Immigration Policy,* AMERICAN CONSTITUTION SOCIETY FOR LAW & POLICY, Jan. 19, 2016 (blog post)

*The Legality of Muslim Exclusion,* AMERICAN CONSTITUTION SOCIETY FOR LAW & POLICY, Dec. 9, 2015 (blog post)

Exhibit - A - Page 68

*States Cannot Reject Syrian Refugees,* WASHINGTON POST, Nov.19, 2015 (Op-Ed) (with S.K. Ramakrishnan)

*An Immigration Policy for the Next 50 Years,* THE HILL, Oct. 8, 2015 (with S.K. Ramakrishnan)

*Forget Border Walls and Mass Deportations: The Real Changes in Immigration are Happening in the States,* WASHINGTON POST, Sept. 24, 2015 (with S.K. Ramakrishnan)

*Campaign Rhetoric versus Facts on Immigration,* LOS ANGELES TIMES, Sept. 23, 2015 (Op-Ed) (with S.K. Ramakrishnan)

*Obama's Actions Likely to Spur States, Not Congress, to Act,* SAN JOSE MERCURY NEWS, Dec. 6, 2014 (Op-Ed) (with S.K. Ramakrishnan)

*Obama's Deferred Action Program is No Overreach,* SAN FRANCISCO CHRONICLE, Sept. 3, 2014 (Op-Ed (with S.K. Ramakrishnan)

*Sheriff Can Dig in Heels More,* SANTA ROSA PRESS DEMOCRAT, Feb. 17, 2014 (Op-Ed)

*Can Obama Unilaterally Ban Deportations?* LOS ANGELES TIMES, Dec. 5, 2013 (Op-Ed) (with S.K. Ramakrishnan)

*Driver's Licenses for Undocumented Immigrants:  How the Obama Administration's Deferred Action Plan Paved the Way,* SAN JOSE MERCURY NEWS, Oct. 12, 2013 (Op-Ed) (with S.K. Ramakrishnan)

*Immigration Federalism Post-Arizona,* AMERICAN CONSTITUTION SOCIETY FOR LAW & POLICY, Aug. 8, 2013 (blog post)

*Gay Marriage Advances Come at a Cost,* USA TODAY, July 1, 2013 (Op-Ed)

*What Does it Mean to be American?* USA TODAY, Apr. 23, 2013 (Op-Ed)

*Partisanship, Not Demography, Explains State Immigration Laws,* AMERICAN CONSTITUTION SOCIETY FOR LAW & POLICY, June 27, 2012 (blog post) (with S.K. Ramakrishnan)

*The Anti-Immigrant Game,* LOS ANGELES TIMES, Apr. 24, 2012 (Op-Ed) (with S.K. Ramakrishnan)

*Why U.S. v. Arizona Won't End the Debate Over State and Local Immigration Regulation,* AMERICAN CONSTITUTION SOCIETY FOR LAW & POLICY, Apr. 27, 2012 (blog post)

*Constitutional Values and the California DREAM Act,* SAN JOSE MERCURY NEWS, Sept. 14, 2011 (Op-Ed)

*A Victory for Immigrants?,* AMERICAN CONSTITUTION SOCIETY FOR LAW & POLICY, Aug. 1 2010 (blog post)

*Legal Scholars Dissect S.F. Sanctuary Ordinance,* N.Y. TIMES, Bay Area Blog, Oct. 21, 2009

*The Immigration Debate: Coming Soon – A City ID?* SAN FRANCISCO CHRONICLE, Sept. 30, 2007 (Op-Ed)

## REPRESENTATIVE PRESENTATIONS & APPEARANCES

Podcast Interviewee, *Who Can Regulate Immigration, States or D.C.?,* History Behind News Podcast (S.3;Ep.22, May 2023)

Paper Presentation, *The Second Amendment's People Problem,* National Conference of Constitutional Law Scholars, The Rehnquist Center, University of Arizona (Mar. 2023)

Panelist, *Regionalism in Immigration Enforcement,* Law & Society Assoc., Global Conference, Lisbon, Portugal (July 2022)

Panelist, *Roundtable on Race and Guns in America,* Center for Firearms Law, Duke University Law School (Nov. 2021)

Panelist, *The Second Amendment at the Supreme Court,* U.C. Davis School of Law (Oct. 2021)

Panelist, *Colloquium on Localism, Popular Constitutionalism, Preemption, and Firearms,* Center for Firearms Law, Duke University Law School (May 2020)

Panelist, *Theorizing the Interior of Immigration Enforcement,* Law & Society Annual Conference (June 2019)

Panelist, *Immigration Federalism, Detention, and Sanctuary Cities*, Symposium, Southwestern Law School Law Review (Feb. 2019)

Panelist, *What are the Limits of Local Control?*, The Federalist Society, Annual Western Chapters Conference (Jan. 2019) (featured on C-Span)

Panelist, *Executive Power: Immigration Reform in the New Administration*, Symposium, University of Pennsylvania Constitutional Law Journal (Jan. 2018)

Panelist, *Immigration in the Trump Administration*, American Association of Law Schools Annual Meeting (Jan. 2018)

Panelist, *Current Issues in Immigration Policy*, Levin Center, Wayne State University Law School (Nov. 2017)

Panelist, *Public Interest Mobilization and Access to Justice Movements in the New Democratic State*, Symposium, University of Wisconsin Law Review (Oct. 2017)

Panelist, *Immigration Law and Resistance: Ensuring a Nation of Immigrants*, Symposium, U.C. Davis Law Review (Oct. 2017)

Speaker, *Immigration Nation? Challenges for All Americans*, American Association of University Women and League of Women Voters, Alameda, Cal. (Sept. 2017)

Speaker, *Progressive Federalism: A New Way Forward?*, Plenary Session, American Constitution Society for Law & Policy, National Convention, Washington, D.C. (June 2017)

*Immigration Exceptionalism* (Paper Presentation)
    Northwestern University Law Review, Speaker Series (April 2017)
    Georgia State University Law School, Faculty Workshop Series (Mar. 2017)
    Northern California International Law Scholars Conference, Stanford Law School (Oct. 2016)
    Washington & Lee School of Law, Faculty Workshop Series (Sept. 2016)
    U.C. Davis School of Law, Faculty Workshop Series (Jan. 2016)

*The New Immigration Federalism* (Book Talk)
    Stanford University, Department of Political Science & School of Law (Feb. 2016)
    UCLA International Institute, UCLA School of Sociology (Oct. 2015)
    Yale University, Center for Study of Inequality (Sept. 2015)

Speaker, *Emerging Federal & State Government Policies*, Cities Association of Santa Clara County Annual Meeting (May 2017)

Speaker, *San Francisco v. Trump: The Legality of Sanctuary Cities*, American Constitution Society for Law & Policy (April 2017)

Panelist, *What is a Sanctuary Campus?* Thelton Henderson Center for Social Justice, U.C. Berkeley Law School (Mar. 2017)

Panelist, *Immigration and the 2016 Presidential Election*, American Association of Law Schools Conf. (Jan. 2016)

Panelist, *Equality Gained, Equality Lost? The 1965 Immigration Act and its Aftermath*, American Constitution Society for Law & Policy, Economic Policy Institute, Washington D.C. (Oct. 2015) (featured on C-Span)

Panelist, *Immigration Reform at 50*, Symposium, University of Michigan Law School (Feb. 2015)

Panelist, *The President's Executive Action on Immigration*, Symposium, Washington College of Law at American University (Jan. 2015)

Panelist, *The Obama Presidency & Federalism*, American Association of Law Schools Conf. (Jan. 2015) (featured on C-Span)

Critic, *Author Meets Critics Session: "Immigration Outside the Law" by Hiroshi Motomura*, UCLA International Institute, UCLA School of Law (Oct. 2014)

Commenter, *Integration – Models of Community and Difference*, Freeman Spogli Institute for International Study, Stanford University (Sept. 2013)

Co-Organizer & Presenter, *Emerging Immigration Law Teachers Workshop*, U.C. Irvine School of Law (June 2013) and American University School of Law (June 2011)

Panelist, *Fresh Perspectives on the Future of Federalism*, American Constitution Society for Law & Policy, National Convention, Washington, D.C. (June 2013)

Panelist, *The Constitutionality of State and Local Immigration Laws*, American Constitution Society for Law & Policy, State Bar of Georgia (Feb. 2012)

Panelist, *Immigration Enforcement Policy and Opinions*, Politics of Race, Immigration, and Ethnicity Consortium (PRIEC), U.C. Davis School of Law (May 2011)

Panelist, *Persistent Puzzles in Immigration Law*, Symposium, U.C. Irvine School of Law (February 2011)

Panelist & Moderator, *Racialization of Immigration Law*, Post-Racial Civil Rights Law, Politics, and Legal Education, American Association of Law Schools Conf. (June 2010)

Presenter, *Immigrants & Guns*, Advanced Critical Race Theory Workshop, UCLA School of Law (Mar. 2010)

Representative Public Television/Public Radio Appearances
> *Latest on Immigration Developments in Lame-Duck Congress*, KPCC AirTalk (Dec. 2022)
> *Breaking Down the Two Affirmative Action Cases*, KPCC AirTalk (Oct. 2022)
> *Review of Kennedy v. Bremerton School District*, KPCC AirTalk (Apr. 2022)
> *Review of Selected Supreme Court Decisions,* KPCC AirTalk (June 2021)
> *Supreme Court Rules to Keep DACA in Place,* KQED Forum, KQED Newsroom (June 2020)
> *Trump Administration's Planned Nationwide Immigration Sweeps*, KQED Forum (July 2019)
> *Tariffs and Immigration,* KQED Newsroom (June 2019)
> *Trump's Merit-Based Immigration Proposal*, KPCC AirTalk (May 2019)
> *Immigration and Border Security*, KQED Newsroom (April 2019)
> *National Emergency Declaration and Border Wall Construction*, KPCC AirTalk (Feb. 2019)
> *The U.S. Asylum Process Explained*, KQED Forum (June 2018)
> *Legality of Trump's Executive Order on Immigration*, KPCC AirTalk (June 2018)
> *Northern California Immigration Sweep*, KQED Forum (Feb. 2018)
> *Dreamers and Temporary Protected Status*, KQED Newsroom (Jan. 2018)
> *Rescinding Federal Funding to Sanctuary Cities*, KPCC AirTalk (Mar. 2017)
> *What New DHS Immigration Memos Mean for California*, KQED Forum (Feb. 2017)

## OTHER PROFESSIONAL EXPERIENCE & CONSULTANCIES

**World Children's Initiative,** *Founder & Director of Operations* (www.wciprojects.org) (2005-Present)
> Co-founded non-profit organization dedicated to improving healthcare and educational systems for children in developing areas, with seed funding from former U.S. Presidents George H.W. Bush & William J. Clinton Built Children's Hospital in southern Sri Lanka (2005-2010); Developed Children's Heart Institute in Uganda, and trained local doctors in life-saving pediatric heart procedures (2010-2016); Developing safe surgery program in Madagascar in partnership with Operation Smile, Inc. (2017-present)

**Mural Music & Arts Project (MMAP)**, *Board of Directors* (East Palo Alto, CA) (2011-2021)

**De La Salle Academy**, *Middle School Teacher* (New York, NY) (1996-1998)

## REFERENCES

**Hiroshi Motomura**
Susan Westerberg Prager Distinguished Professor
Faculty Co-Director, Center for Immigration Law & Policy
U.C.L.A. School of Law
motomura@law.ucla.edu
310.206.5676

**Rose Cuison Villazor**
Interim Dean and Chancellor's Social Justice Scholar
Rutgers Law School
Rose.villazor@law.rutgers.edu
973.353.3159

**Leti Volpp**
Robert D. and Leslie Kay Raven Professor of Law in Access to Justice
U.C. Berkeley Law School
lvolpp@law.berkeley.edu
510.642.0330

**Rick Su**
Professor of Law
Univ. North Carolina School of Law
Rick.su@unc.edu
919.843.9208

**Catherine Y. Kim**
Professor of Law
Brooklyn Law School
Catherine.kim@brooklaw.edu

**Juliet Stumpf**
Robert E. Jones Professor of Advocacy and Ethics
Lewis & Clark Law School
jstumpf@lclark.edu
503.768.6841

**Justin Driver**
Robert R. Slaughter Professor and Counselor to the Dean
Yale Law School
Justin.driver@yale.edu
203.436.9150

**Jennifer M. Chacón**
Professor of Law
Stanford Law School
jchacon@law.stanford.edu
650.723.3208

**S. Karthick Ramakrishnan**
Professor of Public Policy and Political Science & Director, Center for Social Innovation
U.C. Riverside
Executive Director, California 100
Karthick.ramakrishnan@ucr.edu
951.827.5540

**The Hon. Jacques L. Wiener, Jr.** (senior status)
U.S. Court of Appeals for the Fifth Circuit
(email on request)
504.310.7700 (5th Circuit Clerk's Office)

**The Hon. Stephen A. Higginson**
U.S. Court of Appeals for the Fifth Circuit
(email on request)
504.310.7700 (5th Circuit Clerk's Office)