CHIEF JUDGE DAVID G. ESTUDILLO

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR22-5139-DGE |
| Plaintiff, | ) | MR. DEBORBA'S MOTION TO DISMISS COUNT 7 OF THE SUPERSEDING INDICTMENT |
| v. | ) | |
| JOÃO RICARDO DEBORBA, | ) | *Oral Argument Requested* |
| Defendant. | ) | Noted: Nov. 9, 2023 |

João Ricardo DeBorba respectfully moves the Court to dismiss Count 7 of the Superseding Indictment. Count 7 charges Mr. DeBorba with possessing a firearm (specifically, a firearm silencer) that is not registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. § 5861(d). Section 5861(d) is unconstitutional because it violates Mr. DeBorba's right to keep and bear arms under the Second Amendment to the Constitution, as interpreted by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). It is also unconstitutionally vague, in violation of the Fifth Amendment, because "silencer" is defined with so little clarity that Mr. DeBorba and others are not adequately notified of what items are covered, and that law enforcement may arbitrarily enforce the law.

## I.    STATEMENT OF FACTS

On September 6, 2023, after Mr. DeBorba moved to dismiss the existing gun-related charges against him for violation of his Second Amendment rights, the

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

government returned a Superseding Indictment adding a new charge against Mr. DeBorba. *See* Dkt. Nos. 36, 40. The superseding charge, Count 7 of the Superseding Indictment, alleges that Mr. DeBorba knowingly possessed a firearm silencer that was not registered to him in the National Firearms Registration and Transfer Record on May 6, 2022. *See* Dkt. No. 40.

The government found the item in question on a workbench, while searching Mr. DeBorba's apartment. *See* Dkt. No. 2 at 16. The government has described the item as "a cylindrical device bearing no manufacturer markings and no serial number." Dkt. No. 40 at 5. The government's investigator further opined that the item created an "expansion chamber" if attached to a gun, meaning it elongated the barrel. Furthermore, the investigator noted the item appeared to be of a type that is frequently marketed as an automotive filter or lawful cleaning device, but functions to reduce the sound of firing a gun when attached to the barrel of a gun. Finally, the investigator observed that the item had no center hole on one end, meaning that no bullet had ever been fired through it. *See* Ex. K. There is no allegation of Mr. DeBorba using the item nor any firearm in furtherance of any crime. *See* Dkt. No. 2, 40.

## II.   ARGUMENT

Federal law prohibits the possession of certain "firearms"—which are statutorily defined to include silencers—unless such firearms are registered to the owner in the National Firearms Registration and Transfer Record (National Record). 26 U.S.C. § 5861(d). That law—a portion of the National Firearms Act (NFA)—violates the Second Amendment to the United States Constitution, which codifies the right of "the people" to possess "Arms." Under *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2130 (2022), a firearm regulation is constitutional only if the government can prove that it "is consistent with the Nation's historical tradition of firearm regulation." Section 5861(d) is unconstitutional under the *Bruen* test.

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 2

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

First, silencers qualify as "Arms" under the Second Amendment's "plain text" because their noise-suppressing capability makes them necessary to the safe and effective use of firearms. Items that are necessary to use weapons effectively are themselves protected by the Second Amendment. *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016), *vacated on reh'g en banc on other grounds*, 849 F.3d 114 (4th Cir. 2017). Even if silencers were not themselves "Arms," the Second Amendment "implies a corresponding right" to obtain items necessary to exercise the right to armed self-defense the Amendment protects. *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 958 (9th Cir. 2014).

Second, the government cannot carry its burden to show that § 5861(d) "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. Although a handful of states began requiring firearm registration in the early 20th century, there is no widespread tradition of requiring registration of "Arms" around 1791, when the Second Amendment was ratified. Under *Bruen*, the lack of "a comparable tradition of regulation" in the founding era means § 5861(d) is unconstitutional.

Even beyond the application of *Bruen*'s analysis, the statute violates the Second Amendment. The NFA depends on the taxation of constitutionally-protected conduct to a degree that is out of proportion to the cost of administering the NFA's registration scheme. As such, the statute further violates the Second Amendment.

Additionally and alternatively, the definition of "silencer" referenced in 26 U.S.C. § 5845(a)(7) as charged in the Superseding Indictment, and defined at 18 U.S.C. § 921(a)(25), is unconstitutionally vague. The law deems a silencer "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 3

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

such assembly or fabrication." 18 U.S.C. § 921(a)(25). This definition is so vague that ordinary people cannot discern what items are restricted "silencers," and that law enforcement are enabled to arbitrarily enforce the law.

Mr. DeBorba cannot be charged with violating an unconstitutional law. Therefore, the Court should dismiss Count 7 of the Superseding Indictment.

### A.   The NFA's prohibition of unregistered possession of silencers is unconstitutional on its face and as applied to here.

Mr. DeBorba raises both facial and as applied challenges to § 5861(d). To hold the statute facially unconstitutional, the Court must find that "no set of circumstances exists under which the [statute] would be valid," *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 971 (9th Cir. 2003) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (alteration in original). For a facial challenge, the Court's review is limited to the text of the statute itself. *See Calvary Chapel Bible Fellowship v. County of Riverside*, 948 F.3d 1172, 1177 (9th Cir. 2020).

Facial challenges are not disfavored when they neither pertain to "complex and comprehensive legislation" that may be constitutional in many instances, nor rest on speculation. *See Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 962 (9th Cir. 2014) (hearing a facial challenge to a restriction regarding the manner of firearm storage). If a facial challenge is sustained, then the statute "is void in *toto*[.]" *Young v. Hawaii*, 992 F.3d 765, 779 (9th Cir. 2021*), cert. granted, judgment vacated*, 142 S. Ct. 2895, 213 L. Ed. 2d 1108 (2022), *and abrogated on other grounds by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022) (internal quotations omitted).

By contrast, an as-applied constitutional challenge is "wholly fact dependent" and the Court's review would include the facts and circumstances specific to the enforcement of the statute against Mr. DeBorba. *See id.* (internal quotations omitted).

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 4

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

The distinction between facial and as-applied challenges relates to the "breadth of the remedy employed by the court." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). Mr. DeBorba here raises both types of challenges to § 922(g)(1).

**B.    The Court applies *Bruen*'s two-part test to determine whether § 5861(d) violates the Second Amendment.**

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court rewrote the test for determining whether a firearm restriction violates the Second Amendment. Previously, courts of appeals applying *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), had used a two-step test. First, courts asked whether the regulated conduct fell within the scope of the Second Amendment. If it did, then the burden shifted to the government in the second step, to establish whether the government's interest in the restriction outweighed the infringement on the individual. *See United States v. Chovan*, 735 F.3d 1127, 1134–37 (9th Cir. 2013), *abrogated by Bruen*, 142 S. Ct. 2111 (discussing cases).

*Bruen* got rid of the second step. It held that "a constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." 142 S. Ct. at 2129 (internal quotations omitted). Now, for a law to survive a Second Amendment challenge, the government must "identify an American tradition" justifying the prohibition on the individual's conduct under the first step. *Id*. at 2138. If it cannot, courts may no longer apply a "means-end scrutiny" to uphold the law under the second step. *Id*. at 2125, 2138. Instead, the inquiry ends, and the law is unconstitutional.

As *Bruen* summarized, the "standard for applying the Second Amendment" now requires courts to do the following:

- If the Second Amendment's "plain text" covers an individual's conduct, courts must presume the Constitution "protects that conduct";

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 5

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

- To rebut this, the government must show that any restriction is "consistent with the Nation's historical tradition of firearm regulation";
- If the government cannot do so, the law is unconstitutional.

*Id*. at 2129–30 (internal quotations omitted). The Court held that it is the government's burden to "affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 2127. Because "constitutional rights are enshrined with the scope they were understood to have when the people adopted them," this analysis is tethered to the historical tradition in place when "[t]he Second Amendment was adopted in 1791; [or when] the Fourteenth [Amendment was adopted] in 1868." *Id*. at 2136.

*Bruen* further provided guidance to courts in conducting the historical review required for step two of this analysis. Specifically, the Court noted that "not all history is created equal." *Id*. at 2136. *Bruen* emphasized the need to examine the history of arms regulation at the time the Second Amendment was defined by its framers, *id*. at 2136–38, which the Ninth Circuit held was "close in time to 1791 (when the Second Amendment was ratified) or 1868 (when the Fourteenth Amendment was ratified)." *Teter v. Lopez*, 76 F.4th 938, 948 (9th Cir. 2023) (citing *Bruen*, 142 S. Ct. at 2136).

Furthermore, to determine whether a historical tradition of regulation is sufficiently similar to the challenged modern one, courts "must look to the '***how*** and ***why***' of the two regulations; that is, 'whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry.'" *Teter*, 76 F.4th at 951 (quoting *Bruen*, 142 S. Ct, at 2132–33 (cleaned up by *Teter*) (emphasis added). And the Court required a heightened level of similarity when the challenged regulation addresses a long-standing problem that existed when the Second Amendment was enacted:

when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 6

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

> regulation addressing that problem is relevant evidence that the challenged
> regulation is inconsistent with the Second Amendment. Likewise, if earlier
> generations addressed the societal problem, but did so through materially
> different means, that also could be evidence that a modern regulation is
> unconstitutional.

*Bruen*, 142 S. Ct. at 2131; *see also Teter*, 76 F.4th at 954 (quoting same). The Court

must apply these standards, set out by *Bruen*, when deciding this motion.

### C. The plain text of the Second Amendment protects the possession of "arms," including items like silencers that allow for the safe and effective use of firearms.

Silencers are protected by the Second Amendment because they are "arms," or

accessories to arms.[1] Even if they were not, silencers still fall within the scope of the

Second Amendment's implicit guarantee because their use is indispensable to exercise

the core Second Amendment right: the use of a gun for self-defense.

### 1. Silencers are explicitly protected by the Second Amendment because they are "arms" or "accessories to arms."

*Heller* defined "arms" as "weapons of offence, or armour of defence," or "any

thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast

at or strike another." 554 U.S. at 581. To "bear arms," in turn, means to "wear, bear, or

carry . . . for the purpose of being armed and ready for offensive or defensive action in

case of conflict with another person." *Id*. at 584 (ellipses in original).

Silencers are used for an offensive purpose to the same degree as a firearm itself

because a bullet must pass through an attached silencer to arrive at its intended target.

Silencers are an integral part of a firearm, used to "cast . . . or strike" a bullet at another

person. *Id*. at 581. Thus, silencers are "[w]eapons of offence" protected by the Second

---

[1] The Second Amendment's operative clause protects "the right of the people to keep
and bear Arms." U.S. Const. amend. II. Mr. DeBorba's status as one of "the people" is
addressed in his Motion to Dismiss Counts 1 through 6 of the Superseding Indictment,
and his Reply related to that Motion, and is incorporated by reference here. Dkt. Nos.
36, 53. Likewise, to "keep" means "to retain in one's . . . possession" under the Second
Amendment. *Heller*, 554 U.S. at 582.

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Amendment. *See id*. at 582; *but see U.S. v. McCartney*, 357 Fed. App'x. 73, 76 (9th Cir. 2009) (unpublished) (summarily concluding that silencers are not protected by the Second Amendment). Federal law recognizes this fact by defining "firearms" to include silencers. 26 U.S.C. § 5845(a)(7); 18 U.S.C. § 921(a)(3)(C).

Even if silencers were not protected arms in their own right, they are eligible for Second Amendment protection as a modern-day analogue to the various firearm accessories historically considered "arms" for Second Amendment purposes. At the time of the founding, "arms" included the firearm itself and the "proper accoutrements" that made it useful and functional. *United States v. Miller*, 307 U.S. 174, 182 (1939). In *Miller*, the Supreme Court surveyed founding-era state laws and explained that many required militia members to carry such items as "ammunition," "one pound of power," "twenty bullets," a box "contain[ing] not less than Twenty-four Cartridges," a "proper Quantity of Powder and Ball," and "one pound of good powder, and four pounds of lead, including twenty blind cartridges" in addition to a "musket" or "rifle." *Id*. at 180-82. In fact, "[t]he possession of arms also implied the possession of ammunition" when the Second Amendment was adopted. *Id*. at 180.

Further historical research conducted after *Miller* reveals that militiamen were required to carry yet more items than *Miller* catalogued. Based on a survey of "founding-era" "militia statutes," two Second Amendment scholars have concluded that "the arms and accoutrements that Americans were required to possess" for militia service went well beyond firearms and ammunition. David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. Univ. L.J. 495, 497 (2019). Those additional accoutrements included "gun-cleaning equipment" such as brushes, wires, and screw drivers; holsters and scabbards for "carrying and storage"; and items used to keep firearms from decaying, such as a "cover" to "protect[] the gun lock from the elements" and wax to "protect firearms from rain." *Id*. at 497, 521-23.

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 8

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

These objects, just as much as firearms themselves, are "necessarily part of the Second Amendment right, since they are necessary to the use of arms." *Id*. at 511-12.

The Fourth Circuit has endorsed the view, reflected in Kopel and Greenlee's article, that the Second Amendment must be read broadly to include all items "necessary to the use of arms." As the court has explained, "[e]arly American provisions protecting the right to 'arms' were also crafted partly in response to British measures that, while not taking away guns entirely, drastically impaired their utility— suggesting 'arms' should be read to protect all those items necessary to use the weapons effectively." *Kolbe*, 813 F.3d at 175.

The Ninth Circuit has also espoused this view, recognizing that "without bullets, the right to bear arms would be meaningless. [Therefore, a] regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose." *Jackson*, 746 F.3d at 967. This "necessary to use" rule compels the conclusion that silencers are "arms" within the Second Amendment's meaning because they improve the safety and efficacy of lawful firearms use, as described below.

First, scientific research establishes that firearms generate sound pressure levels that can permanently damage a user's hearing. The American Speech-Language-Hearing Association recognizes that "[e]xposure to noise greater than 140 [decibels] can permanently damage hearing,"[2] while the United States Occupational Safety and Health Administration and the National Institute for Occupational Safety and Health USA incorporate a peak limit of 140 decibels for occupational noise exposures.[3] "Peak sound pressure levels . . . from firearms," meanwhile, "range from ~140 to 175

---

[2] Michael Stewart, *Audiology Information Series: Recreational Firearm Noise Exposure*, Am. Speech- Language-Hearing Ass'n (2017), *available at* https://www.asha.org/siteassets/ais/ais-recreational-firearm-noise-exposure.pdf.
[3] 29 C.F.R. § 1910.95 (Table G-16 n.1).

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

[decibels]"—well above the recommended thresholds.[4] As a result, exposure to gunfire, particularly over time, "not only lead[s] to hearing loss and tinnitus"—a ringing in the ear that can become permanent—"but also contribute[s] to the development of numerous other health issues, including sleep disturbance, cardiovascular disease, and diabetes,"[5] as well as "stress, anxiety, high blood pressure, gastro-intestinal problems, and chronic fatigue."[6]

Silencers are recognized as one of "several strategies [that] can be employed to reduce the risk" of hearing damage and other health problems resulting from firearm noise exposure.[7] The Centers for Disease Control, in two separate reports, has

---

[4] Deanna K. Meinke et al., *Prevention of Noise-Induced Hearing Loss from Recreational Firearms*, 38(4) Seminars in Hearing 267–81 (Nov. 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5634813/.

[5] Jay M. Bhatt et al., *Epidemiology of Firearm and Other Noise Exposures in the United States*, 127 Laryngoscope E340-E346 (March 2017).

[6] Chucri A. Kardous, MS, PE, *Solutions for Preventing Lead Poisoning and Hearing Loss at Indoor Firing Ranges*, cdc.gov (May 2009), https://blogs.cdc.gov/niosh-science-blog/2009/05/18/firingrange/; *see also* U.S. Dep't of Veterans Affs., Veterans Health Admin.: Off. of Rsch. & Dev., Fact Sheet: VA Research on Hearing Loss 1 (Aug. 2021), *available at* https://www.research.va.gov/pubs/docs/va_factsheets/HearingLoss.pdf ("Hearing problems – including tinnitus . . . – are by far the most prevalent service connected disability among American Veterans.").

[7] Michael Stewart et al., National Hearing Conservation Association Position Statement: Recreational Firearm Noise 1 (March 2017), *available at* https://www.hearingconservation.org/assets/docs/NHCA_position_paper_on_firea.pdf; *see also* Ronald Turk, White Paper: Options to Reduce or Modify Firearms Regulations 6 (Jan. 2017), *available at* https://www.thefirearmblog.com/blog/wp-content/uploads/2017/02/Read-the-white-paper-on-firearms-regulations.pdf (originally published by the Washington Post in Sari Horwitz, *Senior ATF Official Proposes Loosening Gun Regulations*, Wash. Post, Feb. 6, 2017, https://www.washingtonpost.com/world/national-security/senior-atf-official-proposes-loosening-gun-regulations/2017/02/06/beeb1120-ec7c-11e6-9662-6eedf1627882_story.html (link in article no longer working, so additional link provided

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 10

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

recommended the use of silencers to reduce the unacceptably high levels of noise

exposure at shooting ranges.[8] "Modern muzzle-level suppression," one study

concluded, is the *only available form of suppression* capable of making certain

sporting arms safe for hearing."[9] A firearm owner cannot use his weapon for self-

defense in the home if to do so exposes him to serious and long-term health

consequences.

       Second, silencers improve firearm owners' ability to practice self-defense in

other ways. Silencers can improve accuracy by reducing recoil and "muzzle rise,"

which is the barrel's tendency to move up when the gun is fired.[10] They also can reduce

hearing loss and disorientation immediately after firing, providing a victim additional

time to defend against an attack.[11]

---

above)) ("[Silencers'] use to reduce noise at shooting ranges and applications within the sporting and hunting industry are now well recognized.").

[8] Brueck SE, et al., Nat'l Inst. for Occupational Safety and Health (NIOSH), Health Hazard Evaluation Report: Measurement of Exposure to Impulsive Noise at Indoor and Outdoor Firing Ranges During Tactical Training Exercises 14, HHE Report 2013-0124-3208, *available at* https://www.cdc.gov/niosh/hhe/reports/pdfs/2013-0124-3208.pdf ("If feasible and legally permissible, attach noise suppressors to firearms to reduce peak sound pressure levels."); Lilia Chen, MS, CIH, et al., NIOSH, Noise and Lead Exposures at an Outdoor Firing Range – California 5, NIOSH HETA No. 2011-0069-3140 (Sept. 2011), *available at* https://www.cdc.gov/niosh/hhe/reports/pdfs/2011-0069-3140.pdf ("The *only* potentially effective noise control method to reduce students' or instructors' noise exposure from gunfire is through the use of noise suppressors that can be attached to the end of the gun barrel." (emphasis added)).

[9] Matthew Parker Branch, M.D., 144(6) *Comparison of Muzzle Suppression and Ear-Level Hearing Protection in Firearm Use, Otolaryngology – Head and Neck Surgery* 950-53 (Feb. 2011) (emphasis added).

[10] Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 Cumb. L. Rev. 33, 69 (2016).

[11] A.J. Peterman, *Second Amendment Decision Rules, Non-Lethal Weapons, and Self-Defense*, 97 Marq. L. Rev. 853, 892 n.221 (2014).

---

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 11

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

Like gun-cleaning equipment, holsters, and items that protect firearms from the elements—all of which were considered "Arms" at the founding—silencers are necessary to use weapons effectively.[12] Thus, this Court should conclude that silencers are "arms" within the scope of the Second Amendment's plain text.

### 2. Alternatively, silencers are implicitly protected by the Second Amendment because they are indispensable to effective enjoyment of the right to armed self-defense.

Like all enumerated constitutional provisions, the Second Amendment contains both explicit and implicit guarantees. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 579 (1980) ("[T]he Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees.").[13] If an unarticulated right is "indispensable to

---

[12] Furthermore, the type of "silencer" alleged here improves the usability of a gun by a method also pursued by gun-makers leading up to the ratification of the Second Amendment. The silencer here, a "cylindrical device" that may be attached to the barrel of a gun, Dkt. No. 40 at 5, makes a modern gun barrel longer to improve the gun's utility. *See* Ex. K (describing the device here as an "expansion chamber" that elongates the barrel of a gun). Similarly, ratification era gun-makers innovated and increased the barrel length of guns to improve their utility. For example, a gun-maker in Lancaster County, Pennsylvania, developed the "Pennsylvania Long Rifle," sometimes dubbed the "Kentucky Long Rifle" due to its frequent use by Daniel Boone. *See, e.g.*, Lancaster County Conservation District, Pennsylvania Long Rifle: Overview on an American Artifact, https://lancasterconservation.org/wp-content/uploads/Muzzleloader-PDF.pdf (last visited Oct. 13, 2023); Ryan Thomas, The Pennsylvania Long Rifle, Pennsylvania Ctr. for the Book, Fall 2009, https://pabook.libraries.psu.edu/literary-cultural-heritage-map-pa/feature-articles/pennsylvania-long-rifle. The Pennsylvania Long Rifle was unique not only for its rifling, but also for its elongated barrel. This lengthened barrel improved the gun's utility, and it was used with favor in the era immediately leading up to the ratification of the Second Amendment. *See id*.

[13] While *Richmond Newspapers* is a First Amendment case, the Supreme Court has analogized to the First Amendment when interpreting and applying the Second Amendment. *See Bruen*, 142 S. Ct. at 2130 ("[*Bruen*'s] Second Amendment standard accords with how we protect other constitutional rights. Take, for instance, the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms."). The Ninth Circuit has done the same. *See Jackson*, 746 F.3d at 967 (analogizing to the First Amendment to find that a regulation preventing a person

---

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 12

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

the enjoyment of [a] right[] explicitly defined," it will "share constitutional protection in common with [the] explicit guarantee[]." *Id*. at 580.

The Ninth Circuit has already applied this principle to Second Amendment claims. In *Jackson*, the plaintiffs challenged a local ordinance prohibiting the sale (but not possession) of hollow point ammunition. 746 F.3d at 958. The Ninth Circuit held that the ordinance regulated conduct within the scope of the Second Amendment because "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." *Id*. at 967 (quotation marks omitted). If a gun owner cannot purchase the bullets he needs to exercise his right to self-defense, it doesn't matter that he is allowed to possess the gun he would use to do so. A prohibition on selling ammunition therefore falls within "the historical understanding of the scope of the Second Amendment right." *Id*. at 968.

Likewise, the Seventh Circuit held in *Ezell v. City of Chicago* that a Chicago ordinance prohibiting private citizens from using shooting ranges within city limits regulated conduct within the scope of the Second Amendment because "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." 651 F.3d 684, 704 (7th Cir. 2011). The Fourth Circuit also recognized in *Kolbe* that "to the extent that firearms equipped with detachable magazines are commonly possessed" for self-defense purposes and thus protected by the Second Amendment, "there must also be an ancillary right to possess the magazines necessary to render those firearms operable." 813 F.3d at 175.

The same logic applies here. As explained above, using silencers improves accuracy, reduces disorientation after firing, and helps prevent substantial and

---

from exercising a Second Amendment right in San Francisco constitutes an injury in fact).

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 13

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1    irreversible damage to users' health. If, as *Heller* and *Bruen* hold, the Second

2    Amendment protects the right to use a gun for self-defense, it must also protect the

3    "corresponding right" to do so without incurring serious health risks. *Jackson*, 746 F.3d

4    at 967. Regulation of the possession of silencers therefore imposes a burden on conduct

5    falling within the scope of the Second Amendment's guarantee.

> ### 3. Silencers are not "dangerous and unusual weapons" that have been excluded from Second Amendment protection prior to *Bruen*.

6
7    The government will no doubt contend that silencers are outside the scope of the

8    Second Amendment's protection, on the theory that they are "dangerous and unusual

9    weapons." *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627). Such a

10   contention would be incorrect, under the analysis required by *Bruen*.

11   Although the NFA claims to regulate only a subset of purportedly more

12   dangerous weapons, the firearms regulated by the NFA, even short-barreled rifles,

13   "have no discernable operational differences from firearms excluded from the Act,"

14   such as pistols and other handguns.[14] As discussed at length above, silencers actually

15   make firearms *safer*, by reducing the risk of problematic noise exposure to the user and

16   allowing for more accurate shooting.

17   Silencers are not unusual. Millions of Americans own silencers, and data

18   indicates that silencers are used *less* frequently in crimes than numerous weapons that

19   the NFA does not regulate. As of May 2021, there were over 2.6 million silencers

20   registered with the federal government. B. of Alcohol, Tobacco, Firearms & Explosives

21   (ATF), *Firearms Commerce in the United States: Annual Statistical Update 2021* at 16

22   (2021).  Thus, they are in common use, and the government cannot rely on unusuality as

23   a justification for more strictly regulating silencers than would have been permitted at

24

25

26   [14] James A. D'Cruz, *Half-Cocked: The Regulatory Framework of Short-Barrel Firearms*, 40 HARV. J.L. & PUB. POL'Y 493, 496 (2017).

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 14

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

the founding. *See Bruen*, 142 S. Ct. at 2143 ("Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today . . . Thus, even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today."). Since the test for exclusion from the Second Amendment's coverage is conjunctive (the weapon must be "dangerous *and* unusual"), their common use resolves the matter, regardless of the issue of dangerousness. *See Bruen*, 142 S. Ct. at 2143 (emphasis added). And, of course, the fact that silencers did not exist at the time of the founding has no impact on their inclusion within the Amendment's protection. *See Heller*, 554 U.S. at 582 (rejecting as "bordering on the frivolous [the argument] that only those arms in existence in the 18th century are protected by the Second Amendment.").

Nonetheless, silencers are also not especially dangerous. As detailed above, silencers make firearms *safer*, not less safe. They improve accuracy and reduce detrimental noise exposure to the user.[15] Furthermore, silencers are *not* more likely than other weapons or accessories to be used in criminal activity. Just the opposite. Between

---

[15] *See* Turk, *White Paper: Options To Reduce Or Modify Firearms Regulations, supra* at 6 (Chief Operating Officer of ATF stating that "silencers are very rarely used in criminal shootings."; the ATF recommended an average of only "44 defendants a year for prosecution on a silencer-related violations" in a recent ten-year period); Stephen Gutowski, *ATF: 1.3 Million Silencers in U.S. Rarely Used in Crimes*, Wash. Free Beacon, Feb. 17, 2017, https://freebeacon.com/issues/atf-despite-nearly-1-3-million-silencers-united-states-rarely-used-crimes/; P. Clark, *Criminal Use of Firearm Silencers*, 8 W. Crim. Rev. 44, 53 (2007) ("[U]se of silenced firearms in crime is a rare occurrence, and is a minor problem."; "Guns equipped with a silencer, rather than being more dangerous and more likely to be used by professional criminals or repeat offenders, are far less dangerous and less likely to be employed by professional criminals.").

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 15

2012 and 2015, only 390 silencers were recovered from crime scenes where an ATF trace was requested—compared to more than 600,000 pistols in the same period. Nathan Rott, *Debate Over Silencers: Hearing Protection or Public Safety Threat?*, All Things Considered (NPR Mar. 21, 2017), http://www.npr.org/2017/03/21/520953793/debate-over-silencers-hearing-protection-or-public-safety-threat. In any given year, only 0.003 percent of silencers are used to commit a crime. Gutowski, *supra* n.15. And a recent study of shootings in California found that none of the firearms recovered by the state's Bureau of Forensic Services in 2020 qualified as short-barreled rifles. B. of Forensic Services, 2020 Firearms Used in the Commission of Crimes, *available at* https://oag.ca.gov/sites/default/files/firearms-report-20.pdf.

Silencers are neither unusual nor dangerous. Therefore, they are not excluded from the Second Amendment's protections.

**D.    The government cannot demonstrate a historical tradition of firearm regulation at the time of ratification that justifies the § 5861(d).**

Because the conduct at issue here falls within the ambit of the Second Amendment, "the Constitution presumptively protects [Mr. DeBorba's] conduct." *Bruen*, 142 S. Ct. at 2126. To rebut this presumption, the government must establish that § 5861(d) "is consistent with this Nation's historical tradition of firearm regulation." *Id*. The government cannot carry its burden because registration requirements for "Arms" did not become law until the 20th century.

**1.    *Bruen* imposes a demanding and precise standard for historical analogues.**

In *Bruen*, the Supreme Court explained the standard for reviewing historical evidence depends on what kind of problem a statute is intended to address— specifically, whether that problem is old or new. *Id*. at 2131-32. Old problems are "general societal problems that ha[ve] persisted since the 18th century." *Id*. at 2131. In

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 16

FEDERAL PUBLIC DEFENDER
1331 Broadway, Suite 400
Tacoma, WA 98402
(253) 593-6710

contrast, new problems are those involving "unprecedented societal concerns or dramatic technological changes" that were "unimaginable at the founding." *Id*. at 2132. Therefore, courts faced with a Second Amendment challenge must identify the problem at which the law was aimed, and then determine whether that problem existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes." *Id*. at 2132. Only then will the court know which approach to employ.

When the challenged law addresses an old problem, the test is "fairly straightforward"; the government must identify a tradition of "distinctly similar" laws from the founding era. *Id*. Although *Bruen* did not expressly define "distinctly similar," it indicated the standard is a stringent one. The only historical regulation *Bruen* identified as sufficiently similar to New York's proper-cause requirement was an 1871 Texas law forbidding "anyone from 'carrying on or about his person . . . any pistol . . . unless he has reasonable grounds for fearing an unlawful attack on his person.'" *Id*. at 2153 (citing 1871 Tex. Gen. Laws § 1). This "reasonable grounds" requirement was essentially identical to New York courts' interpretation of that state's proper-cause standard. *See id*. at 2123-24. Still, it was insufficient to justify New York's law.

*Bruen* also noted that "*Heller* . . . exemplifies th[e] kind of straightforward historical inquiry" demanded by the "distinctly similar" test. *Id*. at 2131. *Heller* confirms that the standard is a strict one. When assessing the "total[] ban[]" on handgun possession at issue in *Heller*, the Supreme Court identified only two historical laws for comparison: a Georgia law and a Tennessee law, both of which prohibited the open carry of pistols. 554 U.S. at 628-29. *Bruen* and *Heller* both show that the focus of the "distinctly similar" test is on historical laws that are virtually identical to the modern law.

When the challenged law addresses a new problem, the test is "more nuanced." *Bruen*, 142. S. Ct. at 2132. Courts must determine if the challenged modern law fits into

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 17

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1   a "relevantly similar" tradition of historical laws. *Id*. The Supreme Court identified two

2   "central considerations" for courts to determine if laws are relevantly similar:  "whether

3   modern and historical regulations impose a comparable burden on the right of armed

4   self-defense and whether that burden is comparably justified." *Id*. at 2133.

5   The "relevantly similar" test is less difficult for the government to satisfy

6   because it allows for "analogical reasoning." *Id*. at 2132. But courts may use this test

7   only when the challenged law is aimed at a societal problem that was "unimaginable at

8   the founding." Id. It is not available when the challenged law addresses an old

9   problem—that is, one which "has persisted since the 18th century." *Id*. at 2131. When a

10  law addresses an old problem, it must satisfy the stringent "distinctly similar" test; there

11  must be a historical tradition of laws that are virtually identical to the modern law. *Id*. at

12  2153; *Heller*, 554 U.S. at 628-29.

13  Regardless of whether the case calls for the stringent "distinctly similar" or the

14  looser "relevantly similar" test, the relevant "historical tradition" is that which existed

15  when the Second Amendment was ratified in 1791. *Bruen*, 142 S. Ct. at 2136. That is

16  because "[c]onstitutional rights are enshrined with the scope they were understood to

17  have when the people adopted them." *Id*. (emphasis in original). Courts may look to the

18  tradition of firearms regulation "before . . . and even after the founding" period, but

19  should do so with care. *Id*. at 2131-32. *Bruen* cautioned that "[h]istorical evidence that

20  long predates [1791] may not illuminate the scope of the [Second Amendment] right if

21  linguistic or legal conventions changed in the intervening years." *Id*. at 2136. Courts

22  should not rely on practices "that had become obsolete in England at the time of the

23  adoption of the Constitution and never [were] acted upon or accepted in the colonies."

24  *Id*.

25  Likewise, courts must not "giv[e] postenactment history more weight than it can

26  rightly bear." *Id*. While evidence "of how the Second Amendment was interpreted from

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 18

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation," historical evidence becomes less probative the farther forward in time one goes from 1791. *Id*. at 2136-37. The Court recognized that "discussions of the right to keep and bear arms" that took place after the Civil War provided less insight into the Second Amendment's original meaning than earlier sources because they took place 75 years after its ratification. *Id*. at 2137. Courts therefore should credit such later history to the extent it is consistent with prior practice but should otherwise afford it little weight. *See id*. After all, "post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id*. (emphasis in original); *see also id*. at 2154 n.28 (ignoring "20th-century historical evidence" because it is too far removed from 1791).

Furthermore, the comparable tradition of regulation must be "well-established and representative." *Id*. at 2133; *see also id*. at 2137 (explaining that "a governmental practice" can guide [courts'] interpretation of an ambiguous constitutional provision" only if that practice "has been open, widespread, and unchallenged since the early days of the Republic."). A handful of 'outlier[]" statutes or cases from a small number of "outlier jurisdictions" are not enough to establish a historical tradition. *Id*. at 2153, 2156. For instance, the Supreme Court doubted laws from three of the thirteen original colonies were enough to show a relevant tradition. *See id*. at 2142.

Finally, Bruen emphasized that "the burden falls on [the government] to show that [a law] is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2135. Consistent with "the principle of party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id*. at 2130 n.6. Accordingly, courts "are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the government's] burden." *Id*. at 2150. And insofar as there

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 19

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id*. at 2141 n.11; *see also id*. at 2139 (concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend" a law).

> ### 2. The "why" and "how" of the NFA—a law created to impede possession of certain firearms through the mechanism of a tax and registration scheme.

The NFA was enacted in order to *restrict* access to certain firearms in response to violent crime. However, it sought to achieve this goal via a system of taxation and registration.

The "why" of the NFA was to restrict access to some firearms to reduce violent crime. While the NFA levies taxes on certain firearms, including silencers, Congress did not enact the NFA to raise revenue. As the ATF itself acknowledges, the NFA's "underlying purpose was to curtail, if not prohibit, transactions in NFA firearms." ATF, "National Firearms Act," https://www.atf.gov/content/firearms/firearms-industry/national-firearms-act  (last visited Oct. 13, 2023). Namely, the Act aimed to restrict access to certain weapons to address the problem of violent crime. *See* U.S. Statutes at Large, 73 Cong. Ch. 757, June 26, 1934, 48 Stat. 1236.

The "how" of the NFA was a system of taxation and registration, rather than an outright ban on the weapons in question. As set forth below, the NFA did not technically prohibit possession of the regulated types of firearms. However, Congress set the tax at a prohibitive amount—$200 in 1934 dollars, which would be the equivalent of approximately $4,594 per firearm in today's dollars. *See* B. of Labor Statistics, Inflation Calculator (Feb. 4, 2017), https://www.bls.gov/data/inflation_calculator.htm; ATF, "National Firearms Act," *supra* ("The $200 making and transfer taxes on most NFA firearms were considered quite severe and adequate to carry out Congress' purpose to discourage or eliminate

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 20

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1    transactions in these firearms."). This amount dwarfed the actual cost of the taxed

2    weapons, rendering them practically unavailable to everyone but the rich.

3          The NFA created "an interrelated statutory system for the taxation of certain

4    classes of firearms." *Haynes v. United States*, 390 U.S. 85, 87 (1968). Today, the NFA

5    and its implementing regulations direct the Secretary of the Treasury to "maintain a

6    central registry of all firearms in the United States which are not in the possession or

7    under the control of the United States." 26 U.S.C. § 5841(a). This registry is the

8    National Record. Any firearm manufacturer is required to "register each firearm he

9    manufactures, imports, or makes" in the National Record. § 5841(b). To register a

10   firearm, a manufacturer must file a notice "set[ting] forth the name and address of the

11   manufacturer, . . . the date of manufacture, the type, model, length of barrel, overall

12   length, caliber, gauge or size, serial numbers, and other marks of identification of the

13   firearms he manufactures." 27 C.F.R. § 479.103; *see also* 26 § U.S.C. § 5841(a).

14         Once a firearm is registered in the National Record, it "shall not be transferred"

15   until its current possessor has filed, and the Secretary has approved, an application "for

16   the transfer and registration of the firearm" in the transferee's name. 26 U.S.C.

17   § 5812(a), (b). The new registration is then recorded in the National Record. *See* 27

18   C.F.R. § 479.101(b). The NFA makes it "unlawful for any person . . . to receive or

19   possess a firearm" that "is not registered to him in the [National Record]." 26 U.S.C. §

20   5861(d). Under the NFA, a firearm includes "any firearm muffler or firearm silencer,"

21   which is defined as "any device for silencing, muffling, or diminishing the report of a

22   portable firearm." § 5845(a)(7); 18 U.S.C. § 921(a)(3)(C), (25). "In this context, the

23   word 'report' refers to the sound of a gunshot." *Innovator Enters., Inc. v. Jones*, 28 F.

24   Supp. 3d 14, 18 n.1 (D.D.C. 2014).

25         As such, silencers are subject to taxation and registration. Possessing an untaxed,

26   unregistered silencer carries stiff penalties: up to ten years in federal prison and a

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 21

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

$10,000 fine. 26 U.S.C. § 5871. Thus, the "how" of the statute is a strict taxation and regulation scheme where violations are punished with severe criminal penalties.

### 3.   Looking to historic record, there is no historical tradition that shares the same "how" as the NFA.

The NFA pursues its goal by means of a stringent registration and taxation scheme. Yet there is no historical tradition of similar means—of registration schemes for firearms—at the time of the ratification of the Second Amendment. As an initial matter, the government must identify the "general societal problem" § 5861(d) is intended to address. *Id*. at 2131. This determines which test the government must satisfy: the stringent "distinctly similar" test or the less stringent "relevantly similar" test. *Id*. at 2131-32. As detailed above, and discussed previously, § 5861(d) was intended to address the problem of violent crime, a perpetual societal problem, so the "distinctly similar" test should apply. Nonetheless, under either test, the government cannot carry its burden because people were not required to register their "Arms" with the government as a prerequisite to lawful possession until the 20th century.

The first registration law to take effect was in New York in 1911.[16] That statute required sellers of concealable firearms to "keep a register in which shall be entered at the time of sale" certain identifying information about the transaction and the purchaser, along with the "calibre [sic], make, model, manufacturer's number or other mark of identification" on the firearm.[17] If the purchaser later transferred the firearm to another person without "first notifying the police authorities," he or she would be guilty of a misdemeanor.[18] By the time the federal Act was enacted in 1934, nine states had

---

[16] 1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons, ch. 195, § 2 (Ex. A).

[17] *Id*.

[18] *Id*.

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 22

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

followed New York's lead and enacted registration statutes.[19] These statutes are insufficient to discharge the government's burden for at least three reasons.

First, these statutes appear to be "outliers." *Bruen*, 142 S. Ct. at 2153. At most, ten states passed registration statutes before the federal Act was passed. The Court in *Bruen* "doubt[ed]" that statutes from three of the original thirteen colonies—or roughly 23 percent—"could suffice to show a tradition" of relevant firearm regulation. *Id*. at 2142. Ten states out of the 48 admitted to the Union as of 1934 makes up 21 percent of the total, which is roughly the same as the proportion rejected in *Bruen*. These few registration statutes, therefore, are not "representative" in the way *Bruen* demands. *Id*. at 2133.

---

[19] 1913 Mich. Pub. Acts 472, An Act Providing for the Registration of the Purchasers of Guns, Pistols, Other Fire-Arms and Silencers for Fire-Arms and Providing a Penalty for Violation, § 1 (Ex. B); 1917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person § 7 (Ex. C); 1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, § 5 (Ex. D); 1931 Ill. Laws 453, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 4 (Ex. E); 1933 Wyo. Sess. Laws 117, An Act Relating to the Registering and Recording of Certain Facts Concerning the Possession and Sale of Firearms by all Wholesalers, Retailers, Pawn Brokers, Dealers and Purchasers, Providing for the Inspection of Such Register, Making the Violation of the Provisions Hereof a Misdemeanor, and Providing a Penalty Therefor, ch. 101, §§ 1-4 (Ex. F); 1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8 (Ex. G); 1931-1933 Wis. Sess. Laws 245-47, An Act . . . Relating to Machine Guns and to Make Uniform the Law with Reference Thereto, ch. 76, § 1, pt. 164.01 to 164.06 (Ex. H); 1933 Haw. Sess. Laws 36-37, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 3 (Ex. I); 1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 1-7 (Ex. J).

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1   Second, these statutes almost exclusively address different problems from the

2   "general societal problem" that § 5861(d) may target. Despite the fact that silencers

3   were in common enough use in 1913 for states to require their registration, only the

4   Michigan statute required the registration of silencers. The others required registration

5   of different types of firearms, such as machineguns or guns that could be concealed on

6   the person.[20] Whatever purpose a silencer-registration requirement serves, it is not the

7   same purpose served by requiring registration of fully automatic machineguns. These

8   statutes therefore are not "relevantly similar" to § 5861(d). *Id.* at 2132.

9   Third, and most importantly, none of these statutes was enacted in the period

10  *Bruen* deems crucial—the years immediately surrounding the founding. The earliest of

11  the firearm registration statutes was enacted in 1911, which postdates the Second

12  Amendment's ratification by 120 years. Such recent evidence is irrelevant to the

13  Second Amendment analysis unless it "confirm[s]" what earlier sources have already

14  established, *id.* at 2137, which is not the case here. Indeed, the Court in *Bruen* declined

15  even to "address any of the 20th-century historical evidence brought to bear" because it

16  "does not provide insight into the meaning of the Second Amendment when it

17  contradicts earlier evidence." *Id.* at 2154 n.28. The same is true of the registration

18  statutes identified above. Thus, there is no "comparable tradition of regulation" from

19  the founding era. *Id.* at 2132.

20  Unless the government can bring forward additional historical evidence of which

21  Mr. DeBorba is unaware, it will be unable to establish a sufficient historical tradition of

22  requiring registration of "Arms," including firearm silencers. Section 5861(d) therefore

23  violates the Second Amendment.

24

25

26

[20] *See supra* notes 14 & 17, and sources cited therein.

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 24

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

**E.     The NFA and the prosecution here also violate the Second Amendment because they impose a disproportionate tax on constitutionally protected activity.**

*Bruen* is not the only Second Amendment problem here. Even if the NFA's tax-and-register scheme were historically justified, the NFA's particular requirements run afoul of the Supreme Court's "fee jurisprudence" doctrine. Fee jurisprudence doctrine first arose in the First Amendment context. *Bauer v. Becerra*, 858 F.3d 1216, 1225 (9th Cir. 2017) (describing doctrine).

The basic rule is straightforward: taxes on constitutionally-protected activities are only permissible if they are tailored "to meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed." *Id*. (quoting *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941)). "Put another way, imposing fees on the exercise of constitutional rights is permissible when the fees are designed to defray (and do not exceed) the administrative costs of regulating the protected activity." *Kwong v. Bloomberg*, 723 F.3d 160, 165 (2d Cir. 2013). In other words, taxes on constitutional rights must be tailored as narrowly as possible. They cannot be a vehicle for suppressing protected-but-unpopular conduct.

The registration fee here violates this principle. As the ATF itself admits, the NFA's "underlying purpose was to curtail, if not prohibit, transactions in NFA firearms." *See* ATF, "National Firearms Act," *supra*. The congressional testimony in support of the Act was clear on this point:

> A sawed-off shotgun is one of the most dangerous and deadly weapons. A machine gun, of course, ought never to be in the hands of any private individual. There is not the slightest excuse for it, not the least in the world, and we must, if we are going to be successful in this effort to suppress crime in America, take these machine guns out of the hands of the criminal class.

National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. On Ways & Means, 73rd Cong 1 (1934) [Testimony of Attorney General Homer Stille Cummings].

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 25

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

To be sure, the NFA did not strictly outlaw possession of any of the regulated types of firearms. However, Congress set the tax at a prohibitive amount in 1934 dollars, which would be the equivalent of approximately $4,594 in today's dollars. *See* B. of Labor Statistics, Inflation Calculator, *supra*. Depending on the specific firearm, this amount equaled or dwarfed the actual cost of the gun, rendering them practically unavailable to everyone but the rich. Alexandria Kincaid, *Origins of the NFA*, Recoil Magazine, July 18, 2017, https://www.recoilweb.com/origins-of-the-nfa-128767.html.

This specific scheme is distinct from other fee jurisprudence challenges to gun regulations. In *Bauer*, for instance, the Ninth Circuit considered a California law that exacted "$5 of a $19 fee on firearms transfers to fund enforcement efforts against illegal firearm purchasers[.]" 858 F.3d at 1218. That small fee was permissible because it was a "minimal burden" aimed at "fund[ing] 'costs associated with funding Department of Justice firearms-related regulatory and enforcement activities related to the sale, purchase, possession, loan, or transfer of firearms.'" *Id*. at 1224. California's legislative history likewise supported this conclusion—the relevant senate committee clarified that the challenged fee went toward the costs of administering the firearm registration program. *Id*.

The opposite is true here. The NFA's own drafters made their intent clear: they wanted the tax to suppress firearm possession generally, not to fund NFA program costs. And the $200 fee (in 1934 dollars) outstrips the *Bauer* fee by several orders of magnitude. Congress cannot use the Taxing Power as an end-run around the Second Amendment.[21] Because the 1934 Congress attempted to enact a gun ban in all but

---

[21] Mr. DeBorba also moves to dismiss the indictment on the ground that the NFA is an unconstitutional exercise of Congress's Taxing Power. However, he recognizes that this argument has been rejected by *Sonzinsky v. United States*, 300 U.S. 506, 514 (1937) and *NFIB v. Sebelius*, 567 U.S. 519, 567 (2012).

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 26

name, fee jurisprudence doctrine compels the conclusion that the NFA is

unconstitutional.

### F.   The Court should also or alternatively dismiss Count 7 because the definition of "silencer" incorporated by the NFA is unconstitutionally vague in violation of the Fifth Amendment.

The Court should also dismiss Count 7 because the NFA's definition of

"silencer" is impermissibly vague. The Due Process Clause prohibits laws that fail to

give "ordinary people . . . 'fair notice' of the conduct a statute proscribes." *Sessions v.*

*Dimaya*, 138 S. Ct. 1204, 1212 (2018) (quoting *Papachristou v. Jacksonville*, 405 U.S.

156, 162 (1972)). Accordingly, "a penal statute must define the criminal offense [1]

with sufficient definiteness that ordinary people can understand what conduct is

prohibited and [2] in a manner that does not encourage arbitrary and discriminatory

enforcement." *United States v. Skilling*, 561 U.S. 358, 402–03 (2010) (quoting

*Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).

The exact "degree of vagueness the Due Process Clause will tolerate" varies.

*Kashem v. Barr*, 941 F.3d 358, 370 (9th Cir. 2019). To determine the "strictness" of the

Court's review, "[r]elevant factors include whether the challenged provision involves

only economic regulation, imposes civil rather than criminal penalties, contains a

scienter requirement and threatens constitutionally protected rights." *Id*. (citing *Village*

*of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982)).

Under this standard, vagueness principles should be strictly applied here. The

NFA is not "only economic regulation"—it instead substantively regulates the types of

constitutionally-protected arms a person can bear. *Id*. And although it is housed in the

tax code, the NFA carries severe criminal penalties. 26 U.S.C. § 5871. It likewise

contains murky-at-best scienter requirements. *Compare United States v. Freed*, 401

U.S. 601, 607 (1971) (holding that there is no mens rea requirement for the failure-to-

register element) *with Staples v. United States*, 511 U.S. 600, 619 (1994) (holding that

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 27

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

the government must prove knowledge of the firearm's specific characteristics that render it criminal to possess, though not necessarily knowledge that such possession is unlawful). Finally, the statute "threatens constitutionally protected rights" because it squarely implicates the Second Amendment. *Kashem*, 941 F.3d at 370.

Ordinarily, statutes can only be challenged as vague on an as-applied basis. *Id*. at 377. That rule, however, is not absolute. For instance, statutes implicating the First Amendment may be facially challenged. *Id*. at 375. And even outside the First Amendment context, the Supreme Court has recently struck down a series of statutes in the face of facial vagueness challenges. *Id*. (citing the *Johnson* and *Dimaya* series of cases). As the Ninth Circuit has put it, "exceptional circumstances" may justify the use of a facial challenge. *Id*. at 377.

Here, Mr. DeBorba raises both a facial and as-applied challenge. If the Court does not resolve this issue as applied in this case, a facial vagueness challenge is appropriate here for the same reasons it is appropriate in the First Amendment context. Unlike laws that don't implicate constitutionally-protected activities, vague provisions of the NFA harbor the "potential for arbitrarily suppressing [Second] Amendment liberties." U*nited States v. Jae Gab Kim*, 449 F.3d 933, 942 n.15 (9th Cir. 2006) (quoting *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 91 (1965)).  Similar concerns have animated past facial challenges at the Supreme Court.  *See, e.g.*, *City of Chicago v. Morales*, 527 U.S. 41, 52–64 (1999) (sustaining a facial challenge to a loitering ordinance even though the ordinance did not implicate the First Amendment).

Here, the definition of "silencer" is too vague to put ordinary people on notice of what items qualify as "silencers" subject to the NFA's taxation and registration. Under the plain language of 18 U.S.C. § 921(a)(25), a "silencer," suppressor, or "muffler" is "any device *for* silencing,  muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 28

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." (emphasis added). The Ninth Circuit has previously held that a combination of parts from which a person could make a silencer is sufficient. *See United States v. Endicott*, 803 F.2d 506 (1986). The statute does not inform an ordinary person of average intelligence of what constitutes a "silencer."

Section 921(a)(25) leaves many unanswered questions with respect to the determination of whether an item is for the silencing, muffling, or diminishing of the report of a firearm. In interpreting the meaning of the word "for" in this context, does this mean that the item's only use is for silencing a firearm, its primary use is for silencing of a firearm, or its possible use is for silencing a firearm? Must it be manufactured specifically for silencing a firearm, modified specifically for silencing a firearm, or capable of use for silencing a firearm?

Does the phrase "for" entail some quantum of effectiveness for silencing the firearm? Does the statute require a 50 percent reduction in audible volume to qualify? Does it require 25 percent, 10 percent, or is it satisfied with merely one percent? Perhaps the statute does not require the object to actually function at all, so long as there is an intention to muffle the gun's report? If so, whose intent applies? The manufacturer or the possessor? Or, as discussed below, the government?

Unsurprisingly, the ATF itself has struggled to land on a consistent interpretation of this statute. For example, the ATF has repeatedly changed its analysis of whether "solvent traps"—devices used to clean firearms—are also silencers. Historically, devices called "solvent traps" fell outside the definition of a silencer. Although a solvent trap resembles a silencer and shares multiple design characteristics of a silencer, they are intended for different uses. A solvent trap is a device which is attached to the barrel of a firearm during cleaning in order to catch excess cleaning fluids. It may have the incidental effect of muffling a gunshot, but that is not its intended purpose.

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 29

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1   Notably, here, the government's investigator indicated that the item alleged to be

2   a silencer is of a type frequently marketed as an automotive filter, akin to a "solvent

3   trap." It was a cylinder closed on one end, that lacked a hole through which a bullet

4   could escape. *See* Ex. K. Like a solvent trap: it is advertised for a purpose *other than*

5   use as a silencer, it was not found in a form in which it would fully function as a

6   silencer, and it was essentially an attachment that elongates a barrel with a closed end.

7   As recently as 2017, the ATF published a Technical Bulletin that explicitly

8   stated that "the statutory definition of silencer does not include otherwise unregulated

9   items simply because they have a capability, or may be adapted, to be used as

10   silencers." ATF, Technical Bulletin 17-02: "Solvent Traps," *available at*

11   https://www.gunowners.com/images/pdf/ATF_Tech_Bulletin_17-

12   02_Solvent_Traps.pdf. Instead, the statute speaks of a device "for" silencing or

13   muffling. Therefore, mere possession of a "solvent trap'" or parts which could be used

14   in the assembly of a firearm silencer does not necessarily constitute possession of a

15   firearm silencer. Within this same bulletin, the ATF noted that devices like solvent traps

16   may have a legitimate purpose as a firearm accessory even if they could be utilized as a

17   silencer. The bulletin explains that the "solvent trap" becomes a silencer if it has some

18   indication, such as a hole or index markings, indicating where a hole should be drilled

19   to allow a bullet to pass through.  *See* ATF Technical Bulletin 17-02 at 5.

20   However, the ATF later upended their long-time classification of "solvent traps"

21   as falling outside the definition of a silencer or suppressor and have now reclassified

22   them as such under the Final Rule. *See* 87 FR 24652-01 (Apr. 26, 2022) (proposing

23   amendment to the regulation interpreting the NFA). 27 C.F.R. § 478.11 now defines

24   what constitutes a "complete muffler or silencer device." 87 FR at 24734, 24747. The

25   C.F.R. will now read "a firearm muffler or firearm silencer that contains all the

26   component parts necessary to function, whether or not assembled or operable." 87 FR at

24734. This new rule deviates from what is clearly defined by statute. As noted above, section 921(a)(25) clearly requires the device be *for* silencing and intended for use as a silencer with any part included only if it was "only for use in such assembly or fabrication."

Despite the lack of a hole or markings indicating where a bullet would pass through the item seized here, the government has indicted Mr. DeBorba for unlawful possession of an unregistered silencer. Here, the intent that seemed to matter for the government's indictment of Mr. DeBorba was the *government*'s intent. The government discovered and seized the device in question a mere *10 days* after adopting its own Final Rule reversing its previous exemption of solvent traps from NFA restrictions. *See* Dkt. No. 40; 87 FR. The investigator who opined that the device was a silencer under the NFA claimed that the item seized: " is consistent with many items misrepresented as 'automotive filters' or 'solvent traps' in a thinly veiled attempt at presenting a legitimate and legal use for these devices other than as firearm silencers or a combination of parts intended for use in assembling a firearm silencer." Ex. K at 4. This is precisely the type of arbitrary enforcement that the NFA's vague definition of "silencer" invites. *See Skilling*, 561 U.S. at 402–03. Mr. DeBorba now faces prison time because the ATF changed its mind, and an individual ATF agent personally disbelieved the non-muffling use for the device.

The NFA's definition of silencer is unconstitutionally vague as applied here and on its face. As demonstrated here, the device in question was deemed *not* an NFA silencer for years only to have the government change its mind about how it wanted to enforce the NFA. And the government is prosecuting Mr. DeBorba for allegedly possessing that item less than two weeks after the government changed its own rule. For the same reason the vagueness of the statute failed to notify Mr. DeBorba what items were subject to NFA restrictions and invited the arbitrary enforcement here, it also

MOTION TO DISMISS COUNT 7 OF
SUPERSEDING INDICTMENT
(*United States v. DeBorba*, CR22-5139-DGE) - 31

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**

1   infringes on the constitutional rights of others in the same way. The Court should

2   dismiss Count 7 as unconstitutionally vague in violation of the Fifth Amendment.

3   **III.   CONCLUSION**

4           Mr. DeBorba respectfully asks this Court to dismiss Count 7 of the Superseding

5   Indictment. The statute charged violates the Second Amendment and the Fifth

6   Amendment both facially and as applied to Mr. DeBorba here.

7           DATED this 19th day of October, 2023.

8                                        Respectfully submitted,

9
                                         s/ *Rebecca Fish*
10                                       Assistant Federal Public Defender
                                         Attorney for João Ricardo DeBorba
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**FEDERAL PUBLIC DEFENDER**
**1331 Broadway, Suite 400**
**Tacoma, WA 98402**
**(253) 593-6710**