The Honorable David G. Estudillo

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JOAO RICARDO DEBORBA, <br><br> Defendant. | NO. CR22-5139-DGE <br><br> GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COUNT 7 OF THE SUPERSEDING INDICTMENT |

**INTRODUCTION**

The Second Amendment recognizes "the right of the people to keep and bear Arms" and says the right "shall not be infringed." U.S. Const. amend II. But silencers are not "arms," and even if they were, they are "dangerous or unusual weapons" under the reasoning of *Dist. of Columbia v. Heller*, 554 U.S. 570, 626, 627 (2008). Additionally, the National Firearms Act's ("NFA") registration and taxation requirements, which applied to the silencer that defendant Joao Ricardo DeBorba possessed, do not "infringe" on the right to keep and bear arms, and even assuming that they do, the requirements are nevertheless analogous to historical laws regulating commerce in firearms and pass constitutional muster after *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). The Court should deny DeBorba's motion to dismiss.

Opposition to Motion to Dismiss - 1
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

# ARGUMENT

## I. Silencers are Not "Arms" Within the Meaning of the Second Amendment

The Second Amendment "does not imperil every law regulating firearms." *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion). Indeed, *Heller* held that the Second Amendment applies to "bearable arms." 554 U.S. at 582. According to the Supreme Court, "the most natural reading of [the phrase] 'keep Arms' in the Second Amendment is to 'have weapons.'" *Id.* Although that protection might extend to things necessary to use arms, such as certain magazines and ammunition, or even access to firing ranges—*see, e.g., Kolbe v. Hogan,* 813 F.3d 160 (4th Cir. 2016) (holding magazines, like a firing pin, are necessary to the operability of magazine-loaded firearms); *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)—it does not automatically apply to anything that can be attached to a firearm, but which is not otherwise necessary to render the firearm operable.

A firearm silencer is not necessary to make a firearm operable; rather, it is exclusively a means to reduce sound omitted from an already operable firearm. "A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence')." *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (holding that a silencer is not a "bearable arm" protected by the Second Amendment); *see also United States v. Hasson*, 2019 WL 4573424, at *3-5 (D. Md. Sept. 20, 2019), aff'd, 26 F.4th 610 (4th Cir. 2022) ("Silencers generally have no use independent of their attachment to a gun. They do not fire bullets on their own and do not contain a slide, trigger, firing pin, cartridge case, barrel, primer, or gunpowder.").[1]

---

[1] While defendant claims silencers are "necessary" or "indispensable" to the use of firearms because they may reduce recoil and muzzle rise or reduce risk of hearing loss from use over time, these effects do not render silencers "arms." Nor does the lack of a silencer hinder the use of firearms. Setting aside that firearms are widely used for self-defense without silencers, the defining feature of silencers is sound suppression, and other legally available devices, such as ear protection and barrel extensions, would provide the same effects. *See Hasson*, 2019 WL 4573424 at *2 ("Silencers also have an incidental effect of increasing the accuracy of a firearm because their weight

Opposition to Motion to Dismiss Count 7 - 2
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

Nothing in *Bruen* suggests that silencers fall within the meaning of "arms" under the Second Amendment. *Bruen* spoke of "firearm" regulations, not the regulation of firearm accessories. 142 S. Ct. at 2126, 2131. And *Bruen* did not directly address, or somehow constitutionally shield, an individual's right to possess accessories that merely quiet an otherwise bearable arm. Discussing the historical application of the Second Amendment to "new circumstances," the Supreme Court reiterated that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 2132 (citing *Heller*, 554 U.S. at 582) (emphasis added). The very right at issue in *Bruen* was an individual's ability to lawfully possess a handgun for self-defense outside of the home. *Id.* at 2122. As already discussed, a silencer is not such an arm.

Indeed, courts that have examined the issue appear to have unanimously held that silencers are not weapons protected by the Second Amendment. *See, e.g., United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) (holding that silencers are not protected by the Second Amendment); *Cox*, *supra*; *Hasson*, *supra*; *United States v. Stepp-Zafft*, 733 F. App'x 327, 329-30 (8th Cir. 2018) (finding no plain error where district court failed to dismiss unregistered silencer charge on Second Amendment grounds); *United States v. Grey*, No. CR-18-00412-CAS-1, 2018 U.S. Dist. LEXIS 156618, 2018 WL 4403979, at *13 (C.D. Cal. Sept. 13, 2018) (following *McCartney's* holding and denying motion to dismiss unregistered silencer charge on Second Amendment grounds); *United States v. Perkins*, No. 4:08CR3064, 2008 U.S. Dist. LEXIS 83236, 2008 WL 4372821, at *4 (D. Neb. Sept. 23, 2008) (holding that silencers are not protected by the Second Amendment); *United States v. Garnett*, 2008 U.S. Dist. LEXIS 112728, 2008 WL 2796098, at *4-5 (E.D. Mich. 2008) (finding that nothing in Heller "casts doubt" on the

---

prevents muzzle rise. [Defendant's expert] also explained that when he was on the ATF shooting range as an instructor, he sometimes used firearms without silencers, but he always used earmuffs or earplugs for hearing protection.")

Opposition to Motion to Dismiss Count 7 - 3
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

constitutionality of the NFA's regulation of silencers). *United States v. Saleem*, No. 3:21-CR-00086-FDW-DSC, 2023 WL 2334417, *10 (W.D. N.C. March 2, 2023) ("A firearm is effective as a weapon of self-defense without the use of a silencer, but the reverse is not true; a silencer serves no purpose without a firearm. Thus, silencers are neither arms nor reasonably necessary accoutrements within the purview of the Second Amendment.")

More recently, in *United States v. Cooperman,* No. 1:22-CR-00146, 2023 WL 4762710 (N.D. Ill. July 26, 2023), a district court upheld the constitutionality of the NFA's silencer regulation, and, citing *Cox,* found that silencers are firearm accessories, not weapons, under *Heller's* definition of bearable arms. *Id*. at *1. The court further found that nothing in *Bruen* changes this analysis, because since silencers fall outside the Second Amendment's plain text, *Bruen's* first step was satisfied and "the analysis can stop there." *Id*. at *2. *See also United States v. Royce,* No. 1:22-CR-00130-DLH, 2023 WL 2163677 (D. N.D. February 22, 2023) (finding silencers are not necessary to make firearms operable but simply are a means to reduce sound and thus are not protected as "arms" under the Second Amendment); *United States v. Peterson*, 2023 WL 5383664 (E.D. La.) (finding silencers are accessories, not bearable arms within the scope of the Second Amendment). Defendant cites no case extending Second Amendment protection to the possession of silencers.

Clearly, by its plain text, the Second Amendment does not protect silencers from regulation and restriction. Since *Bruen* did not directly address, or somehow constitutionally shield, an individual's right to possess accessories that merely quiet an otherwise bearable arm, DeBorba's Second Amendment challenge to Count 7 fails.

II.     **Even if Silencers are "Arms," they are "Dangerous or Unusual Weapons" Under the Reasoning of *Heller***

Even assuming that silencers are arms within the meaning of the Second Amendment, the NFA's restrictions on silencers are well in line with what the Supreme Court's decision in *Heller* recognized (and Justice Kavanaugh's concurrence in *Bruen*

Opposition to Motion to Dismiss Count 7 - 4
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

echoed) to be the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627. For example, under English common law, "the offence of riding or going armed, with dangerous or unusual weapons, [was] a crime." 4 William Blackstone Commentaries *148. In the United States, too, courts have long acknowledged that a man commits "an offence at common law" when he "arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." *State v. Langford*, 3 Hawks 381, 383 (NC 1824). Accordingly, the Second Amendment encompasses only arms "of the kind in common use." *Heller*, 554 U.S. at 624 (quoting *United States v. Miller*, 307 U.S.174, 179 (1939)). The Supreme Court has explained that the common-use limitation is consistent with the Second Amendment's prefatory clause: "The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self- defense." *Heller*, 554 U.S. at 624. Thus, the common-use limitation—which supports the NFA restrictions at issue here—"is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id*. at 627; *see also United States v. Tagg*, 572 F.3d 1320, 1326 (11th Cir. 2009) (citing *Heller* in rejecting Second Amendment-based challenge to constitutionality of NFA and finding that "pipe bombs are not typically possessed by law-abiding citizens for lawful purposes" and therefore fall within the historical tradition of prohibiting the carrying of dangerous and unusual weapons); *United States v. Fincher*, 538 F.3d 868, 870, 873-74 (8th Cir. 2008) (after *Heller*, defendant's possession of machinegun was not protected by Second Amendment because machineguns were "not in common use by law-abiding citizens for lawful purposes and therefore [fell] within the category of dangerous and unusual weapons that the government can prohibit for individual use"), *cert. denied*, 555 U.S. 1174 (2009).

Moreover, the historical record indicates that silencers were perceived as dangerous almost immediately after their invention, and that they were quickly used to facilitate crimes. *See* Robert J. Spitzer, *Gun Accessories and the Second Amendment:*

Opposition to Motion to Dismiss Count 7 - 5
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

*Assault Weapons, Magazines, and Silencers*, 83 L. & Contemp. Probs. 231, 246-49 (2020).[2] The silencer was invented in the early 1900s and patented in 1908. *Id.* at 246. "Objections to civilian use of silencers appeared almost immediately." *Id.* By 1909, the first state, Maine, had banned the sale or possession of silencers, and New Jersey followed two years later. *Id.* at 247. The primary concern about unregulated possession of silencers was crime, from both typical criminals and hunters/poachers. *Id.* "From 1909 and 1936, at least fifteen states enacted silencer restrictions," including Arizona, Louisiana, Michigan, North Carolina, Pennsylvania, and Wyoming. *Id.* at 248 n.123. Ultimately, the inventor of the silencer and his company "discontinued manufacturing silencers because of the popular impression that this invention was an aid to crime." *Id.* at 248 n.125 (*Maxim Bans Gun Silencer*, N.Y. TIMES, May 8, 1930, at 27). In short, under *Heller*, even assuming that silencers are "arms," within the meaning of the Second Amendment, they remain unusually dangerous and thus fall permissibly within this nation's historical tradition of regulation.

*Bruen* did not undermine *Heller's* recognition of the historical tradition of regulating "dangerous or unusual weapons"—in fact, it reemphasized it. *See Bruen*, 142 S. Ct. at 2143-44. Instead, *Bruen* focused on handguns, which it described as "indisputabl[y] in common use for self-defense today." *Id*. at 2143. But silencers (if they are even weapons) are uncommon and not necessary (nor truly intended) for self-defense, thus underscoring the particular danger they represent. Silencers remain both dangerous and unusual—especially for self-defense purposes[3]—regardless of whether they existed

---

[2] This article is attached as Exhibit 1.

[3] Defendant notes that silencers are not commonly used in crimes. Far from proving that silencers are not dangerous or unusual, this fact (and the relative scarcity of silencers as compared to firearms in general) show that silencers are indeed unusual and does nothing to demonstrate they are not dangerous as Congress determined (*see infra*), especially as the infrequency of their use can be easily explained by their continuously being under a regulatory scheme almost from the time of their invention.

Moreover, defendant's statistics on the number of registered silencers in the United States underscores how unusual they are. Defendant effectively asks this Court to conclude that silencers are "in common use" because an

Opposition to Motion to Dismiss Count 7 - 6  
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY  
1201 PACIFIC AVE., SUITE 700  
TACOMA, WASHINGTON 98402  
(253) 428-3800

at the time of the founding or are comparable to any weapon that did. Consequently, the NFA restrictions of silencers that are at issue in this case fit within the historical tradition of prohibitions recognized by *Heller*. *See* 554 U.S. at 627.

More than one district court has agreed. In *Saleem*, the court noted that, in enacting the NFA, Congress determined that silencers are "modern and lethal weapons" that are "likely to be used for criminal purposes." 2023 WL 2334417 at *11. The court found that silencers are not "arms," are not necessary to the effective use of protected "arms," and that they fall outside the scope of the Second Amendment because they are "dangerous and unusual." *Id*. *See also United States v. Villalobos*, No. 3:19-CR-00040, 2023 WL 3044770, *12 (D. Id. April 21, 2023) (denying a challenge to the NFA's silencer restrictions in finding, consistent with *McCartney*, that silencers "are not bearable arms within the meaning of the Second Amendment" and further finding that even if silencers are protected as necessary for the use and enjoyment of gun owners, they are in a category of "dangerous and unusual" weapons that courts have decided are not protected by the Second Amendment.)

### III. The NFA's Registration and Taxation Requirements do not "Infringe" on the Right to Keep and Bear Arms

The NFA's registration and taxation requirements, which applied to the silencer that DeBorba possessed, do not "infringe" on the right to keep and bear arms. Under *Bruen*, the government only needs to address historical analogs "[w]hen the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. 2129-30. The Amendment does not say that the right to keep and bear arms cannot be "burdened in any way," but that it shall not be "infringed." Administrative burdens that stop far short of

---

approximate 2.6 million are registered in a country of approximately 261 million adults. *See* United States Census Bureau, *QuickFacts*, https://www.census.gov/quickfacts/fact/table/US/PST045222 (last visited October 31, 2023). In a scenario where less than nine-tenths of a percent of the population owns a silencer (a figure that is conservatively assumes that no individual owns more than one silencer—effectively ignoring the many non-firearm owners in the country), defendant cannot credibly argue that silencers are common in American life.

Opposition to Motion to Dismiss Count 7 - 7
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

disarming law-abiding citizens do not "infringe" the right to keep and bear arms. *See* Webster's 1828 American Dictionary of the English Language (defining "infringe" as "[t]o break; to violate; to transgress" and "[t]o destroy or hinder"). Here, individuals—including, in theory, even Mr. DeBorba himself—can lawfully own and transfer silencers, assuming that they follow the registration and taxation requirements. *See generally* 26 U.S.C. Ch. 53. *Heller* and *Bruen* make clear that the government cannot *prohibit* the in-home possession and public carrying of firearms, at least for self-defense purposes. Yet *Bruen* expressly did not disturb the "shall-issue" licensing laws that exist in 43 states. 142 S. Ct. at 2138 n.9. And Justice Kavanaugh's concurrence emphasized that states can constitutionally require license applicants to "undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." 142 S. Ct. at 2162. A registration scheme for silencers is no more burdensome than the kind of requirements that the Supreme Court has found not to be problematic. The statute alleged in Count 7 does not ban silencer possession; rather, it requires registration and documentation, as well as the payment of appropriate, reasonable taxes. *See* 26 U.S.C. Ch. 53. Thus, such a scheme is constitutional under *Bruen*, even if there is no historical analog to it.

**IV.     The NFA's Registration and Taxation Requirements are Analogous to Historical Laws Regulating Commerce in Firearms and Therefore Part of the Historical Tradition that Delimits the Outer Bounds of the Right to Keep and Bear Arms**

Based on the textual analysis of the Second Amendment explained above, the Court need not consider whether the NFA's registration and taxation requirements are consistent with the nation's historical tradition of firearm regulation. *See Bruen*, 142 S. Ct. 2129-30. Nevertheless, the government submits that the relevant statutes are

Opposition to Motion to Dismiss Count 7 - 8
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 P<small>ACIFIC</small> A<small>VE</small>., S<small>UITE</small> 700
T<small>ACOMA</small>, W<small>ASHINGTON</small> 98402
(253) 428-3800

analogous to historical laws regulating commerce in firearms. As a result, they survive constitutional scrutiny even if *Bruen* is applied.

"[C]olonial governments substantially controlled the firearms trade." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017). For example, "a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals." Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 76 (2017).[4] "A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also 'of arms and munitions.'" *Id.* In the early 17th century, Connecticut banned residents from selling firearms outside the colony. *Teixeira*, 873 F.3d at 685. Virginia provided that people were at "liberty to sell armes and ammunition to any of his majesties loyall subjects *inhabiting this colony*." *Id.* at 685 n.18 (emphasis added). And other colonial governments "controlled the conditions of trade" in firearms. *Id.* at 685.

States continued to enact laws governing "the manufacture, sale, [and] transport" of guns and ammunition in the 18th and 19th centuries. *Id.* at 74. For example, in 1814, "Massachusetts required that all musket and pistol barrels manufactured in the state be first tested," and it appointed a state inspector "to oversee or conduct the testing." *Id.* Likewise, in 1820, "New Hampshire created and appointed state gunpowder inspectors to examine every storage and manufacturing site." *Id.* Meanwhile, "[t]wentieth century laws extended safety regulations pertaining to gunpowder and other explosives." *Id.*

Like these early laws, the NFA's registration and taxation requirements for silencers do not prohibit possessing or even transferring them. Instead, the statutes at issue merely impose record-keeping and attendant payment requirements to document the items, to help ensure that they can be traced (*e.g.*, when they are believed to have been used in a crime). Although the statutes are not identical to the above historical statutes,

---

[4] This article is attached as Exhibit 2.

Opposition to Motion to Dismiss Count 7 - 9
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

*Bruen* explained that the government need only identify a "historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133 (emphasis in original).

Indeed, *Bruen* emphasized that when applying the Second Amendment to modern regulations that were unimaginable at the founding, the historical inquiry that courts must conduct will often involve reasoning by analogy. *Id.* at 2132. Thus, a historical regulation need only be "relevantly similar" to the challenged regulation. Because silencers are a 20th century invention, this Court need only find that there existed historical regulation that is relevantly similar to the NFA. In assessing relevancy, two of the metrics *Bruen* suggested are "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2133. Here, the "how" is through a payment and licensing scheme, which, as explained above, is relevantly similar to historical regulations of dangerous weapons. The "why" is because of the unusual danger posed by silencers. And the burden on self-defense is minimal because silencers are not necessary to the carrying of a firearm for protection. Thus, the practice of the colonies and the United States of regulating commerce in firearms provides a sufficient historical analog to the NFA.

The courts that have considered the issue have come to the same conclusion. In *United States v. Scheffel*, No. 1:21-CR-00164-CCC (M.D. Pa. Nov. 23, 2022), Dkt. No. 75,[5] the district court "assum[ed] arguendo . . . that firearm silencers and mufflers are 'bearable arms'" within the meaning of the Second Amendment (Ex. 3 at 2)—a point that the government here has contested here—and also assumed that silencers are possessed for purposes of self-defense (Ex.3 at 2-3)—another point that the government has contested. Yet *Scheffel* still upheld the constitutionality of the NFA's silencer regulation, finding the statute "consistent with the history and tradition of American firearms regulations." Ex. 3 at 4.

---

[5] This order is attached as Exhibit 3.

Opposition to Motion to Dismiss Count 7 - 10
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

### V. The Definition of "Silencer" is Not Unconstitutionally Vague

DeBorba argues that the statutory definition of "silencer" is unconstitutionally vague, both as applied to his conduct and on its face. These claims fail.

#### A. As-Applied Challenge

Due process requires 'that laws give [a] person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). The doctrine helps guard against arbitrary or discriminatory law enforcement by "insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212, 200 L. Ed. 2d 549 (2018).

The Court first considers whether the statute is vague as applied to the particular facts at issue because "[a] [person] who engages in some conduct that is clearly proscribed cannot complain of vagueness of the law as applied to the conduct of others." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1992). DeBorba argues that the definition of "silencer" is so unconstitutionally vague that it fails to provide people fair notice of the conduct it punishes and that the criteria is so standard-less it invites arbitrary enforcement.

"Whether a provision is vague for lack of fair notice is an objective inquiry." *Kashem v. Barr*, 941 F.3d 358, 371 (9th Cir. 2019). The relevant inquiry is whether the law gives "a person of ordinary intelligence fair notice of what is prohibited," not whether the person being prosecuted or held liable under the statute actually received a warning that alerted him or her that their behavior was subject to the statute. *United States v. Williams*, 553 U.S. 285, 304 (2008). Hence, the question is whether a reasonable person would have known that DeBorba's conduct fell under the NFA's restrictions.

The NFA incorporates the definition of "silencer" found at 18 U.S.C. § 921(a)(25):

Opposition to Motion to Dismiss Count 7 - 11  
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY  
1201 PACIFIC AVE., SUITE 700  
TACOMA, WASHINGTON 98402  
(253) 428-3800

> The terms "firearm silencer" and "firearm muffler" mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.

DeBorba argues this definition does not inform a person of ordinary intelligence what constitutes a "silencer." But a statute is not overly vague if an individual "has been given clear notice that a reasonably ascertainable standard of conduct is mandated; it is for him to insure [sic] that his actions do not fall outside the legal limits." *United States v. Powell*, 423 U.S. 87, 92, 96 S. Ct. 316, 46 L. Ed. 2d 228 (1975).

Here, DeBorba, a gun enthusiast who possessed numerous firearms and maintained a workbench in his bedroom for assembling firearms, had fair notice that he possessed an object that was intended to "silence, muffle, or diminish" the sound of a firearm.

First, when the silencer was found, it was located with many other firearms accessories in DeBorba's bedroom workbench, and it was clearly labelled as a "suppressor." The item was found in the box pictured below:



Opposition to Motion to Dismiss Count 7 - 12
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

The labelling of the item as a "suppressor," a common term for a silencer, demonstrates both that it is intended for use in diminishing the sound of a firearm, and that DeBorba was aware of this purpose. Combined with the fact that DeBorba is clearly knowledgeable about firearms, as indicated by his home workshop and possession of numerous firearms, firearms parts, firearms tools, and firearms accessories, DeBorba's knowledge of the purpose of the device can be scarcely doubted. A reasonable person in DeBorba's position would not have to "guess" whether the silencer found at his home qualified as a silencer—based on the circumstances, the metal cylinder's clear function was to silence a gun.

Second, the Bureau of Alcohol, Tobacco, Firearms and Explosive's ("ATF") examination of the device confirms this. According to the ATF report (defendant's Exhibit K), the device created an expansion chamber that generally causes a reduction in the sound pressure level from a gunshot, had a hole in both the front and read end-caps to allow a bullet to pass through, and had threading at the rear end-cap to allow it to be threaded onto the barrel of a firearm. Furthermore, it had an inline fuel filter element consistent with the type that have been patented to, and have been confirmed by ATF testing to, function as a silencer. Indeed, ATF testing of the device confirmed it diminished the sound from firing a gunshot. Exhibit K at 3-6.

These facts confirm that someone in DeBorba's position would know that the device found in his bedroom functioned to "silence, muffle, or diminish," and thus qualified as a "silencer" within the meaning of Section 921(a)(24).

Because the definition of "silencer" is clear and easy to apply to factual scenarios such as this, it has been upheld against vagueness challenges. *See, e.g., United States v. Alexander*, 480 F.Supp. 3d 988, 997-1000 (N.D. Cal. Aug. 19. 2020); *United States v. Barr*, No. 4:17-CR-0038-HLM-WEJ, 2019 U.S. Dist. LEXIS 119818 (N.D. Ga. May 21, 2019). In light of the facts, DeBorba's claims that the definition of "silencer" is ambiguous is no more persuasive here than in *Alexander* or *Barr*.

Opposition to Motion to Dismiss Count 7 - 13
United States v. DeBorba / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

### B. Facial Challenge

Traditionally, void-for-vagueness challenges to statutes not threatening First Amendment interests are judged on an as-applied basis. Objections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk. Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand. *Maynard v. Cartwright*, 486 U.S. 356, 361 (1998).

DeBorba argues that a facial challenge is nevertheless appropriate because of recent Supreme Court cases allowing facial challenges to so-called "residual clauses" included in the statutory definitions of "violent felony" and "crime of violence." *See Johnson v. United States*, 576 U.S. 591 (2015); *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018). However, the Ninth Circuit has held that neither *Johnson* nor *Dimaya* allow courts to "cast aside the longstanding rule that a litigant whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness challenge." *Kashem v. Barr*, 941 F.3d 358, 376 (9th Cir. 2019). In doing so, the court stated that the residual clauses were atypical and did not lend themselves to an as-applied analysis because they did not allow a court to consider the circumstances of a case, and thus the residual clauses presented "exceptional circumstances." *Id.* Those exceptional circumstances are not present here—an as-applied analysis is possible based on the factual circumstances of the case as explained above. There is no reason to depart from the rule that a person to whom a provision clearly applies cannot raise a facial vagueness challenge. *Alexander*, 480 F.Supp. at 999-1000 (following *Kashem* in declining to reach facial challenge to definition of "silencer.")

### C. ATF Rulemaking Has Not Rendered the Definition of "Silencer" Vague

DeBorba makes two incorrect claims about the definition of "silencer" in arguing that the definition is vague. First, he falsely claims, based on a technical bulletin from

Opposition to Motion to Dismiss Count 7 - 14
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

2017, that ATF previously exempted devices marketed as "solvent traps" from the definition of "silencer," then reversed course in a rule adopted in 2022. This is not the case. As explained in the 2017 bulletin, the determination of whether a device is a firearm silencer is based on the intended use of the device. ATF, Technical Bulletin 17-02: "Solvent Traps" at 1, *available at* https://www.gunowners.com/images/pdf/ATF_Tech_Bulletin_17-02_Solvent_Traps.pdf. And as explained in the ATF's examination report, "solvent traps" are simply devices intended for use as firearm silencers but frequently misrepresented as having another use in a thinly veiled attempt to skirt the regulations governing the manufacture, sale, and transfer of silencer. Exhibit K at 6. ATF did nothing to change the statutory definition of silencer between 2017 and 2022; the definition still hinges on intended use. As explained in the 2022 rule:

> With regard to certain items marketed as ''solvent traps,'' the definition of ''firearm silencer'' in 18 U.S.C. 921(a)(24)[6] means ''any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.'' A so-called ''solvent trap'' that has been indexed for the purpose of allowing the end user to drill a hole for the passage of a projectile to diminish the report of a portable firearm is intended only for use in fabricating a silencer. It is, by definition, a ''firearm silencer'' without regard for the definition of the term ''readily'' or the application of the term ''may readily be converted.''

87 FR 24700. Thus, the definition of "silencer" was not altered; purported "solvent traps" have always been subject to the rule that they meet the definition of silencer if their intended use is to be affixed to a firearm in order to diminish the sound from the discharge of a bullet.

Second, the adoption of 27 C.F.R. § 478.11 similarly did nothing to alter the definition of "silencer." That regulation defined "complete muffler or silencer device," and was adopted to clarify for manufacturers, over whom ATF has regulatory authority,

---

[6] The definition of silencer now resides unchanged at 18 U.S.C. § 921(a)(25).

Opposition to Motion to Dismiss Count 7 - 15
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  when they need only mark a single part with a serial number and when they must mark
2  individual parts. 87 FR 24662, 24664, 24728. This rule did nothing to change the
3  statutory definition of "silencer."
4       And nothing about the rules as applied to so-called "solvent traps" render the
5  definition of "silencer" vague, either facially or as applied to DeBorba. Indeed, the device
6  DeBorba possessed simply could not act as a "solvent trap" to collect solvent or debris,
7  because it has a hole on each end cap. *See* Exhibit K and photo below:



21  Such a device is not capable of "trapping" or collecting solvent. Rather, owing to the
22  threading on one end-cap, the device was designed to affix to a threaded barrel of a
23  firearm, rendering it capable of sound suppression *See generally* Exhibit K. Indeed, even
24  with the interior baffles removed, the device diminished the report of a gunshot
25  significantly when test-fired by ATF. Thus, the intended use of the device is clear. Just as
26  in *Alexander* and *Barr*, DeBorba's vagueness challenge must fail.
27

Opposition to Motion to Dismiss Count 7 - 16
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

### VI. Conclusion

For the reasons set forth above, the government respectfully requests the Court deny DeBorba's motion to dismiss Count 7.

DATED this 2nd day of November, 2023.

Respectfully submitted,

TESSA M. GORMAN
Acting United States Attorney

*Max B. Shiner*
MAX B. SHINER
Assistant United States Attorney
1201 Pacific Ave., Suite 700
Tacoma, WA 98402
Telephone:  (253) 428-3822
Fax:  (253) 428-3826
E-mail:  max.shiner@usdoj.gov

Opposition to Motion to Dismiss Count 7 - 17
*United States v. DeBorba* / CR 22-5139-DGE

UNITED STATES ATTORNEY
1201 PACIFIC AVE., SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800