2023 WL 8587869
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas, El Paso Division.

UNITED STATES of America,

v.

(1) Antonio SING-LEDEZMA, Defendant.

CAUSE NO. EP-23-CR-823(1)-KC

|

Signed December 10, 2023

|

Entered December 11, 2023

**West Codenotes**

**Held Unconstitutional**

[18 U.S.C.A. § 922(g)(5)(A)](#)

**Attorneys and Law Firms**

Catherine S. Dos Santos, U.S. Attorney's Office, El Paso, TX, Patricia Josefina Acosta, [Stanley Michael Serwatka](#), Assistant United States Attorney, El Paso, TX, for United States of America.

[Eduardo Solis](#), Law Offices of Eduardo Solis, P.L.L.C., El Paso, TX, for Defendant.

### ORDER

[Kathleen Cardone](#), Judge

 **\*1**  On this day, the Court considered Defendant Antonio Sing-Ledezma's Motion to Quash Counts One, Three, and Four of the Indictment ("Motion"), ECF No. 23. [1] For the reasons below, the Motion is **GRANTED** in part and **DENIED** in part.

[1]  More than three months after filing his Motion, Sing-Ledezma filed a Reply, ECF No. 42, in which he withdrew his challenge to Count Three of the Indictment with no explanation. Reply 1.

### I. BACKGROUND

On March 31, 2023, El Paso Police Department officers heard gunshots and soon after "observed a blue Chevrolet Malibu sedan ... driving erratically."[2] Compl. 2, ECF No. 1. The officers pulled the car over and spoke to the driver, "who at the time identified himself as 'Ramiro Sing.' " *Id.* Officers soon discovered after scanning the driver's fingerprints that "Ramiro Sing" was in fact Antonio Sing-Ledezma, a Mexican citizen. *Id.* at 2–3. Sing-Ledezma informed the officers that he had been shot, and officers saw "a bullet hole [i]n the driver's side door." *Id.* at 2. Sing-Ledezma got out of the car and officers patted him down for weapons. *Id.* Officers requested a K9 unit, which sniffed the exterior of the car and "alerted to the smell of narcotics." *Id.* Sing-Ledezma then attempted to get back into the car but was stopped by officers. *Id.* Officers asked Sing-Ledezma who shot him, but he "became uncooperative and was then placed in handcuffs." *Id.* Officers then asked Sing-Ledezma if he "had anything illegal on him, to which Sing-Ledezma [responded] that there was a glass pipe inside his left jacket pocket." *Id.* Officers searched Sing-Ledezma's person and found a round of Federal .380 caliber ammunition inside his left jacket pocket. *Id.* An officer "asked Sing-Ledezma if he had anything else on him," and he replied that he had marijuana in his pocket. *Id.* Officers searched the car

and found marijuana, eleven rounds of Federal .380 caliber ammunition, "and a Bersa pistol, model Thunder 380, .380 caliber, with an obliterated serial number." *Id.* After searching the surrounding area, officers found five "spent Federal .380 caliber casings matching the ammunition caliber and manufacturer found" in Sing-Ledezma's car and jacket pocket. *Id.* A criminal history check revealed that Sing-Ledezma had previously pleaded guilty to Improper Entry by an Alien, 8 U.S.C. § 1325, and after being ordered removed, last left the United States on December 31, 2016. *Id.* at 2–3. "Further immigration record checks indicate[d] Sing-Ledezma ha[d] not applied for, nor received permission from the Attorney General or Secretary of Homeland Security to reapply for admission into the United States." *Id.* at 3. Finally, investigators determined "that Sing-Ledezma had an outstanding homicide arrest warrant out of Mexico." *Id.*

[2]   The Court recites the facts alleged in the Complaint for context only, making no finding as to their veracity.

On May 3, 2023, Sing-Ledezma was indicted on four counts: (1) being an unlawfully present alien in possession of a firearm in violation of 18 U.S.C. § 922(g)(5)(A); (2) illegal reentry in violation of 8 U.S.C. § 1326(a); (3) being an unlawfully present alien in possession of ammunition in violation of 18 U.S.C. § 922(g)(5)(A); and (4) knowingly possessing a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k). Indictment 1–2, ECF No. 11.

**\*2**  On August 2, 2023, Sing-Ledezma moved to quash Counts One, Three, and Four of the Indictment, arguing that the statutes under which he is charged are facially unconstitutional because they violate the Second Amendment. *See* Mot 2–3. The Government filed its response to Sing-Ledezma's Motion on August 21, 2023. Resp. to Def.'s Mot. Quash Counts One, Three, & Four of Indictment ("Resp."), ECF No. 29. On November 19, 2023, with leave of the Court, Sing-Ledezma filed his Reply, ECF No. 42, in which he withdraws his challenge to Count Three. Reply 1.

## II. STANDARD

Federal Rule of Criminal Procedure 12 allows a party to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Under this Rule, a defendant may allege pretrial that there is "a defect in the indictment," such as "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). A court may rule on a pretrial motion to dismiss all or part of an indictment when the indictment's alleged infirmity "is essentially one of law." *United States v. Guthrie*, 720 F. App'x 199, 201 (5th Cir. 2018) (quoting *United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011)). Indeed, where " 'a question of law is involved, ... consideration of the motion is generally proper.' " *Id.* (quoting *Fontenot*, 665 F.3d at 644).

## III. ANALYSIS

The constitutional questions Sing-Ledezma raises do not require the Court to resolve any fact disputes and are appropriate for resolution at this stage of the proceedings. *See United States v. Valencia*, No. 17-CR-882-DAE(1)(2), 2018 WL 6182755, at \*2 (W.D. Tex. Nov. 27, 2018) (collecting cases). He argues that the firearms statutes under which he is charged are facially unconstitutional under the Second Amendment of the United States Constitution, following *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111, 213 L.Ed.2d 387 (2022). Mot. 1–5.

### A. *Bruen*'s two-step framework

The Second Amendment enshrines "the people['s]" right "to keep and bear Arms." [3] But "the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). In *Bruen*, the Supreme Court rejected the then-predominant " 'two-step' framework" used to define the scope of the Second Amendment's protections "that combine[d] history with means-end scrutiny." 142 S. Ct. at 2125–26.

[3]   "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

In its place, the Supreme Court adopted a different two-step framework. Under *Bruen*, when the text of the Second Amendment "covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. Then, "[t]o justify its regulation, .... the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*; *United States v. Daniels*, 77 F.4th 337, 341–42 (5th Cir. 2023) (explaining that, at the second step, a court must determine whether the Government has borne "its heavy burden" of proving the existence of a " 'tradition' [of] well-accepted limits on the right to bear arms manifested by a tangible practice of comparable gun regulations"). Only then "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " [4] *Bruen*, 142 S. Ct. at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 n.10, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961)).

[4] The Government bears the burden of proving a historical tradition of sufficiently analogous laws. *Bruen*, 142 S. Ct. at 2130. And the Court need not "engage in 'searching historical surveys,' " as it is "entitled to decide [the] case based on the historical record compiled by the parties." *Id.* at 2130 n.6. Here, the Court engages with history, but only to the extent necessary to evaluate whether the laws cited by the Government, taken together, show a sufficiently "well-established and representative historical analogue" to uphold the challenged laws. *Id.* at 2133.

*3 Before beginning this analysis, the Court pauses to join the choir of lower courts urging the Supreme Court to resolve the many unanswered questions left in *Bruen*'s wake. *See, e.g., Daniels*, 77 F.4th at 358 (Higginson, J., concurring) ("[C]ourts, operating in good faith, are struggling at every stage of the *Bruen* inquiry."). In the estimate of one legal scholar who reviewed more than 300 decisions applying *Bruen*, "lower courts have received *Bruen*'s message to supercharge the Second Amendment, but they have not yet located its Rosetta Stone. Their collective decisions in the months since the ruling have been scattered, unpredictable, and often internally inconsistent." Jacob D. Charles, *The Dead Hand of a Silent Past:* Bruen, *Gun Rights, and the Shackles of History*, 73 Duke L.J. 67, 78 (2023). Against this backdrop of uncertainty, the Court "applie[s] *Bruen* as well as possible in evaluating the constitutionality of" the gun laws that Sing-Ledezma is charged with violating. *See Daniels*, 77 F.4th at 358 (Higginson, J., concurring).

### B. 18 U.S.C. § 922(k)

#### 1. *Bruen* step one: The Second Amendment does not cover the conduct of possessing a firearm with an obliterated serial number.

Sing-Ledezma seeks dismissal of the charge that he possessed a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k). Reply 22–35. Beginning with *Bruen*'s first step, the Court considers whether § 922(k) criminalizes conduct that lies at the heart of the Second Amendment's protections. *See Bruen*, 142 S. Ct. at 2126. The Second Amendment right to "keep and bear arms" plainly encompasses the right to *possess* arms. *See United States v. Rahimi*, 61 F.4th 443, 454 (5th Cir. 2023) ("The amendment grants him the right 'to keep' firearms, and 'possession' is included within the meaning of 'keep.' " (citing *Bruen*, 142 S. Ct. at 2134–35)). And Section 922(k) prohibits the knowing possession of a firearm with "knowledge that the serial numbers on [the] firearm have been altered or removed, as of the time of the possession." *United States v. Hooker*, 997 F.2d 67, 72 (5th Cir. 1993). But § 922(k)'s prohibition does not reach all firearms; only those with obliterated serial numbers.

In *Heller*, the Supreme Court considered the types of weapons protected by the Second Amendment. 554 U.S. at 624–25, 128 S.Ct. 2783. It concluded that, in accordance "with the historical understanding of the scope of the right," "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625, 128 S.Ct. 2783; *id.* at 623, 128 S.Ct. 2783 ("[T]he Second Amendment right, whatever its nature, extends only to certain types of weapons."). In other words, the "arms" protected by the Second Amendment are "the sorts of weapons ... 'in common use at the time.' " *Id.* at 627, 128 S.Ct. 2783.

The *Bruen* Court reaffirmed this principle: "[T]he Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.' " *Bruen*, 142 S. Ct. at 2143 (quoting

*Heller*, 554 U.S. at 627, 128 S.Ct. 2783); *see also id.* at 2162 (Kavanaugh, J., concurring) (commenting that under the Supreme Court's prior precedents, "the Second Amendment allows a 'variety' of gun regulations," including restricting possession to firearms "in common use"). The Fifth Circuit, too, has signaled the continuing vitality of the "common use" limitation on the scope of the Second Amendment, post-*Bruen*. See *Rahimi*, 61 F.4th at 454 (finding it "undisputed that the types of firearms that Rahimi possessed [were] 'in common use,' such that they [fell] within the scope of the amendment" (citing *Bruen*, 142 S. Ct. at 2143)).

The vast majority of lower courts that have considered § 922(k)'s constitutionality since *Bruen* have upheld the law as constitutional because firearms with obliterated serial numbers are not "in common use" and not used "by law-abiding citizens for lawful purposes," thus falling into the category of "dangerous and unusual weapons" that the Second Amendment does not protect. *See, e.g., United States v. Avila*, No. 22-cr-224, ––– F.Supp.3d ––––, ––––, 2023 WL 3305934, at *5 (D. Colo. May 8, 2023) (collecting cases); *United States v. Trujillo*, No. 21-cr-1422, ––– F.Supp.3d ––––, ––––, 2023 WL 3114387, at *4 (D.N.M. Apr. 26, 2023), *appeal dismissed*, No. 23-2080, 2023 WL 5093358 (10th Cir. Aug. 9, 2023) ("The Court holds that the conduct proscribed by § 922(k) is not protected by the text of the Second Amendment because the type of firearms prohibited by § 922(k) are not those typically possessed by law-abiding citizens for lawful purposes."); *United States v. Walter*, No. 20-cr-39, 2023 WL 3020321, at *5 (D.V.I. Apr. 20, 2023) ("Consistent with *Heller* and *Bruen*, the Court finds that firearms with obliterated serial numbers are not typically used by law-abiding citizens for lawful purposes." (citing *United States v. Reyna*, No. 21-cr-41, 2022 WL 17714376, at *5 (N.D. Ind. Dec. 15, 2022))); *United States v. Holton*, 639 F. Supp. 3d 704, 710–11 (N.D. Tex. 2022) ("This Court does not believe that a law requiring serial numbers on firearms infringes on the right to keep and bear arms."). *But see United States v. Price*, 635 F. Supp. 3d 455, 460 (S.D. W. Va. 2022) (concluding that § 922(k) is "a blatant prohibition on possession" and that "[t]he conduct prohibited by Section 922(k) falls squarely within the Second Amendment's plain text").

*4  The Court finds these decisions persuasive. The Government states that defacing a serial number is a difficult task that, when completed, reduces the gun's value. Resp. 24. Thus, the Government argues, the only conceivable purpose for defacing a serial number is to make it difficult for law enforcement to trace the firearm. *Id.* For his part, "Defendant has failed to identify any potential lawful purpose served by removing a firearm's serial number, and the Court cannot conceive of one." See *Trujillo*, ––– F.Supp.3d at ––––, 2023 WL 3114387, at *4. Because § 922(k) prohibits only the possession of "highly unusual" weapons, it falls outside the ambit of the Second Amendment's protection. *See Bruen*, 142 S. Ct. at 2143.

### 2. *Bruen* step two: Section 922(k) is consistent with the Nation's historical tradition of firearm regulation.

The Court agrees with the lower courts that have found § 922(k) constitutional at *Bruen* step one. But even if the law does regulate conduct covered by the plain text of the Second Amendment, Sing-Ledezma's challenge to § 922(k) also fails at step two.

The Supreme Court has recognized that there is a longstanding "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Heller*, 554 U.S. at 625 & n.25, 627, 128 S.Ct. 2783; *see Bruen*, 142 S. Ct. at 2128, 2143. And the Government has "identif[ied] historical regulations, like § 922(k), that served to control and trace the sale of firearms and 'impose[d] a comparable burden on the right of armed self-defense.' " *Trujillo*, ––– F.Supp.3d at ––––, 2023 WL 3114387, at *5.

As one district court explained:

> The purpose of the Gun Control Act of 1968, which enacted § 922(k), "is to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence." Section 922(k) furthers the Act's purpose by "aim[ing] to punish one who possesses a firearm whose principal means of tracing origin and transfers in ownership—its serial number—has been deleted or made appreciably more difficult to make out." Section 922(k) "assist[s] law enforcement by making it possible to use the serial number of a firearm recovered in a crime to trace and identify its owner and source."

*Id.* (citations omitted).

The Government cites Colonial laws from the seventeenth, eighteenth, and nineteenth centuries regulating the manufacture, inspection, marking, and transportation of gunpowder and firearms. Resp. 25–29. Those laws, the Government argues, establish a historical tradition of restricting possession and trade of firearms between certain parties, and were "designed to keep firearms out of the hands of those who might be dangerous," "to protect citizens from explosions[,] and to allow unsafe barrels or powder to be traced to the inspector who first affixed the markings." Resp. 29. "Section 922(k) serves similar purposes," the Government argues, "by allowing authorities to recover stolen firearms and trace firearms that have been used in a crime." *Id.* In that way, § 922(k) "imposes a 'comparable burden' that is 'comparably justified.'" *Id.*

Defendant argues that these laws do not suffice because "*federal serial number* firearm regulation is not moored in the [N]ation's firearm history and tradition." Reply 30 (emphasis added) (citing *Price*, 635 F. Supp. 3d at 464). Assuming Defendant is correct that firearms were not required to carry serial numbers in the Founding era, that fact is not determinative. Under *Bruen*, there need not be a historical tradition of identical regulations—a sufficiently analogous historical tradition suffices. 142 S. Ct. at 2130. The regulations cited by the Government, although not identical in motivation or method, share distinct similarities with § 922(k): they require firearms to bear a nonintrusive permanent marking to convey their safety and help authorities trace responsible parties if they later cause harm. *See United States v. Marzzarella*, 614 F.3d 85, 98–99 (3d Cir. 2010), *abrogated in part by Bruen*, 142 S. Ct. at 2126; *Trujillo*, ––– F.Supp.3d at –––– – ––––, 2023 WL 3114387, at *5–6; *Holton*, 639 F. Supp. 3d at 711–12. The distinction between serial numbers and other such nonintrusive permanent markings splits too fine a hair. *See Bruen*, 142 S. Ct. at 2133 (disclaiming necessity of "a historical twin").

***5** In sum, at both step one and step two, Sing-Ledezma's challenge to § 922(k) fails.[5] Section 922(k) is a constitutional restriction on the right to bear arms. Accordingly, Sing-Ledezma's Motion is denied as to Count Four.

[5] The Government also argues that Sing-Ledezma is not part of "the people" protected by the Second Amendment, Resp. 7, but the Court does not reach that argument as to § 922(k) because even if the Second Amendment protects Sing-Ledezma, it does not protect the right to possess a firearm with an obliterated serial number, for the reasons discussed above.

### C. 18 U.S.C. § 922(g)(5)(A)

Sing-Ledezma next argues that Count One must be dismissed because § 922(g)(5)(A) is facially unconstitutional. Mot. 2–3.

**1. *Bruen* step zero: Whether the Second Amendment protects Sing-Ledezma as an individual turns on whether there is a historical tradition of disarming unlawfully present aliens, which the Court considers at *Bruen* step two.**

The Government first argues that the Second Amendment does not protect Sing-Ledezma because he is an unlawfully present alien. Resp. 4–11. In essence, the Government appears to engage in what the Fifth Circuit has called *Bruen*'s "threshold question," wherein courts consider whether the Second Amendment applies to the defendant at all, due to some aspect of their personal characteristics. *See Daniels*, 77 F.4th at 342. The Court refers to this inquiry as *Bruen* step zero.[6]

[6] *See* Jeff Campbell, *There is No* Bruen *Step Zero: The Law-Abiding Citizen and the Second Amendment*, 26 UDC/DCSL L. Rev. 71, 78 (2023) ("[S]ome courts employ *Bruen* Step Zero before the text-and-history test. They first ask whether a person is 'law-abiding' as a threshold question; if the court decides the answer is no, the analysis stops there.").

This preliminary analysis comes from dicta in *Heller* and *Bruen*, in which the Court described the Second Amendment as protecting "law-abiding, responsible citizens," or "ordinary, law-abiding citizens." *See Rahimi*, 61 F.4th at 451 (citations omitted). Applying these dicta, some courts first consider whether the defendant is part of "the people" entitled to Second

Amendment protection. *See, e.g., United States v. Young*, 639 F. Supp. 3d 515, 523 (W.D. Penn. 2022) ("[C]onvicted felons are not part of 'the people' protected, without reaching historical analysis.").

"[T]here is some debate over the extent to which the Court's 'law-abiding' qualifier constricts the Second Amendment's reach." *Rahimi*, 61 F.4th at 451 (citations omitted). But the Fifth Circuit has now twice held that *Heller* and *Bruen*'s "reference to 'law-abiding, responsible' citizens ... exclude[s] from the Court's discussion groups that have historically been stripped of their Second Amendment rights, i.e., groups whose disarmament the Founders 'presumptively' tolerated or would have tolerated." *Id.* at 452; *Daniels*, 77 F.4th at 343 ("[A]s a general rule, limitations on the Second Amendment come from the traditionally understood restrictions on the right to bear arms ....").

Under the Fifth Circuit's interpretation, then, whether Sing-Ledezma as an individual is protected by the Second Amendment depends on whether he "fall[s] into any group that has 'historically been stripped of their Second Amendment rights.' " *See United States v. Allam*, No. 23-CR-10, ––– F.Supp.3d ––––, ––––, 2023 WL 5846534, at *5 (E.D. Tex. 2023) (quoting *Rahimi*, 61 F.4th at 452); *see also Daniels*, 77 F.4th at 343 ("All others [beside those who were historically stripped of their Second Amendment rights] are presumptively included in the Second Amendment's ambit.").

 *6  For the purposes of Sing-Ledezma's challenge to the constitutionality of § 922(g)(5)(A), the step zero analysis and the step two analysis are functionally identical, collapsing into a single inquiry. At step zero, Sing-Ledezma may be entirely excluded from the Second Amendment's protections because he is an unlawfully present alien only if there is a historical basis for stripping unlawfully present aliens of their Second Amendment rights. *See Daniels*, 77 F.4th at 343. And at step two, § 922(g)(5)(A)'s categorical prohibition on the possession of firearms by unlawfully present aliens only survives constitutional scrutiny if such prohibitions are found in the country's "historical tradition of firearm regulation." *See Bruen*, 142 S. Ct. at 2126. Accordingly, the Court analyzes this issue—whether there is a historical tradition of disarming unlawfully present aliens—only once, below, at *Bruen*'s second step.

The Government also appears to suggest that the Second Amendment does not protect Sing-Ledezma at the outset, under *United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011). Resp. 6–7, 10. In that case, the Fifth Circuit held that "[w]hatever else the term means or includes, the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States." *Portillo-Munoz*, 643 F.3d at 442.

But that holding, together with the rest of the Fifth Circuit's pre-*Bruen* body of Second Amendment caselaw, has been abrogated. "*Bruen* clearly 'fundamentally change[d]' [the] analysis of laws that implicate the Second Amendment, rendering [the Fifth Circuit's] prior precedent obsolete." *Rahimi*, 61 F.4th at 450–51 (first alteration in original) (citations omitted). Because the Court can no longer "rel[y] reflexively on pre-*Bruen* caselaw," the Government's invocation of *Portillo-Munoz* is unavailing. *See Daniels*, 77 F.4th at 355 n.44.

### 2. *Bruen* step one: The Second Amendment covers Sing-Ledezma's conduct, possession of a firearm.

At *Bruen*'s first step, the Court considers whether the challenged law regulates conduct protected by the Second Amendment. 142 S. Ct. at 2129–30. Section 922(g)(5)(A) prohibits the possession of firearms and ammunition. As stated above in connection with the § 922(k) analysis, "[t]he amendment grants ... the right 'to keep' firearms, and 'possession' is included within the meaning of 'keep.' " *Rahimi*, 61 F.4th at 454 (citing *Bruen*, 142 S. Ct. at 2134–35) (cleaned up); *see also Luis v. United States*, 578 U.S. 5, 26, 136 S.Ct. 1083, 194 L.Ed.2d 256 (2016) (Thomas, J., concurring) ("The right to keep and bear arms ... 'implies a corresponding right to obtain the bullets necessary to use them.' " (quoting *Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014))). Section 922(g)(5)(A) thus regulates conduct covered by the text of the Second Amendment.

The Government appears to argue that Sing-Ledezma's challenge to the § 922(g)(5)(A) count fails at *Bruen*'s first step, because the Second Amendment does not cover the "conduct" of being an unlawfully present alien in possession of a firearm. Resp. 6–

7. This attempt to reframe the conduct prohibited by § 922(g)(5)(A) from "possession" to "possession by an unlawfully present alien" is unavailing under *Rahimi* and *Daniels.*

In each of those cases, the defendants challenged laws criminalizing possession of a firearm by a particular class of people. In *Rahimi*, the defendant was charged with violating § 922(g)(8), which prohibits possession of a firearm by anyone who is subject to a domestic violence restraining order. *Rahimi,* 61 F.4th at 448–49. At step one, the court found the "conduct" at issue, "possession of firearms," was plainly protected by the Second Amendment. *Id.* at 452 (citation omitted). Then the court continued to *Bruen*'s second step and ultimately struck down § 922(g)(8) as unconstitutional because it lacked an analogous historical tradition. *Id.* at 461.

\*7  Similarly, in *Daniels*, the defendant was charged with violating § 922(g)(3), which prohibits possession of a firearm by one "who is an unlawful user of or addicted to any controlled substance." *Daniels,* 77 F.4th at 340 (quoting 18 U.S.C. § 922(g)(3)). The court said little about Daniels's conduct at step one, appearing to assume the law infringed his right to possess firearms. *See id.* at 342–43. The *Daniels* and *Rahimi* courts thus implicitly rejected any recasting of prohibited conduct in the mold of the group barred from possession. Both statutes prohibited possession, full stop—not possession by drug users or possession by domestic abusers.

Here too, the regulated conduct is possession—not possession by an unlawfully present alien. *See United States v. Quiroz,* 629 F. Supp. 3d 511, 516 (W.D. Tex. 2022) (rejecting a similar argument). That conduct is plainly protected by the Second Amendment, so the Court proceeds to step two.

### 3. *Bruen* step two: Section 922(g)(5)(A) is not consistent with the Nation's historical tradition of firearm regulation.

Turning to *Bruen*'s second step, the Court must consider whether § 922(g)(5)(A) "is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. The Government argues that § 922(g)(5)(A) is "sufficiently analogous to early gun restrictions to support a conclusion that the [prohibition on] possession of firearms by unlawful noncitizens is part of this country's historical tradition and is therefore protected under the Second Amendment." Resp. 16.

Determining whether the Government has proffered an analogous historical tradition to the challenged law depends in part on whether the problem motivating the law's enactment was a problem that existed at the Founding. *See Bruen,* 142 S. Ct. at 2131. If the problem existed at the Founding, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.*; *Daniels,* 77 F.4th at 342 (stating that, if a regulation "addresses 'a general societal problem that has persisted since the 18th century,' " there must be a "distinctly similar historical regulation addressing that problem" (quoting *Bruen,* 142 S. Ct. at 2131)). The same holds true when "earlier generations addressed the societal problem, but did so through materially different means." *Bruen,* 142 S. Ct. at 2131.

But when the problem motivating the law is *not* one the Founding generation experienced, courts must engage in analogical reasoning: "[D]etermining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.' " *Id.* at 2132. "Relevantly similar" laws are those that "share a common 'why' and 'how'; they must both address a comparable problem (the 'why') and place a comparable burden on the rightsholder (the 'how')." *Daniels,* 77 F.4th at 342 (citing *Bruen,* 142 S. Ct. at 2132–33); *Bruen,* 142 S. Ct. at 2133 ("[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are " 'central' " considerations when engaging in an analogical inquiry." (quoting *McDonald v. Chicago,* 561 U.S. 742, 767, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010))).

When undertaking this inquiry, courts must proceed with caution and "should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.' " *Bruen,* 142 S. Ct. at 2133 (alteration in original) (quoting *Drummond v. Robinson,* 9 F.4th 217, 226 (3d Cir. 2021)). But neither

should courts demand a "historical *twin*." Id. The historical regulation need only be "a well-established and representative historical *analogue*." Id.

**\*8** Because this inquiry requires the Court to compare the means and purposes of the challenged law to those of its antecedents, the Court begins with a discussion of how and why § 922(g)(5)(A) regulates firearm possession. Starting with § 922(g)(5)(A)'s means, the law creates an outright ban on all firearm possession. It bars possession of any firearm, for any purpose, anywhere, at any time. Under § 922(g)(5)(A), unlawfully present aliens may not possess a firearm to defend themselves, their families, or their homes, nor to hunt or use recreationally.

As for its purpose, § 922(g)(5)(A) was enacted as part of the Firearm Owners Protection Act of 1986. Upon the Act's introduction as a bill, Senator McClure explained that its purpose was to "correct demonstrated abuses in present law" by "focus[ing] law enforcement on the kinds of Federal firearms law violations most likely to contribute to violent firearms crime." 131 Cong. Rec. 24 (1985) (statement of Sen. McClure); *see also A Bill to Protect Firearms Owners' Constitutional Rights, Civil Liberties, and Rights to Privacy: Hearing on S. 914 Before the S. Comm. on the Judiciary*, 98th Cong. 4 (1983) (statement of Sen. Orrin Hatch) (describing a nearly identical bill's purpose as "correct[ing] a few flaws in the federal firearms laws that have hampered enforcement"). An earlier law, passed as part of the Gun Control Act of 1968, prohibited possession of firearms by "illegal aliens," but that law was eliminated when the 1986 Act combined the earlier law's prohibitions on certain categories of persons possessing firearms with a then-shorter § 922 to eliminate the confusion created by conflicting statutes. *See* 131 Cong. Rec. 16988 (1985) (statement of Sen. Hatch) ("Current law contains two provisions prohibiting certain persons from exercising firearm ownership rights.... [The bill] consolidates and reconciles the conflicting provisions. Seven classes—felons, fugitives, drug abusers, incompetents, illegal aliens, dishonorably discharged, citizenship renouncers—are prohibited from firearm possession, shipment, transportation, or receipt.").

In defense of § 922(g)(5)(A), the Government submits evidence of historical gun regulations that, it argues, prohibited gun possession in similar ways for similar reasons. *See* Resp. 13–19. These laws come mainly from two time periods: "early modern England" and "the American Colonies and the early Republic." *See Bruen*, 142 S. Ct. at 2135.

### a. Early modern England

The Government begins its argument with the protection against Protestant disarmament in the English Bill of Rights,[7] which "has long been understood to be the predecessor to our Second Amendment." Resp. 13 (quoting *Heller*, 554 U.S. at 593, 128 S.Ct. 2783). The Government contends that the English Bill of Rights' limitation of the right to bear arms to "Subjects" supports its "conclusion that the Second Amendment was understood to extend the right to bear arms only to citizens—and, indeed, only to specific categories of citizens—at the time of its ratification." Resp. 13. The Court first discusses how best to understand the English Bill of Rights as a facet of the Nation's history and tradition of gun regulation. Then, in that context, the Court finds that the English Bill of Rights' limitation of the right to bear arms to "Subjects" does not share a common method and purpose with § 922(g)(5)(A) and is thus not a relevantly similar historical analogue.

[7]   The English Declaration of Rights was codified as the English Bill of Rights, and the Court refers to it as such throughout the Order. *See Heller*, 554 U.S. at 593, 128 S.Ct. 2783.

**\*9** "[W]hen it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 142 S. Ct. at 2136. Although one can look to English common law as it existed when the Constitution was adopted, "courts must be careful when assessing evidence concerning English common-law rights." *Id.* "English common law 'is not to be taken in all respects to be that of America,' " and "cannot be indiscriminately attributed to the Framers of our own Constitution." *Id.* at 2136, 2139 (quoting *Van Ness v. Pacard*, 27 U.S. (2 Pet.) 137, 144, 7 L.Ed. 374 (1829)); *see also id.* at 2136 ("A long, unbroken line of common-law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived, 14th-century English practice.").

The English Bill of Rights was enacted after a period in which Kings Charles II and James II employed militias to disarm their political opponents, including Protestants. *See Heller*, 554 U.S. at 592–95, 128 S.Ct. 2783 (summarizing history of English Bill of Rights). [8] In relevant part, it reads, "That the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by law." *Heller*, 554 U.S. at 593, 128 S.Ct. 2783 (quoting 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441). This right to bear arms was "not available to the whole population, given that it was restricted to Protestants" and "subjects." *Id.* And unlike the Second Amendment, which applies with equal force against all three branches of government, the English Bill of Rights, "like all written English rights[,]was held only against the Crown, not Parliament." *See id.* at 593, 128 S.Ct. 2783; *id.* at 634, 128 S.Ct. 2783 ("The very enumeration of the [Second Amendment] right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.").

[8]  *But see* Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 56 (2018) (disputing the notion that "James II ever authorize[d] the systematic disarmament of Protestants" and that the English Bill of Rights "protected against this by guaranteeing Englishmen a private right to have and hold arms").

Although the Framers drew inspiration from the English Bill of Rights, the right they enacted is not coextensive with the right contained in the English Bill of Rights. While "[t]he predecessors of the Second Amendment gave concrete language to possible limits on the right to bear arms," "that language was not adopted." *Daniels*, 77 F.4th at 352. "Instead, the People ratified the unqualified directive: 'shall not be infringed.' " *Id.* (quoting U.S. Const. amend. II). And "[u]sually, when the relevant lawmaking body does not adopt language in a draft, we presume that the stricken language was not intended." *Id.* (citing *United States v. Skoien*, 614 F.3d 638, 648 (7th Cir. 2010) (Sykes, J., dissenting)). The Second Amendment is not limited on grounds of subjectship or religion, and is held against the entire government, not particular branches. U.S. Const. amend. II. Given its vastly different scope and strength, the English right cannot be read as "that of America." *Bruen*, 142 S. Ct. at 2139 (quoting *Van Ness*, 27 U.S. at 144); *see also* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 136–37, 140, 162 (1994).

Particularly where, as here, the Government's argument hinges on an aspect of the English Bill of Rights—its limitation of the right to bear arms to subjects—that was not adopted by the Framers of the Second Amendment. The decision to use "the people" instead of "subjects" in the Second Amendment reflects a distinction with a difference. To understand the meaning of such terms in the Founding era, courts often turn to the "preeminent authority on English law for the [F]ounding generation," English jurist William Blackstone. *Heller*, 554 U.S. at 593–94, 128 S.Ct. 2783 (quoting *Alden v. Maine*, 527 U.S. 706, 715, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999)). In his treatise, *Commentaries on the Laws of England*, Blackstone enumerates the relative rights of "persons [who] fall under the denomination of the people." 1 William Blackstone, *Commentaries* *354 (1765). The people, he says, can be divided into three categories: aliens, denizens, and natives or natural-born subjects. *Id.* at *354, *362–63 ("The first and most obvious division of the people is into aliens and natural-born subjects.... A denizen is in a kind of middle state between an alien, and natural-born subject, and partakes of both of them."). That the "people" in the Founding era was likely understood to include "aliens" as well as "natural-born subjects" severely undermines the Government's argument that the English Bill of Rights' subjectship limitation should be read into the Second Amendment. In sum, because the English Bill of Rights used meaningfully different language than the Second Amendment on this issue, it provides a poor basis to determine whether § 922(g)(5)(A) comports with that Amendment. *See Bruen*, 142 S. Ct. at 2139.

### b. The American Colonies and the early Republic

**\*10**  The Government also proffers laws from the American Colonies and early Republic to support § 922(g)(5)(A)'s constitutionality. Before addressing the laws cited by the Government, the Court examines the state of unlawful immigration in the Founding era, to determine the degree of similarity that would be expected to justify § 922(g)(5)(A). *See Bruen*, 142 S. Ct. at 2131.

When the Second Amendment's language was agreed upon in Congress,[9] no federal law regulating naturalization had yet been passed. *See* James H. Kettner, *The Development of American Citizenship, 1608–1870* 213 (1978). The states, not the federal government, enacted and enforced naturalization laws until the first federal naturalization law—the Naturalization Act of 1790. *See* Robert J. Steinfeld, Comment, *Subjectship, Citizenship, and the Long History of Immigration Regulation*, 19 L. & Hist. Rev. 645, 647 (2001); Naturalization Act of 1790, Pub. L. No. 1–3, § 1, 1 Stat. 103 (repealed 1795). And for an even longer period, the notion of illegal immigration did not exist: Immigration was essentially unregulated, such that anyone could come to the United States with their family and personal belongings and take up residence wherever they pleased, although they may have faced different limitations on their ability to remain in the United States or naturalize after they arrived. *See* Michael C. Lemay, *From Open Door to Dutch Door: An Analysis of U.S. Immigration Policy Since 1820*, at 7 (1987) ("With the successful establishment of an independent nation and then its newly revised Constitution in the 1790s, the official policy was to keep its gates open to all."); *see also* John Higham, *American Immigration Policy in Historical Perspective*, 21 L. & Contemp. Problems 213, 215 (1956); *Early American Immigration Policies*, U.S. Citizenship & Imm. Servs, https://www.uscis.gov/about-us/our-history/overview-of-ins-history/early-american-immigration-policies (last updated July 30, 2020) [https://perma.cc/G5Q5-VLM8]; Robbie Totten, *National Security and U.S. Immigration Policy, 1776-1790*, 39 J. Interdisc. Hist. 37, 38 (2008).

[9]  Twelve constitutional amendments were agreed to in Congress on September 25, 1789. *See Bill of Rights*, Ctr. Leg. Archives, Nat'l Archives, https://www.archives.gov/legislative/features/bor [https://perma.cc/E4YH-N2EA]. On December 15, 1791, ten of the twelve amendments, including the Second Amendment, were ratified by the states, thus becoming the Bill of Rights. *See id.*

After the first naturalization law went into effect in 1790, foreigners who arrived in the United States would be deemed aliens until they naturalized, but not *illegal* aliens. *See* Naturalization Act of 1790, Pub. L. No. 1–3, § 1, 1 Stat. 103 (1790). The only immigration regulations that existed at the federal level around the time of the Second Amendment's enactment were three laws promulgated in 1798. The first law lengthened the residency requirements for naturalization, prohibited "alien enemies" from naturalizing, and required free white aliens who resided or arrived in the United States to register with the clerk of the district court within forty-eight hours so the clerk could document their "sex, place of birth, age, nation, place of allegiance or citizenship, condition or occupation, and place of actual or intended residence within the United States." Act of June 18, 1798, Pub. L. No. 5–54, §§ 1, 4, 1 Stat. 566 (repealed 1802). Failure to report oneself was punishable by a penalty, *see id.* § 5, but that law was not enforced and was repealed less than four years later. *See* Nancy Morawetz & Natasha Fernández-Silber, *Immigration Law and the Myth of Comprehensive Registration*, 48 U.C. Davis L. Rev. 141, 149 (2014) ("A few years after passage of the 1798 Act, a newspaper described the registration requirements as a failure, having 'been disregarded both by aliens themselves and by the magistrates of places in which they resided.' ... In response, Congress eliminated the legal requirement that all aliens register in 1802." (citations omitted)). The second law, now known as the "Alien Friends Act," authorized the President to remove aliens "dangerous to the peace and safety of the United States" or whom he had "reasonable grounds to suspect are concerned in any treasonable or secret machinations against the government." An Act Concerning Aliens, Pub. L. No. 5–58, § 1, 1 Stat. 570 (1798). And the third law, the "Alien Enemies Act," authorized the President to remove nonnaturalized aliens from countries with which the United States was actively at war. An Act Respecting Alien Enemies, Pub. L. No. 5–66, § 1, 1 Stat. 577 (1798).

 *11  The United States did not create a more robust process to keep track of arriving immigrants until 1819, when Congress enacted a law requiring that all arriving foreign vessels furnish a list of passengers and their demographic information to the customs collector. An Act Regulating Passenger Ships and Vessels, Pub. L. No. 15–46, § 4, 3 Stat. 488 (1819); *see* LeMay, *From Open Door to Dutch Door*, at 21; *Immigration Records*, Nat'l Archives, https://www.archives.gov/research/immigration/overview (last updated Dec. 2, 2022) [https://perma.cc/6WVJ-CT4B]. Failure to provide a passenger list was punishable by a fine equal to that imposed for failure to provide a list of the ship's cargo. An Act Regulating Passenger Ships and Vessels § 4. The customs collector was then to provide the passenger lists to the Secretary of State quarterly. *Id.* § 5.

The first narrow category of "illegal alien" status was created under the 1798 law, which applied to those who had been removed or ordered to depart and were then found in the United States without having obtained authorization. *See* An Act Concerning Aliens §§ 1–2 (authorizing President to order certain aliens to depart and imposing terms of imprisonment of no more than three years for aliens "found at large within the United States after the time limited in such order for his departure"); *id.* § 2 (imposing term of imprisonment for removed aliens who returned without authorization "so long as, in the opinion of the President, the public safety may require"). But in the early nineteenth century, foreigners who arrived in the United States were not deemed "illegal" upon entry and were not subject to inspection. *See, e.g., id.*

It was not until 1882 that Congress created a category of aliens that it deemed "inadmissible"—"convict[s], lunatic[s], idiot[s], or any person unable to take care of himself or herself without becoming a public charge"—and authorized immigration officials to examine passengers on board arriving vessels to determine whether any were inadmissible. An Act to Regulate Immigration, Pub. L. No. 47–376, § 2, 22 Stat. 214 (1882). Those who crossed into the United States by land border were not documented until the Immigration Act of 1891. *See* Immigration Act of 1891, Pub. L. No. 51–551, § 8, 26 Stat. 1084. And to the extent that entering immigrants were inspected during this time, the inspections were limited to inadmissibility determinations and medical examinations—not inspections of one's belongings, for weapons or otherwise. *Id.* § 8.

In short, there was no concept of illegal immigration when the Bill of Rights was enacted, and only a limited notion of illegal immigration developed during the nineteenth century. During those same periods, immigration to the United States was prolific: nearly the entire population was either an immigrant themselves or descended from a recent immigrant. *See* LeMay, *From Open Door to Dutch Door*, at 7 ("When the [N]ation took its first census, in 1790, it recorded a population of 3,227,000, mostly the descendants of seventeenth- and eighteenth-century arrivals, or recent immigrants themselves."); Totten, *National Security and U.S. Immigration Policy*, at 40 tbl. 1 ("Because the federal government did not keep track of the number of immigrants who entered the country prior to 1820, it is difficult to ascertain how many foreigners arrived during this period, but several scholars have attempted estimates, which range from approximately 250,000 to 534,000 immigrants for varying periods between 1781 and 1819."). So, although "illegal immigration" did not exist when the Second Amendment was ratified in 1791, there had been and continued to be a large influx of foreigners coming to the United States without having been previously vetted and without having their belongings searched or weapons seized. *See* LeMay, *From Open Door to Dutch Door*, at 21.

**\*12** The concern, then, about unknown foreigners stepping onto American soil, potentially with firearms, and certainly with unknown intentions, is not a new one. Because § 922(g)(5)(A) "addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem"—or, instead, the existence of historical laws addressing the problem "through materially different means"—would "be evidence that [§ 922(g)(5)(A)] is unconstitutional." *Bruen*, 142 S. Ct. at 2131.

### i. State ratification convention proposals

With the state of immigration in the Founding era in view, the Court turns to the Colonial and early Republic-era laws proffered by the Government to justify § 922(g)(5)(A) as consonant with the Nation's history of firearm regulation. The first class of historical materials cited by the Government are statements made during state conventions, in which delegates deciding whether to ratify the United States Constitution proposed constitutional amendments linking the right to bear arms to citizenship. In New Hampshire, the delegates proposed an amendment that would prohibit disarmament of "citizens," except those "as are or have been in Actual Rebellion." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 761 (1971). And in Massachusetts, delegates proposed an amendment guaranteeing "peaceable citizens" the right to "keep[ ] their own arms." *Id.* at 681. Both proposals were rejected, and the Constitution, of course, was ratified without a right to bear arms. That right did not appear in the Constitution until ratification of the Second Amendment.

The Government pointed to this same Massachusetts proposal and another proposal from Pennsylvania's convention to try to justify another subsection of § 922(g) in *Rahimi,* 61 F.4th at 457. There, the Fifth Circuit explained that such "proposed

amendments are not reflective of the Nation's early understanding of the scope of the Second Amendment right." *Id.* Although "they were influential proposals, neither became part of the Second Amendment as ratified." *Id.* (citation omitted). So while "the proposals might *somewhat* illuminate the scope of firearm rights at the time of ratification, ... they cannot counter the Second Amendment's text, or serve as an analogue for § 922(g)[(5)(A)] because, *inter alia*, they were not enacted." *Id.* (citing *Bruen*, 142 S. Ct. at 2137) (emphasis added).

If anything, the fact that these proposals were rejected cuts against the Government's contention. When the Bill of Rights was later drafted, the drafters opted instead for the language proposed by delegates from New York, North Carolina, Pennsylvania, Rhode Island, and Virginia, conferring the right not just to citizens, but to "the people." *See The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins* 181–83 (Neil H. Cogan, ed. 1997) (collecting ratification convention proposals). Confronted with similar evidence in *Heller*, the Supreme Court explained that "[i]t is dubious to rely on such history to interpret a text that was widely understood to codify a pre-existing right, rather than to fashion a new one." *Heller*, 554 U.S. at 603, 128 S.Ct. 2783. The majority rejected Justice Stevens' dissenting opinion because, despite citing many state ratification convention proposals, he failed to prove "that different people of the [F]ounding period had vastly different conceptions of the right to keep and bear arms." *Id.* at 604–05, 128 S.Ct. 2783. That view, the Court said, "simply does not comport with our longstanding view that the Bill of Rights codified venerable, widely understood liberties." *Id.* at 605, 128 S.Ct. 2783.

**\*13** Accordingly, the unenacted language from the Massachusetts and New Hampshire conventions is not representative of the Framers' understanding of the Second Amendment and thus does not suffice as a historical basis for § 922(g)(5)(A). *See id.*; *Rahimi*, 61 F.4th at 457.

### ii. State constitutional provisions

The Government next cites several state constitutions for their protection of the right to bear arms, each of which limited the right to "citizens." Resp. 15 (citing *United States v. Perez*, 6 F.4th 448, 462–63 (2d Cir. 2021) (Menashi, J., concurring)). Of these, one was enacted in 1790, [10] one in 1792, [11] and the remaining four were enacted between 1817 and 1819. [12] *See Perez*, 6 F.4th at 463 n.6 (Menashi, J., concurring). But as just discussed, similar amendments to the United States Constitution were proposed by at least two states' delegates and rejected. And "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, 142 S. Ct. at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). Therefore, the citizenship restrictions included in state constitutions but knowingly excluded from the Second Amendment do not inform the latter's meaning. [13]

---

[10] Pa. Const. of 1790, art. IX, § 21 ("That the right of the citizens to bear arms, in defence of themselves and the state, shall not be questioned.").

[11] Ky. Const. of 1792, art. XII, § 23 ("The rights of the citizens to bear arms in defence of themselves and the State shall not be questioned.").

[12] Miss. Const. of 1817, art. I, § 23 ("Every citizen has a right to bear arms in defence of himself and the State."); Conn. Const. of 1818, art. I, § 17 ("Every citizen has a right to bear arms in defense of himself and the state."); Me. Const. of 1819, art. I, § 16 ("Every citizen has a right to keep and bear arms for the common defence; and this right shall never be questioned."); Ala. Const. of 1819, art. I, § 23 ("Every citizen has a right to bear arms in defence of himself and the State.").

[13] Moreover, although the Government cites six state constitutions that limited the right to bear arms to citizens, those states were in the minority at the time. Most states that enacted constitutions containing a right to bear arms between 1776 and 1820 opted *against* limiting the right to citizens. N.C. Const. of 1776, Bill of Rights, § XVII ("That the people

have a right to bear arms, for the defence of the State ...."); Va. Const. of 1776, art. I, § 13 ("That a well-regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free State ...."); Vt. Const. of 1777, ch. 1, art. 15 ("That the people have a right to bear arms for the defence of themselves and the State ...."); Mass. Const. pt. 1, art. 17 ("The people have a right to keep and bear arms for the common defence.") (enacted 1780); Tenn. Const. of 1796, art. XI, § 26 ("That the freemen of this State have a right to Keep and to bear Arms for their common defence."); Ohio Const. of 1802, art. VIII, § 20 ("That the people have a right to bear arms for the defense of themselves and the State ...."); Ind. Const. of 1816, art. I, § 20 ("That the people have a right to bear arms for the defense of themselves, and the State ...."); Mo. Const. of 1820, art. XIII, § 3 ("That the people have the right peaceably to assemble for their common good ... and that their right to bear arms in defence of themselves and of the state, cannot be questioned."). The fact that the citizenship limitation represented a minority view among state constitutions only further undermines the argument that such a limitation should be imported into the Second Amendment.

### iii. Danger-based disarmament

*14 The Government next cites state laws prohibiting Native Americans, Catholics, and British Loyalists from possessing guns to show that there is a historical tradition of limiting the right to bear arms "to those within the political community, i.e., law-abiding citizens." Resp. 14–15, 18. The Fifth Circuit has classed this category of laws "danger-based disarmament" laws. *See Daniels*, 77 F.4th at 354 (describing colonists' perceptions of British Loyalists as "political traitors," Catholics as "potential insurrectionists," and Native Americans and slaves as "minorities who the Founders thought threatened violent revolt"); *accord Rahimi*, 61 F.4th at 457. But the Government's appeal to danger-based laws falls short because § 922(g)(5)(A)'s categorical bar on possession of firearms by any unlawfully present alien sweeps much more broadly than the proffered historical laws, each of which is narrowly tailored towards a particular group with which the United States was in active conflict.

Although the fit between the historical regulations and the modern regulation need not be perfect, it does need to be close. There are several questions a court must ask to determine whether "[a] Founding-era restriction is relevantly similar to the modern one":

> *Why* was the group considered dangerous at the Founding and therefore disarmed? And *why* does the modern law classify a person as presumptively dangerous? Is the comparison supported by the record? Furthermore, *how* did the historical regulation limit the rights of the dangerous class? And *how* does the modern regulation do so?

*Daniels*, 77 F.4th at 354.

The first group of danger-based disarmament laws proffered by the Government are Massachusetts and Virginia laws which "forbade the arming of Native Americans." Resp. 14. Those laws prohibited colonists from selling or providing firearms, ammunition, or gunpowder to Native Americans. *See* Malcolm, *To Keep and Bear Arms*, at 140 ("The Massachusetts general laws of 1648, the Commonwealth's first legal code, made it a crime for anyone to 'directly or indirectly amend, repair ... any gun, small or great, belonging to any Indian ... Nor shall [he] sell or give to any Indian, directly or indirectly, any such gun, or any gun-powder ... upon payn of ten pounds fine.' " (alterations in original) (citations omitted)).

The Native American laws were enacted during a period in which Native Americans and colonists were engaged in ongoing hostilities. *See id.* ("[D]uring the great Indian uprising in New England known as King Philip's War, the Indians were 'well supplied with muskets, bullets, and powder' and described as 'dead shots.' No wonder a Virginia statute that same year made selling arms or ammunition to Indians a crime for which the culprit was to die 'without benefit of clergy' and to forfeit his estate." (citations omitted)); *Native Americans and the Boston Harbor Islands*, Nat'l Park Serv., https://www.nps.gov/boha/

learn/historyculture/native-americans-and-the-boston-harbor-islands.htm (last updated Jan. 5, 2021) [https://perma.cc/S2DT-THNG]; Martin Blatt, *King Philip's War and the Cultural Landscape of Boston*, Mass Humanities (Sept. 20, 2018), https://masshumanities.org/ph_king-philips-war-and-the-cultural-landscape-of-boston/ [https://perma.cc/AB55-CNAU]. The answer to *Daniels*'s first question, then, is that Native Americans were considered dangerous because they were engaged in war with the New England colonies. *See* 77 F.4th at 354.

By contrast, § 922(g)(5)(A) seems most likely to be grounded in a presumption that unlawfully present aliens are dangerous because they engage in more criminal activity than other groups, although Congress's rationale is not entirely clear. *See* 131 Cong. Rec. 24 (1985) (statement of Sen. McClure); 131 Cong. Rec. 16988 (1985) (statement of Sen. Hatch). The provision barring unlawfully present aliens from possessing firearms was inserted into the statute with little discussion or debate. But the statute was generally said to be aimed at crime control. *See* 131 Cong. Rec. 24 (1985) (statement of Sen. McClure). In any case, § 922(g)(5)(A) does not bar aliens from possessing firearms because they were at war with the Government in the 1960s or 1980s.

**\*15** *Daniels* next instructs lower courts to consider the means of disarmament, asking "*how* did the historical regulation limit the rights of the dangerous class? And *how* does the modern regulation do so?" *Daniels*, 77 F.4th at 354. The Native American bans did not ban Native Americans themselves from possessing guns, but prohibited colonists from furnishing guns, ammunition, and gunpowder to Native Americans. Section 922(g)(5)(A), by contrast, bans all unlawfully present aliens from possessing guns or ammunition without qualification. On both dimensions—why and how—§ 922(g)(5)(A) sweeps more broadly than the Native American bans. Accordingly, the Native American laws are not sufficiently analogous to § 922(g)(5)(A) to carry the Government's burden.

The Government also cites a 1756 Virginia law that "prohibited Catholics from owning arms unless they swore 'allegiance to the Hanoverian dynasty and to the Protestant succession.' " Resp. 14 (quoting Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157 (2007)). That law was "the one instance in which an American colonial government acted to disarm Catholics, [but] it did so on the basis of allegiance, not on the basis of faith." Churchill, *Gun Regulation*, at 157. The Virginia law "ordered the disarmament of all those refusing the test of allegiance set out in the [British] Parliament's 1714 'Act for the Further Security of his Majesty's Person and Government.' " *Id.* The 1714 Act "required all those claiming membership in the British body politic to swear allegiance to the Hanoverian dynasty and to the Protestant succession and to swear an oath abjuring the ecclesiastical authority of the Pope." *Id.* But "those Catholics willing to swear undivided allegiance to the sovereign enjoyed a right to keep arms denied them in England." *Id.* at 157 & n.47. The 1714 Act was passed in the midst of a competing claim to Protestant King George I's claim to the throne made by James III, Catholic son of King James II, whose pro-Catholic policies had led to the passage of the English Bill of Rights. *See* 1 George I, Stat. 2, c. 13 (1714); *Heller*, 554 U.S. at 592–95, 128 S.Ct. 2783. To the extent that the Virginia law prohibiting Catholic gun ownership was an oath of allegiance requirement, it required an oath to King George I in the face of a competing claim by James III, the "pretended prince of Wales," who had claimed the "title of James the Third, King of England, Scotland and Ireland, in open defiance of the provisions made for the establishment of the title and succession of the crown by ... acts of parliament." *See* 1 George I, Stat. 2, c. 13, § I (1714).

In sum, Virginia's Catholic disarmament law classified Catholics as presumptively dangerous because of the competing claims by Protestant and Catholic nobles for the British throne. Those who were Catholic were presumed to support James III's claim to the throne, in conflict with then-ruling Protestant King George I's claim. Catholics who refused to swear an oath of allegiance to the Protestant king were suspected of being a threat to the Government.

As discussed above, the best reading of § 922(g)(5)(A)'s legislative history suggests that it was enacted in the interest of crime control. *See* 131 Cong. Rec. 24 (1985) (statement of Sen. McClure). The Government has offered no evidence that its purpose was to prevent governmental overthrow in the face of an active threat by a particular group deemed a political enemy. It applies equally to all unlawfully present aliens, regardless of their personal political convictions and whether they are nationals of the United States' allies or of countries with which the United States is at war. Thus, on the evidence before the Court, the purpose of the Catholic law is a far cry from the purpose of § 922(g)(5)(A).

*16  And the Catholic law did not impose an unqualified prohibition on gun ownership, like § 922(g)(5)(A), but allowed Catholics who swore allegiance to the Protestant succession to keep their arms, extending to some loyal Catholics a right to bear arms that they did not possess in Great Britain. By contrast, § 922(g)(5)(A) imposes an unqualified ban on possession by unlawfully present aliens, who are afforded no opportunity to restore their right to bear arms by swearing allegiance. In both its purposes and its means, then, the Government has not carried its burden to show Virginia's Catholic disarmament law is a sufficiently analogous historical tradition justifying § 922(g)(5)(A).

Lastly, in its exposition of danger-based disarmament laws, the Government cites Colonial laws from "during the American revolution, [which] disarmed persons who refused to 'swear an oath of allegiance to the state or the United States.' " Resp. 14 (quoting Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 & nn.128–29 (2004)). "To deal with the potential threat coming from armed citizens who remained loyal to Great Britain, states took the obvious precaution of disarming these persons." Cornell & DeDino, *A Well Regulated Right*, at 506. For example, a Pennsylvania law dictated that "if a person 'refuse[d] or neglect[ed] to take the oath or affirmation' of allegiance to the state, he was required to deliver up his arms to agents of the state, and he was not permitted to carry any arms about his person or keep any arms or ammunition in his 'house or elsewhere.' " *Id.* at 506 & n.129 (alterations in original) (quoting An Act for Further Security of the Government, ch. LXI, § 5, 1777–1778 Pa. Laws 123, 126). That law was passed at the peak of the American Revolution, while Philadelphia neared the end of its months-long occupation by thousands of British troops and after the Continental Congress had fled from Philadelphia and continued to govern from Lancaster and then from York, Pennsylvania. *Court House, York, Sept. 30, 1777–June 27, 1778*, Off. of the Historian, U.S. Dep't of State, https://history.state.gov/departmenthistory/buildings/section6 [https://perma.cc/V6JT-DRKL]. The purpose of the law was to prevent those loyal to Great Britain from supporting its efforts to overthrow the newly established American government. As stated, § 922(g)(5)(A), by contrast, appears to have been enacted to "toughen[ ] firearm enforcement" and control crime. *See* 131 Cong. Rec. 16988 (1985) (statement of Sen. Hatch).

Apart from Pennsylvania, some other state governments also required loyalty oaths of their residents, often those whom the governments had reason to suspect may be loyal to Great Britain or otherwise hostile to the American war efforts due to their political views or their refusal "to take up arms against the king." *See* Churchill, *Gun Regulation*, at 159. States routinely disarmed such so-called "non-associators," "by forcing them to voluntarily exclude themselves from the body politic." *Id.* at 158–60. This often entailed a prohibition on "voting, holding office, serving on juries, suing, and keeping arms," but could also include a "requirement that they attend militia muster unarmed, an indignity traditionally imposed on free blacks." *Id.* at 159–60. Each of these laws was enacted in the context of the Revolutionary War to prevent those loyal to Great Britain from supporting the British war efforts. No state enacted a blanket ban on aliens owning guns. Rather, the laws banned those believed to be opposed to the ongoing American war effort from owning guns unless they swore allegiance to the Nation.

*17  Like the other danger-based disarmament laws, the loyalty-oath laws responded to a concrete and particularized threat during a time of war or rebellion. *See Daniels*, 77 F.4th at 351. The leap from such laws to a blanket disarmament of all unlawfully present aliens is simply too far under the standards set forth by the Fifth Circuit. *See Rahimi*, 61 F.4th at 456–60; *Daniels*, 77 F.4th at 347–48, 353–54. Therefore, the loyalty-oath laws—like the rest of the danger-based disarmament laws—do not carry the Government's burden of establishing a historical tradition of analogous laws to justify § 922(g)(5)(A).

### iv. Restrictions on militia membership

Next, the Government appears to argue that, in the Founding era, militia service was a duty and right attached to citizenship. *See* Resp. 15–16. And because militia membership is connected to firearm ownership in the text of the Second Amendment, the supposed historical exclusion of aliens from militia membership justifies their present-day disarmament. *See id.*

Whether Sing-Ledezma would have been excluded from militia service at the Founding due to his citizenship status is unclear. See *Heller*, 554 U.S. at 595–96, 128 S.Ct. 2783 (explaining that "the ordinary definition of the militia [i]s all able-bodied men," and collecting Founding-era sources describing the group of people subject to militia service); Edward M. Coffman, *The Old Army: A Portrait of the American Army in Peacetime, 1784–1898* 17 (1988) (noting that available enlistment papers from the late 1700s to early 1800s show fifteen to eighteen percent of enlistees were immigrants); J.C.A. Stagg, *Soldiers in Peace and War: Comparative Perspectives on the Recruitment of the United States Army, 1802–1815*, 57 Wm. & Mary Q. 79, 86 (2000) ("During the years of peace between 1802 and 1811, slightly more than four-fifths (81.0 percent) of the recruits [to the United States army] were native-born Americans, and the remainder (19.0 percent) were immigrants."); *id.* at 89 (expressing confusion at high rates of immigrant military service "because the legislation governing the 1802 Peace Establishment and the 1808 Additional Military Force stipulated that 'citizens' only should be enlisted, whereas the laws for the forces after 1812 permitted the recruitment of 'effective able-bodied men' without regard to their citizenship"); *see generally* William W. Fitzhugh, Jr. & Charles Cheney Hyde, *The Drafting of Neutral Aliens by the United States*, 36 Am. J. Int'l L. 369 (1942) (noting that aliens who had not declared intention to become citizens were, at times, excluded from *voluntary* military service, but nondeclarant aliens were drafted and inducted into the military during war).

More importantly, however, the Supreme Court has squarely rejected the notion that one's right to bear arms depends on whether they would be required to serve in the militia, notwithstanding the first clause of the Second Amendment. *Bruen*, 142 S. Ct. at 2127 (citing *Heller*, 554 U.S. at 592, 128 S.Ct. 2783). Regardless of whether Sing-Ledezma would have been eligible for militia service under late eighteenth-century laws, such laws do not establish a historical tradition of excluding unlawfully present aliens from the right to bear arms for self-defense.

### v. Other historical arguments

Finally, the Government appeals broadly to a historical tradition of " 'disarmament of groups associated with foreign elements,' including 'on the ground of alienage.' " Resp. 16 (quoting *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047–48 (11th Cir. 2022)). But upon inspection, that supposedly broad tradition merely comprises laws disarming "loyalists to the English crown and certain religious minorities." See Pratheepan Gulasekaram, *"The People" of the Second Amendment: Citizenship and the Right to Bear Arms*, 85 N.Y.U. L. Rev. 1521, 1547–50 (2010), *cited with approval in Jimenez-Shilon*, 34 F.4th at 1048. As addressed above, disarmament on these grounds does not share an analogous purpose or method of disarmament with § 922(g)(5)(A), and accordingly, cannot establish the historical tradition *Bruen* requires.

**\*18** Before concluding, the Court reiterates its concern that the present framework for assessing Second Amendment challenges is difficult to apply. Indeed, it sends jurists on a quixotic journey through history. In this context, it appears that every court that has considered the constitutionality of § 922(g)(5)(A) under *Bruen* has upheld it as constitutional.[14] But the Court cannot in good faith join this consensus because "the vast majority [of those courts] relied reflexively on pre-*Bruen* caselaw or the same loose analogies that the [G]overnment advances in this case." See *Daniels*, 77 F.4th at 355 n.44. "Engag[ing] carefully with the historical sources and the strictures of *Bruen*," *Daniels*, and *Rahimi* leads inexorably to a finding that the Government has not met its burden of proving a historical tradition sufficiently analogous to justify disarming all unlawfully present aliens. See *id.* By all indications, § 922(g)(5)(A) "is an 'outlier that our ancestors would never have accepted,' " rendering it facially unconstitutional. See *Rahimi*, 61 F.4th at 461 (quoting *Bruen*, 142 S. Ct. at 2133). Accordingly, Sing-Ledezma's Motion to Quash is granted as to Count One.

---

[14] *United States v. Sitladeen*, 64 F.4th 978, 987 (8th Cir. 2023); *United States v. Aguilar Ruiz*, No. 23-CR-105, 2023 WL 7171451, at \*2 (S.D. Ala. Oct. 31, 2023); *United States v. Gil-Solano*, No. 23-cr-18, 2023 WL 6810864, at \*5 (D. Nev. Oct. 16, 2023); *United States v. Morales-Gonzalez*, No. 23-CR-129, 2023 WL 6612480, at \*2 (N.D. Okla. Oct. 10, 2023); *United States v. Pineda-Guevara*, No. 23-cr-2, ––– F.Supp.3d ––––, ––––, 2023 WL 4943609, at \*6 (S.D. Miss. Aug. 2, 2023); *United States v. D'Luna-Mendez*, No. 22-CR-367-OLG-ESC-2, 2023 WL 4535718, at \*4 (W.D. Tex.

July 13, 2023), *adopted*, 2023 WL 4879837 (W.D. Tex. July 28, 2023); *United States v. Andrade-Hernandez*, No. 23-cr-26, 2023 WL 4831408, at *6 (S.D. Miss. July 27, 2023); *United States v. Escobar-Temal*, No. 22-cr-393, 2023 WL 4112762, at *6 (M.D. Tenn. June 21, 2023); *Galvan-Marcelo v. United States*, No. 21-CV-884, 2023 WL 3321667, at *7 (S.D. Ind. May 9, 2023); *United States v. Trinidad-Nova*, No. 22-cr-419, ––– F.Supp.3d ––––, ––––, 2023 WL 3071412, at *5 (D.P.R. Apr. 25, 2023); *United States v. Leveille*, No. 18-cr-2945, ––– F.Supp.3d ––––, ––––, 2023 WL 2386266, at *5 (D.N.M. Mar. 7, 2023); *United States v. Murillo-Lopez*, No. 22-CR-180, 2023 WL 2799712, at *2 (E.D. Va. Apr. 5, 2023); *United States v. Carbajal-Flores*, No. 20-cr-613, 2022 WL 17752395, at *4 (N.D. Ill. Dec. 19, 2022); *United States v. DaSilva*, No. 21-cr-267, 2022 WL 17242870, at *12 (M.D. Penn. Nov. 23, 2022).

## IV. CONCLUSION

For the reasons above, Sing-Ledezma's Motion, ECF No. 23, is **GRANTED** in part and **DENIED** in part. Sing-Ledezma's Motion is **GRANTED** as to Count One and **DENIED** as to Count Four. Sing-Ledezma's Motion is **DENIED** as moot as to Count Three. The Court **ORDERS** that the offense charged in Count One of the Indictment, ECF No. 11, is **DISMISSED**.

**IT IS FURTHER ORDERED** that, should Defendant wish to renew his challenge to Count Three of the Indictment in light of this Order, he may do so by filing a Motion **on or before December 21, 2023**.

**SO ORDERED.**

**All Citations**

--- F.Supp.3d ----, 2023 WL 8587869

---

End of Document    © 2023 Thomson Reuters. No claim to original U.S. Government Works.