UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:22-cr-05139-DGE |
| Plaintiff, | |
| v. | ORDER DENYING MOTIONS TO DISMISS (DKT. NOS. 36, 56) |
| JOAO RICARDO DEBORBA, | |
| Defendant. | |

## I  INTRODUCTION

This matter comes before the Court on Defendant Joao Ricardo DeBorba's Motion to Dismiss the Indictment (Dkt. No. 36) and Motion to Dismiss Count 7 of the Superseding Indictment (Dkt. No. 56). The Court has reviewed the Motions, the Government's Responses (Dkt Nos. 51, 60), DeBorba's Replies (Dkt. Nos. 53, 62), his supplemental authority (Dkt. No.

65) and the remaining record.  For the reasons set forth below, the Court **DENIES** both motions.[1]

## II        BACKGROUND

Joao DeBorba, a Brazilian citizen, was admitted to the United States on a visitor's visa in 1999.  (Dkt. No. 2 at 7.)  His visa expired six months later, requiring him to depart the United States on or before May 9, 2000.  (*Id.*)  Immigration records reveal DeBorba never left the country nor applied for an extension of stay, making him subject to deportation for being present in violation of law pursuant to 8 U.S.C. § 1227(a)(1)(b).  (*Id.*)  He married and had four children, all of whom are U.S. citizens, and has lived in this country for over 20 years.  (*Id.* at 7–8; Dkt. No. 36-1 at 1.)

On February 25, 2019, DeBorba applied for a concealed pistol license through the state of Washington.  (Dkt. No. 2 at 10–11.)  On this application, DeBorba checked the "yes" box next to the question: "Are you a United States citizen?" and checked the "no" boxes next to the questions: "Are you a permanent resident alien?" and "Are you a legal alien temporarily residing in Washington?"  (*Id.* at 10.)

Later that year, he applied to purchase firearms.  On these applications, he checked "United States" in response to a question inquiring about his citizenship and checked "no" on questions asking whether he was a non-citizen unlawfully in the United States and whether he was a non-citizen who had been admitted on a nonimmigrant visa.  (*Id.* at 10–12.)

On November 10, 2019, DeBorba was charged with a domestic violence misdemeanor and became subject to a no-contact order with his then-wife, prohibiting him from possessing

---

[1] DeBorba requested oral argument, but the Court concludes oral argument is not necessary given the briefing submitted.

1   firearms.  (*Id.* at 12–13.)  Police later arrested DeBorba for violating the restraining order and

2   recovered numerous firearms during the arrest.  (*Id.* at 13.)  DeBorba was convicted of fourth-

3   degree assault and violation of the domestic violence no-contact order, and another no-contact

4   order was issued prohibiting him from possessing firearms.  (*Id.* at 13–14.)

5        In 2021, federal agents were informed of DeBorba's status as an undocumented

6   immigrant.  (*Id.* at 7.)  A confidential source sent videos of DeBorba engaged in sport-shooting

7   on YouTube in violation of his no-contact order.  (*Id.* at 14–15.)  Agents obtained a warrant and

8   searched the home he shared with roommates.  (*Id.* at 15–16.)  The agents found firearms,

9   ammunition, firearm parts and tools, a silencer, magazines, and other firearm accessories.  (*Id.* at

10  16.)

11       A grand jury indicted DeBorba on six felony charges.  (Dkt. No. 9.)  Counts 1 and 2

12  charge DeBorba with unlawful possession of firearms and ammunition on May 6, 2022 and

13  November 16, 2019 while he was an undocumented immigrant and subject to a restraining order,

14  in violation of 18 U.S.C. § 922(g)(5) and (8).  (*Id.* at 1–3.)  Count 3 charges DeBorba with

15  unlawful possession of a firearm on April 14, 2019 while he was an undocumented immigrant in

16  violation of 18 U.S.C. § 922(g)(5).  (*Id.* at 3.)  Counts 4 and 5 charge DeBorba with making false

17  statements during the purchase of a firearm on May 8, 2019 and April 4, 2019.  (*Id.* at 4–5.)

18  Count 6 charges DeBorba with making a false claim to U.S. citizenship by falsely representing

19  himself as a U.S. citizen in the concealed pistol license application.  (*Id.* at 4.)

20       DeBorba moved to dismiss the indictment, arguing the charges violate his Second

21  Amendment rights.  (Dkt. No. 36.)  Shortly thereafter, the Government returned a superseding

22  indictment adding a charge against DeBorba.  (Dkt. No. 40.)  The additional charge—Count 7—

23  alleges DeBorba knowingly possessed a firearm silencer that was not registered to him in the

24

National Firearms Registration and Transfer Record on May 6, 2022.  (Dkt. No. 40 at 5.)
DeBorba moved to dismiss Count 7 on the same Second Amendment grounds and on facial and
as-applied challenges for vagueness.  (Dkt. No. 56.)

### III     DISCUSSION

#### A.  Legal Standard

"A party may raise by pretrial motion any defense, objection, or request that the court can
determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  A pretrial motion is proper
when "it involves questions of law rather than fact."  *United States v. Shortt Accountancy Corp.*,
785 F.2d 1448, 1452 (9th Cir. 1986).

#### B.  Second Amendment challenge (Counts 1, 2, 3, 7)

Counts 1, 2, and 3 allege DeBorba violated two federal firearm prohibitions under
18 U.S.C. § 922(g), both prohibiting possession of any firearm or ammunition.  (Dkt. Nos. 9 at
1–3; 40 at 1–3.)  § 922(g)(5)(A) makes possession unlawful for any alien who is unlawfully in
the United States.  18 U.S.C. § 922(g)(5)(A).  § 922(g)(8) makes possession unlawful for any
person subject to a court order meeting certain parameters.[2]  18 U.S.C. § 922(g)(8).  Count 7
alleges DeBorba violated 26 U.S.C. § 5861(d), which makes it unlawful to receive or possess a
firearm not registered in the National Firearms Registration and Transfer Record, which includes
silencers as defined in § 5845(a)(7).  (Dkt. No. 40 at 5); 26 U.S.C. §§ 5861(d), 5845(a)(7).
DeBorba argues recent Supreme Court precedent, *New York State Rifle & Pistol Ass'n, Inc. v.
Bruen*, 597 U.S. 1 (2022), renders these statutes unconstitutional and void under the Second
Amendment, and Counts 1, 2, 3, and 7 therefore must be dismissed.  (Dkt. Nos. 36 at 1; 56 at 1.)

---

[2] Neither party disputes DeBorba's court order meets the three parameters at § 922(g)(8)(A)–(C).

1      In 2022, the Supreme Court rejected the widely accepted two-step framework the Courts

2 of Appeals used in analyzing Second Amendment challenges.  *Bruen*, 597 U.S. at 19.  At the first

3 step, the government had an opportunity to establish the challenged law regulated activity falling

4 outside the scope of the right as originally understood.  *Id.* at 18 (citing *Kanter v. Barr*, 919 F.3d

5 437, 441 (7th Cir. 2019)).  As part of step one, courts ascertained the original scope of the right

6 based on its historical meaning.  *Bruen*, 597 U.S. at 18 (citing *United States v. Focia*, 869 F.3d

7 1269, 1285 (11th Cir. 2017)).  If the Government could prove the regulated conduct fell beyond

8 the Second Amendment's original scope, the analysis stopped there because the regulated

9 activity was categorically unprotected.  *Bruen*, 597 U.S. at 18 (quoting *United States v. Greeno*,

10 679 F.3d 510, 518 (6th Cir. 2012)).  But if the historical evidence was inconclusive or suggested

11 the regulated activity was not categorically unprotected, the analysis proceeded to step two.

12 *Bruen*, 597 U.S. at 18 (quoting *Kanter*, 919 F.3d at 441).

13      At the second step, courts analyzed how close the law came to the core of the Second

14 Amendment right and the severity of the law's burden on that right.  *Id.*  If a "core" Second

15 Amendment right was burdened, courts applied strict scrutiny to determine whether the law was

16 narrowly tailored to achieve a compelling governmental interest.  *Bruen*, 597 U.S. at 18–19

17 (quoting *Kolbe v. Hogan*, 849 F.3d 114, 133 (4th Cir. 2017)).  Otherwise, courts applied

18 intermediate scrutiny and considered whether the regulation was substantially related to the

19 achievement of an important governmental interest.  *Bruen*, 597 U.S. at 19 (quoting *Kachalsky v.

20 Cnty. of Westchester*, 701 F.3d 81, 96 (2d Cir. 2012)).

21      *Bruen* rejected the second half of this approach, which it deemed "one step too many,"

22 finding then-current jurisprudence did not support applying means-end scrutiny in the Second

23 Amendment context.  *Bruen*, 597 U.S. at 19.  Instead, "when the Second Amendment's plain text

24

1    covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 17.

2    To justify the regulation, "the government must demonstrate that the regulation is consistent with

3    this Nation's historical tradition of firearm regulation." *Id.*  "Only if a firearm regulation is

4    consistent with this Nation's historical tradition may a court conclude that the individual's

5    conduct falls outside the Second Amendment's 'unqualified command.'" *Id.*

6         Importantly, it is "the right of *the people* to keep and bear Arms[.]"  U.S. Const.

7    amend. II (emphasis added).  And, *Bruen* does not command the Court to consider only

8    "conduct" in isolation and simply assume that a regulated person is part of "the people."  To the

9    contrary, *Bruen* tells us to begin with a threshold question: whether the person's conduct is

10   "covered by" the Second Amendment's "plain text."  *United States v. Sitladeen*, 64 F.4th 978,

11   987 (8th Cir. 2023).  To conclude DeBorba's Second Amendment rights are violated by 18

12   U.S.C. § 922(g), he must be part of "the people" covered by the Second Amendment.  The

13   parties disagree as to whether an undocumented immigrant is part of "the people."  (Dkt. Nos. 36

14   at 11, 51 at 9.)

15        Supreme Court precedent is not clear on this issue.  *United States v. Vergudo-Urquidez*,

16   494 U.S. 259 (1990) appears to be the only case in which the Court considered the phrase "the

17   people":

18        '[T]he people' seems to have been a term of art employed in select parts of the
          Constitution . . . [Its uses] sugges[t] that 'the people' protected by the Fourth
19        Amendment, and by the First and Second Amendments, and to whom rights and
          powers are reserved in the Ninth and Tenth Amendments, refers to a class of
20        persons who are part of a national community or who have otherwise developed
          sufficient connection with this country to be considered part of that community.

21   *Verdugo-Urquidez*, 494 U.S. at 265 (citing *United States ex rel. Turner v. Williams,* 194 U.S.

22   279, 292 (1904)).  Notably, the Court did not define "the people" by some legal classification but

23

24

by connection to the community, leaving open the possibility undocumented immigrants are included.

In *Heller*, the Court remarked, "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008).  Although generally in line with the statement in *Verdugo-Urquidez*, "national community" became "political community," perhaps reflecting Article II's granting "the people" the right to vote for members of the House of Representatives, something undocumented immigrants cannot do.  U.S. Const. art. I, § 2; *but see United States v. Meza-Rodriguez*, 798 F.3d 664, 670 (7th Cir. 2015) (distinguishing the use of "the people" in this instance because it expressly deals with elections rather than affirmative individual rights.).  *Heller* commented "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," but the Court went no further; its focus on determining the scope of the right on an individual basis gave no categorial exclusions for undocumented immigrants.  *Heller*, 554 U.S. at 626.

*Bruen* provided no additional clarity but nodded to the same "longstanding prohibitions on the possession of firearms" as *Heller* without addition.  *Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring).  Taking these statements together, there is an argument to be made that undocumented immigrants—who, by definition, are not "law-abiding" because they are not in compliance with applicable immigration laws nor part of the "political community"—could be categorically excluded from "the people."  But this conclusion creates a new picture made up of pieces stolen from other puzzles.  *Verdugo-Urquidez* dealt with whether the Fourth Amendment applied to a search of a Mexican residence of a Mexican citizen; *Heller* grappled with whether

the Second Amendment conferred an individual right, and *Bruen* analyzed New York's "proper cause" requirement in its assessment of firearm applications.  The Supreme Court has far from commented on the question of whether undocumented immigrants are covered by the Second Amendment, and this Court is wary to rely on these dicta to categorically strip a group of people of possible constitutional rights.

Lower courts have considered the issue and come to varying conclusions.  Some agree undocumented immigrants are not among "the people" or "political community" to whom the Second Amendment applies, or otherwise are not protected by the Second Amendment.  *See United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) ("[I]llegal aliens do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives protection"); *United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011) ("Whatever else the term means or includes, the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States . . . ."); *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) ("[T]he protections of the Second Amendment do not extend to aliens illegally present in this country . . . ."); *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1050 (11th Cir. 2022) ("[C]onsistent with the Second Amendment's text and history, [undocumented immigrants] do not enjoy the right to keep and bear arms.").  Others have reached the opposite conclusion.  *See Meza-Rodriguez*, 798 F.3d at 669–672 (finding unauthorized status cannot support a *per se* exclusion from "the people" protected by the Bill of Rights).

Another approach, taken before *Bruen* by the Ninth and Tenth Circuits, avoids the question altogether by assuming without deciding undocumented immigrants are part of "the people."  *United States v. Torres*, 911 F.3d 1253, 1261 (9th Cir. 2019) (rejecting a pre-*Bruen*

challenge to § 922(g)(5) but declining to decide "whether unlawful aliens are included in the scope of the Second Amendment right"); *see also United States v. Singh*, 979 F.3d 697, 724–725 (9th Cir. 2020) (assuming without deciding the defendant had Second Amendment rights but noting "[n]onimmigrant aliens, like those unlawfully present, are neither citizens nor members of the political community"), *cert. Denied*, 141 S. Ct. 2671 (2021); *United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012) (assuming without deciding "the people" could include at least some aliens unlawfully present).

In *Huitron-Guizar*, the Tenth Circuit observed "it is not exactly reading between the lines to note how frequently [*Heller*] connected arms-bearing and citizenship." *Huitron-Guizar*, 678 F.3d at 1168. "Yet despite this we hesitate to infer from *Heller* a rule that the right to bear arms is categorically inapplicable to non-citizens . . . the question in *Heller* was the amendment's *raison d'être*—does it protect an individual or collective right?—and aliens were not part of the calculus." *Id.* *Huitron-Guizar* concluded such a "large and complicated" question, without much guidance from *Heller,* was best left unanswered. *Id.* at 1169. The Tenth Circuit assumed without deciding "the Second Amendment, as a 'right of the people,' could very well include, in the absence of a statute restricting such a right, at least some aliens unlawfully here[.]" *Id.*

*Torres*, the leading case on the issue in this circuit, agreed to avoid the question:

> [W]e agree with the Tenth Circuit's approach, because we believe the state of the law precludes us from reaching a definite answer on whether unlawful aliens are included in the scope of the Second Amendment right. The Tenth Circuit correctly held that this question is "large and complicated." *Id.* at 1169. Therefore, on this record, we find it imprudent to examine whether Torres (as an unlawful alien) falls within the scope of the Second Amendment right. As such, we *assume* (without deciding) that unlawful aliens, such as Torres, fall within the scope of the Second Amendment right as articulated under *Heller* and *Vergudo-Urquidez* and proceed to the appropriate scrutiny we should give to § 922(g)(5).

*Torres*, 911 F.3d at 1261.

1    The only change to the "state of the law" since *Torres* in 2019 is *Bruen*.  In this Court's

2    view, *Bruen* provided no more clarity on this issue than *Heller*.  The state of the law is therefore

3    the same as it was at the time of *Torres*, and the Court will assume, without deciding, that an

4    undocumented immigrant is within the scope of "the people" for whom Second Amendment

5    rights are afforded.  *See United States v. Gil-Solano*, No. 3:23-CR-00018-MMD-CLB, 2023 WL

6    6810864, at *2 (D. Nev. Oct. 16, 2023), *reconsideration denied sub nom.,* 2023 WL 8877809 (D.

7    Nev. Dec. 22, 2023).

8    Assuming undocumented immigrants are part of "the people" and are entitled to Second

9    Amendment rights as described in *Heller*, the Court now moves to the *Bruen* test.

10    **a.  *Bruen* Step One**

11    At the first step, the question is whether the "Second Amendment's plain text covers"

12    DeBorba's conduct.  *Bruen*, 597 U.S. at 17.  If so, "the Constitution presumptively protects that

13    conduct."  *Id.*  DeBorba's conduct at issue both under § 922(g)(5) and (8) is possession.  The

14    Government does not argue DeBorba's possession of firearms is not covered by the plain text of

15    the Constitution.  The plain text, the "right of the people to keep and bear Arms," covers

16    DeBorba's possession of firearms in his home because "'bear arms' was unambiguously used to

17    refer to the carrying of weapons outside of an organized militia."  *Heller*, 554 U.S. at 584.  The

18    plain text "guarantee(s) the individual right to possess and carry weapons in case of

19    confrontation."  *Id.* at 592.  The Constitution presumptively protects DeBorba's conduct, and he

20    clears Step One.

21    **b.  *Bruen* Step Two**

22    At Step Two, the burden shifts to the Government to justify § 922(g)(5) and (8).  To

23    justify the regulations, "the government must demonstrate that the regulation[s] [are] consistent

24

1  with this Nation's historical tradition of firearm regulation." *Id.* "Only if a firearm regulation is

2  consistent with this Nation's historical tradition may a court conclude that the individual's

3  conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* For the Court to

4  uphold § 922(g)(5) and (8), the Government must demonstrate the provision has a "well-

5  established and representative historical analogue," though it need not identify a "historical

6  twin." *Id.* at 30. "Even if a modern-day regulation is not a dead ringer for historical precursors, it

7  still may be analogous enough to pass constitutional muster." *Id.*

8       Although *Bruen* did not detail the features rendering regulations relevantly similar, the

9  opinion pointed toward at least two metrics: "how and why the regulations burden" the right to

10  armed self-defense. *Id.* at 29. Therefore, whether modern and historical regulations impose a

11  comparable burden on the right and whether the burden is comparably justified are "central"

12  considerations when engaging in the analogical inquiry. *Id.*

13       How § 922(g)(5) and (8) burden the Second Amendment right is by dispossession, but in

14  different ways. § 922(g)(5) dispossesses persons based on "unlawful or illegal" conduct

15  associated with their immigration status. § 922(g)(8) works based on a finding that the person

16  represents a credible threat to the physical safety of an intimate partner or child. Why

17  dispossession is deemed appropriate in these instances requires a more in-depth look at the

18  history of § 922(g)'s predecessors and the rationale for identifying the categories of people it

19  seeks to dispossess.

20       The National Firearms Act of 1934 was Congress's first attempt to create comprehensive

21  federal firearms regulations. National Firearms Act of 1934, ch. 757, 48 Stat. 1236. The statute,

22  enacted as part of President Roosevelt's effort to combat Prohibition-era violence, created the

23  fundamental scheme of firearm registration, taxation, and regulated the transfer of firearms from

24

1    one person to another.  *See* 73 Cong. Rec. 11,400 (1934) (statement of Rep. Robert L. Doughton)

2    ("For some time this country has been at the mercy of the gangsters, racketeers, and professional

3    criminals.  The rapidity with which they can go across State lines has become a real menace to

4    the law-abiding people in this country.")

5           Enacted shortly thereafter, the Federal Firearms Act of 1938 was the next significant

6    attempt to impose federal controls on firearm commerce.  It is also the first codification of

7    dispossessing "prohibited persons," banning possession for those under indictment or conviction

8    for felonies, violent criminals, and "fugitive[s] of justice"—those who had fled from any state or

9    territory to avoid prosecution for a crime of violence or to avoid giving testimony in any criminal

10   proceeding.  Federal Firearms Act of 1938, ch. 850, 52 Stat. 1250.

11          Between 1938 and 1965, Congress displayed little interest in gun control legislation.

12   William J. Vizzard, *The Gun Control Act of 1968*, 18 St. Louis U. Pub. L. Rev. 79, 80 (1999).

13   Although members of Congress introduced a variety of gun bills between 1964 and 1968, one

14   bill—later amended to be more restrictive in the wake of President Kennedy's assassination with

15   a mail order, surplus military rifle—was debated for nearly five years before its passage.  *Id.* at

16   80–81.  The Gun Control Act of 1968 was designed to "provide support to Federal, State, and

17   local law enforcement officials in their fight against crime and violence."  Gun Control Act of

18   1968, § 101, Pub. L. No. 90-618, 82 Stat. 1213.  Again, the classes of persons Congress deemed

19   unfit to ship or transport guns in interstate commerce largely mirrored the 1938 Act, but some

20   new ones were added: drug users and those adjudicated to be mentally defective or committed to

21   mental institutions.  *Id.*

22          The assassination attempt on President Reagan in 1981 created a resurgence in public

23   anxiety over handgun violence, resulting in the introduction of the "Brady Bill."  Andy

24

1    DiRosa, *The Brady Handgun Violence Prevention Act: Lessons in the Development and*

2    *Implementation of Federal Policy*, 8 POL'Y PERSP. 2, 2–3 (2001).  The Violent Crime Control

3    and Law Enforcement Act of 1994 added one new category of prohibited persons: those with

4    domestic violence or stalking restraining orders.  Pub. L. No. 103-322, 108 Stat. 1796.  The

5    addition was motivated by the concern that guns were not being kept away from domestic

6    abusers under felon-in-possession laws because "many people who engage in serious spousal or

7    child abuse ultimately are not charged with or convicted of felonies."  *United States v. Chovan*,

8    735 F.3d 1127, 1139 (9th Cir. 2013) (quoting 142 Cong. Rec. 22985 (1996) (statement of Sen.

9    Lautenberg)).  Congress sought to "close this dangerous loophole" and "establish [ ] a policy of

10   zero tolerance when it comes to guns and *domestic* violence."  *Id.* (citing *United States v.*

11   *Booker*, 644 F.3d 12, 16 (1st Cir. 2011) and 142 Cong. Rec. S8831 (daily ed. July 25, 1996)

12   (statement of Sen. Lautenberg)).

13          Supreme Court precedent confirms Congress's longstanding ability to disarm these

14   "prohibited persons" and "dangerous individuals."  *See NYSRPA v. City of New York*, 140 S. Ct.

15   1525, 1541 (2020) (Alito, J., dissenting); *Heller*, 554 U.S. at 626; *Bruen*, 597 U.S. at 81

16   (Kavanaugh, J., concurring).  Disarmament is appropriate for those "who have demonstrated a

17   proclivity for violence or whose possession of guns would otherwise threaten the public safety,"

18   *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting).

19          The "why" for these restrictions, dating back to prohibition, is quite clearly the

20   prevention of crime and gun violence.  For over 80 years, in various iterations of this same

21   statute, Congress has outlined the groups of people it deems more likely to commit crimes with a

22   firearm, warranting regulation on their possession of a gun: "dangerous individuals"—including

23

24

those who have a propensity for violence due to their criminal history, flagrancy for the law by acting as a fugitive of justice, or impaired judgment due to mental illness.

Having identified the "how" and "why" of § 922(g)(5) and (8), we can turn to whether there are relevant historical analogues matching these same features.

### i. 18 U.S.C. § 922(g)(8)[3]

§ 922(g)(8) makes possession unlawful for a person who is subject to a court order that:

> (A)  was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;
>
> (B)  restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and
>
> (C)
>
> > (i)  includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or
> >
> > (ii)  by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury[.]

18 U.S.C. § 922(g)(8).

§ 922(g)(8) addresses conduct that has only recently been deemed problematic. "While it is undoubtedly true that Americans have engaged in domestic abuse from this Nation's very origins, we did not consider this ugly aspect of our society a 'problem' to be solved until

---

[3] Whether § 922(g)(8) is constitutional under the *Bruen* test will soon be answered by the Supreme Court.  *United States v. Rahimi*, 143 S. Ct. 2688, 216 L. Ed. 2d 1255 (2023).  The Fifth Circuit's *Rahimi* is the only circuit to address the question, and it found § 922(g)(8) without a historical analogue, striking the statute down as unconstitutional.  *United States v. Rahimi*, 61 F.4th 443 (5th Cir.), *cert. granted*, 143 S. Ct. 2688, 216 L. Ed. 2d 1255 (2023).

1    somewhat recently." *United States v. Brown*, No. 22-CR-00239-JNP-CMR, 2023 WL 4826846,

2    at *8 (D. Utah July 27, 2023).  Attitudes and laws surrounding domestic violence "have evolved,

3    in part as women's rights and roles in society expanded. The absence of stronger laws may

4    reflect the fact that the group most impacted by domestic violence lacked access to political

5    institutions, rather than a considered judgment about the importance or seriousness of the issue."

6    *United States v. Nutter*, 624 F. Supp. 3d 636, 641 (S.D.W. Va. 2022).  Historical firearm

7    regulation often sought to disarm those classes of persons it saw as "dangerous," which, for most

8    of this Nation's history, did not include domestic abusers.  But "[t]o suggest that only people

9    convicted of crimes with an exact historical analogue can be subject to gun restrictions would

10   lead to absurd results." *Id.* at 641–642.  Indeed, "the ethical concerns of our society evolve over

11   time, and *Bruen*'s framework permits this progress."  *United States v. Lewis*, No. 21 Cr. 789

12   (NSR), 2023 WL 6066260, at *7 (S.D.N.Y. Sept. 18, 2023).

13        Under *Bruen*, "when a challenged regulation addresses a general societal problem that

14   has persisted since the 18th century, the lack of a distinctly similar historical regulation

15   addressing that problem is relevant evidence that the challenged regulation is inconsistent with

16   the Second Amendment."  597 U.S. at 26.  However, if the regulation was "unimaginable at the

17   founding," courts must conduct "reasoning by analogy" to determine "whether a historical

18   regulation is a proper analogue" and is "relevantly similar" to the modern regulation.  *Id.* at 28–

19   29.  Against this backdrop, a relevantly similar analogue disarming domestic abusers cannot be

20   found, but those disarming dangerous or violent persons *like* domestic abusers, for the purpose of

21   preventing violence or crime, can be.  Because the Second Amendment "codified a right

22   inherited from our English ancestors," pre-founding English legal tradition helps clarify the

23

24

scope of the right secured by the Second Amendment.  *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 599).

Beginning with the pre-founding era, the Militia Act of 1662 authorized local officials to disarm individuals they judged "dangerous to the Peace of the Kingdome." 14 Car. 2, c. 3, § 13 (Eng.).  Consistent with the Militia Act, the Crown often directed local officials to disarm those whom it did not trust to use weapons responsibly, *e.g.*, those who had "disturbed the public Peace."  *United States v. Perkins*, No. 22-CR-30102-DWD, 2023 WL 8879001, at *10 (S.D. Ill. Dec. 22, 2023) (citing Privy Council to Lord Newport (Jan. 8, 1661), *Transactions of the Shropshire Archaeological and Natural History Society,* pt. 2, 3d ser., vol. 4, at 156 (1904)).

At the time of this Nation's founding, the right to bear arms was understood to be conditional on the lawful behavior of its possessors.  In 1780, the town of Williamsburg proposed amending the Massachusetts constitution to establish "the people have a right to keep and bear Arms for their Own and the Common defence." *Id.* (citing *The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780*, at 624 (Oscar Handlin & Mary Handlin eds., 1966)).  The town commented: "we esteem it an essential priviledge to keep Arms in Our houses for Our Own Defence and while we Continue honest and Law-full Subjects of Government we Ought Never to be deprived of them." *Id.*

Another set of colonial statutes, referred to as "going armed" statutes, penalized the offense of terrorizing people by brandishing weapons, such as Colonial Massachusetts and New Hampshire's authorization to justices of the peace to arrest "all Affrayers, Rioters, Disturbers, or Breakers of the Peace, and such as shall ride or go armed Offensively . . . by Night or by Day, in Fear or Affray of Their Majesties Liege People."  1692 Mass. Acts and Laws no. 6 at 11–12; *see* 1699 N. H. Acts and Laws ch. 1.  These statutes, requiring offenders forfeit their arms, "merely

codified the existing common-law offense of bearing arms to terrorize the people[.]"  *Bruen*, 597

U.S. at 47.  *See also* 4 Blackstone, *Commentaries on the Laws of England* 144 (The "offence

of *riding* or *going armed*, with dangerous or unusual weapons, is a crime against the public

peace, by terrifying the good people of the land[.]").

Post-founding, the notion of reserving firearm possession for peaceful, law-abiding

citizens maintained.  The Government cites John Holmes, who recited the common

understanding of the Second Amendment as meaning a "free citizen, if he demeans himself

peaceably, is not to be disarmed."  (Dkt. No. 51 at 32) (citing John Holmes, *The Statesman, or

Principles of Legislation and Law*, 186 (1840)).  "Thus are the rights of self defence guarded and

secured," he added, "to every one who entitles himself by his demeanor to the protection of his

country."  *Id.*  The Government points to a state convention in Rhode Island finding the Second

Amendment forbade "taking from peaceable citizens their arms." (*Id.*) (citing *State Convention

of the Suffrage men of Rhode Island*, Vermont Gazette, Dec. 13, 1842, at 1).  Joseph Gales, a

mayor of Washington, D.C., recognized the right of a "peaceable citizen" to bear arms, but

asked, "why should not the lawless ruffian be disarmed and deprived of the power of executing

the promptings of his depraved passions?"  (*Id.*) (citing Joseph Gales, Prevention of Crime, in

*O.H. Smith, Early Indiana Trials and Sketches*, 466–467 (1858)).

Leading up to emancipation, attitudes continued to reflect the proper disarmament of

unlawful or unpeaceful people.  In response to the Bleeding Kansas conflict of the mid-1850s,

Senator Henry Wilson complained that "armed bandits" were "violating law, order, and peace,"

and called for legislation "to disarm any armed bands, from the slave States or the free States,

who enter the Territory for unlawful purposes."  Cong. Globe App., 34th Cong., 1st Sess., 1090

(Aug. 7, 1856).  Senator Benjamin Wade likewise called on Congress to "[d]isarm these lawless

bands." Cong. Globe App., at 1091. Opponents of slavery criticized Kansas authorities for disarming "peaceable" free-state settlers. New-York Daily Tribune, Oct. 2, 1856, at 4 ("When [a Kansas official] entered the houses of peaceable citizens and demanded that they should deliver up their arms, he . . . violated one of those provisions of the Constitution which a free people should guard with the most jealous care."); *High-Handed Outrage in Kansas*, Holmes County Republican, Oct. 30, 1856, at 1 (denouncing the disarmament of "[p]eaceable American [c]itizens" in Kansas as a violation of their "constitutional rights").

State court precedent carried on the unbroken tradition of disqualifying dangerous persons from firearm possession. The Missouri Supreme Court upheld a ban on carrying arms while intoxicated as a "reasonable regulation" that prevented the "mischief to be apprehended from an intoxicated person going abroad with fire-arms." *State v. Shelby*, 2 S.W. 468, 469 (1886). The Ohio Supreme Court found a law disarming "tramps" consistent with the right to keep and bear arms because the right "was never intended as a warrant for vicious persons to carry weapons with which to terrorize others." *State v. Hogan*, 58 N.E. 572, 575 (1900).

States also adopted surety laws requiring certain individuals post bond before carrying weapons in public. *See Bruen*, 597 U.S. at 55. These laws "typically targeted only those threatening to do harm." *Id.* The earliest such statute, enacted in Massachusetts, required a gun owner to post bond if his conduct created "reasonable cause to fear an injury, or breach of the peace," and if he lacked a special need for self-defense. Mass. Rev. Stat. ch. 134, § 16 (1836). At least nine other jurisdictions adopted variants of that law later in the 19th century. *See Bruen*, 597 U.S. at 56 n.23. "'[U]nder surety laws . . . everyone started out with robust carrying rights' and only those reasonably accused were required to show a special need in order to avoid posting a bond." *Id.* at 57 (quoting *Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017)).

1   At common law, only an individual who could show he had "just cause to fear" that another

2   would injure him or destroy his property could "demand surety of the peace against such

3   person."  4 William Blackstone, Commentaries on the Laws of England 252 (1769).

4          In comparison to § 922(g)(8), the "going armed" laws are not a great match; those subject

5   to § 922(g)(8) need not brandish weapons or inspire terror to warrant dispossession.  In fact,

6   someone subject to a no-contact order may never have touched a gun in their life.  Unlike "going

7   armed" statutes, which punished breaches of the peace caused by terrorizing the public with

8   weapons, § 922(g)(8) targets only those who "represent[] a credible threat to the physical safety"

9   potentially unrelated to their use of a firearm.  Laws based generally on a person's

10  "dangerousness" are a similarly loose fit.  Although "dangerousness" could be an individualized

11  determination, it could, and often would, stem from a blanket prejudice against entire

12  populations based on race or religion.  *See Nutter*, 624 F.Supp.3d at 643–644 ("Without domestic

13  violence statutes, there was no mechanism to readily identify and disarm domestic abusers in the

14  founding era.  Groups perceived as dangerous were identified by far more problematic criteria,

15  including race, ethnicity, and religious identity for broad-based disarmament[.]").  "Indeed, when

16  one compares § 922(g)(8) and early "dangerousness" laws, § 922(g)(8)'s restrictions on allowing

17  potentially dangerous individuals to possess firearms are relatively tame."  *Brown*, 2023 WL

18  4826846 at *11.

19         The surety laws provide a closer analogue than any other historical firearm regulation the

20  Government cites.  *See United States v. Rahimi*, 61 F.4th 443, 459 (5th Cir. 2023) ("The surety

21  laws come closer to being 'relevantly similar' to § 922(g)(8) than the 'dangerousness' and 'going

22  armed' laws . . . .").  "Unlike the 'dangerousness' laws, § 922(g)(8) requires an *individualized*

23  determination of dangerousness during an adversarial civil hearing."  *Brown*, 2023 WL 4826846

24

1    at *11.  Surety laws did the same thing.  "Requir[ing] only a civil proceeding, not a criminal

2    conviction[,]" surety laws singled out individuals the public had "just cause to fear[,]" echoing

3    the "credible threat" to the safety of others, namely, an intimate partner or child.  *See Rahimi*, 61

4    F.4th at 459–460.  Like § 922(g)(1), which has been upheld by a majority of courts in this circuit

5    as constitutional under *Bruen*,[4] § 922(g)(8) disarms those who may be characterized as not "law

6    abiding," without sacrificing due process, because they have been deemed to represent a credible

7    threat to the physical safety of an intimate partner or child.  Where § 922(g)(1) protects a

8    person's due process by disarming only those persons who have been convicted of a felony,

9    (compared to previous iterations within the Federal Firearms Act of 1938 and Gun Control Act

10   of 1968, both of which include persons merely indicted for a felony), § 922(g)(8) addresses due

11   process in the language of the statute itself, requiring a "hearing of which such person received

12   actual notice, and at which such person had an opportunity to participate[,]" and a "finding that

13   such person represents a credible threat to the physical safety of such intimate partner or child[.]"

14

---

15   [4] *United States v. Robinson*, No. 2:22-CR-00212-TL, 2023 WL 5634712 (W.D. Wash. Aug. 31,
     2023); *United States v. Jackson*, No. CR22-37RSL, 2023 WL 1967199 (W.D. Wash. Feb. 13,
16   2023); *United States v. Saba*, No. CR22-248, 2023 WL 5333255 (D. Idaho Aug. 17, 2023);
     *United States v. Pineda*, No. CR21-482, 2023 WL 4053583 (D. Or. Jun. 16, 2023); *United States
17   v. Buffalo Bulltail*, No. CR22-86, 2023 WL 3947823 (D. Mont. Jun. 12, 2023); *United States v.
     Sais*, No. CR-22-2456, 2023 WL 3510406 (S.D. Cal. May 17, 2023); *United States v. Chatman*,
18   No. CR22-453, 2023 WL 3509699 (N.D. Cal. May 16, 2023); *United States v. Villalobos*, No.
     CR19-40, 2023 WL 3044770 (D. Idaho Apr. 21, 2023); *Walker v. Bonta*, No. C20-31, 2023 WL
19   2815356 (S.D. Cal. Apr. 6, 2023); *United States v. Guthery*, No. CR22-173, 2023 WL 2696824
     (E.D. Cal. Mar. 29, 2023); *United States v. Kilgore*, No. CR21-277, 2023 WL 2505012 (E.D.
20   Cal. Mar. 14, 2023); *United States v. Davis*, No. CR21-206, 2023 WL 2505039 (E.D. Cal. Mar.
     14, 2023); *United States v. Serrano*, No. CR21-1590, 2023 WL 2297447 (S.D. Cal. Jan. 17,
21   2023); *United States v. Moore*, No. CR20-474, 2023 WL 154588 (D. Or. Jan. 11, 2023); *United
     States v. Butts*, 637 F. Supp. 3d 1134 (D. Mont. 2022); *United States v. Delpriore*, 634 F. Supp.
22   3d 654 (D. Alaska 2022); *United States v. Siddoway*, No. CR21-205, 2022 WL 4482739 (D.
     Idaho Sept. 27, 2022); *United States v. Perez*, No. CR21-508, 2022 WL 17484969 (S.D. Cal.
23   Sep. 26, 2022); *United States v. Hill*, 629 F. Supp. 3d 1027 (S.D. Cal. 2022); *United States v.
     Nevens*, No. CR19-774, 2022 WL 17492196 (C.D. Cal. Aug. 15, 2022).
24

1    18 U.S.C. § 922(g)(8).

2           *Rahimi* ultimately rejected the surety analogy because surety laws imposed a conditional,

3    partial restriction on the Second Amendment right, and § 922(g)(8) "works an absolute

4    deprivation of the right, not only publicly to carry, but to *possess* any firearm, upon entry of a

5    sufficient protective order." *Id.* at 460.  This is where *Rahimi* strayed from *Bruen*'s framework.

6    Surety laws are not a "dead ringer," but are still "analogous enough to pass constitutional

7    muster." *Bruen*, 597 U.S. at 30.  Analogical reasoning is based on a comparison or

8    correspondence between two things, and necessarily accepts and acknowledges differences.

9    *Bruen* "does not empower courts to strike down a statute purely because our Nation neglected to

10   pass a nearly identical law in past centuries." *Lewis*, 2023 WL 6066260, at *7.  *Rahimi* sought a

11   much closer comparison than was necessary.

12          Both laws presume individuals have the right to bear arms.  *Bruen,* 597 U.S. at 56

13   ("While New York presumes that individuals have *no* public carry right without a showing of

14   heightened need, the surety statutes presumed that individuals had a right to public carry[.]").

15   Surety laws identified persons who, through some individualized finding, created a reasonable

16   cause to fear an injury or breach of the peace.  Those persons were required to post surety; if they

17   could not, they could not carry a firearm publicly.  The remedy fit the cause: because these

18   individuals were more likely to breach the peace, they were publicly disarmed (or, made to bear

19   a greater financial burden to do so), addressing the concern of *public* violence.  § 922(g)(8)

20   identifies persons who, through fact-finding subject to notice and opportunity, are deemed to be

21   dangerous to their intimate partners or children.  Because the individuals are more likely to be

22   violent at home, they are disarmed not only publicly, but also domestically, addressing the

23   concern of *domestic* violence.  The two are not twins, but they are analogues, and this is not the

24

first Court to think so.  *See United States v. Guthery*, No. 2:22-CR-00173-KJM, 2023 WL

2696824, at *9 (E.D. Cal. Mar. 29, 2023) (rejecting *Rahimi* and finding surety laws analogous to

§ 922(g)(8)); *United States v. Ryno,* No. 3:22-CR-00045-JMK, 2023 WL 3736420, at *7 (D.

Alaska May 31, 2023) (finding § 922(g)(9), which disarms those convicted of a misdemeanor

crime of domestic violence, analogous to surety laws); *Lewis*, 2023 WL 6066260, at *5 (finding

surety laws analogues to § 922(g)(8)).

        And, despite *Rahimi*'s concern that the statute "works an absolute deprivation of the

right[,]" persons subject to § 922(g)(8) are not dispossessed forever.  Only so long as the person

remains subject to a court order meeting the statutory requirements will their right be burdened.

Should the order at any time be lifted or altered such that it no longer meets those requirements,

the Second Amendment right would be restored.  In fact, one of DeBorba's no-contact orders

already expired on October 14, 2022.  (Dkt. No. 2 at 12.)

        Although the regulations operate in slightly different ways, the two are similar enough

under the analytical framework required under *Bruen* that this Court is satisfied § 922(g)(8) is

consistent with this Nation's historical tradition of firearm regulation, and therefore

constitutional.  DeBorba's motion to dismiss the indictment as it relates to his charges under

§ 922(g)(8) is **DENIED.**

        ii.   **18 U.S.C. § 922(g)(5)**

        § 922(g)(5) makes possession unlawful for a person "who, being an alien—(A) is

illegally or unlawfully in the United States; or (B) except as provided in subsection (y)(2), had

been admitted to the United States under a nonimmigrant visa (as that term is defined in section

101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)))[.]"[5]  18 U.S.C. § 922(g)(5).

One would not expect to find a statute disarming immigrants at any time prior to the nineteenth century, because immigration regulation is relatively new.  "The federal government first forayed into the realm of immigration legislation during the 1870s.  One decade later, the 1882 Chinese Exclusion Act prohibited Chinese laborers from entering the United States for ten years."  *United States v. Munoz-De La O*, 586 F.Supp.3d 1032, 1036 (E.D. Wash. Feb. 18, 2022); *see also* U.S. Citizenship and Immigration Services, Early American Immigration Policies, https://www.uscis.gov/about-us/our-history/overview-of-ins-history/early-american-immigration-policies (July 30, 2020) ("Americans encouraged relatively free and open immigration during the 18th and early 19th centuries, and rarely questioned that policy until the late 1800s.").  By contrast, in 2022, the U.S. Citizenship and Immigration Services reported using its $5.4 billion budget to employ nearly 20,000 people in sorting through more than nine million applications, petitions, and requests.  U.S. Citizenship and Immigr. Servs., Ann. Stat. Rep., at 3 (2022) (available at:

---

[5] Assuming the allegations in the indictment are true, DeBorba meets the criteria for § 922(g)(5)(A).  According to the regulation interpreting § 922(g)(5)(A), "[a]lien illegally or unlawfully in the United States" includes "any alien" "[w]ho is a nonimmigrant and whose authorized period of stay has expired."  27 C.F.R. 478.  *See also United States v. Anaya-Acosta*, 629 F.3d 1091, 1094 (9th Cir. 2011).  Although he was indicted generally under § 922(g)(5) (Dkt. No. 40), based on the current record, the Court preliminarily finds DeBorba does not meet any criteria under § 922(g)(5)(B).  The *Bruen* analysis is thus focused on subsection (A)—aliens who are "illegally or unlawfully" in the United States.  *See United States v. Sing-Ledezma*, No. EP-23-CR-823(1)-KC, 2023 WL 8587869 (W.D. Tex. Dec. 11, 2023) (analyzing only § 922(g)(5)(A) but not (B) under *Bruen*).  If the parties believe DeBorba meets some criteria under subsection (B), the Court invites motions for reconsideration on that issue.  And, although subsection (B) need not be analyzed, this Court questions whether it would pass constitutional muster under *Bruen*—categorically disarming all lawful, nonimmigrant visa holding aliens, including vacationers, business visitors, media, athletes, students, victims of human trafficking, certain diplomats, and more.

1     https://www.uscis.gov/sites/default/files/document/reports/FY2022_Annual_Statistical_Report.p

2     df).  Similarly, the distinction between "legal and lawful" and "illegal and unlawful"

3     immigration as we understand the terms today is primarily the product of legislation passed in

4     the latter twentieth century.  *See* Immigration and Nationality Act of 1965, Pub. L. 89–732, 79

5     Stat. 911; Immigration Reform and Control Act of 1986, Pub. L. 99–603, 100 Stat. 3445.  Direct

6     comparison to founding-era laws disarming immigrants is thus impossible, and again, the Court

7     must turn to analogous comparison.

8          The Government argues the Bill of Rights codified an existing understanding that the

9     right to bear arms was connected to citizenship and membership in and preservation of the

10     political community.  (Dkt. No. 51 at 18.)  In support of § 922(g)(5), the Government cites early

11     prohibitions on "dangerous persons" and those refusing to take an oath of loyalty to the United

12     States.  (*Id.* at 19–21.)

13          "Dangerous persons" laws disarmed groups viewed as threatening the integrity of the

14     United States.  *United States v. Daniels*, 77 F.4th 337, 354 (5th Cir. 2023) (describing colonists'

15     perceptions of British Loyalists as "political traitors," Catholics as "potential insurrectionists,"

16     and Native Americans and slaves as "minorities who the Founders thought threatened violent

17     revolt"); *accord Rahimi*, 61 F.4th at 457.  For example, laws disarming Papists provided that any

18     Catholic who refused to make a declaration renouncing his or her faith could not "have or keepe

19     in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than

20     such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for

21     the defence of his House or person").  1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm*

22     71–73 (1688).  That same Parliament wrote the predecessor to our Second Amendment into the

23     1689 English Bill of Rights, which also drew a religion–based distinction.  *Bruen*, 597 U.S. at 44

24

1  (quoting *Heller*, 554 U.S. at 593); *see* 1 W. & M., Sess. 2, c. 2, in 6 The Statutes of the Realm

2  143 (1688) ("Protestants may have Arms for their Defence suitable to their Conditions and as

3  allowed by Law").

4       Continuing this precaution in the American colonies, Maryland, Virginia, and

5  Pennsylvania disarmed Catholics who refused to take a loyalty oath during the French and Indian

6  War.  Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms*

7  *Ownership*, 1607–1794, 16 Law & Hist. Rev. 567, 574 (1998), 52 Archives of Maryland 454 (J.

8  Hall Pleasants ed., 1935); 7 *The Statutes at Large; Being A Collection of All the Laws of Virginia*

9  35–39 (1820) (1756 Va. law); 5 *The Statutes at Large of Pennsylvania from 1682 to 1801*, 627

10  (WM Stanley Ray ed., 1898).  Several American states continued to disarm Catholics as well.

11  *See, e.g.*, Act of March 25, 1756, ch. 4, reprinted in 7 *Statutes At Large; Being a Collection of*

12  *All The Laws Of Virginia From The First Session of The Legislature In The Year 1619*, at 9, 35–

13  36 (William Waller Hening ed., Richmond, Franklin Press 1820) (disarming "Papists" because it

14  was "dangerous at this time to permit [them] to be armed").  Legislatures at this time also

15  prohibited Native Americans from owning firearms.  Bellesiles, *supra*, at 578–579; *see also* Act

16  of Aug. 4, 1675, 5 *Records of the Colony of New Plymouth* 173 (1856); Act of July 1, 1656,

17  *Laws and Ordinances of New Netherland* 234–235 (1868).

18       At the founding, the same logic extended to those refusing to swear allegiance to the

19  emerging United States.  A 1775 Connecticut law provided that any person convicted of "libel

20  [ing] or defam[ing]" any acts or resolves of the Continental Congress or the Connecticut General

21  Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be

22  disarmed and not allowed to have or keep any arms."  *The Public Records of the Colony of*

23  *Connecticut From May, 1775 to June, 1776*, at 1993 (1890) (1775 Conn. law).  In March 1776,

24

1  the Continental Congress instructed the Colonies "immediately cause all persons to be disarmed

2  within their respective colonies, who are notoriously disaffected to the cause of America, or who

3  have not associated or who refuse to associate . . . against the hostile attempts of the British."  4

4  *Journals of the Continental Congress, 1774-1789*, pgs. 201–205 (1906).  Some states prohibited

5  firearm possession by those "who refused to declare an oath of loyalty."  *United States v.*

6  *Jackson*, 69 F.4th 495, 503 (8th Cir. 2023) (citing examples); *see also Medina v. Whitaker*, 913

7  F.3d 152, 159 (D.C. Cir. 2019) (discussing theory that the right to arms does not preclude laws

8  disarming the unvirtuous).  As late as 1863, a Union general ordered "all *loyal* and peaceable

9  citizens in Missouri will be permitted to bear arms."  Hdqrs. Dep't of the Missouri, General

10  Orders, No. 86 (Aug. 25, 1863), in *The War of the Rebellion: A Compilation of the Official*

11  *Records of the Union and Confederate Armies*, ser. 1, vol. 22, pt. 2, at 475 (1888) (emphasis

12  added).

13          "Oath-based" laws targeting the "dangerous" and "untrustworthy" do not seem

14  sufficiently analogous to § 922(g)(5)(A).  "We must ask: *Why* was the group considered

15  dangerous at the Founding and therefore disarmed? And *why* does the modern law classify a

16  person as presumptively dangerous?"  *United States v. Daniels*, 77 F.4th at 354. (5th Cir. 2023).

17  Papists, loyalists, and Native Americans were considered "dangerous" to the Colonies due to

18  their non-allegiance to the political community and potential for uprising.  By contrast, aliens

19  subject to § 922(g)(5)(A) are not dispossessed based on their allegiance elsewhere.

20  § 922(g)(5)(A) does not restrict aliens from owning guns because they are aliens; rather, the

21  statute disarms aliens who are "illegally or unlawfully" present in the United States.  The "why"

22  of the statute therefore cannot be "because he is an alien," but rather "because he is present in the

23  United States illegally or unlawfully."  Indeed, aliens not meeting either subcategory in

24

§ 922(g)(5) may lawfully purchase a firearm.  18 U.S.C. 922 (d)(5), (g)(5) and (y)(2); 27 C.F.R. 478.11 and 478.32(a)(5); *see also United States v. Oscar Vazquez-Ramirez*, No. 2:22-CR-87-RMP-1, 2024 WL 115224, at \*4 (E.D. Wash. Jan. 10, 2024) ("Accordingly, the differential treatment of unlawfully present noncitizens based upon their status as unlawful and not law-abiding is reasonable and not arbitrary.").

Although undocumented immigrants are not "law-abiding," most do not resemble criminals at all.  *Meza-Rodriguez*, 798 F.3d at 673 ("While it is a misdemeanor to enter the country improperly, *see* 8 U.S.C. § 1325(a), many unauthorized immigrants . . . were too young to form the requisite intent to violate this statute when they were originally brought to the United States.").  But whether our complex immigration system is fair from a policy perspective is not a question this Court can confront—it is still the law, and undocumented immigrants have not complied with it.  Of the original "prohibited persons" subject to § 922(g)(5)'s precursors, undocumented immigrants are less like those with a propensity for violence due to their criminal history, and more like those with some flagrancy for the law by acting as fugitives of justice.  They are closer to law "avoiders" than law "violators."  *See Arizona v. United States*, 567 U.S. 387, 407 (2012) ("As a general rule, it is not a crime for a removable alien to remain present in the United States.").  Although they may not be "dangerous" to the point of uprising, having circumvented current methods of lawful immigration, undocumented immigrants are necessarily not "law-abiding" people to whom this Nation's historical tradition of firearm regulation reserved the right.

In addition to those mentioned previously in connection with § 922(g)(8), there are a great number of analogous statutes prohibiting possession of firearms for those who are not law-abiding.  "[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to

1   the concept of a virtuous citizenry and that, accordingly, the government could disarm

2   'unvirtuous citizens.'"   *United States v. Yancey*, 621 F.3d 681, 684–685 (7th Cir. 2010) (quoting

3   *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010), Glenn Harlan Reynolds, *A*

4   *Critical Guide to the Second Amendment*, 62 TENN. L. REV. 461, 480 (1995), and Don B. Kates,

5   Jr., *The Second Amendment: A Dialogue, Law & Contemp. Probs.*, Winter 1986, at 143, 146

6   (1986)).   For example, felons "were excluded from the right to arms" because they were deemed

7   unvirtuous.   Reynolds, *supra*, at 480; *see also* David Yassky, *The Second Amendment: Structure,*

8   *History, and Constitutional Change*, 99 MICH. L. REV. 588, 626 (2000) ("The average citizen

9   whom the Founders wished to see armed was a man of republican virtue[.]"); Saul Cornell &

10   Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73

11   FORDHAM L. REV. 487, 491–492 (2004) ("Historians have long recognized that the Second

12   Amendment was strongly connected to the republican ideologies of the Founding Era,

13   particularly the notion of civic virtue.").

14       The influential "Dissent of the Minority," published by Anti-Federalist delegates in

15   Pennsylvania, proposed that the people should have a right to bear arms "unless for crimes

16   committed, or real danger of public injury from individuals."   2 Bernard Schwartz, *The Bill of*

17   *Rights: A Documentary History*, 665 (1971).   But, like undocumented immigrants, one did not

18   need to be violent to break the law and consequently forfeit their arms.   Early legislatures also

19   ordered forfeiture of firearms by persons who committed non-violent hunting offenses, *see* Act

20   of Oct. 9, 1652, *Laws and Ordinances of New Netherland* 138 (1868); Act of Apr. 20, 1745, ch.

21   III, 23 *The State Records of North Carolina* 218–219 (1904).   By comparison, punishments for

22   non-violent offenses involving deceit and wrongful taking of property subsumed disarmament,

23

24

including death or forfeiture of a perpetrator's entire estate.  *Jackson*, 69 F.4th at 503 (citing sources).

The tradition of disarming people failing to abide by the law is supported by *Bruen* itself, which "refers to those falling under the protection of the Second Amendment as 'law abiding' people (or the equivalent) twenty-four times, with over half of those references appearing in the main opinion."  *United States v. Robinson*, No. 2:22-CR-00212-TL, 2023 WL 5634712, at *5 (W.D. Wash. Aug. 31, 2023) (citing *Bruen*, 142 S. Ct. at 2125, 2133, 2159).  Denying persons who violate the law the right to bear arms is also consistent with the explicit purpose of the Second Amendment to maintain "the security of a free state."  U.S. Const. amend II.

Finding § 922(g)(5)(A) constitutional for this reason seems like a backwards way of reaching the same conclusion avoided at the outset: undocumented immigrants are not part of "the people" to whom the right attaches.  True, the two approaches "will typically yield the same result; one uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away."  *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting).  But the consequences of using one method over another are important.  Defining "the people" to exclude undocumented immigrants seriously implicates that group's rights wherever "the people" is used within the Constitution—including First Amendment speech protections and Fourth Amendment searches and seizures.  There is "no principled way to carve out the Second Amendment and say that the unauthorized (or maybe all noncitizens) are excluded.  No language in the Amendment supports such a conclusion, nor, as we have said, does a broader consideration of the Bill of Rights."  *Meza-Rodriguez*, 798 F.3d at 672.  Finding otherwise would potentially eviscerate the most fundamental protections for nearly eleven million people.  *See* Bryan Baker, *Estimates of the Unauthorized Immigrant Population*

1    *Residing in the United States: January 2015–January 2018*, DHS Office of Immigration

2    Statistics, at 3 (January 2021) (available at:

3    https://www.dhs.gov/sites/default/files/publications/immigration-

4    statistics/Pop_Estimate/UnauthImmigrant/unauthorized_immigrant_population_estimates_2015_

5    -_2018.pdf) (estimating 11,390,000 unauthorized immigrants); Jeffrey S. Passel & Jens Manuel

6    Krogstad, *What we know about unauthorized immigrants living in the U.S.*, PEW Research

7    Center (Nov. 16, 2023) (available at: https://www.pewresearch.org/short-reads/2023/11/16/what-

8    we-know-about-unauthorized-immigrants-living-in-the-us/) (estimating 10.5 million).  Assuming

9    without deciding "the people" includes undocumented immigrants, § 922(g)(5)(A) is still

10   constitutional because disarmament of those who circumvent the legal system—including

11   undocumented immigrants—is consistent with this Nation's historical tradition of firearm

12   regulation.

13        DeBorba filed as supplemental authority *United States v. Sing-Ledezma*, No. EP-23-CR-

14   823(1)-KC, 2023 WL 8587869 (W.D. Tex. Dec. 11, 2023).  (Dkt. No. 65.)  That court concluded

15   the Government had not met its burden and found § 922(g)(5)(A) "an outlier that our ancestors

16   would never have accepted."  *Id.* at *18 (citing *Bruen*, 597 U.S. at 30).  This Court agrees with

17   *Sing-Ledezma* to the extent that oath-based and foreign-allegiance-based disarmaments are not

18   sufficient analogues to § 922(g)(5)(A).  But in addition to the tradition of disarming loyalists,

19   Catholics, Native Americans, and slaves as "potential insurrectionists" who threatened uprising,

20   there ran parallel a separate tradition of disarming non-law-abiding persons.  The latter resembles

21   § 922(g)(5)(A) much better than the former, and *Sing-Ledezma* did not consider the exclusion of

22   undocumented immigrants based on their failure to abide by the law.  "[T]he best reading

23   of § 922(g)(5)(A)'s legislative history suggests that it was enacted in the interest of crime

24

1    control." *Id.* at *15.  Restrictions on possession for those who break the law, which have existed

2    since the pre-founding era, match § 922(g)(5)(A)'s legislative intent.

3         Finally, although this Court disagrees with *Sing-Ledezma*'s conclusion, it echoes the

4    opinion's concern "that the present framework for assessing Second Amendment challenges is

5    difficult to apply.  Indeed, it sends jurists on a quixotic journey through history." *Id.* at *18.

6    And like another court in the Western District of Texas, this Court "wonders if the Government

7    sees anything concerning about relying on historical laws that disarmed anyone seen as

8    'unvirtuous' or 'dangerous.'" *United States v. Hicks*, 649 F. Supp. 3d 357, 363 (W.D. Tex.

9    2023).  For example, the Supreme Court has consistently reflected upon this Nation's abuses

10   "violating blacks' right to keep and bear arms." *Bruen*, 597 U.S. at 61; (citing *McDonald*, 561

11   U.S. at 771 (noting the "systematic efforts" made to disarm blacks)).  And yet the Court is forced

12   to accept as "traditional" the reasoning behind these laws to determine validity for modern

13   disarmament statutes.  Many of the "danger-based" disarmament laws are grounded,

14   fundamentally, on prejudices against groups of people based solely on their race, religion, or

15   national origin.  *See United States v. Escobar-Temal*, No. 3:22-CR-00393, 2023 WL 4112762, at

16   *4 (M.D. Tenn. June 21, 2023) ("[The basis for disarming Papists] is not analogous to the criteria

17   for placing persons within the scope of the prohibition of § 922(g)(5), and if they were,

18   § 922(g)(5) would be unconstitutional on grounds other than the Second Amendment.").  But it

19   is certainly within this Nation's historical tradition of firearm regulation to disarm people on that

20   basis—Native Americans, blacks, Catholics, and any other minority group the zeitgeist deems

21   suspicious and worthy of stifling.  Why would this "tradition" of disarming now-protected

22   classes make it Constitutional to disarm immigrants?  To consider the same about any other

23   fundamental Constitutional right, many of which traditionally excluded these groups, would be

24

strange.  And yet *Bruen* insists upon the exercise, making it hard to square which prejudices the Constitution supports, and when.

Having rejected his last argument under *Bruen*, DeBorba's motion to dismiss Counts 1, 2, 3, and 7 on Second Amendment grounds is **DENIED**.[6]

## C.  Fifth Amendment Challenge (Count 7)

DeBorba also challenges Count 7 as unconstitutionally vague facially and as applied in violation of the Fifth Amendment, because "silencer" is defined so unclearly that it fails to adequately notify the public of what items are covered, allowing law enforcement to arbitrarily enforce the law.  (Dkt. No. 56 at 1.)

The terms of a penal statute must be sufficiently explicit to inform those subject to it what conduct will render them criminally liable; a statute defining "in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application" violates due process.  *Connally v. General Const. Co.* 269 U.S. 385, 391 (1926).

DeBorba brings both a facial and as-applied challenge to the statute.  But a facial challenge is not available.  "[V]agueness challenges to statutes that do not involve First Amendment violations must be examined as applied to the defendant."  *United States v. Jae Gab Kim*, 449 F.3d 933, 942 (2006); *Kashem v. Barr*, 941 F.3d 358, 375 (9th Cir. 2019).  DeBorba argues the Supreme Court took exception to this rule by recently striking down a series of

---

[6] Notwithstanding the constitutionality of § 922(g)(5) and (8), Count 7, which alleges DeBorba possessed a silencer, cannot be dismissed on Second Amendment grounds because silencers are not considered "arms."  *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009); *United States v. Serrano*, 651 F.Supp.3d 1192, 1213 (S.D. Cal. 2023).  "Silencers, grenades, and directional mines are not typically possessed by law-abiding citizens for lawful purposes . . . [and] therefore are not protected by the Second Amendment."  *McCartney*, 357 F. App'x at 76; *see also United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("A silencer is a firearm accessory; it's not a weapon in itself . . . [a]ccordingly, it can't be a 'bearable arm' protected by the Second Amendment.").

1  statutes on facial vagueness challenges justified by "exceptional circumstances," citing to

2  *Johnson v. United States*, 576 U.S. 591 (2015) and *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018).

3  (Dkt. No. 56 at 28.)

4  In *Johnson*, the Court struck down as vague a section of the Armed Career Criminal Act

5  of 1984, which proscribed more severe punishment to felons in possession if the violator had

6  three or more earlier convictions for a "serious drug offense" or a "violent felony." *Johnson*, 576

7  U.S. at 593.  "Violent felony" included a crime that is burglary, arson, extortion, involving the

8  use of explosives, or "otherwise involv[ing] conduct that presents a serious potential risk of

9  physical injury to another," which became known as the "residual clause." *Id.* at 594 (citing

10 18 U.S.C. § 924(e)(2)(B)(ii)).  Courts use the "categorical approach" when deciding whether an

11 offense is a violent felony, looking "only to the fact that the defendant has been convicted of

12 crimes falling within certain categories, and not to the facts underlying the prior

13 convictions." *Id.* at 596 (citing *Taylor v. United States,* 495 U.S. 575, 600 (1990)).

14 Deciding whether the residual clause covered a crime thus required a court to picture the

15 kind of conduct that the crime involved in "the ordinary case," and to judge whether that

16 abstraction presented a serious potential risk of physical injury.  *Id.* at 596.  The Supreme Court

17 concluded increasing a defendant's sentence under the clause denied due process.  *Id.* at 597.

18 The Court based the conclusion on the compounding of uncertainties; the mysterious threshold

19 level of risk making any given crime a "violent felony" would not, on its own, have violated the

20 void-for-vagueness doctrine because many perfectly constitutional statutes use imprecise terms

21 like "serious potential risk" or "substantial risk."  *Id.* at 604.  The problem arose from layering

22 the standard on top of the requisite "ordinary case" inquiry.  *Id.*

23

24

1    *Dimaya* operated nearly identically.  The defendant in that case brought another

2    challenge to the same statute requiring the initial "ordinary case" inquiry.  *Dimaya*, 138 S.Ct. at

3    1215.  The residual clause at issue in *Dimaya* required a judge to determine whether any other

4    felony, by its nature, "involves a substantial risk that physical force against the person or

5    property of another may be used in the course of committing the offense."  *Id.* at 1211 (citing 18

6    U.S.C. § 16).  The section at issue in *Dimaya* had the same two features conspiring to make the

7    residual clause in *Johnson* unconstitutionally vague.  *Id.* at 1216.

8        There is no such abstract layering here.  The Court is not required to abstract some

9    "ordinary case" or "ordinary item" in addition to this definition to determine whether "firearm

10   silencer" encompasses the item DeBorba allegedly possessed.  As this is not a First Amendment

11   challenge, and no "exceptional circumstances" exist warranting *Johnson* and *Dimaya*'s exception

12   to the rule against facial vagueness challenges, DeBorba can only challenge § 5861(d)'s

13   vagueness as applied to his conduct.

14       The inquiry, then, is whether the statute gave someone in DeBorba' position fair notice

15   that his conduct was criminal.  *U.S. v. Harris*, 705 F.3d 929, 932 (9th Cir. 2013); *United States v.*

16   *Kilbride*, 584 F.3d 1240, 1257 (9th Cir. 2009).  Count 7 alleges DeBorba violated

17   26 U.S.C. § 5861(d), which makes it unlawful to receive or possess an unregistered "firearm" as

18   defined in 26 U.S.C. § 5845(a)(7).  (Dkt. No. 40 at 5.)  § 5845(a)(7) defines "firearm" as

19   including any "silencer" as defined by 18 U.S.C. § 921:

20       The terms "firearm silencer" and "firearm muffler" mean any device for silencing,
         muffling, or diminishing the report of a portable firearm, including any combination
21       of parts, designed or redesigned, and intended for use in assembling or fabricating
         a firearm silencer or firearm muffler, and any part intended only for use in such
22       assembly or fabrication.

23

24

1   18 U.S.C. § 921(a)(25).  DeBorba argues the use of the word "for" in this definition is confusing.

2   "[D]oes this mean that the item's only use is for silencing a firearm, its primary use is for silencing

3   of a firearm, or its possible use is for silencing a firearm?"  (Dkt. No. 56 at 29.)

4           DeBorba maintains the item he allegedly possessed is an automotive filter, akin to a

5   "solvent trap," whose advertised purpose is other than for use as a silencer.  (*Id.* at 30.)  The Bureau

6   of Alcohol, Tobacco, Firearms and Explosives (ATF) investigator concluded the item at issue was

7   a silencer:

8           Exhibit 1 is consistent with many items misrepresented as "Automotive filters" or
           "solvent traps" in a thinly veiled attempt at presenting a legitimate and legal use for
9           these devices other than as firearm silencers or a combination of parts intended for
           use in assembling a firearm silencer.  In actuality, these devices clearly meet the
10          GCA definition of a firearm silencer and are intended to provide a means to skirt
           the laws and regulations governing the manufacture, sale, and transfer of firearms
11          silencers.

12  (Dkt. No. 56-2 at 7.)   DeBorba believes this explanation is "precisely the type of arbitrary

13  enforcement that the statute's vague definition of 'silencer' invites." (Dkt. No. 56 at 31.)

14          But the question is not whether enforcement of the statute against DeBorba is arbitrary.  It

15  is whether DeBorba had fair notice that his conduct was criminal.  And the standard is not what

16  DeBorba knew, but whether, as applied to the specific factual scenario, a reasonable person of

17  average intelligence in DeBorba's position would be on notice that their conduct was legally

18  prohibited.  *United States v. Alexander*, 480 F. Supp. 3d 988, 998 n.5 (N.D. Cal. 2020).

19          A reasonable person of average intelligence in DeBorba's position would be on notice

20  that possessing the item—whether it be referred to as a solvent trap, a stick suppressor, a

21  silencer—is a device for silencing, muffling, or diminishing the report of a portable firearm.  In

22  fact, DeBorba's item was located with other firearms accessories in his bedroom workbench, in a

23  box labeled "suppressor."  (Dkt. No. 60 at 12.)

24

1    ATF provided a report of technical examination of the object.  (Dkt. No. 56-2.)  The item

2    was reported to be a cylindrical device with no manufacturer marking and no serial number.  (*Id.*

3    at 2.)  The front endcap of the device contained a hole to allow passage of a bullet, and the rear

4    endcap also had a hole in its center that was internally threaded to facilitate attachment to a

5    firearm barrel.  (*Id.* at 6.)  ATF conducted sound-comparison testing at a test range using a

6    calibrated firearm and determined the item, when attached to a portable firearm, reduced sound

7    reporting by at least twelve decibels.  (*Id.* at 7.)

8    DeBorba notes the internal cylinder lacks a hole on one end, which would not allow a

9    bullet to pass through, thus suggesting its use as an automotive fluid filter.  (Dkt. No. 62 at 8.)

10   ATF explains one silencer patent (U.S. Patent No. 4,530,417) purposefully leaves one end solid,

11   allowing the second hole to be created by firing a round through the solid end to reduce the cost

12   of fabricating the hole and to ensure proper alignment.  (Dkt. No. 56-2 at 6.)

13   A reasonable person would not have to "guess" whether the metal cylinder's clear

14   function was to silence a gun.  To be sure, a District Court in the Northern District of California

15   has rejected this exact argument:

16       It is clear that the threaded metal cylinder is a device for "silencing, muffling, or
          diminishing the report of a portable firearm." Here, Defendant, a gun enthusiast,
17       had fair notice that he possessed an object whose *only* purpose was to silence,
          muffle, or diminish the sound of a firearm. A reasonable person in Defendant's
18       position would not have to "guess" whether the silencer found at Defendant's home
          qualified as a silencer—the metal cylinder's clear function was to silence a gun.

19   *Alexander*, 480 F. Supp. 3d at 998.  The parties dispute whether DeBorba is a "gun enthusiast."

20   (*See* Dkt. Nos. 60 at 12; 62 at 7.)  It is not necessary to decide if he is, but the Court notes the

21   superseding indictment reports DeBorba allegedly possessing eleven rifles, seven handguns, one

22   shotgun, and twenty-seven rounds of ammunition.  (Dkt. No. 40 at 2–3.)

23

24

A reasonable person of average intelligence in DeBorba's position was on fair notice that possession of the unregistered item (which could be used as a silencer and was likely intended for use as a silencer) was criminal conduct.  18 U.S.C. § 921(a)(25) is not vague as applied to DeBorba and conviction under the statute would not violate his Fifth Amendment due process rights.

**D.  Immigration status challenge (Counts 4, 5, 6)**

Counts 4 and 5 allege DeBorba violated § 922(a)(6), which prohibits false statements in the acquisition of a firearm.  (Dkt. Nos. 9 at 3–4; 40 at 3–4); 18 U.S.C. § 922(a)(6).  To sustain a conviction, the government must prove that the false statement was "material to the lawfulness of the sale or other disposition of such firearm[.]" 18 U.S.C. § 922(a)(6).  This materiality requirement is met only if the false statement would prevent the gun sale in question from legally occurring if the truth were known.  *See Abramski v. United States*, 573 U.S. 169, 189 (2014).

DeBorba argues the false statements made in connection with the purchase of the firearms were not material to obtaining the firearms because any restriction on the purchase of a firearm related to citizenship is unconstitutional under *Bruen*.  (Dkt. No. 36 at 43–47.)  He argues the indictment therefore fails to allege the materiality elements of the statutes charged, and to allege a crime in Counts 4 and 5.  (*Id.* at 44.)

Similarly, Count 6 alleges DeBorba violated § 911, which makes it unlawful for someone to falsely and willfully represent himself to be a citizen of the United States.  (Dkt. Nos. 9 at 4, 40 at 5); 18 U.S.C. § 911.  The false representation of U.S. citizenship must be "made to a person having some right to inquire or adequate reason for ascertaining a defendant's citizenship[.]" *United States v. Esparza-Ponce*, 193 F.3d 1133, 1137–1138 (9th Cir. 1999) (quoting *United States v. Achtner*, 144 F.2d 49, 52 (2d Cir. 1944)).  DeBorba argues the Washington Department of Licensing could not constitutionally deny a person a concealed carry permit based on their

Case 3:22-cr-05139-DGE   Document 74   Filed 01/30/24   Page 38 of 40

lack of U.S. citizenship, and therefore, the Department as a matter of law lacked any right to inquire or adequate reason for ascertaining his citizenship.  (Dkt. No. 36 at 47.)

Both arguments are premised on *Bruen* prohibiting citizenship requirements in connection with the purchase or possession of a firearm.  As explained at length above, restrictions on firearm possession for undocumented immigrants is consistent with this Nation's historical tradition of firearm regulation, and any restrictions on firearm possession based on DeBorba's status as an undocumented immigrant are not unconstitutional.

When he applied for the license, DeBorba checked the "yes" box next to the question: "Are you a United States citizen?" and checked the "no" boxes next to the questions: "Are you a permanent resident alien?" and "Are you a legal alien temporarily residing in Washington?" (Dkt. No. 2 at 10–11.)  When he applied to purchase firearms, he checked "United States" in response to a question inquiring about his citizenship and checked "no" on questions asking whether he was a non-citizen unlawfully in the United States and whether he was a non-citizen who had been admitted on a nonimmigrant visa.  (*Id.* at 10–12.)

If answered truthfully, these questions would have revealed DeBorba did not maintain lawful status and was therefore subject to § 922(g)(5)(A)'s prohibition on firearm possession for aliens illegally or unlawfully in the United States.  The questions need not resolve his eligibility for possession on their own, but all are relevant to whether DeBorba was lawfully in the United States.  For example, "Are you a U.S. citizen?" is relevant and necessary information to know whether DeBorba might be subject to § 922(g)(5)(A) but would not, on its own, resolve whether he is subject to that provision.  "Are you a permanent resident alien?" and "Are you a legal alien temporarily residing in Washington?" both get at whether DeBorba is an alien here lawfully or unlawfully, but without the citizenship question do not resolve the issue.  Together, all three

ORDER DENYING MOTIONS TO DISMISS (DKT. NOS. 36, 56) - 38

questions are material to the lawfulness of the sale of the firearm, and the Department as a matter of law had the right to inquire.  DeBorba's Motion to Dismiss Counts 4, 5, and 6 is therefore **DENIED.**

### E.  Motion to Strike

Attached as Exhibit B to DeBorba's Reply in Support of the original Motion to Dismiss was an Expert Report and Declaration of Pratheepan Gulasekaram, a law professor.  (Dkt. No. 53-1.)  The Government argues the expert report was not included in the defendant's Motion to Dismiss the Indictment and therefore must be stricken because he attempts to submit new arguments in his Reply.  (*See* Dkt. No. 57 at 3.)  In response, DeBorba explains the arguments in his reply "were not ones he was required to raise in his Motion; they were instead responsive to the arguments and facts the government was obligated to raise in its Response if it were to meet its burden."  (Dkt. No. 58 at 2.)

It is true that "new arguments should not be reserved for a reply brief, as it gives the opposition no opportunity to respond."  *Roth v. BASF Corp.*, No. C07-106MJP, 2008 WL 2148803, at *2 (W.D. Wash. May 21, 2008).  While a court need not consider evidence submitted for the first time in a reply, *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007), it may consider evidence and argument submitted with a reply that is responsive to arguments raised in the non-moving party's brief in opposition.  *Ejonga v. Strange*, No. 2:21-cv-01004-RJB-GJL, 2023 WL 4457142, at *1 (W.D. Wash. July 11, 2023) (citing *PSM Holding Corp. v. Nat'l Farm Fin. Corp.*, No. CV 05-08891, 2013 WL 12080306, at *4 (C.D. Cal. Oct. 8, 2013), *aff'd in part*, 884 F.3d 812 (9th Cir. 2018)).

Because it was the Government's burden to show a statute is consistent with this Nation's historical tradition of firearm regulation, a reply on the issue will no doubt contain new historical

evidence or arguments to attack the Government's position.  DeBorba argues Professor

Gulasekaram's declaration is useful to the Court because he can "attest to a lack of similar

historical analogues uncovered by his research, something that counsel cannot do through a

citation and that the government would likely claim undersigned counsel is not qualified to do."

(Dkt. No. 58 at 6.)

No precedent in this Circuit requires the Court strike the declaration.  Especially

considering *Bruen*'s unique burden-shifting scheme, the declaration in response to the

Government's arguments is not so clearly improper as to necessitate its striking, and therefore,

the Government's Motion to Strike is **DENIED.**

## F.  CONCLUSION

Accordingly, and having considered the Motions, the briefing of the parties, and the

remainder of the record, the Court finds and ORDERS:

    **a.**  DeBorba's Motion to Dismiss the Indictment (Dkt. No. 36) is **DENIED.**

    **b.**  DeBorba's Motion to Dismiss Count 7 of the Superseding Indictment (Dkt. No.

       56) is **DENIED.**

    **c.**  The Government's Motion to Strike Expert Declaration (Dkt. No. 57) is

       **DENIED.**

Dated this 30th day of January 2024.

David G. Estudillo
United States District Judge