Exhibit 5



Vancouver Police Department

## Report Number 2021-007757 - *Offense / Incident Report

| REPORT DATE / TIME | EVENT START DATE / TIME - EVENT END DATE / TIME | REPORT WRITER |
|---|---|---|
| Apr 15, 2021 21:32 | Apr 15, 2021 18:48 | Christopher Douville #1517 |

ASSISTING PERSONNEL / TYPE(S)
Timothy Lear #1233 (Investigative Assistance)

VILLAGE PARK APARTMENTS, ██████████ , VANCOUVER, WA 98661

## NARRATIVE

### Synopsis

Defendant allegedly assaulted victim ██ J.M. ██ by using pushing him with a two handed shove to his upper chest, causing him pain, as he stood between the victims and the exit of the residence. Defendant and both victims lived together at the listed address on the listed date and time. Victims ██ J.M. ██ and Wesley said they were afraid of being assaulted after the defendant allegedly said, "You aren't going anywhere." I later attempted to contact the defendant via telephone, but he refused to meet with me in person. Defendant is outstanding.

### Narrative

I responded to an "assault just occurred" call for service at ████████████ , on 04152201 at about 1902 hours after the complainant ██ T.W. ██ called to report that her room mate, whom I later identified from ██ T.W. ██ 's statement and premise history at the residence as Joao Deborba, assaulted her room mate, ██ J.M. ██ . I later learned that ██ T.W. ██ , Deborba, and ██ J.M. ██ were all room mates at the residence together, and that ██ T.W. ██ and ██ J.M. ██ were involved in a significant dating relationship.

On the listed date and time the City of Vancouver employed me as a state certified police officer, empowered to enforce state law and local ordinance. I wore full uniform and operated a marked patrol vehicle on this date and time, responding to radio call sign 2S21.

I arrived on scene shortly after Ofcs. Lear and Suarez. Please see their reports for further information. When I arrived, I spoke with ██ T.W. ██ and ██ J.M. ██ , who were waiting for me in the parking lot of the apartment complex. Wesley and ██ J.M. ██ appeared calm and sober when I spoke with them. ██ T.W. ██ told me that she had been sitting with ██ J.M. ██ on the couch in the living room of the apartment, when Deborba entered. ██ T.W. ██ told me that Deborba said, "hi," to the two of them, and while ██ J.M. ██ said, "hi," back to him, ██ T.W. ██ admitted that she said, "bye," to him, in a dismissive tone. ██ T.W. ██ said that there had been tensions between the three of them, and she alleged that Deborba had been pocketing money that she and ██ J.M. ██ had given to him to pay the rent, and that she discovered recently to this report that they owed the apartment management nearly $4,000 in back rent.

██ T.W. ██ said that Deborba went to his room, but returned to the living area about five minutes later and said words to the effect of, "That's fine, I don't have to speak to you." ██ T.W. ██ said that she told him, "I don't want to talk to you," or, "I wasn't speaking to you," and when she said this Deborba exited the residence for about five minutes, but that when he returned about five minutes later, he said that he was calling the police.

I asked ██ T.W. ██ why Deborba would call the police, and she told me that he was trying to get her and ██ J.M. ██ in trouble, and that in the past he had alleged that ██ J.M. ██ was armed with a knife and had participated in at least one road range incident. ██ T.W. ██ said that she told Deborba, "Fine, I can call the police too!" She said that she told Deborba that she knew that he had been violating the terms of a served No Contact Order with the mother of his children, and that she knew that he had been harassing the apartment management.

██ T.W. ██ said that this infuriated Deborba, and both she and ██ J.M. ██ said that he walked to where the two stood in the living room and came "within inches," according to ██ T.W. ██ , of their faces. She said that he began screaming at them about talking with the apartment manager, and ██ T.W. ██ said that she cut Deborba off by saying, "We're done living with you, go talk to the manager."

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Christopher Douville #1517   Apr 16, 2021 00:38 (e-signature) | Clesson Werner #1494   Apr 16, 2021 02:55 (e-signature) |
| PRINT NAME | PRINT NAME |
| Christopher Douville #1517 | Clesson Werner #1494 |

Mark43 RMS Form v2.0 generated by E. Boyle #1778 on Aug 24, 2021 01:20.

08806

Report Number 2021-0077573 Offense / Incident Report (Vancouver Police Department)

J.M. said that Deborba was scaring him, because he was getting so loud and angry, and he told me, "I knew it was my time to leave." He said that he attempted to walk around Deborba, but that Deborba pushed him with a two handed shove to his upper chest, causing him mild pain and discomfort. He said that although Deborba did not knock him down, he did fall back several feet. J.M. said that after Deborba pushed him back, he turned and locked the door to the apartment, and said words to the effect of, "You're not going anywhere!"

I asked J.M. what he thought would happen after Deborba locked the door, and he said, "I thought I was about to get hit. I thought about running out the back sliding door." I asked T.W. what she thought about Deborba locking the door, and she told me that she was terrified that she would be attacked; T.W. said that she began crying in fear, and that about 15 seconds later Deborba opened the door and left, screaming in the parking lot, "They're trying to kill me!"

I asked T.W. why Deborba would scream such a thing, and she told me that she believed Deborba was trying to frame the confrontation to make himself appear the victim. I asked her if she or J.M. ever retaliated against him, but she and J.M. both said that they did not. T.W. and J.M. told me that Deborba got into his black Volkswagen Jetta and left the area.

I asked T.W. and J.M. if Deborba had any access to firearms. Both nodded vehemently, and said that Deborba worked at a firearms retailer, though he was not allowed to possess firearms. The two thought that Deborba was a convicted felon, but when I asked CRESA to check his status, the operator told me that while he was not a convicted felon, he was the respondent in an NCO that prohibited him from possessing weapons. J.M. said that Deborba had turned in his weapons after a recent SWAT search warrant at the residence, but said that he still had a bolt action rifle chambered in 7.62 x 39, capable of being dismantled into several parts. J.M. said that Deborba often carried the rifle in a backpack, and described it as a black rifle with a synthetic stock, but a gold barrel and a scope or similar optic. J.M. said that he last saw Deborba with the rifle about four weeks prior to my response, and maintained that the rifle was not involved in this call for service. I did not believe I had PC to petition the Court for a search warrant for Deborba's bedroom based on the information that I had at the time.

I asked J.M. to complete a written statement, which he did. I provided J.M. and T.W. a DV resource sheet. I completed a risk assessment for J.M. and T.W., and the threat score was "increased." J.M. and T.W. agreed to go to their friend's residence that evening to maintain separation from Deborba, who was still outstanding.

Shortly after I cleared the call, I received a phone call from Ofc. Suarez stating that Deborba was calling into 911, asking to speak with an officer. I called Deborba from my work phone and asked him what had happened. He told me that there had been a heated argument at his residence, and he had left the area. I asked him if anyone had pushed anyone locked anyone inside the residence. He told me that nothing of the kind had happened. I asked him what caused the disagreement. He told me that he had been upset because J.M. and T.W. had allegedly been using his things, and that the two had agreed to leave his apartment on the last day of April.

Deborba told me that he had entered the residence and that T.W. sarcastically said, "hi," to him, but then quickly escalated to screaming. Deborba said, "I lost it," and said he started screaming as well. He said that he exited the residence and began yelling for help. I asked him why he would yell for help if there had been mere shouting in the residence, and he told me, "I felt trapped." I asked him if anyone restrained him or curtailed his movements. He said, "no." He said that he thought that J.M. was going to stab him. I asked him why he thought that, and he told me, "I don't know."

I asked Deborba if he would meet with me, and he refused. We ended the call shortly thereafter.

I later compiled a BOLO and a PC declaration, as I believe PC exists to charge Deborba for Assault IV/ DV and Unlawful Imprisonment / DV. Please see other officers' respective reports for further details.

**Attachments**

PC Declaration

Photo

BOLO to CRESA

**Recommendation**

Forward to DV Unit

Douville/1517

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| Christopher Douville #1517   Apr 16, 2021 00:38 (e-signature) | Clesson Werner #1494   Apr 16, 2021 02:55 (e-signature) |
| PRINT NAME | PRINT NAME |
| Christopher Douville #1517 | Clesson Werner #1494 |